1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| TERADATA CORPORATION, TERADATA US, INC., and TERADATA OPERATIONS, INC. <br><br> Plaintiffs, <br><br> v. <br><br> SAP SE, SAP AMERICA, INC., and SAP LABS, LLC, <br><br> Defendants. | MISC NO. 2:20-mc-00074-RSM <br><br> **REVISED DECLARATION OF DAVID D. CROSS IN SUPPORT OF TERADATA'S MOTION TO COMPEL DISCOVERY FROM MICROSOFT** |

I, David D. Cross, declare as follows:

1.      I am a partner at the law firm of Morrison & Foerster LLP, counsel for Plaintiffs Teradata USA, Inc., Teradata Corporation, and Teradata Operations, Inc. ("Teradata").  I am duly licensed to practice in the courts of the State of New York and the District of Columbia.   I have personal knowledge of the facts set forth herein, and if called as a witness could competently testify thereto.

2.      I submit this declaration in support of Teradata's Local Civil Rule ("LCR") 37 Motion to Compel Microsoft Corp.'s Compliance with Teradata's Federal Rules of Civil Procedure ("FRCP") 45 Subpoena.

3.      The parties conferred regarding Teradata's subpoena to Microsoft in an effort to narrow or resolve any disputes without court action on at least the following occasions:

REVISED DECLARATION OF DAVID D. CROSS IN SUPPORT OF TERADATA'S MOTION TO COMPEL DISCOVERY FROM MICROSOFT -1 MISC. NO. 2:20-mc-00074-RSM

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

| Date | Manner | Participants |
|------|--------|--------------|
| June 1-2, 2020 | E-mail | Mary Kaiser & David Cross (Teradata); Ben Byer (Microsoft) |
| June 19, 2020 | Telephone | Mary Kaiser & David Cross (Teradata); Ben Byer (Microsoft) |
| June 25, 2020 | Telephone | Mary Kaiser & David Cross (Teradata); Ben Byer & David Maas (Microsoft) |
| June 29, 2020 | E-mail | Mary Kaiser & David Cross (Teradata); Ben Byer & David Maas (Microsoft) |
| July 3, 2020 | E-mail | Mary Kaiser & David Cross (Teradata); Ben Byer & David Maas (Microsoft) |
| July 9, 2020 | E-mail | Mary Kaiser & David Cross (Teradata); Ben Byer & David Maas (Microsoft) |
| July 13, 2020 | E-mail | Mary Kaiser, David Cross & David Grothouse (Teradata); Ben Byer & David Maas (Microsoft) |
| July 16-27 | E-mail | Mary Kaiser, David Cross & David Grothouse (Teradata); Ben Byer & David Maas (Microsoft) |
| August 7-21, 2020 | E-mail | David Cross & Mary Kaiser (Teradata); Ben Byer & David Maas (Microsoft) |

4.      During these communications, Teradata repeatedly offered to limit its requests, including by narrowing and tabling certain requests and providing a list of product versions and custodians for various requests.  For example, Teradata agreed to limit Request No. 1 by agreeing not to request product roadmaps or product development plans.

5.      During the last three months, Microsoft failed to respond meaningfully to Teradata's offers and it has not offered any counter proposal.  On July 20, two months after receiving the subpoena, Microsoft agreed to provide a proposed plan within two weeks. Unfortunately, Microsoft has never provided any plan or proposal at all.

6.      On August 7, Microsoft offered about 2.5 boxes of documents for inspection at its counsel's office, all of which evidently concern the patent-related requests in the subpoena (Request Nos. 10 and 11), which are not at issue in this Motion.  It reiterated its refusal to produce

REVISED DECLARATION OF DAVID D. CROSS IN
SUPPORT OF TERADATA'S MOTION TO COMPEL
DISCOVERY FROM MICROSOFT -2
MISC. NO. 2:20-mc-00074-RSM

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

any documents in response to antitrust-related Request Nos. 5-9 and again offered no proposal for

producing documents in response to antitrust-related Request Nos. 1-4, indicating for the first time

that it finally had contacted Microsoft business personnel regarding those requests.  It also

requested an amendment to the Protective Order for the first time, after months of negotiations.

Teradata's counsel sent an amended Protective Order to Microsoft on August 21, 2020.  As of the

date of this filing, Microsoft has again failed to respond.

7.      On August 18, 2020, Microsoft made its first and only production of documents

(apart from the 2.5 boxes sitting at its counsel's office).  That production totals only 22 pages.

Microsoft produced eight short, public, press releases from 1999-2002 (which it encrypted despite

their public availability).  Thus, Microsoft still has produced no documents responsive to the

antitrust-related requests at issue in this Motion or offered any proposal for doing so.

8.      Attached to the Appendix in Support of Teradata's LCR 37 Motion to Compel

Microsoft Corp.'s Compliance with Teradata's Rule 45 Subpoena as **Exhibit 1** is a true and

correct copy of Teradata's Notice of Subpoena to Produce Documents, Information, or Objects or

to Permit Inspection of Premises in a Civil Action to Microsoft Corporation, served on May 22,

2020.

9.      Attached to the Appendix in Support of Teradata's LCR 37 Motion to Compel

Microsoft Corp.'s Compliance with Teradata's Rule 45 Subpoena as **Exhibit 2** is a true and

correct copy of Teradata's Second Amended Complaint against SAP SE, SAP America, Inc., and

SAP Labs, LLC ("SAP").

10.     **[INTENTIONALLY LEFT BLANK**.]

11.     Attached to the Appendix in Support of Motion to Compel Microsoft Corp.'s

Compliance with Teradata's Rule 45 Subpoena as **Exhibit 4** is a true and correct copy of SAP's

Amended Answer and Counterclaims to Teradata's Second Amended Complaint.

REVISED DECLARATION OF DAVID D. CROSS IN
SUPPORT OF TERADATA'S MOTION TO COMPEL
DISCOVERY FROM MICROSOFT -3
MISC. NO. 2:20-mc-00074-RSM

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1        12.     Attached to the Appendix in Support of Motion to Compel Microsoft Corp.'s

2  Compliance with Teradata's Rule 45 Subpoena as **Exhibit 5** is a true and correct copy of

3  Microsoft's June 12, 2020 Objections to Teradata's Subpoena.

4        13.     Attached to the Appendix in Support of Motion to Compel Microsoft Corp.'s

5  Compliance with Teradata's Rule 45 Subpoena as **Exhibit 6** is a true and correct copy of a set of

6  correspondences between counsel for Teradata and counsel for SAP, ending with an August 21,

7  2020 email from David Grothouse "Re: Teradata subpoena to Microsoft – Update."

8        14.     Attached to the Appendix in Support of Teradata's Motion to Compel Microsoft

9  Corp.'s Compliance with Teradata's Rule 45 Subpoena as **Exhibit 7** is a true and correct copy of a

10  set of correspondences between counsel for Teradata and Counsel for SAP, containing many of

11  the communications listed above and ending with a July 27, 2020 Email from David Cross "Re:

12  Teradata Subpoena."

13       15.     Attached to the Appendix in Support of Teradata's Motion to Compel Microsoft

14  Corp.'s Compliance with Teradata's Rule 45 Subpoena as **Exhibit 8** is a true and correct copy of

15  the additional communications between counsel for Teradata and Counsel for SAP, containing

16  many of the communications listed above and ending with a June 2, 2020 Email from Mary Kaiser

17  "Re: Teradata Subpoena."

18        I declare under penalty of perjury under the laws of the United States of America that the

19  foregoing is true and correct.

20        Executed this 28th day of September, 2020, in Washington, D.C.

21

22                     *s/David D. Cross*

                          David D. Cross

23

24

25

26

REVISED DECLARATION OF DAVID D. CROSS IN
SUPPORT OF TERADATA'S MOTION TO COMPEL
DISCOVERY FROM MICROSOFT -4
MISC. NO. 2:20-mc-00074-RSM

# EXHIBIT  1

MARK L. WHITAKER (admitted *Pro Hac Vice*)
MWhitaker@mofo.com
DANIEL P. MUINO (CA BAR NO. 209624)
DMuino@mofo.com
G. BRIAN BUSEY (admitted *Pro Hac Vice*)
GBusey@mofo.com
BRADLEY S. LUI (CA BAR NO. 143088)
BLui@mofo.com
MARY PRENDERGAST (CA BAR NO. 272737)
MPrendergast@mofo.com
FAHD H. PATEL (admitted *Pro Hac Vice*)
FPatel@mofo.com
MORRISON & FOERSTER LLP
2000 Pennsylvania Avenue, NW
Washington, D.C. 20006-1888
Telephone:    (202) 887-1500
Facsimile:    (202) 887-0763

Attorneys for Plaintiffs
TERADATA CORPORATION,
TERADATA US, INC., and
TERADATA OPERATIONS, INC.

BRYAN WILSON (CA BAR NO. 138842)
BWilson@mofo.com
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, California 94304-1018
Telephone:    (650) 813-5600
Facsimile:    (650) 494-0792

WENDY RAY (CA BAR NO. 226269)
WRay@mofo.com
MORRISON & FOERSTER LLP
707 Wilshire Boulevard, Suite 6000
Los Angeles, California  90017-3543
Telephone:    (213) 892-5200
Facsimile:    (213) 892-5454

JACK W. LONDEN (CA BAR NO. 85776)
JLonden@mofo.com
WESLEY E. OVERSON (CA BAR NO. 154737)
WOverson@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| TERADATA US, INC.,<br><br>Plaintiff,<br><br>and<br><br>TERADATA CORPORATION and TERADATA OPERATIONS, INC.,<br><br>Plaintiffs/Counterclaim-Defendants,<br><br>v.<br><br>SAP SE,<br><br>Defendant/Counterclaim-Plaintiff,<br><br>and<br><br>SAP AMERICA, INC. and<br>SAP LABS, LLC,<br><br>Defendants. | Case No. 3:18-CV-03670-WHO<br><br>**TERADATA'S NOTICE OF SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION TO MICROSOFT CORPORATION** |

1    PLEASE TAKE NOTICE that, pursuant to Federal Rule of Civil Procedure 45, Plaintiff

2   and Counter-Defendant Teradata U.S., Inc. provides notice of the following subpoena to be

3   served upon Microsoft Corporation for the production of documents as described in Schedule A

4   to the subpoena.

5
    Dated: May 21, 2020                          MORRISON & FOERSTER LLP
6

7
                                         By:     /s/ Bradley S. Lui
8                                                Bradley S. Lui

9                                                TERADATA CORPORATION,
                                                 TERADATA US, INC., and
10                                               TERADATA OPERATIONS, INC.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**CERTIFICATE OF SERVICE**

2

     I declare that I am employed with the law firm of Morrison & Foerster LLP, whose address is 250 West 55th Street, New York, NY 10019-9601. I am not a party to the within cause, and I am over the age of eighteen years.

3

4

     I further declare that on the date hereof, I served a copy of:

5

- **TERADATA'S NOTICE OF SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION TO MICROSOFT CORPORATION**

6

7

     **BY ELECTRONIC SERVICE [Fed. Rule Civ. Proc. rule 5(b)]** by electronically mailing a true and correct copy through Morrison & Foerster LLP's electronic mail system to the e-mail address(es) set forth below, or as stated on the attached service list per agreement in accordance with Federal Rules of Civil Procedure rule 5(b).

8

9

10

| | |
|---|---|
| Tharan Gregory Lanier | Kenneth A. Gallo |
| Nathaniel P. Garrett | David J. Ball |
| Joshua L. Fuchs | William B. Michael |
| Joseph M. Beauchamp | PAUL, WEISS, RIFKIND, WHARTON, & |
| JONES DAY | GARRISON LLP |
| 555 California Street, 26th Floor | 2001 K Street NW |
| San Francisco, CA  94104 | Washington, DC  20006-1047 |

11

12

13

14

15

Email:  tglanier@JonesDay.com         Email:  kgallo@paulweiss.com
       ngarrett@JonesDay.com              dball@paulweiss.com
       jlfuchs@JonesDay.com               wmichael@paulweiss.com
       jbeauchamp@JonesDay.com        grp-sap-td@paulweiss.com
       SAP-Teradata@JonesDay.com

16

17

18

19

Kristin L. Cleveland
J. Christopher Carraway
John D. Vandenberg
Klarquist Sparkman, LLP
121 SW Salmon Street, Suite 1600
Portland, OR 97204

20

21

22

Email:     Kristin.cleveland@klarquist.com
            Chris.carraway@klarquist.com
            john.vandenberg@klarquist.com
            KS-SAP-Teradata@klarquist.com

23

24

25

26

27

28

1     I declare under penalty of perjury that the foregoing is true and correct.

2   Executed at New York, New York, this 21st Day of May, 2020.

3

4

| Michael Curtis | /s/ Michael Curtis |
|---|---|
| (typed) | (signature) |

Teradata's Notice Of Subpoena To Produce Documents, Information, Or Objects Or To Permit Inspection Of Premises In A Civil Action To Microsoft Corporation
Case No. 3:18-CV-03670-WHO
ny-1920694

3

# MORRISON | FOERSTER

2000 PENNSYLVANIA AVE., NW
WASHINGTON, D.C.
20006-1888

TELEPHONE: 202.887.1500
FACSIMILE: 202.887.0763

WWW.MOFO.COM

MORRISON & FOERSTER LLP

BEIJING, BERLIN, BOSTON,
BRUSSELS, DENVER, HONG KONG,
LONDON, LOS ANGELES, NEW YORK,
NORTHERN VIRGINIA, PALO ALTO,
SAN DIEGO, SAN FRANCISCO, SHANGHAI
SINGAPORE, TOKYO, WASHINGTON, D.C.

May 22, 2020

Writer's Direct Contact
+1 (202) 887.6952
MKaiser@mofo.com

**Confidential**

By Hand Delivery

Microsoft Corp.,
c/o PTSGE Corp.,
925 Fourth Ave., Ste 2900,
Seattle,
WA 98104-1158

Re:     Teradata Corp. et al. v. SAP et al., No. 3:18-cv-3670-WHO (N.D. Cal.)

To Whom It May Concern:

      Pursuant to Rule 45 of the Federal Rules of Civil Procedure, attached is a Subpoena
to Produce Documents or Electronically Stored Information in the above-captioned matter.
Schedule A to the subpoena identifies the categories of information that Teradata needs in
order to prosecute its claims against SAP and to rebut SAP's counterclaims.  Teradata is
cognizant of the burden that subpoenas can impose on entities that are not parties to a
lawsuit.  We are prepared to discuss ways to alleviate any burden as best we can.  In
addition, Attachment B to the subpoena is a copy of the protective order in this case, which
allows non-parties to designate materials that qualify under the appropriate standards as
protected, and ensures that such protected materials will be used in connection with this case
only.

Sincerely,

*/s/ Mary G. Kaiser*

Mary G. Kaiser

ny-1921137

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the
Northern District of California

<table>
<tr><td>TERADATA US, INC., TERADATA CORPORATION and TERADATA OPERATIONS, INC.<br><br> <i>Plaintiff</i> <br>v.<br><br>SAP SE, SAP AMERICA, INC. and SAP LABS, LLC<br> <i>Defendant</i> </td><td>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)</td><td>Civil Action No. 3:18-CV-03670-WHO</td></tr>
</table>

### SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
### OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:  MICROSOFT CORPORATION

(Name of person to whom this subpoena is directed)

☒ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:
See SCHEDULE A

<table>
<tr><td>Place: Buell Realtime Reporting<br>    1325 Fourth Avenue Suite 1840<br>    Seattle, WA<br>    98101</td><td>Date and Time:<br>6/22/2020 9:30 a.m.</td></tr>
</table>

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

<table>
<tr><td>Place:</td><td>Date and Time:</td></tr>
</table>

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 5/22/2020

<table>
<tr><td><i>CLERK OF COURT</i><br><br>_____<br> <i>Signature of Clerk or Deputy Clerk</i> </td><td>OR</td><td>_____<br> <i>Attorney's signature</i> <br>Bradley S. Lui</td></tr>
</table>

The name, address, e-mail address, and telephone number of the attorney representing (name of party) Plaintiff
TERADATA US, INC., TERADATA CORPORATION and
TERADATA OPERATIONS, INC. , who issues or requests this subpoena, are:
Bradley Lui, Morrison & Foerster LLP, 2000 Pennsylvania Avenue, NW, Washington, D.C., 20006-1888, (202) 887-8766, BLui@mofo.com


American LegalNet, Inc.
www.FormsWorkFlow.com

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

ny-1920733



AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 2:18-CV-01481 DDP (JEMx)

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 _____

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:


American LegalNet, Inc.
www.FormsWorkFlow.com

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
**(i)** is a party or a party's officer; or
**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
**(i)** fails to allow a reasonable time to comply;
**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
**(iv)** subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
**(i)** expressly make the claim; and
**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).


American LegalNet, Inc.
www.FormsWorkFlow.com

# Attachment A

**SCHEDULE A**

**DEFINITIONS**

1.      **"And"** as well as **"Or"** are to be construed either disjunctively or conjunctively

as necessary to bring within the scope of the Requests all Documents or other information that

might otherwise be construed to be outside their scope.

2.      **"Any"** means each and every.

3.      **"Communication"** shall mean any transmission of information by any means,

including without limitation: (a) any written letter, memorandum, or other Document of any kind

by mail, courier, other delivery services, telecopy, facsimile, telegraph, electronic mail,

voicemail, or any other means; (b) any telephone call, whether or not such call was by chance or

prearranged, formal or informal; and (c) any conversation or meeting between two or more

persons, whether or not such contact was by chance or prearranged, formal or informal.

4.      **"Concerning, "Concern," "Relating to," "Relate to," and "Related to,"** and

any variation of these terms, shall mean concerning, relating to, involving, discussing, regarding,

pertaining to, mentioning, commenting on, connected with, describing, depicting, demonstrating,

analyzing, explaining, summarizing, showing, evidencing, reflecting, identifying, setting forth,

dealing with, embodying, comprising, consisting of, containing, constituting, supporting,

refuting, contradicting, resulting from, recording, or in any way relevant to a particular subject,

directly or indirectly, in whole or in part.

5.      **"Document(s)"** or **"Thing(s)"** shall have the same meaning and scope as in Rule

34 of the Federal Rules of Civil Procedure and shall include any written, printed, recorded, or

graphic matter that is or has been in Microsoft's actual or constructive possession or control,

regardless of the medium on which it is produced, reproduced, or stored, including without

limitation anything that can be classified as a "writing," "original," or "duplicate."  Any

document bearing marks, including without limitation initials, stamped indicia, comments, or

notations not a part of the original text or photographic reproduction thereof, is a separate

document.

6.      **"EDAW Product"** means products that provide data storage, warehousing, and

analytic functionality, including, but not limited to, Azure SQL Data Warehouse, Microsoft SQL

Server, Teradata Database, SAP HANA, SAP Business Warehouse (BW), SAP B/W4HANA,

and any and all competing products.

7.      **"ERP Applications"** means those products that allow companies to gather and

manage data required to conduct day-to-day operations across many aspects of a business

enterprise, including, but not limited to, sales and inventory transactions, financial and

accounting transactions, and human-resource transactions, such as, but not limited to, SAP ERP,

SAP Customer Relationship Management, SAP Supply Chain Management, SAP Supplier

Relationship Management, SAP S/4HANA, SAP ECC, Oracle ERP,  Microsoft Dyanmics 365,

all current and/or legacy versions of such products sold throughout the Relevant Time Period,

and any and all competing products.

8.      **"Including"** means including without limitation.

9.      **"Microsoft," "You," or "Your"** means Microsoft Corporation and its

predecessors, successors, or anyone acting on its behalf.

10.     "**Named Product(s)**" means all versions and releases of Microsoft SQL Server,

Microsoft SQL Server Analysis Services, Microsoft Commerce Server, and any other or prior

versions of these products.

11.    **"Person"** means natural persons and formal or informal entities and organizations, including, but not limited to, public and private corporations, partnerships, professional corporations, limited liability companies, business trusts, banking institutions, associations, firms, joint ventures, commissions, bureaus, departments, and any other legal entity, including any divisions, subsidiaries, departments, and other units thereof.

12.    **"Relevant Time Period"** is defined to include any time between January 1, 2011 and present, inclusive.

13.    **"SAP" or "Defendants"** mean collectively and individually: SAP SE, SAP America Inc., and SAP Labs, LLC, their predecessors, and their successors, or anyone acting on their behalf.

14.    **"SAP HANA"** means BW on SAP HANA, SAP B/W4HANA, SAP HANA, and any predecessor product, including prototypes during development and before release of the first version of SAP HANA.

15.    **"S/4HANA"** means SAP's most recent ERP Application.

16.    **"Teradata" or "Plaintiffs"** means Teradata Corporation, Teradata US, Inc., and Teradata Operations, Inc., their predecessors, and their successors, or anyone acting on their behalf.

## INSTRUCTIONS

1.    In complying with the Subpoena, You are required to produce all documents described below that are in Your possession, custody, or control, including any hard copies or electronically stored information.

2.    If any portion of a document or communication is responsive to any Request, the entire document or communication should be produced.

3.      If You object to any Request, in whole or in part, state the grounds of Your objection with specificity and produce documents responsive to the remainder of the Request.

4.      If, in answering this Subpoena, You encounter any ambiguities when construing a request, instruction, or definition, Your response shall set forth the matter deemed ambiguous and the construction used in responding.

5.      Where a claim of privilege or other protection from discovery is asserted in objecting to any Request, You should identify the nature of the privilege or protection (including work product protection) that is being claimed.  In such case, You should also indicate, as to the information requested, whether (a) any documents exist, and (b) describe the nature of the withheld Document(s) in a "privileged documents log" or similar format that meets the requirements of Federal Rule of Civil Procedure 45(e)(2)(A).

6.      Unless otherwise noted, the Subpoena and the Requests contained herein call for the search for, collection, and production of all responsive documents created, obtained, or retained by You during the Relevant Time Period, as defined in the "Definitions" section.

7.      Documents produced pursuant to this Subpoena should be produced as they are kept in the ordinary course of business, including electronically stored information.  Electronic materials, information, and data that are electronically searchable should be produced in a form that does not remove or degrade this feature.

8.      The following rules of construction apply: (i) the singular includes the plural and vice versa; (ii) the terms "and" and "or" should be read either disjunctively or conjunctively as necessary to bring within the scope of the Subpoena all Documents that might otherwise be construed to be outside of its scope; (iii) the words "include" and "including" should be read to mean including without limitation; (iv) the present tense should be construed to include the past

tense and vice versa; and (v) references to employees, officers, directors, or agents include both current and former employees, officers, directors, and agents.

9.        If Your response to a particular Request is a statement that You lack the ability to comply fully and completely with that Request, You must answer each such Request to the fullest extent You deem possible; specify the portion of each Request that You claim to be unable to answer fully and completely; state what efforts were made to obtain the requested information and the facts upon which You rely to support Your contention that You are unable to answer the Request fully and completely; and state what knowledge, information, or belief You have concerning the unanswered portion of each such Request.  Additionally, if no Documents exist for a particular Request, You must so state.

## **<u>REQUESTS</u>**

1.        Documents comprising or reflecting Your product roadmaps, promotional materials, product development plans, and marketing plans for each of the ERP Applications or EDAW Products and related services that You offer.

2.        Documents reflecting or concerning any assessment or evaluation of competition between or among Microsoft, Oracle, IBM, Teradata, and SAP for ERP Applications and/or EDAW Products and all data underlying or evaluated in such assessments or evaluations.

3.        Documents reflecting Microsoft's wins and losses of sales of ERP Applications and EDAW Products in competition with Oracle, IBM, Teradata, or SAP, including for each win and loss an identification of the product and supplier the customer switched away from and identification of the product and supplier it switched to.

4.        Documents sufficient to identify Your top 100 customers by revenue for each of the ERP- and EDAW-based products or services You offer, the specific Microsoft ERP- or

EDAW-based products or services that each such customer purchases, the amounts paid annually by each such customer for each of those ERP- or EDAW-based products or services, and when each such customer began using and stopped using (for any that stopped) each of those ERP- or EDAW-based products or services.

5.      Documents comprising or relating to any communication between Microsoft and SAP regarding HANA or S/4HANA, including but not limited to any changes to Microsoft's or SAP's business practices or the business relationship between SAP and Microsoft relating to HANA or S/4HANA or restrictions on the ability of users of S/4HANA to transfer, export, or copy data derived, created, or processed by S/4HANA into a Named Product.

6.      Documents comprising or relating to any communication between Microsoft and SAP concerning Teradata.

7.      Documents comprising or relating to any communication between Microsoft and SAP, any other competitor, any customer, or any government authority concerning any restrictions or prohibitions imposed by SAP on exporting, extracting, or transferring data derived, created, or processed by any SAP ERP Applications for use with an EDAW Product not offered by SAP.

8.      Documents sufficient to show the existence of any restrictions or prohibitions imposed by SAP on the interoperability or the integration of Microsoft ERP Applications or data derived, created, or processed by such Microsoft ERP Applications with SAP HANA.

9.      Documents sufficient to show the existence of any restrictions or prohibitions imposed by SAP on the ability of users of any SAP ERP Application to transfer, export, or extract data derived, created, or processed by such SAP ERP Applications for use or storage in a Named Product.

10.    Documents sufficient to show the operation of each of the Named Products —— including but not limited to user manuals, technical guides, developer instructions, and internal reports —— that was sold or on sale between May 1998 and May 2003, inclusive.

11.    Documents sufficient to establish that each of the Named Products was sold or on sale in the United States between May 1998 and May 2003, inclusive, including at least the earliest time in this period during which each version or release of each Named Product was sold or on sale.

Attachment B

Mark L. Whitaker (*Pro Hac Vice*)
MWhitaker@mofo.com
Daniel P. Muino (CA SBN 209624)
DMuino@mofo.com
G. Brian Busey (*Pro Hac Vice*)
GBusey@mofo.com
Mary Prendergast (CA SBN 272737)
MPrendergast@mofo.com
Fahd H. Patel (*Pro Hac Vice*)
FPatel@mofo.com
Corinna J. Alanis (CA SBN 287164)
CAlanis@mofo.com
MORRISON & FOERSTER LLP
2000 Pennsylvania Ave., NW
Washington, D.C. 20006-1888
Telephone: 202.887.1500
Facsimile: 202.887.0763

Bryan Wilson (CA SBN 138842)
BWilson@mofo.com
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, California 94304-1018
Telephone:    650.813.5600
Facsimile:    650.494.0792

Attorneys for Plaintiffs
TERADATA CORPORATION,
TERADATA US, INC., AND
TERADATA OPERATIONS, INC.

Tharan Gregory Lanier (State Bar No. 138784)
tglanier@JonesDay.com
Nathaniel P. Garrett (State Bar No. 248211)
ngarrett@JonesDay.com
Joshua L. Fuchs (Pro Hac Vice)
jlfuchs@JonesDay.com
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104
Telephone: +1.415.626.3939
Facsimile: +1.415.875.5700

Kenneth A. Gallo (Pro Hac Vice)
kgallo@paulweiss.com
David J. Ball (Pro Hac Vice)
dball@paulweiss.com
William B. Michael (Pro Hac Vice)
wmichael@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
2001 K Street NW
Washington, DC 20006-1047
Telephone: +1.202.223.7356
Facsimile: +1.202.204.7356

Attorneys for Defendants
SAP SE,
SAP AMERICA, INC., AND
SAP LABS, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| TERADATA CORPORATION, TERADATA US, INC., and TERADATA OPERATIONS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> SAP SE, SAP AMERICA, INC., and SAP LABS, LLC, <br><br> Defendants. | Case No. 3:18-cv-03670-WHO (EDL) <br><br> **STIPULATED [PROPOSED] PROTECTIVE ORDER** |

1.     PURPOSES AND LIMITATIONS

        Disclosure and discovery activity in this action are likely to involve production of
confidential, proprietary, or private information for which special protection from public
disclosure and from use for any purpose other than prosecuting this litigation may be warranted.
Accordingly, the parties hereby stipulate to and petition the court to enter the following Stipulated
Protective Order. The parties acknowledge that this Order does not confer blanket protections on
all disclosures or responses to discovery and that the protection it affords from public disclosure
and use extends only to the limited information or items that are entitled to confidential treatment
under the applicable legal principles. The parties further acknowledge, as set forth in Section
13.4, below, that this Stipulated Protective Order does not entitle them to file confidential
information under seal; Civil Local Rule 79-5 sets forth the procedures that must be followed and
the standards that will be applied when a party seeks permission from the court to file material
under seal.

2.     DEFINITIONS

        2.1     Challenging Party: a Party or Non-Party that challenges the designation of
information or items under this Order.

        2.2     "CONFIDENTIAL" Information or Items: information (regardless of how it is
generated, stored or maintained) or tangible things that qualify for protection under Federal Rule
of Civil Procedure 26(c).

        2.3     Counsel (without qualifier): Outside Counsel of Record and House Counsel (as
well as their support staff).

        2.4     Designated House Counsel: House Counsel who seek access to "HIGHLY
CONFIDENTIAL – ATTORNEYS' EYES ONLY" information in this matter who have signed
the "Acknowledgment and Agreement to Be Bound."  Each side (Plaintiffs on one hand and
Defendants on the other) may designate up to—but no more than—four (4) House Counsel as
Designated House Counsel in this litigation.

        2.5     Designating Party: a Party or Non-Party that designates information or items that it
produces in disclosures or in responses to discovery as "CONFIDENTIAL" or "HIGHLY

CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE".

2.6 <u>Disclosure or Discovery Material</u>: all items or information, regardless of the medium or manner in which it is generated, stored, or maintained (including, among other things, testimony, transcripts, and tangible things), that are produced or generated in disclosures or responses to discovery in this matter.

2.7 <u>Expert</u>: a person with specialized knowledge or experience in a matter pertinent to the litigation who (1) has been retained by a Party or its counsel to serve as an expert witness or as a consultant in this action, (2) is not a current employee of a Party or of a Party's competitor (for avoidance of doubt this subsection (2) applies only to a current employee and not to a current consultant of a Party's competitor), and (3) at the time of retention, is not anticipated to become an employee of a Party or of a Party's competitor.

2.8 <u>"HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" Information or Items</u>: extremely sensitive "Confidential Information or Items," disclosure of which to another Party or Non-Party would create a substantial risk of serious harm that could not be avoided by less restrictive means.

2.9 <u>"HIGHLY CONFIDENTIAL – SOURCE CODE" Information or Items</u>: extremely sensitive "Confidential Information or Items" representing computer code, or detailed descriptions of computer code that might reveal the substance of computer code, that define or otherwise describe in detail the algorithms or structure of software or hardware designs, disclosure of which to another Party or Non-Party would create a substantial risk of serious harm that could not be avoided by less restrictive means.

2.10 <u>House Counsel</u>: attorneys who are employees of a party to this action. House Counsel does not include Outside Counsel of Record or any other outside counsel.

2.11 <u>Non-Party</u>: any natural person, partnership, corporation, association, or other legal entity not named as a Party to this action.

2.12   <u>Outside Counsel of Record</u>: attorneys who are not employees of a party to this action but are retained to represent or advise a party to this action and have appeared in this action on behalf of that party or are affiliated with a law firm which has appeared on behalf of that party.

2.13   <u>Party</u>: any party to this action, including all of its officers, directors, employees, consultants, retained experts, predecessors in interest, successors, subrogors, subsidiaries, parent entities, affiliates, divisions, and Outside Counsel of Record (and their support staffs).

2.14   <u>Producing Party</u>: a Party or Non-Party that produces Disclosure or Discovery Material in this action.

2.15   <u>Professional Vendors</u>: persons or entities that provide litigation support services (e.g., photocopying, videotaping, translating, preparing exhibits or demonstrations, and organizing, storing, or retrieving data in any form or medium) and their employees and subcontractors.

2.16   <u>Protected Material</u>: any Disclosure or Discovery Material that is designated as "CONFIDENTIAL," as "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," or as "HIGHLY CONFIDENTIAL – SOURCE CODE."

2.17   <u>Receiving Party</u>: a Party that receives Disclosure or Discovery Material from a Producing Party.

3.   <u>SCOPE</u>

The protections conferred by this Stipulation and Order cover not only Protected Material (as defined above), but also (1) any information copied or extracted from Protected Material that might reveal Protected Material; (2) all copies, excerpts, summaries, or compilations of Protected Material that might reveal Protected Material; and (3) any testimony, conversations, or presentations by Parties or their Counsel that might reveal Protected Material. However, the protections conferred by this Stipulation and Order do not cover the following information: (a) any information that is in the public domain at the time of disclosure to a Receiving Party or becomes part of the public domain after its disclosure to a Receiving Party as a result of publication not involving a violation of this Order, including becoming part of the public record through trial or otherwise; and (b) any information known to the Receiving Party prior to the

disclosure or obtained by the Receiving Party after the disclosure from a source who obtained the information lawfully and under no obligation of confidentiality to the Designating Party. Further, nothing in this Stipulation and Order shall limit Outside Counsel of Record or Designated House Counsel for a Party from providing general advice that does not disclose specific details of the Protected Material. Any use of Protected Material at trial shall be governed by a separate agreement or order.

4.    DURATION

Even after final disposition of this litigation, the confidentiality obligations imposed by this Order shall remain in effect until a Designating Party agrees otherwise in writing or a court order otherwise directs. The Court shall retain jurisdiction after final disposition of this matter to hear and resolve any disputes arising out of this Stipulated Protective Order. Final disposition shall be deemed to be the later of (1) dismissal of all claims and defenses in this action, with or without prejudice; and (2) final judgment herein after the completion and exhaustion of all appeals, rehearings, remands, trials, or reviews of this action, including the time limits for filing any motions or applications for extension of time pursuant to applicable law.

5.    DESIGNATING PROTECTED MATERIAL

5.1    Exercise of Restraint and Care in Designating Material for Protection. Each Party or Non-Party that designates information or items for protection under this Order must take care to limit any such designation to specific material that qualifies under the appropriate standards.

Mass, indiscriminate, or routinized designations are prohibited. Designations that are shown to be clearly unjustified or that have been made for an improper purpose (e.g., to unnecessarily encumber or retard the case development process or to impose unnecessary expenses and burdens on other parties) expose the Designating Party to sanctions.

If it comes to a Designating Party's attention that information or items that it designated for protection do not qualify for protection at all or do not qualify for the level of protection initially asserted, that Designating Party must promptly notify all other parties that it is withdrawing the mistaken designation.

5.2    Manner and Timing of Designations. Except as otherwise provided in this Order (see, e.g., second paragraph of section 5.2(a) below), or as otherwise stipulated or ordered, Disclosure or Discovery Material that qualifies for protection under this Order must be clearly so designated before the material is disclosed or produced.

Designation in conformity with this Order requires:

(a) For information in documentary form (e.g., paper or electronic documents, but excluding transcripts of depositions or other pretrial or trial proceedings), that the Producing Party affix the legend "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," or "HIGHLY CONFIDENTIAL – SOURCE CODE" to each document that contains Protected Material.

A Party or Non-Party that makes original documents or materials available for inspection need not designate them for protection until after the inspecting Party has indicated which material it would like copied and produced. During the inspection and before the designation, all of the material made available for inspection shall be deemed "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY." After the inspecting Party has identified the documents it wants copied and produced, the Producing Party must determine which documents, or portions thereof, qualify for protection under this Order. Then, before producing the specified documents, the Producing Party must affix the appropriate legend ("CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," or "HIGHLY CONFIDENTIAL – SOURCE CODE") to each document that contains Protected Material.

(b) for testimony given in deposition or in other pretrial or trial proceedings, that the Designating Party may identify on the record, before the close of the deposition, hearing, or other proceeding, all protected testimony and may further specify any portions of the testimony that qualify as "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," or "HIGHLY CONFIDENTIAL – SOURCE CODE." Alternatively, within 30 days of receipt of a transcript or recording of a deposition or other pretrial or trial proceeding, the Designating Party may designate such transcript or recording or any portion thereof as "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," or "HIGHLY CONFIDENTIAL

– SOURCE CODE" by notifying all Parties, in writing, of the specific pages and lines of the transcript or recording that should be treated as "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," or "HIGHLY CONFIDENTIAL – SOURCE CODE." All transcripts or recordings of depositions or other pretrial or trial proceedings shall be treated as "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" for 30 days after receipt of the transcript or recording, or until written notice of a designation is received, whichever occurs first.   In the case of a Non-Party witness, testimony can be designated as "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," or "HIGHLY CONFIDENTIAL – SOURCE CODE" by a Party, the Non-Party witness, or upon agreement of the Parties.

Transcript pages containing Protected Material must be separately bound by the court reporter, who must affix to the top of each such page the legend "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," or "HIGHLY CONFIDENTIAL – SOURCE CODE" as instructed by the Designating Party.  In the event that the deposition is videotaped, the original and all copies of the videotape shall be marked by the video technician to indicate that the content of the videotape is subject to this Stipulated Protective Order, substantially along the lines of "This videotape contains confidential testimony used in this case and is not to be viewed or the contents thereof to be displayed or revealed except pursuant to the terms of the operative Stipulated Protective Order in this matter or pursuant to the written stipulation of the Parties."

Parties shall give the other parties notice if they reasonably expect a deposition, hearing or other proceeding to include Protected Material so that the other parties can ensure that only authorized individuals who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A) are present at those proceedings. The use of a document as an exhibit at a deposition shall not in any way affect its designation as "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," or "HIGHLY CONFIDENTIAL – SOURCE CODE."

(c) for electronic files and documents produced in native electronic format, that the Designating Party append to the file names or designators information indicating whether the file contains "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY"

material, or shall use any other reasonable method for so designating the Protected Material produced in native electronic format. When electronic files or documents produced in native electronic format are printed for use at deposition, a court proceeding, a court filing, or for provision to an Expert, the Party printing the electronic files or documents shall affix a legend to the printed file or document corresponding to the appropriate designation and including the production number and designation associated with the native file.

(d) for information produced in some form other than documentary and for any other tangible items, that the Producing Party affix in a prominent place on the exterior of the container or containers in which the information or item is stored the legend "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," or "HIGHLY CONFIDENTIAL – SOURCE CODE." If only a portion or portions of the information or item warrant protection, the Producing Party, to the extent practicable, shall identify the protected portion(s) and specify the level of protection being asserted.

5.3     <u>Inadvertent Failures to Designate</u>. If timely corrected upon discovery of an inadvertent failure to mark information as qualified information, an inadvertent failure to designate qualified information or items does not, standing alone, waive the Designating Party's right to secure protection under this Order for such material. Upon timely correction of a designation, the Receiving Party must make reasonable efforts to assure that the material is treated in accordance with the provisions of this Order.

6.     <u>CHALLENGING CONFIDENTIALITY DESIGNATIONS</u>

6.1     <u>Timing of Challenges</u>. Any Party or Non-Party may challenge a designation of confidentiality at any time. A Party does not waive its right to challenge a confidentiality designation by electing not to mount a challenge promptly after the original designation is disclosed.

6.2     <u>Meet and Confer</u>. The Challenging Party shall initiate the dispute resolution process by providing written notice of each designation it is challenging and describing the basis for each challenge. To avoid ambiguity as to whether a challenge has been made, the written notice must recite that the challenge to confidentiality is being made in accordance with this

specific paragraph of the Protective Order. The parties shall attempt to resolve each challenge in good faith and must begin the process by conferring directly (in voice to voice dialogue; other forms of communication are not sufficient) within 14 days of the date of service of notice. In conferring, the Challenging Party must explain the basis for its belief that the confidentiality designation was not proper and must give the Designating Party an opportunity to review the designated material, to reconsider the circumstances, and, if no change in designation is offered, to explain the basis for the chosen designation. A Challenging Party may proceed to the next stage of the challenge process only if it has engaged in this meet and confer process first or establishes that the Designating Party is unwilling to participate in the meet and confer process in a timely manner.

6.3    Judicial Intervention. If the Parties cannot resolve a challenge without court intervention, the Designating Party shall file and serve a motion to retain confidentiality under Civil Local Rule 7 (and in compliance with Civil Local Rule 79-5, if applicable) within 14 days of the parties agreeing that the meet and confer process will not resolve their dispute. Each such motion must be accompanied by a competent declaration affirming that the movant has complied with the meet and confer requirements imposed in the preceding paragraph. Failure by the Designating Party to make such a motion including the required declaration within the applicable time shall automatically waive the confidentiality designation for each challenged designation. In addition, the Challenging Party may file a motion challenging a confidentiality designation at any time if there is good cause for doing so, including a challenge to the designation of a deposition transcript or any portions thereof. Any motion brought pursuant to this provision must be accompanied by a competent declaration affirming that the movant has complied with the meet and confer requirements imposed by the preceding paragraph.

The burden of persuasion in any such challenge proceeding shall be on the Designating Party. Frivolous challenges and those made for an improper purpose (e.g., to harass or impose unnecessary expenses and burdens on other parties) may expose the Challenging Party to sanctions. Unless the Designating Party has waived the confidentiality designation by failing to file a motion to retain confidentiality as described above, all parties shall continue to afford the

material in question the level of protection to which it is entitled under the Producing Party's designation until the court rules on the challenge.

7.    ACCESS TO AND USE OF PROTECTED MATERIAL

7.1    Basic Principles. A Receiving Party may use Protected Material that is disclosed or produced by another Party or by a Non-Party in connection with this case only for prosecuting, defending, or attempting to settle this litigation.  A Receiving Party may not use Protected Material for any other purpose, including but not limited to the preparation or prosecution of patents and patent applications, challenging a patent before a domestic or foreign agency (including, but not limited to, a reissue protest, ex parte reexamination, or inter partes review proceeding), or in connection with any other litigation or agency proceeding.  Such Protected Material may be disclosed only to the categories of persons and under the conditions described in this Order. When the litigation has been terminated, a Receiving Party must comply with the provisions of section 14 below (FINAL DISPOSITION).

Protected Material must be stored and maintained by a Receiving Party with a vendor in the United States and in a secure manner that ensures that access is limited to the persons authorized under this Stipulated Protective Order.  Protected Material may be accessed and reviewed outside of the United States.

7.2    Disclosure of "CONFIDENTIAL" Information or Items. Unless otherwise ordered by the court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated "CONFIDENTIAL" only to:

 (a) the Receiving Party's Outside Counsel of Record in this action, as well as employees of said Outside Counsel of Record to whom it is reasonably necessary to disclose the information for this litigation;

 (b) the officers, directors, and employees (including House Counsel) of the Receiving Party to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(c) Experts (as defined in this Order) of the Receiving Party to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(d) the Court and its personnel;

(e) court reporters or videographers retained to record testimony taken in this action, and their respective staff;

(f) Professional jury or trial consultants, mock jurors, and Professional Vendors to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(g) during their depositions, witnesses in the action to whom disclosure is reasonably necessary, unless otherwise agreed by the Designating Party or ordered by the Court. Pages of transcribed deposition testimony or exhibits to depositions that reveal Protected Material must be separately bound by the court reporter and may not be disclosed to anyone except as permitted under this Stipulated Protective Order.

(h) any mutually agreed upon mediator or settlement officer, and his or her supporting personnel;

(i) the author or recipient of a document containing the information or a custodian or other person who otherwise possessed or knew the information; and

(j) any other person upon Court order or upon prior written consent of the Designating Party.

7.3    Disclosure of "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" and "HIGHLY CONFIDENTIAL – SOURCE CODE" Information or Items. Unless otherwise ordered by the court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" only to:

(a) the Receiving Party's Outside Counsel of Record in this action, as well as employees of said Outside Counsel of Record to whom it is reasonably necessary to disclose the information for this litigation;

(b) Designated House Counsel of the Receiving Party (i) to whom disclosure is reasonably necessary for this litigation, (ii) who has signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A), and (iii) as to whom the procedures set forth in paragraph 7.4(a)-(c), below, have been followed;[1]

(c) Experts of the Receiving Party (1) to whom disclosure is reasonably necessary for this litigation, (2) who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A), and (3) as to whom the procedures set forth in paragraph 7.4(a)-(c), below, have been followed;

(d) the Court and its personnel;

(e) court reporters or videographers retained to record testimony taken in this action and their respective staff,

(f) professional jury or trial consultants, mock jurors, and Professional Vendors to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(g) the author or recipient of a document containing the information or a custodian or other person who otherwise possessed or knew the information; and

(h) any other person upon Court order or upon prior written consent of the Designating Party.

7.4     Procedures for Approving or Objecting to Disclosure of "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" Information or Items to Designated House Counsel or Experts.

(a) Unless otherwise ordered by the court or agreed to in writing by the Designating Party, a Receiving Party that seeks to disclose to Designated House Counsel or an Expert (as defined in this Order) any information or item that has been designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE

---

[1] This Order contemplates that Designated House Counsel shall not have access to any information or items designated "HIGHLY CONFIDENTIAL – SOURCE CODE" with the exception of source code incorporated into expert reports and court filings.

CODE" pursuant to paragraph 7.3(c) first must make a written request to the Designating Party that (1) identifies the general categories of "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" information that the Receiving Party seeks permission to disclose to Designated House Counsel or the Expert, (2) sets forth the full name of the Designated House Counsel or Expert and the city and state of his or her primary residence, (3) for an Expert attaches a copy of the Expert's current resume, (4) for an Expert identifies the Expert's current employer(s), (5) for an Expert identifies each person or entity from whom the Expert has received compensation or funding for work in his or her areas of expertise or to whom the expert has provided professional services, including in connection with a litigation, at any time during the preceding five years,[2] and (6) for an Expert identifies (by name and number of the case, filing date, and location of court) any litigation in connection with which the Expert has offered expert testimony, including through a declaration, report, or testimony at a deposition or trial, during the preceding five years.

(b) A Party that makes a request and provides the information specified in Paragraph (a) may disclose the subject Protected Material to the identified Designated House Counsel or Expert unless, within 14 days of delivering the request, the Party receives a written objection from the Designating Party. Any such objection must set forth in detail the grounds on which it is based.

(c) A Party that receives a timely written objection under Paragraph (b) must meet and confer with the Designating Party (through direct voice to voice dialogue) to try to resolve the matter by agreement within seven days of the written objection. If no agreement is reached, the Party seeking to make the disclosure to the Designated House Counsel or Expert may file a motion as provided in Civil Local Rule 7 (and in compliance with Civil Local Rule 79-5, if applicable) seeking permission from the court to do so. Any such motion must describe the circumstances with specificity, set forth in detail the reasons why the disclosure to the Designated

---

[2] If the Expert believes any of this information is subject to a confidentiality obligation to a third-party, then the Expert should provide whatever information the Expert believes can be disclosed without violating any confidentiality agreements, and the Party seeking to disclose to the Expert shall be available to meet and confer with the Designating Party regarding any such engagement.

House Counsel or Expert is reasonably necessary, assess the risk of harm that the disclosure would entail, and suggest any additional means that could be used to reduce that risk. In addition, any such motion must be accompanied by a competent declaration describing the parties' efforts to resolve the matter by agreement (i.e., the extent and the content of the meet and confer discussions) and setting forth the reasons advanced by the Designating Party for its refusal to approve the disclosure.

In any such proceeding, the Party opposing disclosure to the Designated House Counsel or Expert shall bear the burden of proving that the risk of harm that the disclosure would entail (under the safeguards proposed) outweighs the Receiving Party's need to disclose the Protected Material to its Designated House Counsel or Expert.

7.5    Disclosure of Statements Pursuant to Cal. Civ. Code section 2019.210. Notwithstanding any other provision of this Stipulated Protective Order, Defendants may disclose, to four non-attorney employees of Defendants to be identified, with the appropriate technical and product background to assist in defense of Teradata's claims and who have agreed to the "Acknowledgment and Agreement to Be Bound" (Exhibit A), the following: "Plaintiffs Teradata Corporation, Teradata US, Inc., and Teradata Operations, Inc.'s List of Asserted Trade Secrets Pursuant to Cal. Cod. Civ. Proc. Section 2019.210" served on December 21, 2018, any subsequent disclosure by Plaintiffs pursuant to section 2019.210, and any documents or text explicitly referenced in the Section 2019.210 List, including Teradata's Orange Books.  Defendants shall identify each such non-attorney employee to Plaintiffs at least 14 days in advance of disclosure to that employee, and if Plaintiffs object, the procedure set forth in section 7.4 of this Protective Order shall apply; provided, however, that involvement of the employee in developing what Teradata believes are competing products shall not by itself be a ground for objection.  Should Defendants subsequently believe that disclosure to additional non-attorney employees is warranted, both sides will discuss in good faith adding a proportionate and reasonable number of additional non-attorney employees.  To the extent an agreement cannot be reached, the parties will seek guidance from the Court.

8.    SOURCE CODE

(a) A Producing Party may designate source code as "HIGHLY CONFIDENTIAL - SOURCE CODE" for any information or items identified in Paragraph 2.9 if they comprise or include confidential, proprietary, or trade secret source code.

(b) Protected Material designated as "HIGHLY CONFIDENTIAL – SOURCE CODE" shall be subject to all of the protections afforded to "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" information and may be disclosed only to the individuals to whom "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" information may be disclosed, as set forth in Paragraphs 7.3 and 7.4.

(c) Protected Material designated as "HIGHLY CONFIDENTIAL – SOURCE CODE" shall be made available for inspection during normal business hours or at other mutually agreeable times at two offices of the Producing Party's counsel or at other mutually agreed upon locations, in a format allowing it to be reasonably reviewed and searched.  Such material shall be made available for inspection in a secured room on a secured computer without Internet access or network access to other computers, and the Receiving Party shall not copy, remove, or otherwise transfer any portion of the source code onto any recordable media or recordable device. The Producing Party may visually monitor the activities of the Receiving Party's representatives during any HIGHLY CONFIDENTIAL – SOURCE CODE review, but only to ensure that there is no unauthorized recording, copying, or transmission of the information designated as HIGHLY CONFIDENTIAL – SOURCE CODE.[3]

(d) The Receiving Party may request paper copies of limited portions of source code that are reasonably necessary in this action for the preparation of court filings, pleadings, expert reports, or other papers, or for deposition or trial, but shall not request paper copies for the purposes of reviewing the source code other than electronically as set forth in paragraph (c) in the

---

[3] It may be appropriate under certain circumstances to require the Receiving Party to keep a paper log indicating the names of any individuals inspecting the HIGHLY CONFIDENTIAL – SOURCE CODE information and dates and times of inspection, and the names of any individuals to whom paper copies of portions of source code are provided.

first instance. The Producing Party may challenge the amount of source code requested in hard copy form pursuant to the dispute resolution procedure and timeframes set forth in Paragraph 6 whereby the Producing Party is the "Challenging Party" and the Receiving Party is the "Designating Party" for purposes of dispute resolution. The Producing Party shall print the identified source code on yellow (or other non-white) colored paper. The Producing Party shall clearly label each page with bates numbers and the label "HIGHLY CONFIDENTIAL - SOURCE CODE."

(e) The Receiving Party shall maintain a record of any individual who has inspected any portion of the source code in electronic or paper form. The Receiving Party shall maintain all paper copies of any printed portions of the source code in a secured, locked area. The Receiving Party shall not create any electronic or other images of the paper copies and shall not convert the paper copies into an electronic format. The Receiving Party may be permitted to include short excerpts of source code (20 lines or less) in court filings or expert reports so long as these documents are designated "HIGHLY CONFIDENTIAL – SOURCE CODE." The Receiving Party shall only make additional paper copies if such additional copies are (1) necessary to prepare court filings, pleadings, or other papers (including a testifying expert's expert report), (2) necessary for deposition, or (3) otherwise necessary for the preparation of its case. Any paper copies used during a deposition shall be retrieved by the Producing Party at the end of each day and must not be given to or left with a court reporter or any other unauthorized individual.[4] The Receiving Party may request that the Producing Party bring a source code computer to a deposition; the Producing Party shall comply unless its compliance would be unduly burdensome.

9.    PROTECTED MATERIAL SUBPOENAED OR ORDERED PRODUCED IN OTHER LITIGATION

If a Party is served with a subpoena or a court order issued in other litigation that compels

---

[4] The nature of the information designated as "HIGHLY CONFIDENTIAL – SOURCE CODE" at issue in a particular case may warrant additional protections or restrictions, For example, it may be appropriate under certain circumstances to require the Receiving Party to provide notice to the Producing Party before including "HIGHLY CONFIDENTIAL – SOURCE CODE" information in a court filing, pleading, or expert report.

disclosure of any information or items designated in this action as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" that Party must:

(a) promptly notify in writing the Designating Party. Such notification shall include a copy of the subpoena or court order;

(b) promptly notify in writing the party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena or order is subject to this Protective Order. Such notification shall include a copy of this Stipulated Protective Order; and

(c) cooperate with respect to all reasonable procedures sought to be pursued by the Designating Party whose Protected Material may be affected.[5]

If the Designating Party timely seeks a protective order, the Party served with the subpoena or court order shall not produce any information designated in this action as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" before a determination by the court from which the subpoena or order issued, unless the Party has obtained the Designating Party's permission. The Designating Party shall bear the burden and expense of seeking protection in that court of its confidential material – and nothing in these provisions should be construed as authorizing or encouraging a Receiving Party in this action to disobey a lawful directive from another court.

10.    <u>A NON-PARTY'S PROTECTED MATERIAL SOUGHT TO BE PRODUCED IN THIS LITIGATION</u>

(a) The terms of this Order are applicable to information produced by a Non-Party in this action and designated as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE." Such information produced

---

[5] The purpose of imposing these duties is to alert the interested parties to the existence of this Protective Order and to afford the Designating Party in this case an opportunity to try to protect its confidentiality interests in the court from which the subpoena or order issued.

by Non-Parties in connection with this litigation is protected by the remedies and relief provided by this Stipulated Protective Order. Nothing in these provisions should be construed as prohibiting a Non-Party from seeking additional protections.

(b) In the event that a Party is required, by a valid discovery request, to produce a Non-Party's confidential information in its possession, and the Party is subject to an agreement with the Non-Party not to produce the Non-Party's confidential information, then the Party shall:

1.    promptly notify in writing the Requesting Party and the Non-Party that some or all of the information requested is subject to a confidentiality agreement with a Non-Party;

2.    promptly provide the Non-Party with a copy of the Stipulated Protective Order in this litigation, the relevant discovery request(s), and a reasonably specific description of the information requested; and

3.    make the information requested available for inspection by the Non-Party.

(c) If the Non-Party fails to object or seek a protective order from this court within 14 days of receiving the notice and accompanying information, the Receiving Party may produce the Non-Party's confidential information responsive to the discovery request. If the Non-Party timely seeks a protective order, the Receiving Party shall not produce any information in its possession or control that is subject to the confidentiality agreement with the Non-Party before a determination by the court. Absent a court order to the contrary, the Non-Party shall bear the burden and expense of seeking protection in this court of its Protected Material.

11.    UNAUTHORIZED DISCLOSURE OF PROTECTED MATERIAL

If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed Protected Material to any person or in any circumstance not authorized under this Stipulated Protective Order, the Receiving Party must immediately (a) notify in writing the Designating Party of the unauthorized disclosures, (b) use its best efforts to retrieve all unauthorized copies of the Protected Material, (c) inform the person or persons to whom unauthorized disclosures were made of all the terms of this Order, and (d) request such person or persons to execute the "Acknowledgment and Agreement to Be Bound" that is attached hereto as Exhibit A.

Unauthorized or inadvertent disclosure does not change the status of Protected Material or waive the right to maintain the disclosed document or information as Protected Material.

12.     <u>PRODUCTION OF PRIVILEGED OR OTHERWISE PROTECTED MATERIAL</u>

Nothing in this Stipulated Protective Order shall require disclosure of information which is protected by the attorney-client privilege, work product immunity, or other privilege or immunity.  The production of privileged or work-product-protected documents, electronically stored information ("ESI") or information is not a waiver of the privilege or protection from discovery in this case or in any other federal or state proceeding, except when the producing party provides notice that it is intentionally and knowingly waiving a privilege or immunity, that privilege or immunity shall be waived as to this case.  This Order shall be interpreted to provide the maximum protection allowed by Federal Rule of Evidence 502(d).  For the avoidance of any doubt and for purposes of the application of this paragraph, the parties agree that Federal Rule of Evidence 502(b) does not apply.

To promote the just, speedy, and inexpensive determination of this action pursuant to Federal Rule of Civil Procedure 1, the parties agree to use best efforts to comply with the following standard:  If a Receiving Party, upon review of Disclosure or Discovery Material produced to it, becomes aware that any portion of such Disclosure or Discovery Material is protected by the attorney-client privilege, work product immunity, or other privilege or immunity, the Receiving Party shall promptly notify the Producing Party of the specific Materials which could be so considered and will not use such Materials for any purpose until the issue has been resolved by agreement of the Parties or by order of the Court.  Inadvertent failure to comply with this standard shall not be grounds for relief.

When a Producing Party gives notice to a Receiving Party that certain inadvertently produced Disclosure or Discovery Material is subject to a claim of privilege or other protection, the obligations of the Receiving Party are those set forth in Federal Rule of Civil Procedure 26(b)(5)(B). Each Receiving Party must immediately return such Disclosure or Discovery Material and all copies to the Producing Party, except for any pages containing privileged markings by the Receiving Party, which shall instead be destroyed and certified as such by the

Receiving Party to the Producing Party.

Nothing contained herein is intended to or shall serve to limit a party's right to conduct a review of documents, ESI, or information (including metadata) for relevance, responsiveness and/or segregation of privileged and/or protected information before production. This provision is not intended to modify whatever procedure may be established in an e-discovery order that provides for production without prior privilege review.

13.     MISCELLANEOUS

13.1     Right to Further Relief. Nothing in this Order abridges the right of any person to seek its modification by the court in the future.

13.2     Right to Assert Other Objections. By stipulating to the entry of this Protective Order no Party waives any right it otherwise would have to object to disclosing or producing any information or item on any ground not addressed in this Stipulated Protective Order. Similarly, no Party waives any right to object on any ground to use in evidence of any of the material covered by this Protective Order.

13.3     Export Control. Disclosure of Protected Material shall be subject to all applicable laws and regulations relating to the export of technical data contained in such Protected Material, including the release of such technical data to foreign persons or nationals in the United States or elsewhere. The Producing Party shall be responsible for identifying any such controlled technical data, and the Receiving Party shall take measures necessary to ensure compliance.

13.4     Filing Protected Material. Without written permission from the Designating Party or a court order secured after appropriate notice to all interested persons, a Party may not file in the public record in this action any Protected Material. A Party that seeks to file under seal any Protected Material must comply with Civil Local Rule 79-5. Protected Material may only be filed under seal pursuant to a court order authorizing the sealing of the specific Protected Material at issue. Pursuant to Civil Local Rule 79-5, a sealing order will issue only upon a request establishing that the Protected Material at issue is privileged, protectable as a trade secret, or otherwise entitled to protection under the law. If a Receiving Party's request to file Protected Material under seal pursuant to Civil Local Rule 79-5(e) is denied by the court, then the

Receiving Party may file the Protected Material in the public record pursuant to Civil Local Rule 79-5(e)(2) unless otherwise instructed by the court.

13.5    Computation of Time:   The computation of any period of time prescribed or allowed by this Stipulated Protective Order shall be governed by the provisions for computing time in Federal Rule of Civil Procedure 6 except as otherwise provided in Civil Local Rule 7.

13.6    Successors:   This Stipulated Protective Order shall be binding upon the Parties hereto, their Counsel, and their successors, executors, heirs, assigns, and employees.

13.7    Fact of Designation Not Admissible:   The fact of designation or failure to designate Disclosure or Discovery Material as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" pursuant to this Stipulated Protective Order shall not be admissible for any purpose in a trial on the merits or at any other proceeding other than a proceeding arising from or related to this Stipulated Protective Order.

14.   FINAL DISPOSITION

Within 60 days after the final disposition of this action, as defined in paragraph 4, each Receiving Party must return all Protected Material to the Producing Party or destroy such material. As used in this subdivision, "all Protected Material" includes all copies, abstracts, compilations, summaries, and any other format reproducing or capturing any of the Protected Material. Whether the Protected Material is returned or destroyed, the Receiving Party must submit a written certification to the Producing Party (and, if not the same person or entity, to the Designating Party) by the 60-day deadline that (1) identifies (by category, where appropriate) all the Protected Material that was returned or destroyed and (2) affirms that the Receiving Party has not retained any copies, abstracts, compilations, summaries or any other format reproducing or capturing any of the Protected Material. Notwithstanding this provision, Counsel are entitled to retain an archival copy of all pleadings, motion papers, trial, deposition, and hearing transcripts, legal memoranda, correspondence, deposition and trial exhibits, expert reports, attorney work product, and consultant and expert work product, even if such materials contain Protected Material. Any such archival copies that contain or constitute Protected Material remain subject to

1   this Protective Order as set forth in Section 4 (DURATION).

2   15.   DATA SECURITY

3       Any Party in possession of Discovery Material designated as "CONFIDENTIAL" or

4   "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL –

5   SOURCE CODE" shall maintain a written information security program that includes reasonable

6   administrative, technical and physical safeguards designed to protect the security and

7   confidentiality of such information, protect against any reasonably anticipated threats or hazards

8   to the security of such information, and protect against unauthorized access to or use of such

9   information.   To the extent a Party does not have an information security program they may

10  comply with this provision by having the "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL –

11  ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" Discovery

12  Material managed by and/or stored with eDiscovery vendors or claims administrators that

13  maintain such an information security program.   If the Receiving Party discovers a breach of

14  security, including any actual or suspected unauthorized access, relating to another party's

15  "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or

16  "HIGHLY CONFIDENTIAL – SOURCE CODE" Discovery Material, the Receiving Party shall:

17  (1) promptly provide written notice to Designating Party of such breach; (2) investigate and make

18  reasonable efforts to remediate the effects of the breach, and provide Designating Party with

19  assurances reasonably satisfactory to Designating Party that such breach shall not recur; and (3)

20  provide sufficient information about the breach that the Designating Party can reasonably

21  ascertain the size and scope of the breach.   If required by any judicial or governmental request,

22  requirement or order to disclose such information, the Receiving Party shall take all reasonable

23  steps to give the Designating Party sufficient prior notice in order to contest such request,

24  requirement or order through legal means.   The Receiving Party agrees to cooperate with the

25  Designating Party or law enforcement in investigating any such security incident.   In any event,

26  the Receiving Party shall promptly take all necessary and appropriate corrective action to

27  terminate the unauthorized access.

28

IT IS SO STIPULATED, THROUGH COUNSEL OF RECORD.

DATED: May 13, 2019       */s/ Mark Whitaker*
                         MORRISON & FOERSTER LLP

                         Attorneys for Plaintiffs
                         TERADATA CORP.,
                         TERADATA US, INC., and
                         TERADATA OPERATIONS, INC.

DATED: May 13, 2019       */s/ Tharan Gregory Lanier*
                         JONES DAY
                         PAUL, WEISS, RIFKIND, WHARTON &
                         GARRISON LLP

                         Attorneys for Defendants
                         SAP SE,
                         SAP AMERICA, INC., and
                         SAP LABS LLC

PURSUANT TO STIPULATION, IT IS SO ORDERED.

DATED:  May 14, 2019     _____
                         Magistrate Judge Elizabeth B. LaPorte
                         United States ~~District~~ Judge
                              Magistrate

**ATTESTATION OF E-FILED SIGNATURE**

     I, Mark L. Whitaker, am the ECF User whose ID and password are being used to file this Stipulated Proposed Protective Order.  In compliance with Local Rule 5-1(i)(3), I hereby attest that the concurrence to the filing of this document has been obtained from each signatory hereto. Executed this 13th day of May 2019

                             */s Mark Whitaker*
                             Mark Whitaker

EXHIBIT A

ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND

I, _____ [print or type full name], of _____ [print or type full address], declare under penalty of perjury that I have read in its entirety and understand the Stipulated Protective Order that was issued by the United States District Court for the Northern District of California on _____ [date] in the case of *Teradata Corporation, et al. v. SAP SE, et al.* Case No. 3:18-cv-03670-WHO (N.D. Cal.). I agree to comply with and to be bound by all the terms of this Stipulated Protective Order and I understand and acknowledge that failure to so comply could expose me to sanctions and punishment in the nature of contempt. I solemnly promise that I will not disclose in any manner any information or item that is subject to this Stipulated Protective Order to any person or entity except in strict compliance with the provisions of this Order.

I further agree to submit to the jurisdiction of the United States District Court for the Northern District of California for the purpose of enforcing the terms of this Stipulated Protective Order, even if such enforcement proceedings occur after termination of this action.

I hereby appoint _____ [print or type full name] of _____ [print or type full address and telephone number] as my California agent for service of process in connection with this action or any proceedings related to enforcement of this Stipulated Protective Order.

Date: _____

City and State where sworn and signed: _____

Printed name: _____

Signature: _____

# EXHIBIT 2

Mark L. Whitaker (admitted *Pro Hac Vice*)
MWhitaker@mofo.com
Daniel P. Muino (CA BAR NO. 209624)
DMuino@mofo.com
G. Brian Busey (admitted *Pro Hac Vice*)
GBusey@mofo.com
Bradley S. Lui (CA BAR NO. 143088)
BLui@mofo.com
Mary Prendergast (CA BAR NO. 272737)
MPrendergast@mofo.com
Fahd H. Patel (admitted *Pro Hac Vice*)
FPatel@mofo.com
Corinna J. Alanis (CA BAR NO. 287164)
CAlanis@mofo.com
MORRISON & FOERSTER LLP
2000 Pennsylvania Avenue, NW
Washington, District of Columbia 20006-1888
Telephone:    (202) 887-1500
Facsimile:    (202) 887-0763

Bryan Wilson (CA BAR NO. 138842)
BWilson@mofo.com
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, California 94304-1018
Telephone:    (650) 813-5600
Facsimile:    (650) 494-0792

Wendy Ray (CA SBN 226269)
WRay@mofo.com
MORRISON & FOERSTER LLP
707 Wilshire Boulevard, Suite 6000
Los Angeles, California  90017-3543
Telephone:    (213) 892.5200
Facsimile:    (213) 892.5454

Attorneys for Plaintiffs
TERADATA CORPORATION,
TERADATA US, INC., and
TERADATA OPERATIONS, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| TERADATA CORPORATION, TERADATA US, INC., and TERADATA OPERATIONS, INC. | Case No. 3:18-CV-03670-WHO |
|---|---|
| Plaintiffs, | **SECOND AMENDED COMPLAINT FOR TRADE SECRET MISAPPROPRIATION, COPYRIGHT INFRINGEMENT, VIOLATION OF SHERMAN ACT § 1, VIOLATION OF CLAYTON ACT § 3, VIOLATION OF SHERMAN ACT § 2** |
| v. | |
| SAP SE, SAP AMERICA, INC., and SAP LABS, LLC | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

Plaintiffs Teradata Corporation, Teradata US, Inc., and Teradata Operations, Inc. (collectively, "Teradata") complain and allege as follows against Defendants SAP SE, SAP America, Inc., and SAP Labs, LLC (collectively, "SAP").

## THE NATURE OF THE ACTION

1.      This case is about SAP's campaign of anticompetitive conduct directed at Teradata.  Over at least the last decade, SAP has used its powerful position in Enterprise Resource Planning ("ERP") Applications to gain entrance to and quickly grab market share in the Enterprise Data Analytics and Warehousing ("EDAW") market, in which it previously had essentially no presence.  SAP's strategy began in 2008, when SAP leveraged its position in ERP Applications to lure Teradata into a purported joint venture in order to gain access to Teradata's valuable intellectual property.  The purpose of the joint venture—a purpose which Teradata now knows was a false one on SAP's part—was to combine SAP's ERP Applications suite and Business Warehouse reporting tool (SAP BW) with Teradata's industry-leading "massively parallel processing" (MPP) architecture for EDAW.  SAP then stole Teradata's trade secrets (accumulated by Teradata over the course of four decades in the EDAW space), and used them to quickly develop and introduce a competing (though inferior) product: SAP HANA.

2.      Upon release of its new product, SAP promptly terminated the parties' joint venture, and it is now attempting to coerce its customers into using HANA only, to the exclusion of Teradata, by forcing its customers to adopt HANA in exchange for upgrading their ERP Applications.  Moreover, and on information and belief, SAP has begun significantly restricting Teradata's ability to access customers' SAP-derived data.  Through this conduct, SAP has deliberately sought to exploit its large, existing ERP customer base to the detriment of Teradata and its customers.  Given the extremely high costs of switching ERP providers, SAP's ERP customers are effectively locked-in to using SAP's ERP Applications, and SAP is now attempting to lock them into using only HANA in the EDAW market as well.

3.      SAP could not have so quickly developed and marketed HANA in the first place without its theft of Teradata's trade secrets.  Now, using the fruits of that theft and its position in ERP Applications, SAP is attempting to foreclose Teradata from supplying EDAW solutions to

1   many of the largest corporations in the world.  SAP's anticompetitive strategy has resulted in

2   irreparable and ongoing harm to Teradata in the form of lost customer relationships and

3   opportunities, lost profits, and continued erosion of market share in the very industry Teradata

4   pioneered.  Teradata therefore is entitled to an injunction barring SAP's illegal conduct, monetary

5   damages, and all other legal and equitable relief available under law and which the court may

6   deem proper.

7                                         **PARTIES**

8        4.     Teradata Corporation is organized under the laws of Delaware.  Its global

9   headquarters is currently located at 10000 Innovation Drive, Miamisburg, Ohio 45342, with an

10  announced move to 17095 Via del Campo, San Diego, California 92127, in late 2018.  Teradata

11  Corporation, either itself or through one or more of its subsidiaries, conducts research,

12  development, engineering, and other technical operations related to its EDAW products at its

13  facilities at 17095 Via del Campo, San Diego, California 92127.

14       5.     Teradata US, Inc., a wholly-owned subsidiary of Teradata Corporation, is a

15  corporation organized under the laws of Delaware, with its current headquarters at 10000

16  Innovation Drive, Miamisburg, Ohio 45342.  Teradata US, Inc. will also be moving its

17  headquarters to San Diego in late 2018.  Teradata US, Inc. is the owner of all Teradata intellectual

18  property worldwide.

19       6.     Teradata Operations, Inc., a wholly-owned subsidiary of Teradata Corporation, is a

20  corporation organized under the laws of Delaware, with its current headquarters at 10000

21  Innovation Drive, Miamisburg, Ohio 45342.  Teradata Operations, Inc. will also be moving its

22  headquarters to San Diego in late 2018.  Teradata Operations, Inc. is responsible for conducting

23  all of Teradata's business operations in the United States, including product development and

24  sales.

25       7.     Defendant SAP SE is a European company.  Its principal place of business is

26  located at Dietmar-Hopp-Allee 16, Walldorf, Germany, 69190.  SAP SE converted from a

27  German "AG" corporation to an "SE" European company in 2014.

28

8.      Defendant SAP America, Inc. ("SAP America"), a wholly-owned subsidiary of SAP SE, is a Delaware corporation.  Its principal place of business is 3999 West Chester Pike, Newtown Square, PA 19073, and it also has a place of business located in this District, at 1999 Harrison Street, Suite 675, Oakland, CA 94612.  SAP America is responsible for sales, marketing, distribution, technical support, and customer service related to SAP HANA occurring in the United States, including throughout this District.

9.      Defendant SAP Labs, LLC ("SAP Labs"), a wholly owned subsidiary of SAP America, is a Delaware limited liability company.  SAP Labs has places of business in Palo Alto and San Francisco, California, including its Co-Innovation Lab ("COIL") facility located at 3410 Hillview Avenue, Palo Alto, CA 94304.  COIL housed a development, analysis, and testing environment for the SAP-Teradata joint venture discussed herein (known as the "Bridge Project") and featured customer demonstrations of the integrated solution jointly developed by SAP and Teradata (referred to as "Teradata Foundation").  SAP Labs conducts research, development, and engineering activities related to SAP HANA.

## JURISDICTION

10.      This Court has subject matter jurisdiction under 18 U.S.C. § 1836(c) and 28 U.S.C. §§ 1331, 1337(a), 1338(a), and 1367.

11.      This Court has personal jurisdiction over SAP SE, SAP America, and SAP Labs (collectively, "SAP").  This Court has personal jurisdiction over SAP SE because it has committed acts of misappropriation and infringement within this District.  SAP SE used its power in the ERP Applications market to enter into agreements with Teradata and gain access to Teradata's technology and know-how, including through installation of Teradata software at the COIL facility in this District.  SAP SE then used these activities to misappropriate Teradata's trade secrets and infringe Teradata's copyrighted software in this District.  In addition, SAP SE, directly or through intermediaries, sells or offers for sale infringing products and services in this District.  This Court also has personal jurisdiction over SAP SE, SAP America, and SAP Labs for the purpose of Teradata's antitrust claims pursuant to 15 U.S.C. § 22.

12.     This Court has personal jurisdiction over SAP America because it has committed acts of infringement and misappropriation in this District.  SAP America has sufficient minimum contacts with this District because, for example, SAP America's wholly owned subsidiary, SAP Labs, is located within this District.  SAP America also has a place of business in this district.  In addition, SAP America, directly or through intermediaries, sells or offers for sale infringing products and services in this District.

13.     This Court has personal jurisdiction over SAP Labs because it has a place of business located within this District.  Further, SAP's misappropriation and infringement of Teradata's intellectual property was carried out, at least in part, at SAP Labs' COIL facility in this District.

## VENUE AND INTRADISTRICT ASSIGNMENT

14.     Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred or a substantial part of property that is the subject of the action is situated in this District.  Additionally, venue is proper under 28 U.S.C. § 1400(a) and 15 U.S.C. § 22 for the copyright and antitrust claims, respectively, because SAP Labs and SAP America (and SAP SE, through its subsidiaries) may be found and transact business in this district.

15.     This is an Intellectual Property and Antitrust Action to be assigned on a district-wide basis pursuant to Local Rule 3-2(c).

## BACKGROUND

**A.      Teradata Is One of the World's Leading Technology Companies and a Pioneer of EDAW Products, Including MPP Database Systems.**

16.     Teradata's flagship product, and the cornerstone of all of its enterprise-analytics offerings, is Teradata Database.  Teradata Database is a massively parallel relational database management system (RDBMS) specifically designed for Enterprise Data Analytics and Warehousing (EDAW).  EDAW involves the centralized storage and integration of vast amounts of data collected from numerous sources across an entire business enterprise in its day-to-day operations, giving the business a complete "enterprise view" of its operational activities.  In

addition to data storage, EDAW is especially valuable in helping the world's largest companies (most of whom serve millions or even billions of customers and/or process millions or billions of transactions or data-generating events every day) analyze and fully understand the entirety of their business operations, including how events happening in one area of the business impact operations in other areas.  EDAW also assists these companies in making the strategic and tactical decisions, often in real-time, which allow them to operate as efficiently and profitably as possible.

17.     Teradata has been a leading provider of EDAW products for nearly 40 years. Teradata pioneered and was the first commercial EDAW vendor to employ the highly scalable computing architecture known as "massively parallel processing" (MPP).  Teradata's MPP architecture is designed specifically for executing high volumes of complex analytical queries (tens of thousands at a time) on the massive amounts of data generated by EDAW customers.  As the term MPP suggests, Teradata's architecture accomplishes this by dividing equally both the data and the analytical workload across dozens, hundreds, or (in many cases) thousands of parallel processor units, and executing the analytical tasks concurrently across these parallel units.

18.     A Teradata system does this with "linear-performance scalability," meaning that the system can grow to fit each customer's needs, taking on as many additional parallel processor units and data-storage devices as necessary to accommodate whatever amount of data and whatever type of analytics workload the customer can throw at it.  As the customer's data volumes and workload demands increase, the Teradata system can grow to accommodate them with the simple addition of parallel units and (if necessary) redistribution of data and workload across the expanded system. The Teradata system is unique in its ability to accommodate this type of growth without diminishing the returns or sacrificing the processing power or efficiency of any of its parallel units.

19.     Teradata's MPP technology grew out of research conducted at the California Institute of Technology.  After starting the company in a garage in Marina Del Rey, California, the founders obtained funding in mid-1979 and Teradata was born on July 13, 1979.  The founders chose the name "Teradata" to symbolize the ability of their flagship database to manage trillions of bytes of data, an unimaginable amount of data at that time.

20.    Teradata released the first commercial system incorporating its MPP architecture in the early 1980s and has spent the last *four decades* expanding and improving its technology, generating substantial trade secrets and other intellectual property in the process.  In 1983, Teradata received the seminal patent on first-generation MPP design for data analytics (hardware-based parallelism; U.S. No. 4,412,285, "Multiprocessor Interconnection System and Method").  Eleven years later it also received the seminal patent on second-generation MPP design (software-based parallelism; U.S. No. 5,640,584, "Virtual Processor Method and Apparatus for Enhancing Parallelism and Availability in Computer Systems"), technology that continues to distinguish Teradata's systems from those of its competitors today.  It is access to this experience and innovation that SAP sought and received through the joint venture with Teradata and then ultimately unlawfully used to Teradata's detriment, both through its development and release of HANA and through its subsequent attempts to monopolize the EDAW Market, which encompasses SAP's customers in the Top-Tier ERP Applications Market (defined below).

21.    In the 25 years since its early breakthroughs, Teradata has continued in its role as the pioneer for massively parallel analytics, developing and patenting technologies that remain the gold standard in a wide variety of technology areas.  For example, in 2012, Teradata released its Unified Data Architecture (UDA), which allows a customer to collect and analyze all of its data no matter the type (including, *e.g.*, traditional "structured" data along with "unstructured" data like audio and video content) in a single analytical environment.  In 2017, Teradata released IntelliCloud, which provides EDAW capabilities in a secured cloud-services environment.  Today, Teradata has over 10,000 employees globally, including over 1450 employees based in California at Teradata's San Diego, Santa Clara, San Francisco, and El Segundo facilities.  On June 6, 2018, Teradata announced that it will be moving its headquarters from Miamisburg, Ohio, to its campus in San Diego.

22.    Teradata serves the world's largest enterprise customers operating in a diverse range of industries.  Its customers include all 17 of the top telecommunications companies, 17 of the top 20 global and commercial savings banks, 16 of the top 20 travel and transportation companies, 15 of the top 20 global retailers, 10 of the top 15 pharmaceutical companies, and 12

of the top 20 manufacturing companies, among others.  Teradata also serves a variety of customers in the nonprofit and public sectors.  Teradata's customer base primarily consists of companies with data collected from millions of daily transactions from many data sources across a wide variety of enterprise applications, business lines, and geographic locations.  These companies present the most complex data-analytics challenges and require the scalability and sophistication for which Teradata's EDAW technologies were specifically designed.

23.     Since the release of its first database product in the early 1980s, Teradata and its products repeatedly have been recognized as standouts in the high-tech industry and within the business community in general.  Fortune magazine named Teradata's database system its "Product of the Year" in 1986, and Gartner named Teradata the "Leader in Commercial Parallel Processing" in 1994.  Intelligent Enterprise magazine named Teradata the best global data warehouse and business intelligence appliance vendor in 2007, and Forrester Research rated Teradata number one in its first-ever enterprise data warehousing report in 2009.  Forbes named Teradata one of the world's 100 most innovative companies in 2013, and just a few months ago Thompson Reuters named Teradata a Top 100 Global Technology Leader.  Finally, the Ethisphere Institute consistently has recognized Teradata as one of the World's Most Ethical Companies, awarding this distinction to Teradata in 2018 for the ninth consecutive time.

**B.     Teradata Scrupulously Protects Its Intellectual Property.**

24.     Over its nearly 40-year history of innovation, Teradata has developed extensive intellectual property related to its database and data-analytics technologies, obtaining more than 1000 patents.  Teradata's intellectual property includes confidential techniques related to the ingestion and management of massive amounts of data and the concurrent execution of large numbers of highly complex analytical queries against that data.  Teradata safeguards these optimization techniques, which provide Teradata a significant advantage over its competitors, as among its most valuable and confidential information.

25.     Teradata's proprietary and highly valuable data-analytics techniques are not known outside the company except under strict duties of non-disclosure, and Teradata scrupulously maintains these techniques in confidence through many safeguards, including but

1   not limited to non-disclosure agreements, confidentiality provisions, password protection, express

2   licenses for end users, and secure infrastructure.

3         26.     When Teradata was initially spun-off from its parent company NCR in 2007, each

4   employee was required to sign a contract containing a strict non-disclosure provision.  When any

5   new employee joins Teradata, that employee is required to sign an agreement acknowledging the

6   duty to keep strictly confidential and treat as trade secret any information learned during the

7   course of employment related to the business or activities of Teradata.  The employment

8   agreement also states that, upon termination, the employee will comply with this non-disclosure

9   agreement, and will surrender any Teradata information in the employee's possession upon

10  leaving the company.  Additionally, upon their departure from Teradata, employees are required

11  to sign exit agreements reminding them they have a continuing obligation not to use or disclose,

12  or directly or indirectly aid others in using or disclosing, any of the proprietary information or

13  data they may have learned while employed at Teradata.

14        27.     Teradata also requires third-party contractors, distributors, vendors, and

15  development partners to enter into non-disclosure agreements that strictly limit the use and

16  disclosure of any confidential information obtained in the course of their relationships with

17  Teradata.  In those agreements, Teradata controls what resources a given partner or contractor can

18  access, how they can be accessed (often via specific passwords), and which specific personnel

19  can access those resources.

20        28.     Any time Teradata is considering joint development with a third party, it requires

21  an NDA be signed before any confidential information can be exchanged as part of those initial

22  discussions.  With respect to end users, Teradata protects its intellectual property by providing

23  access to its software tools and technical information only to persons who agree to the terms of

24  Teradata's end-user license agreements.  Teradata also employs secure computing infrastructure

25  for its source code, design documents, and other proprietary and confidential information.

26        29.     Teradata owns the copyright in the software associated with Teradata Database.

27  U.S. Copyright Registration Numbers for Teradata Database are provided below:

28

| Work | Case Number | Effective Date of Registration (Date Submitted) | Registration Number |
|------|-------------|--------------------------------------------------|---------------------|
| Teradata Database 12.0 | 1-6668876091 | June 19, 2018 | TXu 2-091-495 |
| Teradata Database 13.0 | 1-6668993302 | June 19, 2018 | TXu 2-091-496 |
| Teradata Database 13.1 | 1-6668993339 | June 19, 2018 | TXu 2-091-497 |
| Teradata Database 14.0 | 1-6668993374 | June 19, 2018 | TXu 2-091-498 |
| Teradata Database 14.1 | 1-6668993409 | June 19, 2018 | TXu 2-091-500 |
| Teradata Database 15.0 | 1-6668993464 | June 19, 2018 | TXu 2-091-501 |
| Teradata Database 15.1 | 1-6668983602 | June 19, 2018 | TXu 2-091-493 |

**C.     Teradata and SAP Enter into the Bridge Project.**

30.     SAP is the dominant provider of ERP (Enterprise Resource Planning) software ("ERP Applications") in the market comprised of the world's most complex, large-scale business enterprises (the "Top-Tier ERP Applications Market"). This market is more fully defined in Paragraphs 59 through 61 below. ERP Applications allow companies to gather and manage the data required to conduct their day-to-day operations across many aspects of the business enterprise, including sales and inventory transactions, financial and accounting transactions, human-resource transactions, and the like. ERP Applications typically are designed around a relational database that acts as a common repository for all the data used and managed by the ERP Applications in carrying out the entity's business transactions. This database, known as a "transactional database," ensures that all users of the entity's ERP Applications have access to a uniform and current set of data, so that a given transaction will yield the same result no matter which of the users performs the transaction. Examples of commonly used transactional databases are the Oracle Database, IBM Db2, and Microsoft SQL Server.

31.     Teradata traditionally has focused its development activities on the EDAW products and services consumed by the same complex, large-scale enterprises that form the Top-Tier ERP Applications Market (the "EDAW Market"). SAP, on the other hand, has traditionally focused on ERP Applications and, to a lesser extent, "business intelligence" (BI) tools (including the SAP BW tool) that allow ERP users to generate reports using their ERP-derived data. In the mid-2000s, SAP's Top-Tier ERP Applications customers were fully reliant on third parties like Teradata to provide the analytical database and data-analytics backbone necessary to meet their

1   EDAW needs.  Recognizing the potential synergies in integrating and marketing their

2   technologies to a common customer base, in 2008 Teradata and SAP entered into a partnership to

3   develop a solution that would "bridge" SAP's Top-Tier ERP Applications customers to an

4   analytic solution based on Teradata's market-leading EDAW product, which would be accessed

5   through the interface of the SAP BW tool (the "Bridge Project").

6          32.     Teradata sharply limited SAP's use of information, software, tools, and other

7   materials that it provided during the Bridge Project.  The parties entered into a mutual

8   non-disclosure agreement (MNDA) in December 2008 and a further MNDA in June 2009.  These

9   NDAs limited the disclosure and use of the parties' "Confidential Information," including both

10  parties' "software and related documentation," stating that such information "shall not be

11  reproduced in any form except as required to accomplish the intent of this Agreement."  On

12  February 27, 2009, SAP and Teradata entered into a Software Development Cooperation

13  Agreement (SDCA) and a Technology Partner Agreement (TPA) related to the Bridge Project.

14  These agreements restricted disclosure of the parties' confidential information and included

15  prohibitions on reverse engineering.

16         33.     A key challenge of the Bridge Project was to ensure fast and efficient

17  interoperation between SAP's front-end systems and Teradata's EDAW product.  Subject to the

18  strict non-disclosure agreements that limited the use of any confidential Teradata information to

19  the Bridge Project only, Teradata shared its valuable trade secret and proprietary techniques for

20  optimizing the integration and analysis of massive amounts of data at an enterprise-wide scale.

21  Using those techniques, Teradata and SAP succeeded in jointly developing and putting into

22  production an integrated solution called "Teradata Foundation," which would enable SAP's

23  Top-Tier ERP Applications customers to use Teradata as the underlying analytical database for

24  EDAW activities.  SAP and Teradata brought Teradata Foundation to market, as they installed

25  and finalized Foundation on site at one major customer's facilities and developed business

26  opportunities for numerous other potential customers, a business projected at hundreds of millions

27  of dollars annually.

28

### D. Teradata Shares Trade Secret Information with SAP

34.     During the Bridge Project, subject to the terms of the parties' agreements, Teradata provided to SAP proprietary, confidential, and trade secret information acquired through decades of research and development. Upon information and belief, SAP improperly used this information to develop its own EDAW products. The intellectual property that Teradata made available to SAP in connection with the Bridge Project is discussed below, and a detailed list of trade secrets is attached as sealed Exhibit A.

### 1. Teradata Provides SAP with Confidential Orange Books

35.     As part of the Bridge Project, Teradata permitted SAP to access Teradata's proprietary technical manuals called "Orange Books," which contain extensive trade secret information concerning Teradata's MPP database technology. Teradata has always taken measures to protect the secrecy of the trade secrets contained in the Orange Books, including limiting their dissemination to customers and partners, and requiring that each customer and partner sign a non-disclosure agreement before accessing the Orange Books. The Orange Books themselves plainly state that the documents are intended for use by Teradata customers and dissemination or copying of the documents without Teradata's consent is prohibited. Nearly all of the Orange Books include the following notice or similar language: "[This document] may only be used by you for the exclusive purpose of facilitating your internal Teradata-authorized use of the Teradata product(s) described in this document to the extent that you have separately acquired a written license from Teradata for such product(s)." Additionally, nearly all of the Orange Books include "Teradata Confidential" at the bottom of each page. Teradata prohibits readers of the Orange Book from using its contents for any activities that were not authorized by Teradata.

36.     The Orange Books provided to SAP included numerous trade secrets pertaining to MPP databases that Teradata developed over its many years as the world's leading supplier of MPP database systems. This technology included, for example, novel techniques for managing database statistics, partitioning data across multiple processors, cost-based query optimization, data compression, and other MPP database technologies. Teradata's long experience developing

MPP databases gave Teradata unique insight into the challenges of designing and operating such systems, for which Teradata developed optimal solutions. Teradata's insights and know-how are reflected in its confidential Orange Books. For instance, the Orange Books describe techniques for managing database statistics that are uniquely applicable to the complex environment of MPP databases. Likewise, methods discussed in the Orange Books for data compression and cost-based optimization are tailored for use in an MPP environment.

37. In contrast with Teradata's pioneering experience in the MPP database field over decades, SAP had never purported to offer an MPP database prior to the introduction of HANA. Accordingly, Teradata's Orange Books and other proprietary information would have been immensely valuable to SAP in its efforts to develop its own competing MPP database. This information would have given SAP a short-cut to avoiding years of development work. By studying Teradata's insights into and solutions to the design and operational challenges of MPP databases, SAP would have saved itself the long, hard work of independently developing its own MPP technology. Instead of having to figure out optimal solutions for database statistics, data partitioning, cost-based query optimization, and other technical challenges of MPP databases, SAP could simply have helped itself to Teradata's accumulated wisdom on these technical subjects. Upon information and belief, that is precisely what SAP did—it utilized proprietary techniques learned from Teradata's Orange Books to develop SAP's own EDAW products, without authorization from Teradata, thereby advancing the development and commercialization of HANA by many years.

### 2. Teradata Shares Other Trade Secret Information with SAP During the Bridge Project

38. Teradata engineers also collaborated with SAP during the Bridge Project in the highly technical areas of product testing, evaluation, and development related to the creation of the integrated solution. During these activities, Teradata's engineers provided extensive trade secret information on the design and optimization of Teradata's MPP architecture and the execution of analytical queries in such systems. This information was subject to various confidentiality and limited use provisions in the agreements identified in paragraph 32 above.

Thus, SAP was not permitted to use the information learned from Teradata engineers for activities outside the Bridge Project.

39.     Teradata engineers provided SAP with trade secrets to advance the Bridge Project and yield a workable integrated solution that could be marketed and sold.  SAP partnered with Teradata because SAP did not understand the MPP architecture or how to design an analytical database that could efficiently handle massive amounts of information.  As part of the collaboration among the parties, Teradata engineers identified certain inefficiencies in SAP's software that prevented SAP from leveraging the power and parallel-processing capabilities of the Teradata Database.  In a series of emails from 2008 to 2010 between SAP and Teradata employees, for example, Teradata identified the causes of these inefficiencies and suggested solutions based on its own decades-long experience with MPP databases and the confidential and proprietary solutions it implemented in its own product offerings.  These solutions included Teradata trade secrets related to restructuring database queries to take advantage of an MPP architecture handling massive amounts of information.  The solutions also involved reducing inefficiencies associated with inaccurate statistics, improved techniques of cost-based query optimization, and improved architecture of virtual processors.  In addition, Teradata conveyed numerous other trade secrets to SAP during the Bridge Project, including innovative techniques for optimizing the speed and efficiency of (a) the concurrent execution of many analytical queries and (b) the distribution of vast amounts of data and complex analytical workloads across massively parallel processing units.

40.     Teradata provided protected intellectual property to SAP in other ways during the Bridge Project.  For example, Teradata conducted training sessions on Teradata's database solutions for SAP developers working on the Bridge Project and the training sessions were subject to confidentiality agreements.  Teradata also provided SAP with access to its database systems for experimental and research purposes in connection with the Bridge Project.  For example, Teradata installed its database system at SAP's COIL facility in Palo Alto, California, and at SAP's research center in Walldorf, Germany.  Teradata also provided SAP's developers with access to Teradata Express, a fully functional trial version of Teradata Database, pursuant to

1  Teradata's standard end user license.  Among other things, SAP's use of the Teradata Database

2  installations at COIL and in Walldorf and its use of Teradata Express were conditioned on SAP's

3  agreement not to perform any reverse-engineering or to disclose any test or evaluation results

4  without Teradata's prior written consent.

5         **E.**       **SAP Quickly Develops and Releases HANA, SAP's Flagship Database Offering, by Misappropriating Teradata's Intellectual Property.**

6

7         41.     While it was actively partnering with Teradata on the Bridge Project, SAP also

8  was developing its own competing database solution—SAP HANA.  In the summer of 2009, just

9  months after the Bridge Project formally began, SAP co-founder Hasso Plattner and then-CTO

10  Dr. Vishal Sikka announced their goal of revitalizing SAP's lackluster and outdated product

11  offerings by developing a new, faster database architecture.  Dr. Sikka quickly restructured SAP's

12  engineering teams to develop and deploy SAP HANA in less than a year, an extremely short time

13  frame for a project of such magnitude.

14         42.     In November 2010, Dr. Sikka announced at SAP's annual user conference,

15  SAPPHIRE, that SAP had begun shipping its HANA product.  In May 2011, again at SAP's

16  SAPPHIRE conference, an SAP customer demonstrated HANA for SAP BW to create what

17  purported to be an EDAW-type environment.  SAP's CTO described this version of SAP HANA

18  as incorporating a "massively parallel" database "with various data processing engines"—a

19  similar type of database architecture as that pioneered by Teradata and used in Teradata Database.

20  SAP announced general availability of SAP HANA in June 2011.

21         43.     Two months later, on August 19, 2011, after the parties had been working on the

22  Bridge Project for nearly three years, SAP unilaterally terminated the project and stopped

23  supporting, selling, or marketing Teradata Foundation.  Just days later in September 2011, SAP

24  announced HANA for SAP BW, which combined front-end software with the back-end database

25  engine (HANA) for the purpose of creating an EDAW solution—the same thing Teradata

26  Foundation was intended to achieve.

27         44.     Initial success of HANA (including HANA for SAP BW) was limited, in part

28  because, despite SAP's statements to the contrary, BW was ill-equipped to generate reports using

data from any other source besides SAP's ERP Applications. Nonetheless, SAP HANA use

eventually took off (aided by SAP's anticompetitive conduct discussed below), with HANA

revenue reaching $2 billion by 2016. SAP HANA has also led to hundreds of millions of dollars

in additional licensing sales. Dr. Sikka was lauded in the industry as the "father" and

"mastermind" of SAP HANA, and was credited with reversing SAP's stagnant product offerings.

45. Like SAP and Teradata's jointly developed solution, SAP's HANA product

combines a database solution with integrated software to perform data analytics. HANA purports

to serve as both types of database required by the large-scale, complex enterprises that make up

the Top-Tier ERP Applications Market and the EDAW Market: (1) a transactional database that

allows for the processing of transactional data in real-time; and (2) EDAW functionality that SAP

claims can enable enterprise analytics similar to those offered by Teradata. Thus, with HANA

(and BW on HANA), SAP now positions itself as a direct competitor in the EDAW market,

which Teradata essentially created, and in which Teradata has operated for almost forty years.

46. In developing HANA, SAP faced the same challenges which Teradata and SAP

faced during the Bridge Project and which Teradata engineers solved — the speed, efficiency,

and effectiveness of interoperation between SAP's front-end software and an MPP database

engine as it attempted to store and analyze massive amounts of data. On information and belief,

to overcome this challenge during HANA development, the HANA developers, at the direction of

Dr. Sikka, utilized the same solution developed by Teradata's engineers and developers during

the Bridge Project — using Teradata's trade-secret techniques for optimizing the execution of

analytical queries and the speed of data storage and retrieval in large-scale databases.

47. Among other instances of misappropriation, SAP used Teradata trade secrets to

optimize the processing of certain Open SQL queries for large volumes of data, enabling

improved performance speed and opportunities for parallel processing and other enhancements on

SAP's HANA. On information and belief, key SAP employees, including Dr. Sikka, the so-

called "mastermind" of HANA, were aware of and supported SAP's misappropriation of

Teradata's trade secrets during the development of HANA.

48.     SAP also was able to carry out this repurposing because it staffed its HANA development team with veterans of the Bridge Project.  In some cases, SAP engineers were working on both HANA development and the Bridge Project simultaneously, despite the requirements in SAP and Teradata's agreements that confidential Teradata information provided to SAP for the Bridge Project was to be used only for that purpose.  In addition, a number of Teradata employees working on the Bridge Project left Teradata and went to SAP, where they worked on HANA, despite agreeing not to disclose any confidential and trade secret information learned during their time at Teradata.  At the time, Teradata was not aware of this cross-pollination between SAP's Bridge Project and HANA development teams.

49.     In addition, on information and belief, SAP developers further infringed Teradata's copyrighted software, Teradata Express, which includes a fully functional copy of Teradata Database, by reverse engineering the software in violation of Teradata's end-user license.  Specifically, Teradata has reason to believe that SAP engineers downloaded Teradata Express and ran debugging or other tools against the software to circumvent Teradata's protections and uncover Teradata confidential and proprietary techniques for database processing and analytics.

**F.     Teradata Discovers SAP's Theft of Teradata's IP.**

50.     As Teradata would later learn (well after SAP's termination of the Bridge Project), SAP was able to develop and bring HANA to market so quickly because SAP stole and misused Teradata's intellectual property.  On September 4, 2015, *Der Spiegel* published an article reporting that an internal SAP auditor (later identified as Dr. Thomas Waldbaum) concluded that SAP misappropriated proprietary and confidential information from Teradata that SAP engineers obtained during the Bridge Project.

51.     The article explained that the auditor dug deep "into the evolutionary history of HANA" and "focuse[d] on the Bridge Project."  In October 2012, according to *Der Spiegel*, Dr. Waldbaum conducted interviews with SAP developers who worked with Teradata on the Bridge Project.  Although SAP executives initially met with Dr. Waldbaum to hear his allegations, SAP's attorneys terminated their investigation by May 2013.

52.     In January 2014, Dr. Waldbaum drew renewed attention to the issue, sending an email to SAP's supervisory board stating that SAP improperly used the intellectual property of a number of competitors, including Teradata, in its HANA product, and demanding that SAP take action.  On February 12, 2014, SAP fired Dr. Waldbaum.  Teradata has reason to believe Dr. Waldbaum has knowledge of additional information demonstrating SAP's theft of Teradata's intellectual property.

53.     In May 2014, less than two months after Dr. Waldbaum's termination, Dr. Sikka left SAP for "personal reasons."  Various media outlets noted that Dr. Sikka's departure was sudden and unexpected, as the industry considered him a "star executive" who had been the "face of SAP" and "a potential future leader of the company."  Neither SAP nor Dr. Sikka has explained the reasons for his departure.

54.     Despite being in possession of Dr. Waldbaum's audit reports for nearly three years, SAP concealed the investigation and its findings from Teradata and the public until it was exposed by *Der Spiegel* in September 2015.  As a result of *Der Spiegel*'s probe and the resulting article, Teradata began investigating these allegations, which led to the discoveries culminating in this lawsuit.  For example, Teradata learned that several SAP employees working on the Bridge Project, who therefore had access to and used confidential Teradata information, were simultaneously working on HANA.  Later, many of these employees would be assigned to HANA full-time.  Teradata also learned that SAP had incorporated Teradata's proprietary and confidential information into HANA, solving HANA's speed and efficiency problems using the same solutions that Teradata employees developed using Teradata's trade-secret techniques during the Bridge Project.

55.     Unbeknownst to Teradata at the time, SAP stole Teradata's trade secrets related to optimizing data storage and retrieval (including query execution) in an MPP environment, without authority incorporated them into HANA, and otherwise used them to aid development of HANA, which has become SAP's flagship database product.  Unlike Teradata, which has spent four decades developing its EDAW technologies, SAP managed an initial release of its competing HANA product after spending mere months in development.  It has become clear to Teradata that

1  SAP was able to go to market so quickly only because SAP entered into an agreement with

2  Teradata under the false pretense of integrating the two companies' technologies, stole key

3  Teradata trade secrets, and then incorporated them into and used them to develop HANA.

4  Despite SAP's public statements denying any wrongdoing, SAP's misuse has continued unabated

5  to the present.

6       56.     SAP's theft of Teradata's intellectual property has irretrievably harmed Teradata.

7  By unilaterally terminating the Bridge Project and ceasing support for Teradata Foundation in

8  favor of HANA, SAP killed an important line of business for Teradata—one in which Teradata

9  had invested considerable time, effort, and resources.  SAP's actions also have effectively

10  blocked Teradata from developing relationships with the SAP customers that could most benefit

11  from Teradata's EDAW products, and have otherwise hampered Teradata's ability to sell and

12  market its own database management and business analytics technologies.  The harm to Teradata

13  has only increased as a result of SAP's exploitation of its dominance in the market for Top-Tier

14  ERP Applications and its improper use of HANA in an attempt to eliminate Teradata as a

15  competitor (discussed below).

16       57.     SAP, on the other hand, has capitalized on its unlawful use of Teradata's IP and its

17  anticompetitive conduct to the tune of billions of dollars in revenue.  Just two years after the

18  launch of HANA, SAP's estimated annual revenue for HANA alone was over $1 billion, and SAP

19  estimates it had over 18,000 HANA customers in 2017.  In February 2018, SAP estimated that

20  over 50% of its ERP client base would be using HANA by 2020.  Recent industry research

21  indicates that 60% of SAP's Top-Tier ERP Applications customers, and perhaps in excess of

22  80%, are employing or preparing to employ HANA.  Furthermore, SAP has generated billions of

23  dollars in additional revenue from the SAP applications that HANA users have also purchased.

24      **G.**     **SAP's Unlawful Efforts to Restrain Competition.**

25       58.     As outlined above, HANA is the product of theft.  However, rather than merely

26  attempting to compete on the merits with a tainted product, SAP has engaged in conduct designed

27  to eliminate competition in the EDAW market for SAP Top-Tier ERP Applications customers.

28  The growth and revenue information cited above is not the result of SAP's business acumen,

innovation, or skill, but instead is the direct result of SAP's anticompetitive efforts. SAP has carried out its plan through a previously undisclosed change to its long-standing sales practices that leaves its locked-in Top-Tier ERP Applications customers with little choice but to adopt HANA to the exclusion of Teradata's EDAW products: tying upgrades of customers' ERP Applications to customers' adoption of HANA (while ending support for older versions of ERP Applications). On information and belief, SAP has also begun significantly restricting Teradata's ability to access customers' SAP ERP data stored in HANA (which is necessary for the functional use of Teradata's EDAW products), thereby ensuring the success of its tying arrangement in coercing customers to adopt HANA.

### 1. Relevant Markets and SAP's Market Power.

59. As outlined above, there is a separate, relevant product market for ERP Applications, such as SAP's S/4HANA and SAP's predecessor ERP programs, used by large-scale, complex enterprises (the "Top-Tier ERP Applications Market").

60. Market participants recognize the distinct needs of these types of customers and may refer to ERP Applications for customers with the above characteristics as "Tier 1" ERP Applications. As it is understood in the industry, the customer base for "Tier 1" ERP Applications generally consists of the largest companies in the world, such as Fortune 1000 companies in the United States, FTSE 100 companies in Europe, and similarly-sized privately-held entities.

61. Top-Tier ERP Applications constitute a relevant product market because these products provide unique, specialized tools and functionality at a scale that is designed to meet the needs of customers with extremely high data volumes and complex sources of data. These customers possess some or all of the following characteristics: (1) millions of transactions and/or data-generating events on a daily basis; (2) multiple and distinct business lines; (3) diverse geographic locations for operations; (4) multiple and disparate sources and formats of data related to distributors, suppliers, competitors, customers, and/or employees; and (5) revenues typically exceeding $1 billion. These characteristics result in customer demand for highly customizable and flexible software that is readily scalable.

62.     Given the critical importance of a customer's ERP Applications to its business, customers of Top-Tier ERP Applications will migrate to the most recent version of their provider's ERP Applications to have access to the latest features and functionality, most robust support, and most recent security and software updates.  Where, as here, a Top-Tier ERP Applications vendor announces the end, or "sunset," of prior versions of its ERP Applications, Top-Tier ERP Applications customers have no choice but to upgrade.

63.     There are no reasonable or adequate economic substitutes for upgrades of SAP ERP Applications for the vast majority of Top-Tier ERP Applications customers because they are locked-in to their current ERP application provider as a result of the information disparity at the time of purchase and enormously high costs of switching, as set forth below.

64.     Customers are unable to perform detailed cost analyses for the lifecycle of their ERP Applications at the time of purchase.  It is difficult for customers to obtain the necessary information among competing ERP Applications with respect to maintenance costs, upgrade timelines (or the costs of such upgrades), as well as any disruption in service that may occur over the life of the product.  Such pre-purchase analyses also cannot account for any post-sale changes in policy or practice such as SAP's changes set forth below.  This creates an information disparity between Top-Tier ERP Applications customers and providers.

65.     Severe switching costs associated with changing a customers' Top-Tier ERP Applications provider effectively preclude the vast majority of customers from changing their ERP Applications.  These switching costs include both direct financial costs and indirect costs at every stage of the switching process.  Initially, Top-Tier ERP Application customers devote substantial resources to evaluating ERP Applications.  This process can take several years to complete, given the need to thoroughly examine the functionality of ERP Applications and measure that functionality against the unique needs of a particular customer.

66.     After the evaluation process, customers spend significant sums on the actual licensing, development, and implementation of ERP Applications within their specific business environments.  An individual customer may spend tens of millions of dollars on its ERP

Applications in a given year, depending upon the complexity and customization of its ERP Applications, the number of users, and other factors.

67.     Implementing ERP Applications involves extensive costs and substantial devotion of resources, including but not limited to training employees on how to properly use those ERP Applications, troubleshooting problems, and realigning business practices with the selected provider.  In addition to employee-focused change management, implementation involves major costs associated with migrating data, testing and deployment of specific software developed for each customer, and technical implementation that occurs during this time period.

68.     Accordingly, changing Top-Tier ERP Applications providers is not a task completed in days or weeks but over a period of months or years, from the date a license agreement is signed, through development, testing, and training, to the actual deployment.

69.     These switching costs, coupled with the information disparity between provider and customer as to future changes in policy or practice, mean that Top-Tier ERP Applications customers are locked-in to their current providers and thus may be exploited by a change in policy or practice from their provider that was not known at the time customers made their initial choice of ERP Applications provider.

70.     SAP has held and continues to hold a dominant position in the Top-Tier ERP Applications Market, and possesses a market share that ranges, on information and belief, from 60% to 90% depending on the industry in which the customer operates.  Oracle is the only other significant competitor for these Top-Tier customers, but industry research indicates that Oracle's market share has historically been less than SAP's with respect to the number of installed Top-Tier ERP Applications customers.

71.     As outlined above, there is also a separate relevant product market for EDAW products (the "EDAW Market"), which enable Top-Tier ERP Applications customers to retain, and more importantly to perform complex analytical operations on, vast amounts of data from a wide variety of data streams (*i.e.*, the companies' ERP Applications and numerous other sources).

72.     EDAW products are separate and distinct products from ERP Applications. EDAW products are also separate and distinct products from transactional databases, which are

1  used primarily for the storage and processing of transactional data. EDAW products have

2  historically been designed for their specialized purpose and sold separately from ERP

3  Applications and transactional databases, and each of these three products serves different

4  functions for customers.

5         73.    Teradata's EDAW products include tools that were developed to copy a

6  customer's ERP Applications data from the customer's transactional database for incorporation

7  into Teradata's EDAW system, where a customer can run complex analytical functions against all

8  the data the customer collects from its business enterprise, including its ERP data and data from

9  other sources. Teradata's EDAW tools also allow for extraction of historical data from the

10  customer's transactional system and storage of that historical data in the EDAW system. As a

11  general rule, ERP Applications like SAP's do not perform well when historical data is kept in the

12  underlying transactional database, and use of an EDAW system allows the customer to purge the

13  data from the transactional system and warehouse it elsewhere.

14         74.    For all Teradata customers, regardless of the transactional database a customer is

15  using, Teradata's tools copy ERP Application data from the transactional database by reading the

16  transaction-log files maintained in that database. The Teradata tools do this with a read-only

17  operation from the transaction log and do not manipulate the actual data within the transactional

18  database in any way. These tools are designed to understand the structure of the stored data and

19  copy it in a way that is accurate/consistent with the customer's ERP Applications but without the

20  risk of corrupting the integrity of the ERP data. Teradata then incorporates a customer's ERP

21  data with data from other sources in its EDAW system to perform a wide variety of analytical

22  functions. Teradata utilizes its software on a variety of transactional databases deployed with a

23  variety of ERP Applications.

24         75.    Most Top-Tier ERP Applications customers also use EDAW products.

25  Multinational companies with diverse product lines, complex supply chains, and large workforces

26  require the ability to quickly analyze and understand historical and incoming real-time data to

27  inform current and future business decisions. EDAW products are indispensable for these

28  companies. SAP itself has recognized the evolving analytic needs of these companies, which

influenced SAP to engage Teradata, under the guise of a partnership, in order to steal Teradata's intellectual property and develop a competing EDAW product.

76.     SAP developed HANA to function as both a transactional database for managing ERP Applications data and an analytical database with EDAW functionality.  Teradata Database is designed primarily for use as an EDAW product but can also process analytical workloads with transactional components.  Thus, SAP has positioned itself as a direct competitor to Teradata in the EDAW Market within its Top-Tier ERP Applications customer base.  However, HANA also serves as a potential source of data (specifically, a customer's SAP ERP data) for its Top-Tier ERP Applications customers who want the performance and linear-scalability offered only by Teradata's EDAW products.

77.     As discussed above, to copy the data generated by a specific application (such as an ERP Application), EDAW products require software specifically designed for and tailored to that application.  Providers of EDAW products make substantial investments in developing products that can successfully and reliably copy a customer's data derived from a specific ERP Application.  The software used to accurately replicate data derived from a provider's ERP Applications, such as SAP's ERP Applications, is not reasonably interchangeable with software used to copy data derived from another provider's ERP Application absent significant development work.

78.     Because EDAW products serve as "back-end" systems for the storage and analysis of data from various streams across the entire business enterprise, these products are dependent upon other sources, such as ERP Applications, to obtain the data that is then uploaded and analyzed.  EDAW products providers, such as Teradata, must be able to access these data sources in a way that permits the efficient and accurate copying of data in order to serve as a viable option for their customers.  This dependence of EDAW products upon other sources of data and the need to develop the ability to efficiently and accurately obtain that data constitute barriers to entry, and are particularly acute here, where SAP's anticompetitive conduct effectively prevents other companies from offering viable EDAW products for SAP's Top-Tier ERP Applications customers.

79.     The relevant geographic markets are the sale of Top-Tier ERP Applications and EDAW products on a worldwide basis, given the multi-national nature of the market participants, as further described herein.

**2.     Historically, SAP's Top-Tier ERP Applications Customers Could Freely Select Their EDAW Product of Choice.**

80.     SAP's Top-Tier ERP Applications customers historically were able to use the EDAW products of their choosing, knowing that their EDAW product could access and obtain data that was created in their SAP ERP Applications and then stored in a transactional database. SAP previously did not offer a competitive EDAW product or transactional database with the requisite functionality and scalability for SAP's Top-Tier ERP Applications customers. Thus, a Top-Tier ERP SAP Applications customer could select a separate transactional database vendor other than SAP and select a separate EDAW product vendor, such as Teradata.

81.     This arrangement permitted SAP's Top-Tier ERP Applications customers to create ecosystems that best fit their needs. For example, historically, nearly all of the customers who used SAP's ERP Applications would run the applications on an Oracle, IBM, or Microsoft transactional database, and a very high percentage of those Top-Tier ERP Applications customers would use Teradata for their EDAW needs.

82.     Teradata made substantial investments to create software that could reliably and accurately take extremely large amounts of a customer's SAP-derived data and copy it into Teradata's systems to perform data analytics within this ecosystem. For example, after SAP ended the Bridge Project in 2011, Teradata was forced to find other ways to meet consumer demand for accessing SAP-derived data for use in Teradata's EDAW systems. Teradata spent tens of millions of dollars to acquire a company with existing technology in this area, and invested additional millions annually to develop and optimize that solution for Teradata and bring it to market.

83.     SAP was aware of and supported this arrangement. SAP knew that Teradata was obtaining customers' SAP-derived data for use in Teradata's EDAW products via the replication method described above. This arrangement between SAP and Teradata was mutually beneficial

for both parties: Teradata's ability to efficiently access a customer's SAP-derived data increased the marketability and desirability of Teradata's EDAW products, and the ability of SAP's ERP-derived data to be integrated into Teradata's EDAW products increased the marketability and desirability of SAP's ERP Applications.

84. At the time HANA was first released in 2010, and up through the introduction of S/4HANA in February 2015, SAP continued to allow its ERP customers to choose their own database solutions, including their transactional databases and EDAW products. Teradata did not actively attempt to integrate with HANA during this time period because there was little to no demand for integration among its customers, who, because of the size and complexity of their database needs, were not in a position to adopt HANA.

85. Thus, Teradata continued to serve its SAP customers by accessing log files of customers' SAP-derived data and importing them into Teradata's systems for storage and analysis. SAP customers made their ERP Application choices with the understanding that they would be able to use the EDAW providers that best suited their needs.

### 3. SAP Ties Upgrades of its ERP Application Product to HANA.

86. Notwithstanding SAP's theft of Teradata's intellectual property, early iterations of HANA did not have widespread success among SAP's large-scale ERP Applications customers because of HANA's deficiencies in functionality and lack of true linear-performance scalability, and because (even when operating with SAP's BW reporting tool) it was ill-suited for integration of enterprise data from third-party sources.

87. Following the release of HANA, mutual SAP-Teradata customers still overwhelmingly preferred Teradata's EDAW products to HANA. Even as customers began evaluating whether to adopt HANA for their transactional database functionality, customers also approached Teradata and encouraged it to develop an integration for HANA.

88. It stands to reason that SAP was well-aware that its largest SAP ERP customers would likely maintain their current software ecosystems rather than adopt HANA. Thus, SAP concluded the only possible way to gain widespread acceptance of HANA among its largest ERP

Applications customers was to exert control over its locked-in ERP Applications customers and force them to adopt HANA.

89.     SAP first carried out this plan by tying SAP ERP upgrades to the adoption of HANA.  Specifically, SAP launched the latest version of its ERP Application, SAP S/4HANA, in February 2015.  SAP describes S/4HANA as being "built on" and "natively written" for HANA.  This marketing language attempts to conceal the fact that, in an abrupt change to past practice, SAP S/4HANA is wholly incompatible with other transactional databases and can only run on HANA.  Thus, in order to upgrade to SAP's newest ERP Application, customers must now also adopt HANA.

90.     In addition to making S/4HANA incompatible with any other transactional database (unlike prior versions of its ERP Applications), SAP has combined the two distinct products, its ERP Application and HANA, into a single offering (in contrast to its prior sales practice of offering both products separately).  Moreover, and on information and belief, SAP's licensing agreements further restrict the ability of customers to read and copy S/4HANA ERP data to any other database.

91.     The facts demonstrate SAP's decision to combine these two products as a single product offering was done for the sole purpose of forcing its locked-in, Top-Tier ERP Applications customers to adopt HANA and to restrain competition.  There is no technological or other justification for SAP's drastic change in sales practice, and any such justification is greatly outweighed by the anticompetitive effect of SAP's actions on both customers and competitors.

92.     SAP has also announced that it is ending support for prior versions of its ERP Applications by 2025.  SAP has thus forced its current customers into upgrading to S/4HANA, and, by extension, adopting HANA as their database solution, by setting a deadline on the support of their non-HANA-based SAP ERP Applications.  On information and belief, SAP knows that the vast majority of its customers will not be able to evaluate, select, and implement an alternative ERP provider in this time period.  These customers therefore will be forced to adopt HANA when they upgrade their ERP Application.

93.     SAP's conditioning ERP upgrades on customers' adoption of HANA as the database underlying their ERP Applications is a previously undisclosed reversal in its sales practices.  HANA had been on the market for approximately five years before the release of S/4HANA.  SAP had not previously conditioned customers' use of SAP's ERP Applications on their adoption of HANA.  SAP's ERP customers could not have reasonably anticipated when they entered into their license agreements with SAP that they would be subject to such an undisclosed, future reversal of practice.

94.     On information and belief, SAP has made substantial efforts to force its customers to adopt HANA sooner rather than later by limiting updates for legacy SAP Applications and limiting the release of new features to S/4HANA.

95.     The purpose and impact of SAP's change in practice is clear: whereas previously SAP's Top-Tier ERP Applications customers were free to choose how to manage their data needs, those locked-in customers will now be forced to adopt HANA.  Given the costs of licensing, implementing, and maintaining EDAW products, the vast majority of large-scale customers will have no choice but to abandon their prior EDAW providers because they cannot support dual EDAW providers.  Thus, because HANA purports to offer some or all of the functionality offered by Teradata, SAP is effectively coercing its customers into leaving Teradata and adopting the full stack of SAP products (including HANA).

96.     On information and belief, SAP has also more recently begun significantly restricting Teradata's ability to access customers' SAP ERP data stored in HANA for use in Teradata's EDAW products, thereby ensuring that SAP's Top-Tier ERP Applications customers utilize HANA (and only HANA) for all of their database needs.

97.     SAP's unreasonable restrictions and limitations on Teradata's ability to access customers' SAP-derived data have heightened the success of SAP's unlawful tie at the expense of SAP's Top-Tier ERP Applications customers and Teradata.

98.     A number of existing Teradata customers have threatened to terminate their relationship with Teradata if Teradata cannot properly access their SAP ERP data from HANA. Moreover, prospective SAP Top-Tier ERP Applications customers will not license Teradata's

1    EDAW products if Teradata cannot properly access their SAP ERP data from HANA or will

2    otherwise be limited in its ability to incorporate SAP ERP data into its EDAW products.

3         99.    As a direct consequence of this calculated anticompetitive conduct, Teradata has

4    been harmed and continues to be harmed in its business and in its ability to provide products to its

5    SAP Top-Tier ERP Applications customers and prospective customers who are already utilizing

6    SAP ERP Applications.

7         100.    SAP's conduct has no legitimate business rationale and is directly contrary to the

8    practices of other ERP Applications and database solutions providers.  These providers

9    understand the value-add of allowing customers to choose the software components that best suit

10   their needs.  For example, Teradata currently provides EDAW products to customers using other

11   ERP Applications (including those who also offer EDAW products).  As the market operates

12   under a more open environment, SAP is conspicuously moving in the other direction.

13        101.    As the above demonstrates, after stealing Teradata's intellectual property to create

14   HANA, SAP has used HANA as a weapon to eliminate competition for EDAW products among

15   its locked-in ERP customers by forcing customers to use HANA in order to upgrade their ERP

16   Applications (which customers must do) while simultaneously tightening restrictions on

17   Teradata's ability to access customers' SAP data stored in HANA.

18        102.    SAP's intentional, unfair, and unlawful attempts to eliminate competition create a

19   dangerous probability that SAP will succeed and, as a result, will be in a position to raise prices,

20   reduce innovation, unreasonably restrain customer choice, and reduce innovation and output

21   among its locked-in customer base.

22                                **COUNT I**
                **(Trade Secret Misappropriation Under the Defend Trade Secrets Act**
23                           **(18 U.S.C. § 1836, *et seq.*))**

24        103.    Teradata hereby restates and re-alleges the allegations set forth in paragraphs 1

25   through 102 above and incorporates them by reference.

26        104.    Teradata's confidential information relating to Teradata Database, including

27   Teradata's proprietary and confidential techniques for optimizing the speed of data storage and

28   retrieval in large-scale, massively parallel databases, constitutes information that has independent

economic value because it is not generally known to, and is not readily ascertainable through proper means, by individuals or entities outside of Teradata.  This confidential information is crucial to the operation of Teradata's business, and, if available to others, would enable them to compete with Teradata to Teradata's detriment.  Teradata has taken reasonable measures to keep such information secret.  Confidential information related to Teradata Database therefore qualifies as a trade secret within the meaning of 18 U.S.C. § 1839.

105.    SAP disclosed, used and continues to use Teradata's trade secrets without express or implied consent, and SAP knew or had reason to know at the time of such disclosure and use that the knowledge of the trade secrets was acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secrets or limit the use of the trade secrets.

106.    Additionally, without consent, authorization, approval, or license, SAP knowingly, willingly, and unlawfully acquired, disclosed, and/or used or intended to use Teradata's trade secrets through improper means and continues to use Teradata's trade secrets without consent.

107.    SAP's misappropriation of Teradata's trade secrets is and has been willful and malicious, such that Teradata is entitled to exemplary damages and its reasonable attorney's fees.

108.    SAP has realized unjust profits, gains, and advantages as a proximate result of its trade secret misappropriation.

109.    SAP will continue to realize unjust profits, gains, and advantages as a proximate result of its trade secret misappropriation as long as such misappropriation is permitted to continue.

110.    Teradata is entitled to an injunction restraining SAP from engaging in continuing and further acts of trade secret misappropriation.  Unless SAP is enjoined and prohibited from disclosing or using Teradata's trade secrets and all materials disclosing or derived from the misappropriated information are seized, SAP will continue to misappropriate Teradata's trade secrets.

111.    As a direct and proximate result of SAP's misappropriation of Teradata's trade secrets, Teradata has suffered, and will continue to suffer, monetary loss to its business, reputation, and goodwill.  Teradata is entitled to recover from SAP, in an amount to be

determined at trial, the damages Teradata has sustained and will sustain, for its actual losses and any unjust enrichment obtained by SAP as a result of its misappropriation of Teradata's trade secrets.

**COUNT II**

**(Trade Secret Misappropriation Under the California Uniform Trade Secrets Act (Cal. Civil Code § 3426, *et seq.*))**

112.     Teradata hereby restates and re-alleges the allegations set forth in paragraphs 1 through 111 above and incorporates them by reference.

113.     Teradata's confidential information relating to Teradata Database, including Teradata's proprietary and confidential techniques for optimizing the speed of data storage and retrieval in large-scale databases, constitutes information that has independent economic value because it is unknown to others and is the subject of reasonable efforts to maintain its secrecy or limit its use.  It therefore qualifies as a trade secret within the meaning of California Civil Code Section 3426, *et seq*.

114.     SAP disclosed, used and continues to use Teradata's trade secrets without express or implied consent, and SAP knew or had reason to know at the time of such disclosure and use that the knowledge of the trade secrets was acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secrets or limit the use of the trade secrets.

115.     Additionally, without consent, authorization, approval, or license, SAP knowingly, willingly, and unlawfully acquired, disclosed, and/or used or intended to use Teradata's trade secrets through improper means and continues to use Teradata's trade secrets without consent.

116.     SAP's misappropriation of Teradata's trade secrets is and has been willful and malicious, such that Teradata is entitled to exemplary damages and its reasonable attorney's fees and costs.

117.     SAP has realized unjust profits, gains, and advantages as a proximate result of its trade secret misappropriation.

118.     SAP will continue to realize unjust profits, gains, and advantages as a proximate result of its trade secret misappropriation as long as such misappropriation is permitted to continue.

119. Teradata is entitled to an injunction restraining SAP from engaging in further acts of trade secret misappropriation. Unless SAP is enjoined and prohibited from disclosing or using Teradata's trade secrets and all materials disclosing or derived from the misappropriated information are seized, SAP will continue to misappropriate Teradata's trade secrets.

120. As a direct and proximate result of SAP's misappropriation of Teradata's trade secrets, Teradata has suffered, and will continue to suffer, monetary loss to its business, reputation, and goodwill. Teradata is entitled to recover from SAP, in an amount to be determined at trial, the damages Teradata has sustained and will sustain, for its actual losses and any unjust enrichment obtained by SAP as a result of its misappropriation of Teradata's trade secrets.

## COUNT III
### (Copyright Infringement (17 U.S.C. § 501))

121. Teradata hereby restates and re-alleges the allegations set forth in paragraphs 1 through 120 above and incorporates them by reference.

122. Teradata owns the copyright in the software associated with Teradata Database. U.S. Copyright Registration Numbers for Teradata Database are provided below:

| Work | Case Number | Effective Date of Registration (Date Submitted) | Registration Number |
|---|---|---|---|
| Teradata Database 12.0 | 1-6668876091 | June 19, 2018 | TXu 2-091-495 |
| Teradata Database 13.0 | 1-6668993302 | June 19, 2018 | TXu 2-091-496 |
| Teradata Database 13.1 | 1-6668993339 | June 19, 2018 | TXu 2-091-497 |
| Teradata Database 14.0 | 1-6668993374 | June 19, 2018 | TXu 2-091-498 |
| Teradata Database 14.1 | 1-6668993409 | June 19, 2018 | TXu 2-091-500 |
| Teradata Database 15.0 | 1-6668993464 | June 19, 2018 | TXu 2-091-501 |
| Teradata Database 15.1 | 1-6668983602 | June 19, 2018 | TXu 2-091-493 |

123. The Teradata Express simulator, which contains a fully functional version of Teradata Database, contains a substantial amount of original material that is copyrightable subject matter under the Copyright Act, 17 U.S.C. § 101 *et seq*.

124. Without consent, authorization, approval, or license, SAP knowingly, willingly, and unlawfully copied Teradata's copyrighted work, including by loading unauthorized copies of

1   Teradata Express into RAM for reverse-engineering and other purposes prohibited by Teradata's

2   end-user license.

3       125.    SAP was aware of Teradata's copyrights of its Teradata Database (and therefore

4   its Teradata Express) software.  SAP's infringement therefore was knowing and willful.

5       126.    By its unlawful copying and distribution, SAP has violated Teradata's exclusive

6   rights under 17 U.S.C. § 106.

7       127.    SAP has realized unjust profits, gains, and advantages as a proximate result of its

8   infringement.

9       128.    SAP will continue to realize unjust profits, gains, and advantages as a proximate

10  result of its infringement as long as such infringement is permitted to continue.

11      129.    Teradata is entitled to an injunction restraining SAP from engaging in any further

12  acts in violation of the United States copyright laws.  Unless SAP is enjoined and prohibited from

13  infringing Teradata's copyrights and unless all infringing products and advertising materials are

14  seized, SAP will continue to intentionally infringe Teradata's copyrights.

15      130.    As a direct and proximate result of SAP's direct willful copyright infringement,

16  Teradata has suffered, and will continue to suffer, monetary loss to its business.  Teradata is

17  entitled to recover from SAP, in an amount to be determined at trial, the damages it has sustained

18  and will sustain, and any gains, profits, and advantages obtained by SAP as a result of its acts of

19  infringement and use of the copied materials.  Alternatively, Teradata is entitled to an award of

20  statutory damages for SAP's infringement of Teradata's registered copyrights.

21                              **COUNT IV**
    **(Unlawful Tying, SAP Top-Tier ERP Applications and EDAW Products for SAP Top-Tier**
22                **ERP Applications Customers (15 U.S.C. §§ 1, 14))**

23      131.    Teradata hereby restates and re-alleges the allegations set forth in paragraphs 1

24  through 130 above and incorporates them by reference.

25      132.    SAP's Top-Tier ERP Applications (the tying product) are a separate and distinct

26  product and market from the market for SAP's HANA product (the tied product) and the overall

27  market for EDAW products for SAP Top-Tier ERP Applications, including Teradata EDAW

28

1    products.  HANA unquestionably possesses EDAW product functionality, which is largely the

2    result of SAP's theft of Teradata's intellectual property.

3        133.    SAP is coercing its current Top-Tier ERP Application customers into adopting

4    HANA, to the exclusion of other EDAW products, through a previously undisclosed reversal in

5    practice, that is, conditioning upgrades of SAP's ERP Applications on customers' adoption of

6    HANA.

7        134.    As set forth above, SAP has sufficient economic power in the market for Top-Tier

8    ERP Applications to (a) coerce its current Top-Tier ERP Applications customers into adopting

9    HANA through its previously undisclosed reversal in practice and (2) effectively preclude

10   customers from purchasing competitive EDAW products (including Teradata's EDAW products),

11   given the fact that these customers know they must adopt SAP's HANA in order to upgrade their

12   mission-critical ERP Applications.  Further, SAP's economic power is derived from severe

13   information and switching costs.  SAP Top-Tier ERP Applications customers are locked-in to

14   their SAP ERP Applications and are now being exploited by SAP.

15       135.    SAP has effectively entered into arrangements with current and prospective

16   Teradata customers in order to restrain a not insubstantial amount of interstate commerce.

17       136.    SAP's unlawful tying is economically irrational conduct that has no legitimate

18   business justification and only serves to foreclose competition in the EDAW Market for SAP's

19   Top-Tier ERP Applications customers.  Any justification SAP could offer is either pretextual or is

20   else far outweighed by the anticompetitive effects.

21       137.    By reason of the foregoing, SAP's arrangements with its current Top-Tier ERP

22   Applications customers constitute unlawful agreements or combinations in restraint of trade, in

23   violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 3 of the Clayton Act, 15

24   U.S.C. § 14.

25       138.    SAP's tying is per se unlawful given the high degree of market power SAP

26   possesses in the market for Top-Tier ERP Applications and the power it exercises over its current

27   Top-Tier ERP Applications customers.  Competition in the EDAW Market has been and is

28   appreciably restrained as a consequence of SAP's conduct.

139.     Alternatively, even if SAP's tying is not a per se violation, SAP's tying unreasonably restrains competition in the tied product market and constitutes a rule of reason violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 3 of the Clayton Act, 15 U.S.C. § 14.

140.     SAP's conduct affects far more than a not insubstantial amount of commerce in the EDAW Market.  The amount of business affected by SAP's tying arrangement is in the millions and will only continue to increase.

141.     Teradata has been harmed and will continue to suffer irreparable harm as a consequence of SAP's conduct.  Teradata is entitled to an injunction restraining SAP from engaging in the unlawful tying of upgrades to its ERP Applications with HANA.  Unless and until SAP is enjoined, SAP will continue to engage in the unlawful tying set forth above.

142.     By reason of the foregoing, Teradata is entitled to injunctive and monetary relief, including treble damages and attorneys' fees, pursuant to 15 U.S.C. §§ 15 and 26.

## COUNT V
### (Attempted Monopolization of EDAW Market for SAP Top-Tier ERP Applications Customers (15 U.S.C. § 2))

143.     Teradata hereby restates and re-alleges the allegations set forth in paragraphs 1 through 142 above and incorporates them by reference.

144.     SAP provides Top-Tier ERP Applications and EDAW products.

145.     As set forth above, EDAW products for SAP's Top-Tier ERP Applications customers constitutes a relevant product market.

146.     SAP has acted with the specific intent to monopolize the EDAW Market for SAP's Top-Tier ERP Applications customers through its exclusionary conduct, specifically, tying upgrades of SAP's Top-Tier ERP Applications to the adoption of HANA, as set forth above.

147.     The impact of the above-described exclusionary conduct has been heightened by SAP's attempts to significantly restrict Teradata's ability to access customers' SAP ERP-derived data stored in HANA.

148.     SAP was able to engage in the exclusionary practice described above through its misappropriation of Teradata's trade secrets.

149.    As set forth above, SAP's Top-Tier ERP Application customers could not have known that SAP would restrict their ability to utilize their EDAW products of choice and force them to adopt HANA at the time they entered into their agreements with SAP.  Further, SAP's abrupt reversal in its practices after years of permitting customers to use competing EDAW products demonstrates that SAP's conduct lacks any legitimate business purpose, and serves solely to foreclose competition.

150.    Given SAP's power over its Top-Tier ERP Applications customers and the extent to which SAP's anticompetitive conduct precludes competition in the EDAW Market, there is a dangerous probability that SAP will acquire monopoly power in the EDAW Market for SAP's Top-Tier ERP Applications customers.

151.    SAP has already begun to enjoy the fruits of its anticompetitive conduct, as an estimated 60% of SAP's largest ERP Applications customers (and perhaps more than 80%), are employing or preparing to employ HANA.  This rate will only rise more rapidly as more customers upgrade to S/4 HANA and are foreclosed from either licensing alternative EDAW products or accessing their SAP ERP data for use with Teradata's EDAW products.  Rather than being the product of skill, business acumen, or luck, much of HANA's adoption rate is the direct result of SAP's anticompetitive conduct.

152.    Moreover, SAP's conduct has immediate and significant anticompetitive effects.  As set forth above, customers cannot justify paying for EDAW products with substantially overlapping functionality.  As the result of this conduct, Teradata and similarly situated vendors will be forced to exit the market.

153.    As a result of SAP's conduct, SAP's Top-Tier ERP Applications customers have suffered and will continue to suffer from a reduction in choice in the EDAW Market.  SAP's conduct will also have the effect of higher prices, reduced quality, and lower innovation and output in the EDAW Market for SAP's Top-Tier ERP Applications customers.

154.    The conduct set forth above constitutes unreasonable and anti-competitive means by which SAP is attempting to monopolize the EDAW Market for SAP Top-Tier ERP Applications customers, in violation of the Sherman Antitrust Act, 15 U.S.C. § 2.

155.     Teradata has suffered direct and tangible injury as a result of SAP's anticompetitive conduct and the damage it has caused to free and fair competition in the EDAW Market for SAP Top-Tier ERP Applications customers.  By reason of the foregoing, Teradata is entitled to injunctive and monetary relief, including treble damages and attorneys' fees, pursuant to 15 U.S.C. §§ 15 and 26.

### PRAYER FOR RELIEF

WHEREFORE, Teradata respectfully requests the following relief:

A.     A preliminary injunction prohibiting SAP, its officers, agents, servants, employees, attorneys, and affiliated companies, its assigns and successors in interest, and those persons in active concert or participation with them, from continued acts of (1) misappropriation of Teradata's trade secrets, (2) infringement of the Teradata copyrights at issue in this litigation, and (3) violation of antitrust laws;

B.     A permanent injunction prohibiting SAP, its officers, agents, servants, employees, attorneys, and affiliated companies, its assigns and successors in interest, and those persons in active concert or participation with them, from continued acts of (1) misappropriation of Teradata's trade secrets, (2) infringement of the Teradata copyrights at issue in this litigation, and (3) violations of antitrust laws;

C.     Entry of judgment holding SAP liable for infringing the Teradata copyrights at issue in this litigation;

D.     A permanent injunction prohibiting SAP, its officers, agents, servants, employees, attorneys, and affiliated companies, its assigns and successors in interest, and those persons in active concert or participation with them, from disclosing, exploiting, or continuing to utilize Teradata's confidential information relating to Teradata Database, including but not limited to Teradata Database source code;

E.     Entry of judgment holding SAP liable for misappropriating Teradata's trade secrets;

F.     Entry of judgment holding SAP liable for violating the Sherman and Clayton Acts;

G.     An order that all copies made or used in violation of Teradata's copyrights or trade

1    secrets, and all means by which such copies may be reproduced, be impounded and destroyed or

2    otherwise reasonably disposed of;

3         H.      An order awarding damages, together with pre-judgment and post-judgment

4    interest, to compensate Teradata for SAP's copyright infringement and acts of trade secret

5    misappropriation, including actual and exemplary damages and lost profits, or in the alternative

6    for copyright infringement, statutory damages under 17 U.S.C. § 504(c);

7         I.      An order awarding treble damages, along with reasonable attorney's fees, pre-

8    judgment and post-judgment interest, for SAP's violation of the antitrust laws;

9         J.      An order awarding Teradata its costs and attorney's fees; and

10        K.      Any and all other legal and equitable relief as may be available under law and

11   which the court may deem proper.

12                                    **JURY DEMAND**

13        Teradata hereby demands TRIAL BY JURY of all claims and issues presented in this

14   Second Amended Complaint so triable.

15   Dated:    December 21, 2018              MORRISON & FOERSTER LLP

16

17                                           By:   _/s/ Mark Whitaker_____
                                                   Mark Whitaker
18
                                             Attorneys for Plaintiffs
19                                           TERADATA CORPORATION,
                                             TERADATA US, INC., and
20                                           TERADATA OPERATIONS, INC.

21

22

23

24

25

26

27

28

# EXHIBIT 3

[WITHDRAWN]

# EXHIBIT 4

1  Tharan Gregory Lanier (State Bar No. 138784)
   tglanier@JonesDay.com
2  Nathaniel P. Garrett (State Bar No. 248211)
   ngarrett@JonesDay.com
3  Joshua L. Fuchs (*Pro Hac Vice*)
   jlfuchs@JonesDay.com
4  Joseph M. Beauchamp (*Pro Hac Vice*)
   jbeauchamp@jonesday.com
5  JONES DAY
   555 California Street, 26th Floor
6  San Francisco, CA  94104
   Telephone:    +1.415.626.3939
7  Facsimile:    +1.415.875.5700

8  *Attorneys for Defendants*
   *SAP SE, SAP AMERICA, INC., AND SAP*
9  *LABS, LLC*

   Kenneth A. Gallo (*Pro Hac Vice*)
   kgallo@paulweiss.com
   David J. Ball (*Pro Hac Vice*)
   dball@paulweiss.com
   William B. Michael (*Pro Hac Vice*)
   wmichael@paulweiss.com
   Crystal M. Johnson (*Pro Hac Vice*)
   cjohnson@paulweiss.com
   PAUL, WEISS, RIFKIND, WHARTON &
   GARRISON LLP
   2001 K Street NW
   Washington, DC 20006-1047
   Telephone:    +1.202.223.7356
   Facsimile:    +1.202.204.7356

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

TERADATA US, INC.,

    Plaintiff,

and

TERADATA CORPORATION and
TERADATA OPERATIONS, INC.,

    Plaintiffs/Counterclaim-
    Defendants,

    v.

SAP SE,

    Defendant/Counterclaim-
    Plaintiff,

and

SAP AMERICA, INC. and SAP LABS, LLC,

    Defendants.

Case No. 3:18-CV-03670-WHO

**DEFENDANTS' AMENDED
ANSWER TO THE SECOND
AMENDED COMPLAINT;
SAP SE'S COUNTERCLAIMS**

1      Pursuant to Federal Rules of Civil Procedure 8 and 12, Defendants SAP SE, SAP

2  America, Inc., and SAP Labs, LLC (collectively, "SAP") submit this Amended Answer

3  ("Answer") to the Second Amended Complaint ("Complaint") filed by Plaintiffs Teradata Corp.,

4  Teradata US, Inc., and Teradata Operations, Inc. (collectively, "Teradata") on December 21,

5  2018.  Each Defendant answers only those allegations that pertain to it and does so upon

6  personal knowledge and/or upon information and belief.  With respect to allegations concerning

7  other Defendants, each Defendant lacks knowledge and/or information sufficient to answer.

8  Counterclaim-Plaintiff SAP SE additionally states counterclaims against Counterclaim-

9  Defendants, Teradata Corporation and Teradata Operations, Inc., pursuant to Federal Rule of

10 Civil Procedure 13.

11              **GENERAL DENIAL AND ANSWER**

12      SAP denies each of Teradata's claims and in particular denies that it has misappropriated

13 any trade secret, infringed any copyright, or violated any antitrust law.  Unless specifically

14 admitted below, SAP denies each and every allegation in the Complaint.  Where SAP has not

15 had sufficient time and opportunity to collect and review information that may be relevant and

16 necessary to respond to allegations in the Complaint, and where for some other reason SAP lacks

17 knowledge or information sufficient to form a belief about such allegations, SAP on that basis

18 denies them.  SAP reserves the right to take any further positions and raise additional defenses as

19 may become apparent as a result of further information which may be discovered after filing this

20 Answer.

21      Founded in 1972, SAP has long been and remains a leader in the software industry due to

22 innovation and foresight.  SAP launched its first commercial Enterprise Resource Planning

23 ("ERP") application software shortly after it was founded.  Over the past half century, SAP has

24 consistently developed, improved, and expanded upon its ERP application product line to

25 maintain its position as a trusted business software provider for large and small companies alike.

26      SAP's long history of innovation is demonstrated by, among other things, its extensive

27 patent portfolio covering numerous technologies related to this case.  Many of SAP SE's patents

28 reflect pioneering developments in the same technical areas identified in Teradata's purported

trade secret list, although for SAP inventions made long before the Bridge Project at issue in this case. Contrary to Teradata's allegations, SAP has its own intellectual property in the areas of parallel processing of queries, data compression, efficient information handling, and optimization of queries and analysis, including, for example, U.S. Patents Nos. 9,626,421; 8,214,321; 7,421,437; 7,617,179; and 7,437,516. As alleged in SAP SE's counterclaims, and based on publicly-available information, Teradata's current products (including those based on Teradata's acquisition of a former SAP partner called New Frontiers) infringe at least five SAP SE patents. As will be seen, Teradata has infringed SAP SE's patents in a failed effort to compete in the modern marketplace.

Long before the SAP-Teradata "Bridge Project" commenced in 2008–2009, SAP had already begun expanding its products beyond ERP applications and into databases. In 1997 SAP acquired MaxDB, a transactional database vastly different from Teradata's so-called "EDAW" products. MaxDB has been an SAP database product for 20 years and it was this previously-existing MaxDB product that SAP used to develop the "bridge" between SAP's Business Warehouse ("BW") and Teradata's database during the Bridge Project. Around 2003, SAP began developing Business Warehouse Accelerator ("BWA"), an in-memory accelerator for processing database queries, using SAP's own in-house-developed TREX search engine. In 2005, SAP acquired Transact in Memory, Inc., a South Korea-based startup company that had developed its own innovative in-memory column-storage transactional database called P*TIME—another product unlike Teradata's EDAW database products.

Before the Bridge Project, SAP saw the utility of an in-memory database that could simultaneously perform both transactions and analytics, and SAP's developers began working wholly independently of Teradata to bring that innovative idea to life by combining the technologies of P*TIME and BWA into what became SAP's "HANA" software. HANA's in-memory architecture is entirely different from the architecture used by Teradata at the time of the Bridge Project. HANA executes queries in-memory and avoids the massive replication of data required by Teradata's then-existing products based on decades-old technology.

1    As time passed, the cost of memory decreased and the number of HANA customers

2    increased.  With the rising success of HANA, SAP took the next logical step—independently

3    developing its "S/4HANA" software by redesigning its industry-leading ERP application suite of

4    products to be completely integrated with HANA.  This procompetitive product development

5    allowed customers to fully take advantage of HANA's functionality and technological features

6    while running SAP's ERP application suite.

7    Teradata's allegations that SAP needed and lured Teradata into disclosing its intellectual

8    property are meritless.  At the time of the Bridge Project, Teradata primarily sold databases

9    stored on hard drives that support the operation of separate analytics applications, not integrated

10   applications as in S/4HANA.  Indeed, because SAP's customers significantly outnumbered

11   Teradata's customers, it was Teradata that repeatedly sought to become one of SAP's officially

12   supported database providers.  After SAP purchased a third-party company called Business

13   Objects, SAP agreed to invest the work needed to support Teradata as a database provider for

14   SAP's BW product only (not all ERP applications), in return for Teradata's agreement to market

15   and resell Business Object software to Teradata's customers.  As a result, in 2008–2009,

16   Teradata and SAP embarked on a short-term, limited collaboration to build a "bridge" between

17   Teradata's database and SAP's BW application, allowing communication between the two

18   despite their vastly different architectures.  Even with the efforts of the parties, only one

19   customer used the joint offering.

20   On information and belief, it was Teradata that used the Bridge Project to gain access to

21   SAP's technology.  For example, Teradata wanted to use SAP's data migration technology so

22   that Teradata could extract, transform, and load ("ETL") SAP data into Teradata Database.  After

23   the Bridge Project concluded, Teradata acquired a former SAP partner called New Frontiers and,

24   through information obtained from Teradata's acquisition of New Frontiers, continued to use

25   SAP's ETL technology in violation of SAP's intellectual property rights.  As alleged in SAP's

26   counterclaims below, Teradata is infringing SAP's U.S. Patent No. 8,214,321 concerning

27   mapping database tables and online analytical processing cubes.

28

1    SAP's independently-developed HANA is a fast, revolutionary database that is

2    successfully competing against product offerings from Teradata, Oracle, IBM, Microsoft, and

3    others.  S/4HANA is a hugely successful complete customer solution with transaction services

4    (such as ERP software) and analytical services all integrated into one system.  HANA and

5    S/4HANA are built on an entirely different architecture than Teradata, and were not developed

6    using any trade secrets or copyrights belonging to Teradata.  HANA and S/4HANA are the

7    procompetitive fruits of SAP's own investment, innovation, and independent development.

8    Teradata has not been able to compete effectively with S/4HANA because Teradata

9    focuses on its flagship analytical database and has failed to offer innovative and relevant

10   compelling products.  Having fallen behind, Teradata has now elected to sue SAP, making time-

11   barred and conclusory claims for theft of trade secrets and copyright violations related to the

12   parties' unsuccessful collaboration nearly a decade ago that are defeated by the contracts

13   governing that collaboration.  Teradata also has tacked on antitrust allegations that fail to state a

14   claim for tying or attempted monopolization and fail to plausibly allege anticompetitive effects

15   in any properly defined antitrust market.  But it is Teradata that is improperly attempting to use

16   its meritless claims in this lawsuit to impede fair competition.

17   Teradata did not file this lawsuit until 2018 even though, according to Teradata's own

18   Complaint, the Bridge Project ended in 2011, SAP's annual HANA revenues exceeded $1 billion

19   by 2013, and the *Der Spiegel* article referred to in Teradata's Complaint was published in 2015.

20   Moreover, before filing this lawsuit, Teradata never made any effort to raise or discuss its

21   alleged concerns with SAP.

22   On information and belief, the real reason Teradata brought this lawsuit is because

23   Teradata knows that its technology is outdated and that Teradata cannot win a fair competitive

24   fight against SAP and the many other strong competitors in today's marketplace, including not

25   only Oracle, IBM, and Microsoft but also relative newcomers such as Greenplum and Amazon.

26   **RESPONSE TO ALLEGATIONS REGARDING "THE NATURE OF THE ACTION"**

27       1.    SAP denies the allegations in Paragraph 1.

28

1    2.    SAP admits that it provided Teradata notice of termination, pursuant to Section

2    13.1 of the Software Development Cooperation Agreement with Teradata, by letter dated August

3    19, 2011, and that Teradata responded with a letter acknowledging the termination on November

4    9, 2011.  SAP denies the remaining allegations in Paragraph 2.

5    3.    SAP denies the allegations in Paragraph 3.

6    **RESPONSE TO ALLEGATIONS REGARDING "PARTIES"**

7    4.    SAP lacks knowledge or information sufficient to form a belief about the truth of

8    the allegations in Paragraph 4, and on that basis denies them.

9    5.    SAP lacks knowledge or information sufficient to form a belief about the truth of

10   the allegations in Paragraph 5, and on that basis denies them.

11   6.    SAP lacks knowledge or information sufficient to form a belief about the truth of

12   the allegations in Paragraph 6, and on that basis denies them.

13   7.    SAP admits the allegations in Paragraph 7.

14   8.    SAP admits the allegations in Paragraph 8.

15   9.    SAP admits the allegations in the first, second and fourth sentences of Paragraph

16   9.  In response to the allegations in the third sentence of Paragraph 9, SAP admits that there was

17   a Teradata installation at SAP's COIL facility for testing of Teradata Foundation.  SAP denies

18   the remaining allegations in Paragraph 9.

19   **RESPONSE TO ALLEGATIONS REGARDING "JURISDICTION"**

20   10.   SAP admits the allegations in Paragraph 10.

21   11.   SAP does not contest personal jurisdiction over any Defendant and thus, for

22   purposes of this lawsuit only, does not contest the allegations in the first and sixth sentences of

23   Paragraph 11.  SAP denies the remaining allegations in Paragraph 11.

24   12.   SAP America does not contest personal jurisdiction and thus, for purposes of this

25   lawsuit only, does not contest the allegations in the second and third sentences of Paragraph 12.

26   SAP denies the remaining allegations in Paragraph 12.

27

28

13.    SAP Labs does not contest personal jurisdiction and thus, for purposes of this lawsuit only, does not contest the allegations in the first sentence of Paragraph 13.  SAP denies the remaining allegations in Paragraph 13.

## RESPONSE TO ALLEGATIONS REGARDING "VENUE AND INTRADISTRICT ASSIGNMENT"

14.    SAP does not contest venue and thus, for purposes of this lawsuit only, does not contest the allegations in Paragraph 14.

15.    SAP admits the allegations in Paragraph 15.

## RESPONSE TO ALLEGATIONS REGARDING "BACKGROUND"

16.    In response to the allegations in the first and second sentences of Paragraph 16, SAP admits that Teradata Database is Teradata's primary product, that it is an analytic RDBMS database with a parallel hardware disk-drive-based design that Teradata refers to as "massively parallel processing" or "MPP," and that it was designed for so-called "EDAW" or EDW applications.  In response to the allegations in the third through fifth sentences of Paragraph 16, SAP admits that these sentences generally describe some aspects of data warehousing applications, but SAP denies that these sentences provide support for any purported technological advantage of Teradata's products.  SAP denies that Teradata's products are based on work before or contemporaneous with the Bridge Project, given that, SAP is informed and believes, many of Teradata's products contain or rely on technology acquired by Teradata when it bought New Frontiers after the Bridge Project ended.  SAP denies the remaining allegations in Paragraph 16.

17.    SAP lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 17, and on that basis denies them.

18.    SAP lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 18, and on that basis denies them.

19.    SAP lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 19, and on that basis denies them.

20.    SAP admits the allegations in the second and third sentences of Paragraph 20 insofar as they allege that U.S. Patent No. 4,412,285 was issued to Teradata more than three

- 6 -

1    decades ago and that U.S. Patent No. 5,640,584 was issued to Teradata more than two decades

2    ago. Both patents have expired. SAP denies the allegations in the last sentence of Paragraph 20.

3    SAP lacks knowledge or information sufficient to form a belief about the truth of the allegations

4    in the remainder of Paragraph 20, and on that basis denies them.

5           21.    In response to the allegations in Paragraph 21, SAP denies that Teradata could be

6    considered to be a continuing pioneer innovator or considered as a gold standard by current

7    customers for database functionality in any market in which SAP competes. SAP lacks

8    knowledge or information sufficient to form a belief about the truth of the remaining allegations

9    in Paragraph 21, and on that basis denies them.

10          22.    SAP lacks knowledge or information sufficient to form a belief about the truth of

11   the allegations in Paragraph 22, and on that basis denies them.

12          23.    SAP lacks knowledge or information sufficient to form a belief about the truth of

13   the allegations in Paragraph 23, and on that basis denies them.

14          24.    SAP lacks knowledge or information sufficient to form a belief about the truth of

15   the allegations in Paragraph 24, and on that basis denies them.

16          25.    In response to the allegations in Paragraph 25, SAP denies that Teradata's

17   allegedly proprietary data-analytics techniques are not known outside the company except under

18   strict duties of non-disclosure. SAP lacks knowledge or information sufficient to form a belief

19   about the truth of the remaining allegations in Paragraph 25, and on that basis denies them.

20          26.    SAP lacks knowledge or information sufficient to form a belief about the truth of

21   the allegations in Paragraph 26, and on that basis denies them.

22          27.    In response to the allegations in Paragraph 27, SAP denies that Teradata "strictly

23   limit[s]" the use and disclosure of Teradata's alleged confidential information. SAP admits that

24   SAP and Teradata entered into contracts, including Mutual Non-Disclosure Agreements

25   ("MNDAs") executed in 2008 and 2009, defining the requirements for disclosure and protection

26   of any confidential information exchanged during the Bridge Project and the parties' rights with

27   respect to such information, including the receiving party's right to use "Feedback." For

28   example, section 7 of the 2008 MNDA defines "Company Feedback" as including "input

- 7 -

Defs.' Amended Answer & SAP SE's Counterclaims 3:18-CV-03670-WHO

regarding SAP's Software, products, services, business or technology plans, including, without limitation, comments or suggestions regarding the possible creation, modification, correction, improvement or enhancement of SAP Software, products and/or services," and provides:  "In order for SAP to utilize such Company Feedback, Company [Teradata] grants to SAP a non-exclusive, perpetual, irrevocable, worldwide, royalty-free license, with the right to sublicense to SAP's licensees and customers, under all relevant Company intellectual property rights, to use, publish and disclose such Company Feedback in any manner SAP chooses and to display, perform, copy, make, have made, use, sell, and otherwise dispose of SAP's and its sublicensee's products or services embodying Company Feedback in any manner and via any media SAP chooses, without reference to the source.  SAP shall be entitled to use Company Feedback for any purposes without restriction or remuneration of any kind with respect to Company and/or its representatives."  SAP lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 27, and on that basis denies them.

28.     In response to the allegations in Paragraph 28, SAP admits that SAP and Teradata entered into contracts, including Mutual Non-Disclosure Agreements ("MNDAs") executed in 2008 and 2009, defining the requirements for disclosure and protection of any confidential information exchanged during the Bridge Project and the parties' rights with respect to such information, including the receiving party's right to use "Feedback."  SAP lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 28, and on that basis denies them.

29.     In response to the allegations in Paragraph 29, SAP admits that Teradata applied for certain copyright registrations the same day it filed this lawsuit in June 2018, and that Teradata has since received copyright registration numbers TXu 2-091-493, TXu 2-091-495, TXu 2-091-496, TXu 2-091-497, TXu 2-091-498, TXu 2-091-500, and TXu 2-091-501.  SAP lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 29, and on that basis denies them.

30.     In response to the allegations in the first through third sentences of Paragraph 30, SAP admits that it has long provided Enterprise Resource Planning ("ERP") applications

1   software that allows companies to gather and manage data across many aspects of business

2   enterprise, but denies that Teradata has properly defined a so-called "Top-Tier ERP Applications

3   Market," and denies that SAP is "dominant" in any properly-defined market in which Teradata

4   competes.  In response to the allegations in the fourth through sixth sentences of Paragraph 30,

5   SAP admits that they generally describe some aspects of relational and transactional databases

6   and some examples of such databases.  SAP denies the remaining allegations in Paragraph 30.

7          31.    In response to the allegations in Paragraph 31, SAP admits that it developed and

8   sold both ERP applications software and business intelligence tools for years before the

9   inception of the Bridge Project but denies that SAP's product offerings were limited to these

10  categories.  SAP lacks knowledge or information sufficient to form a belief about the truth of any

11  allegations regarding Teradata's "traditional" focus in its development activities, and on that

12  basis denies them.  SAP denies that Teradata has properly defined a so-called "Top-Tier ERP

13  Applications Market" or "EDAW Market"; SAP denies that its customers have ever been "fully

14  reliant" on Teradata; and SAP denies the allegations in the third sentence of Paragraph 31.  With

15  respect to the last sentence of Paragraph 31, SAP admits that SAP and Teradata entered into the

16  Bridge Project in 2008, and SAP admits that the functionality to be developed in the Bridge

17  Project was a "bridge," using SAP's MaxDB database software, between SAP's data

18  warehousing (Business Warehouse or "BW") software and Teradata's database software.  SAP

19  denies that either party's motivation in entering the Bridge Project was to recognize synergies.

20  SAP denies that the Bridge Project extended to any SAP software other than BW or that it was a

21  legal partnership or joint venture between SAP and Teradata.  SAP denies the remaining

22  allegations in Paragraph 31.

23         32.    SAP denies the allegations in the first sentence of Paragraph 32.  SAP admits that

24  the parties entered into mutual non-disclosure agreements ("MNDAs") in 2008 and 2009 and

25  that the MNDAs contain the phrases quoted in the third sentence of Paragraph 32, but denies any

26  implication that Teradata actually provided any confidential or proprietary information to SAP

27  during the Bridge Project, or that Teradata complied with the MNDA requirements that

28  confidential or proprietary information exchanged between the parties be designated as such and

1    protect only information so designated. SAP admits that, on February 27, 2009, SAP and

2    Teradata entered into the Software Development Cooperation Agreement ("SDCA") and

3    Technology Partner Agreement ("TPA") governing the Bridge Project and that both agreements

4    contained provisions regarding reverse engineering and referred to the 2008 MNDA for their

5    confidentiality terms. SAP denies the remaining allegations in Paragraph 32.

6        33.    SAP denies the allegations in the first sentence of Paragraph 33. Answering

7    further, on information and belief, it was Teradata's desire to ensure fast and efficient

8    interoperation between SAP's systems and Teradata Database that motivated Teradata to enter

9    into the Bridge Project to gain access to SAP's data migration technology so that Teradata could

10   extract, transform, and load ("ETL") SAP data into Teradata Database. After the Bridge Project

11   concluded, Teradata continued to use SAP's ETL technology in violation of SAP's intellectual

12   property rights. In response to the remaining allegations in Paragraph 33, SAP admits that the

13   Bridge Project was governed by contracts, including Mutual Non-Disclosure Agreements

14   ("MNDAs") executed in 2008 and 2009, but denies that those contracts limited all use of all

15   confidential information shared; to the contrary, the contracts expressly provided SAP broad

16   rights to "Feedback," "Input," "Newly Developed Materials" and "SAP Related Developments"

17   that go beyond the scope of the Bridge Project and defeat Teradata's claims. An exemplary

18   provision regarding "Feedback" is quoted in the answer to Paragraph 27 above. Section 1.6 of

19   the SDCA defines "Input" to include "suggestions, comments, and feedback (whether in oral or

20   written form), including any included ideas and know-how, voluntarily provided by one Party to

21   the other Party with respect to the work performed under this Agreement," and section 9.4 of the

22   SDCA provides SAP with "a worldwide, nonexclusive, royalty-free fully paid up, perpetual and

23   irrevocable license to use, reproduce, display, distribute, create derivative works, or sublicense

24   any Input submitted by Partner [Teradata] to SAP," including "to display, reproduce, disclose,

25   import, export, distribute, license, offer to sell and sell copies of that Input (and derivative words

26   thereof) as part of any SAP product," and provides: "To the extent that any such Input is

27   incorporated into an SAP product, any inherent disclosure of Confidential and/or trade secret

28   Information of Partner through the exercise of the license grants set forth in this Section 9.4 shall

DEFS.' AMENDED ANSWER & SAP SE's COUNTERCLAIMS 3:18-CV-03670-WHO

1   not constitute a breach of this Agreement including, but not limited to, any agreement between

2   the Parties with respect to such Confidential or trade secret information referenced herein."

3   Section 1.8 of the SDCA defines "Newly Developed Materials" to include "any software,

4   systems, tools, data, specifications, documentation or other material developed by SAP and/or

5   Partner [Teradata] in connection with or as a result of a party's interaction with the other party

6   within the context of this Agreement," and section 10.3 provides:  "Except to the extent

7   otherwise provided for elsewhere in this Agreement, any and all Intellectual Property Rights to

8   or arising out of any Newly Developed Materials shall belong to SAP."  Section 8.5 of the TPA

9   provides that "with respect to any developments created under this Agreement that primarily

10  relate to the SAP Software ('SAP Related Developments'), any and all Intellectual Property

11  Rights in such SAP Related Developments shall be owned by SAP."  SAP also denies that

12  Teradata shared any purported trade secrets or proprietary techniques with SAP; SAP denies that

13  any such trade secrets or techniques were used in the Bridge Project; and SAP denies that

14  Teradata has properly defined a so-called "Top-Tier ERP Applications" market or that such a

15  market exists.  SAP admits that the name of the bridge software product was Teradata

16  Foundation and that it functioned as a bridge, using SAP's MaxDB database software, between

17  SAP's BW (Business Warehouse) software and Teradata's analytical database.  SAP admits that

18  one customer—Levi Strauss & Co.—licensed Teradata Foundation.  SAP denies that there was

19  demand for the Teradata Foundation among other SAP customers.  SAP lacks knowledge or

20  information sufficient to form a belief about the truth of the allegations in the last sentence of

21  Paragraph 33 regarding Teradata's alleged evaluation of business opportunities and projections,

22  and on that basis denies them.  SAP denies the remaining allegations in Paragraph 33.

23          34.     SAP denies the allegations in Paragraph 34, and denies that Paragraph 34 or the

24  list in sealed Exhibit A to Teradata's Complaint (or any subsequent versions) identifies

25  Teradata's purported trade secrets with reasonable particularity or that any identified items are or

26  were Teradata's Trade Secrets or meet the legal standard for trade secret protection.

27          35.     In response to the allegations in Paragraph 35, on information and belief, SAP

28  denies that Teradata provided SAP access to Orange Books containing any Teradata trade secret

1    information. SAP also denies that Teradata's generic references to Orange Books identify any

2    purported trade secrets with reasonable particularity. SAP lacks knowledge or information

3    sufficient to form a belief about the truth of the remaining allegations in Paragraph 35, and on

4    that basis denies them.

5        36.    In response to the allegations in Paragraph 36, on information and belief, SAP

6    denies that Teradata provided SAP access to Orange Books containing any Teradata trade secret

7    information. SAP also denies that Teradata's generic references to Orange Books identify any

8    purported trade secrets with reasonable particularity. SAP lacks knowledge or information

9    sufficient to form a belief about the truth of the remaining allegations in Paragraph 36, and on

10   that basis denies them.

11       37.    SAP denies the allegations in Paragraph 37.

12       38.    In response to the allegations in Paragraph 38, SAP admits that SAP and Teradata

13   collaborated during the Bridge Project and that the Bridge Project was governed by the MNDAs,

14   SDCA and TPA identified in Paragraph 32 of the Complaint. SAP denies the remaining

15   allegations in Paragraph 38.

16       39.    In response to the allegations in Paragraph 39, SAP admits that it collaborated

17   with Teradata during the Bridge Project to develop the Teradata Foundation, including by

18   working together to reduce inefficiencies and other deficiencies. SAP denies that Teradata's

19   Complaint identifies any purported trade secret with reasonable particularity, and denies that

20   Teradata provided any proprietary, confidential, or trade secret information to SAP. Contrary to

21   Teradata's allegations, SAP has its own intellectual property in the areas of parallel processing of

22   queries, data compression, efficient information handling, and optimization of queries and

23   analysis, including, for example, U.S. Patents Nos. 9,626,421; 8,214,321; 7,421,437; 7,617,179;

24   and 7,437,516, which predate the Bridge Project. SAP denies the remaining allegations in

25   Paragraph 39.

26       40.    In response to the allegations in Paragraph 40, SAP denies that Teradata provided

27   any so-called protected intellectual property to SAP during the Bridge Project. SAP admits that

28   SAP and Teradata made training presentations to each other regarding their respective products,

1    but the training Teradata provided consisted of the same high-level, non-proprietary, non-

2    confidential, non-trade secret information that Teradata made publicly available. SAP admits

3    that Teradata installed a Teradata database system at SAP's COIL facility used in testing the

4    SAP-Teradata bridge. SAP also admits that its developers, like the general public, had access to

5    Teradata Express trial software, but denies that this represented special treatment; Teradata made

6    Teradata Express freely available on its website to anyone who clicked through on its standard

7    end-user license. SAP denies the allegations in the last sentence of Paragraph 40 as inconsistent

8    with the terms of Teradata's standard end-user license, the MNDAs, the SDCA and the TPA,

9    which authorized lawful reverse engineering and thus authorized reverse engineering for

10   interoperability. SAP denies that it ever had access to Teradata's source code or reverse

11   engineered any Teradata software. SAP denies the remaining allegations in Paragraph 40.

12          41.    In response to the allegations in Paragraph 41, SAP admits that SAP co-founder

13   Hasso Plattner and then-CTO Dr. Vishal Sikka were involved in the conception and development

14   of HANA. SAP denies Teradata's characterization of the announcement and denies the

15   remaining allegations in Paragraph 41.

16          42.    In response to the allegations in Paragraph 42, SAP admits that Dr. Sikka

17   announced HANA developments at the SAPPHIRE conference in 2011. On information and

18   belief, Teradata was aware of each of these developments at the time. SAP further admits that

19   HANA has an in-memory design that can use many CPUs (central processing units) but denies

20   that HANA's in-memory, hybrid row- and column-storage, transactional and analytic database

21   design using parallel CPUs owes anything to Teradata's disk-drive-based, row-storage, analytical

22   database design from the time of the Bridge Project or any other database design from Teradata

23   from the time of the Bridge Project. SAP denies the remaining allegations in Paragraph 42.

24          43.    In response to the allegations in Paragraph 43, SAP admits that it sent Teradata

25   notice of termination, pursuant to Section 13.1 of the SDCA, on August 19, 2011, and that

26   Teradata responded with a letter acknowledging the termination on November 9, 2011. SAP

27   denies that it stopped supporting Teradata Foundation's one customer in 2011. SAP admits that

28   in 2011 it announced SAP NetWeaver BW Powered by SAP HANA, a product allowing

1  customers to run BW on SAP HANA as a fully functioning in-memory database, but SAP denies

2  that SAP NetWeaver BW Powered by SAP HANA was intended to achieve the same thing as

3  Teradata Foundation.  SAP denies the remaining allegations in Paragraph 43.

4       44.    SAP denies the allegations in the first sentence of Paragraph 44.  SAP admits that

5  HANA has achieved significant revenues.  SAP denies that it engaged in any anticompetitive

6  conduct and denies that HANA's success was the result of anticompetitive conduct.  SAP admits

7  that Dr. Sikka was one of the creators of HANA and received recognition for this

8  accomplishment.  SAP denies the remaining allegations in Paragraph 44.

9       45.    In response to the allegations in Paragraph 45, SAP denies that Teradata has

10  properly defined a so-called "Top-Tier ERP Applications Market" or "EDAW Market."  SAP

11  admits that HANA is both a transactional and an analytic in-memory database but denies that it

12  owes anything to the Teradata Foundation software developed in the Bridge Project.  SAP denies

13  the remaining allegations in Paragraph 45.

14       46.    SAP denies the allegations in Paragraph 46.

15       47.    SAP denies the allegations in Paragraph 47.

16       48.    In response to the allegations in Paragraph 48, SAP admits that some SAP

17  engineers who had worked on the Bridge Project also worked on HANA and that some former

18  Teradata employees who were subsequently hired by SAP worked on HANA.  SAP denies that it

19  engaged in "repurposing" of any purported Teradata trade secrets or confidential information;

20  SAP denies that it made staffing decisions so that anything learned during the Bridge Project

21  could be used in HANA development; SAP denies that any SAP employee used any purported

22  Teradata confidential or trade secret information, including any such information learned during

23  the Bridge Project or during employment by Teradata, to develop HANA; SAP denies that the

24  contracts governing the Bridge Project limited use of any such information provided to use for

25  the Bridge Project; SAP denies that any SAP employees who formerly worked at Teradata have

26  used any confidential or trade secret Teradata information during their SAP employment; and on

27  information and belief SAP denies that Teradata lacked knowledge at the time when former

28  Teradata employees joined SAP.  SAP lacks knowledge or information sufficient to form a belief

1    about the truth of the allegation in the last sentence of Paragraph 48, and therefore denies that

2    allegation.  SAP denies the remaining allegations in Paragraph 48.

3        49.    In response to the first sentence of Paragraph 49, SAP denies that it infringed

4    Teradata's allegedly copyrighted software or committed any act of copyright infringement

5    whatsoever.  SAP denies reverse engineering Teradata's software and SAP denies violating

6    Teradata's end-user license.  SAP lacks knowledge or information sufficient to form a belief

7    whether Teradata Express is a fully functional copy of Teradata Database or whether Teradata

8    Express contains any matter subject to copyright, and on that basis denies those allegations.  SAP

9    denies the remaining allegations in Paragraph 49.

10        50.    In response to the allegations in Paragraph 50, SAP admits that the German

11    magazine *Der Spiegel* published an article, dated September 4, 2015, reporting that an unnamed

12    SAP auditor had made allegations that SAP had purportedly misappropriated intellectual

13    property but denies that the selective description in Paragraph 50 accurately conveys the article.

14    SAP denies the auditor's allegations and denies that the *Der Spiegel* article endorsed those

15    allegations.  SAP denies the remaining allegations in Paragraph 50.

16        51.    In response to the allegations in the first sentence of Paragraph 51, SAP admits

17    that the *Der Spiegel* article can be loosely translated from the German language using the words

18    quoted but denies that these selective quotations accurately convey the article.  In response to the

19    second and third sentences of Paragraph 51, SAP admits that the *Der Spiegel* article reported that

20    the auditor conducted interviews with SAP developers who worked on the Bridge Project and

21    that SAP's attorneys terminated their investigation in May 2013.  SAP denies the auditor's

22    allegations and denies that the *Der Spiegel* article endorsed those allegations.

23        52.    In response to the first two sentences in Paragraph 52, SAP admits that the auditor

24    sent an email in January 2014 to SAP's supervisory board claiming that SAP improperly used

25    the intellectual property of competitors in its HANA product and that SAP terminated the auditor

26    on February 12, 2014.  SAP denies Teradata's suggestion of an implicit causal relationship of the

27    two events and denies the auditor's allegations.  In response to the last sentence of Paragraph 52,

28    SAP denies that it has stolen any of Teradata's purported intellectual property whatsoever, and

1    SAP denies that the auditor has knowledge or information regarding any such alleged theft.  SAP

2    denies the remaining allegations in Paragraph 52.

3        53.    In response to the allegations in Paragraph 53, SAP admits that Dr. Sikka left SAP

4    in May 2014 in order to become the CEO and Managing Director of Infosys Ltd., India's second-

5    largest IT services exporter, a position he held until August 2017.  SAP denies the remaining

6    allegations in Paragraph 53.

7        54.    SAP denies the first sentence of Paragraph 54.  SAP lacks knowledge or

8    information sufficient to form a belief about the truth of the allegations in the remaining

9    sentences of Paragraph 54 about when Teradata actually began its alleged "investigation" and

10   what Teradata allegedly learned, and on that basis denies them.  SAP denies the remaining

11   allegations in Paragraph 54.

12       55.    In response to the allegations in Paragraph 55, SAP denies that it stole any

13   purported Teradata trade secrets or incorporated or used them in HANA; SAP denies that it spent

14   "mere months" developing HANA; SAP denies that it entered into the Bridge Project under false

15   pretenses; and SAP denies that it has engaged in any misuse.  Answering further, it was Teradata

16   that needed access to ETL technology so that Teradata could migrate SAP data into Teradata

17   Database; it was Teradata that, on information and belief, entered into the Bridge Project with

18   this purpose; it was Teradata that, after the conclusion of the Bridge Project, acquired a company

19   called New Frontiers, itself a former SAP partner, that had ETL technology and renamed the

20   technology "Teradata Analytics for SAP Solutions"; and it is Teradata that infringes SAP's

21   intellectual property rights using Teradata Analytics for SAP Solutions.  SAP lacks information

22   or knowledge to form a belief about the truth of Teradata's allegations relating to its opinions,

23   and on that basis denies them.  SAP denies the remaining allegations in Paragraph 55.

24       56.    SAP denies the allegations in Paragraph 56.

25       57.    SAP denies the allegations in the first sentence of Paragraph 57 and denies that it

26   has engaged in any unlawful use of any purported Teradata IP or anticompetitive conduct

27   whatsoever.  SAP admits the allegations regarding HANA's success in the remaining sentences

28   of Paragraph 57, and notes that they further illustrate that Teradata had notice of HANA's

1    success and Teradata's alleged claims years before the *Der Spiegel* article was published in

2    2015.

3          58.    SAP denies the allegations in Paragraph 58.

4          59.    SAP denies the allegations in Paragraph 59.

5          60.    SAP denies the allegations in Paragraph 60.

6          61.    SAP denies the allegations in Paragraph 61.

7          62.    SAP denies the allegations in Paragraph 62.

8          63.    SAP denies the allegations in Paragraph 63.

9          64.    SAP denies the allegations in Paragraph 64.

10          65.    SAP denies the allegations in Paragraph 65.

11          66.    SAP admits the allegations in Paragraph 66.

12          67.    SAP lacks knowledge or information sufficient to form a belief about the truth

13    of the allegations in Paragraph 67 regarding whether customers would characterize implementation

14    costs as "extensive" and "major" and on that basis denies them.

15          68.    In response to the allegations in Paragraph 68, SAP admits that changing to a new

16    provider of ERP applications can take months or years, but denies any implications added by the

17    word "Accordingly" and denies that Teradata has properly defined any market for so-called

18    "Top-Tier Applications providers."  SAP denies the remaining allegations in Paragraph 68.

19          69.    SAP denies the allegations in Paragraph 69.

20          70.    In response to the allegations in Paragraph 70, SAP denies that Teradata has

21    properly defined a so-called "Top-Tier ERP Applications Market" and SAP denies that it holds a

22    "dominant position" in any market.  SAP admits that Oracle makes significant sales of ERP

23    applications to large and sophisticated customers and that Teradata does not.  SAP lacks

24    knowledge or information sufficient to form a belief about the truth of the allegations in

25    Paragraph 70 regarding market share or alleged industry research and on that basis denies them.

26    SAP denies the remaining allegations in Paragraph 70.

27          71.    SAP denies the allegations in Paragraph 71.

28          72.    SAP denies the allegations in Paragraph 72.

73.    SAP denies the allegations in the last sentence of Paragraph 73.  SAP admits the allegations in the second sentence of Paragraph 73, but notes the extraction, separate warehousing, and extensive replication of customer data relied on by Teradata Database is rendered potentially unnecessary using HANA.  SAP lacks knowledge or information sufficient to form a belief about the truth of the allegations in the first sentence of Paragraph 73 regarding Teradata's motivations in designing its products and on that basis denies them.  SAP denies the remaining allegations in Paragraph 73.

74.    SAP lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 74, and on that basis denies them.

75.    In response to the allegations in Paragraph 75, SAP admits that some of its customers use EDAW products for the analysis of data.  SAP denies the remaining allegations in Paragraph 75.

76.    In response to the allegations in Paragraph 76, SAP admits that HANA is both a transactional and analytic database, that S/4HANA includes both ERP and data warehousing applications, and that SAP's customers remain free to use HANA as a data source for third-party software including Teradata Database.  SAP denies that Teradata has properly defined an "EDAW Market" within SAP's "Top-Tier Applications customer base."  SAP also denies that Teradata Database's decades-old hardware disk-drive based architecture offers unique performance benefits in today's marketplace.  SAP lacks knowledge or information sufficient to form a belief about the truth of the allegations in the second sentence of Paragraph 76 regarding Teradata's purpose in designing Teradata Database, and on that basis denies them.  SAP denies the remaining allegations in Paragraph 76.

77.    With the exception of the vague references to allegations made "above" and to "substantial" investments and "significant" development work, SAP admits the allegations in Paragraph 77.

78.    In response to the allegations in Paragraph 78, SAP admits that Teradata Database is a back-end system dependent on other data sources but denies the remaining allegations in Paragraph 78.

1    79.    SAP denies the allegations in Paragraph 79.

2    80.    SAP denies the allegations in the second sentence of Paragraph 80. In response to

3    the allegations in the first and third sentences of Paragraph 80, SAP admits that its customers are

4    and always have been free to choose third-party data-warehousing products and its customers

5    have always been able to transfer data from SAP ERP applications into those products. SAP

6    denies any implication that this has changed or that SAP is restricting its customers' freedom of

7    choice in any way.

8    81.    In response to the allegations in Paragraph 81, SAP admits that its customers are

9    and always have been free to choose among SAP and third-party ERP and data-warehousing

10   products and that many of its customers of ERP applications would run them on Oracle, IBM, or

11   Microsoft transactional databases. SAP denies that "a very high percentage" of its ERP

12   customers were also Teradata customers. SAP denies the remaining allegations in Paragraph 81.

13   82.    SAP lacks knowledge or information sufficient to form a belief about the truth of

14   the allegations in Paragraph 82, and on that basis denies them.

15   83.    SAP denies the allegations in Paragraph 83.

16   84.    In response to the allegations in the first sentence of Paragraph 84, SAP admits

17   that its customers are and always have been free to choose third-party transactional database and

18   data-warehousing products. SAP denies any implication that this has changed or that SAP is

19   restricting its customers' freedom of choice in any way. SAP lacks knowledge or information

20   sufficient to form a belief about the truth of the allegations in the second sentence of Paragraph

21   84 and on that basis denies them, but SAP observes that Teradata's assertion in Paragraph 84 that

22   it "did not actively attempt to integrate with HANA during this time period" appears inconsistent

23   with its allegations in Paragraph 82 of the Complaint.

24   85.    SAP lacks knowledge or information sufficient to form a belief about the truth of

25   the allegations in the first sentence of Paragraph 85, and on that basis denies them. In response

26   to the allegations in the second sentence of Paragraph 85, SAP admits that its customers are and

27   always have been free to choose third-party data warehousing products. SAP denies any

28

1  implication that this has changed or that SAP is restricting its customers' freedom of choice in
2  any way.

3       86.    SAP denies the allegations in Paragraph 86.

4       87.    SAP lacks knowledge or information sufficient to form a belief about the truth of
5  the allegations in the second sentence of Paragraph 87, and on that basis denies them.  SAP
6  denies the allegations in the first sentence of Paragraph 87.

7       88.    SAP denies the allegations in Paragraph 88.

8       89.    In response to the allegations in Paragraph 89, although SAP does not know the
9  source of the partial quotes that Teradata references in the third sentence of Paragraph 89, the
10  content appears consistent with SAP's marketing of S/4HANA, and so SAP admits the
11  allegations in the third sentence.  SAP also admits the allegations in the second sentence.  SAP
12  denies the allegations in the first, fourth and fifth sentences of Paragraph 89.

13       90.    In response to the allegations in Paragraph 90, SAP admits that S/4HANA
14  combines ERP applications and HANA.  SAP denies the remaining allegations in Paragraph 90.

15       91.    SAP denies the allegations in Paragraph 91.

16       92.    In response to the allegations in Paragraph 92, SAP admits that it announced in
17  October 2014 that it would prolong mainstream maintenance until the end of 2025 on SAP
18  Business Suite 7 core application releases and SAP Business Suite powered by SAP HANA
19  2013.  SAP denies that this eleven-year window deprived its customers of effective choice.  SAP
20  denies the remaining allegations in Paragraph 92.

21       93.    In response to the allegations in Paragraph 93, SAP admits the second sentence
22  and SAP admits that it did not previously and still does not condition use of ERP applications on
23  HANA.  SAP denies the remaining allegations in Paragraph 93.

24       94.    SAP denies the allegations in Paragraph 94.

25       95.    SAP denies the allegations in Paragraph 95.

26       96.    SAP denies the allegations in Paragraph 96.

27       97.    SAP denies the allegations in Paragraph 97.

28

1    98.    SAP lacks knowledge or information sufficient to form a belief about the truth of

2    the allegations in Paragraph 98, and on that basis denies them.

3    99.    SAP denies the allegations in Paragraph 99.

4    100.    SAP denies the allegations in Paragraph 100.

5    101.    SAP denies the allegations in Paragraph 101.

6    102.    SAP denies the allegations in Paragraph 102.

7                              **RESPONSE TO COUNT I**

8    103.    SAP incorporates its responses to paragraphs 1 through 102.

9    104.    SAP denies the allegations in Paragraph 104.

10    105.    SAP denies the allegations in Paragraph 105.

11    106.    SAP denies the allegations in Paragraph 106.

12    107.    SAP denies the allegations in Paragraph 107.

13    108.    SAP denies the allegations in Paragraph 108.

14    109.    SAP denies the allegations in Paragraph 109.

15    110.    SAP denies the allegations in Paragraph 110.

16    111.    SAP denies the allegations in Paragraph 111.

17                              **RESPONSE TO COUNT II**

18    112.    SAP incorporates its responses to paragraphs 1 through 111.

19    113.    SAP denies the allegations in Paragraph 113.

20    114.    SAP denies the allegations in Paragraph 114.

21    115.    SAP denies the allegations in Paragraph 115.

22    116.    SAP denies the allegations in Paragraph 116.

23    117.    SAP denies the allegations in Paragraph 117.

24    118.    SAP denies the allegations in Paragraph 118.

25    119.    SAP denies the allegations in Paragraph 119.

26    120.    SAP denies the allegations in Paragraph 120.

27                              **RESPONSE TO COUNT III**

28    121.    SAP incorporates its responses to paragraphs 1 through 120.

122.    In response to the allegations in Paragraph 122, SAP admits that Teradata applied for certain copyright registrations the same day it filed this lawsuit in June 2018, and that Teradata has since received copyright registration numbers TXu 2-091-493, TXu 2-091-495, TXu 2-091-496, TXu 2-091-497, TXu 2-091-498, TXu 2-091-500, and TXu 2-091-501.  SAP lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 122, and on that basis denies them.

123.    SAP lacks knowledge or information sufficient to form a belief about the truth of the allegations that the Teradata Express simulator contains a fully functional version of Teradata Database or that Teradata Express contains any matter subject to copyright, and on that basis denies them.  SAP denies that Teradata Express contains any intellectual property that SAP has infringed.

124.    SAP denies the allegations in Paragraph 124.

125.    SAP denies the allegations in Paragraph 125.

126.    SAP denies the allegations in Paragraph 126.

127.    SAP denies the allegations in Paragraph 127.

128.    SAP denies the allegations in Paragraph 128.

129.    SAP denies the allegations in Paragraph 129.

130.    SAP denies the allegations in Paragraph 130.  Teradata is not entitled to statutory damages because Teradata did not obtain copyright registrations until after it brought this action.

## RESPONSE TO COUNT IV

131.    SAP incorporates its responses to paragraphs 1 through 130.

132.    SAP denies the allegations in Paragraph 132.

133.    SAP denies the allegations in Paragraph 133.

134.    SAP denies the allegations in Paragraph 134.

135.    SAP denies the allegations in Paragraph 135.

136.    SAP denies the allegations in Paragraph 136.

137.    SAP denies the allegations in Paragraph 137.

138.    SAP denies the allegations in Paragraph 138.

1    139.    SAP denies the allegations in Paragraph 139.

2    140.    SAP denies the allegations in Paragraph 140.

3    141.    SAP denies the allegations in Paragraph 141.

4    142.    SAP denies the allegations in Paragraph 142.

5                    **RESPONSE TO COUNT V**

6    143.    SAP incorporates its responses to paragraphs 1 through 142.

7    144.    SAP admits that it provides ERP applications and data warehousing products.

8    SAP denies the remaining allegations in Paragraph 144.

9    145.    SAP denies the allegations in Paragraph 145.

10    146.    SAP denies the allegations in Paragraph 146.

11    147.    SAP denies the allegations in Paragraph 147.

12    148.    SAP denies the allegations in Paragraph 148.

13    149.    SAP denies the allegations in Paragraph 149.

14    150.    SAP denies the allegations in Paragraph 150.

15    151.    SAP denies the allegations in Paragraph 151.

16    152.    SAP denies the allegations in Paragraph 152.

17    153.    SAP denies the allegations in Paragraph 153.

18    154.    SAP denies the allegations in Paragraph 154.

19    155.    SAP denies the allegations in Paragraph 155.

20                        **DEFENSES**

21    SAP, as further and separate defenses to the Complaint and without assuming any burden

22    it would not otherwise have, without admitting that each of the following is an affirmative

23    defense and without admitting that it bears the burden of proof, alleges the following defenses.

24    SAP expressly reserves its right to allege additional defenses after appropriate discovery.

25    1.    The Complaint fails to state a claim upon which relief can be granted.

26    2.    Plaintiffs lack standing to bring some or all of the claims alleged in the

27    Complaint.

28

3.     The alleged conduct of Defendants was not the cause or proximate cause of the losses alleged by Plaintiffs.

4.     Plaintiffs' claims are barred, in whole or in part, because Plaintiffs failed to take reasonable action to mitigate any alleged injuries and damages, if any, suffered as a result of the conduct alleged in the Complaint.

5.     Plaintiffs' claims are barred, in whole or in part, by the applicable statutes of limitations.

6.     Plaintiffs' claims are barred, in whole or in part, by contractual limitations provisions.

7.     Plaintiffs' claims are barred, in whole or in part, by the doctrines of waiver, estoppel, laches, and unclean hands.

8.     Any and all of Defendants' actions challenged by Plaintiffs were lawful, reasonable, justified, procompetitive, without intent to injure competition and were carried out in furtherance of Defendants' legitimate business interests.

9.     Any recovery is barred, or must be reduced, under the doctrine of avoidable consequences.

10.     Plaintiffs did not suffer any competitive injury or antitrust injury cognizable under the applicable statutes.

11.     Plaintiff's claims are barred, in whole or part, because Defendants independently developed any purported intellectual property Plaintiffs allege has been misappropriated or infringed.

12.     Plaintiffs' trade secret and copyright claims are barred, in whole or part, by contractual provisions authorizing the conduct alleged in the Complaint, including without limitation contractual provisions assigning or licensing intellectual property to Defendants or authorizing Defendants to use, publish, and disclose any purported intellectual property conveyed during the Bridge Project.

13.     Plaintiffs' trade secret claims are barred because Plaintiffs did not disclose and Defendants have not misappropriated any trade secrets.

14.     Plaintiff's trade secret claims are barred because Plaintiffs failed to comply with the contractual requirements for designating any purported intellectual property allegedly disclosed to Defendants as confidential or proprietary.

15.     Plaintiffs' trade secret claims are barred because Plaintiffs have not taken reasonable measures to keep secret any information allegedly disclosed to Defendants and because the information does not derive independent economic value from not being generally known to or reasonably ascertainable through proper means by another person who can obtain economic value from disclosure or use of the information.

16.     Plaintiffs' trade secret claims are barred because Defendants did not acquire any purported trade secrets by improper means and Defendants have not disclosed or used any purported trade secrets without express or implied consent.

17.     Plaintiffs' claims under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq.*, are barred, in whole or part, because the alleged misappropriation occurred before the DTSA took effect.

18.     To the extent Plaintiffs purport to allege willful or malicious trade secret misappropriation, any such claim is barred because Plaintiffs failed to provide notice of any alleged trade secrets and Defendants lacked any intent to misappropriate or cause the misappropriation of any alleged trade secrets.

19.     Plaintiffs' copyright claims are barred, in whole or part, because the software alleged to be infringed contains no copyrightable subject matter.

20.     Plaintiffs' copyright claims are barred because Defendants did not make any unauthorized copies of its allegedly copyrightable works.

21.     Plaintiff's copyright claims are barred because the Copyright Act permits reverse engineering for interoperability, 17 U.S.C. § 1201(f)(2); the SDCA and TPA authorize reverse engineering expressly permitted by applicable law; and Plaintiffs' standard end-user license agreement for Teradata Express authorizes reverse engineering that is not illegal.

1    22.    To the extent Plaintiffs seek statutory damages for alleged copyright

2    infringement, any such claim is barred in whole or part because Plaintiffs did not obtain

3    copyright registrations until after they brought this action.

4    23.    To the extent Plaintiffs purport to allege willful copyright infringement, any such

5    claim is barred because Defendants lacked any intent to infringe and because Plaintiffs failed to

6    seek or obtain copyright registrations until Plaintiffs filed the original Complaint in this action in

7    June 2018, years after the Bridge Project ended.

8    24.    Plaintiffs' claims are barred, in whole or in part, because Plaintiffs have failed to

9    properly define a relevant product or geographical market.

10    25.    Plaintiffs' claims are barred, in whole or in part, because Defendants do not have

11    monopoly power or market power in any properly defined relevant product or geographic

12    market.

13    26.    Plaintiffs' claims are barred, in whole or in part, because the alleged damages, if

14    any, are too speculative and uncertain and because of the impossibility of proving such alleged

15    damages.

16    27.    To the extent Plaintiffs purport to request lost profits, any such claim is barred

17    because any alleged lost profits are too speculative and uncertain and because of the

18    impossibility of proving lost profits.

19    28.    To the extent Plaintiffs purport to request injunctive relief, any such claim is

20    barred because Plaintiffs have an adequate remedy at law.

21    29.    Plaintiffs' claims are barred, in whole or in part, to the extent Plaintiffs seek

22    recovery of attorney's fees, because Plaintiffs have failed to establish a basis for such a claim.

23                                  **SAP SE'S COUNTERCLAIMS**

24    Counterclaim-Plaintiff SAP SE brings these counterclaims against Counterclaim-

25    Defendants, Teradata Corporation and Teradata Operations, Inc., pursuant to Federal Rule of

26    Civil Procedure 13.

27    1.    SAP SE re-alleges and incorporates by reference the admissions, denials, and

28    Defenses contained in its Answer as if fully set forth herein.

1

**PARTIES**

2        2.       SAP SE is a European company.  Its principal place of business is located at

3    Dietmar-Hopp-Allee 16, Walldorf, Germany, 69190.

4        3.       Teradata Corporation is organized under the laws of Delaware.  Its global

5    headquarters is located at 17095 Via del Campo, San Diego, California 92127.  It also has a

6    place of business in this District, at 2055 Laurelwood Road, 1st Floor, Santa Clara, California

7    95054.  On information and belief, Teradata Corporation, either itself or through one or more of

8    its subsidiaries, conducts research, development, engineering, other technical operations related

9    to its so-called "EDAW" products and other products.

10        4.       Teradata Operations, Inc., a wholly-owned subsidiary of Teradata Corporation, is

11    a corporation organized under the laws of Delaware, with its headquarters at 17095 Via del

12    Campo, San Diego, California 92127.  It also has a place of business in this District, at 2055

13    Laurelwood Road, 1st Floor, Santa Clara, California 95054.  On information and belief, Teradata

14    Operations, Inc. is responsible for conducting all of Teradata's business operations in the United

15    States, including product development and sales.

16        5.       Teradata Corporation and Teradata Operations, Inc. have offices and employees

17    in this District and regularly conduct business in this District.

18

**JURISDICTION AND VENUE**

19        6.       SAP SE brings these counterclaims under the patent laws of the United States, 35

20    U.S.C. § 1 *et seq.*  This Court has original subject matter jurisdiction over SAP SE's

21    counterclaims under 28 U.S.C. §§ 1331 and 1338(a).

22        7.       Teradata Corporation and Teradata Operations, Inc. consented to the personal

23    jurisdiction of this Court by filing their Complaint in this action.  Additionally, this Court has

24    personal jurisdiction over Teradata Corporation and Teradata Operations, Inc. because they have

25    offices and employees in this District and regularly conduct business in this District.

26        8.       To the extent that venue is proper for Teradata Corporation's and Teradata

27    Operations, Inc.'s claims, it also is proper for SAP SE's counterclaims under 28 U.S.C. §§

28

1391(b) and 1391(c), as well as under 28 U.S.C. § 1400(b).  Additionally, Teradata Corporation
and Teradata Operations, Inc. have consented to venue in this District by bringing this action.

## SAP SE'S PATENTS

9.      SAP SE's counterclaims are based on the following five patents:  (a) U.S. Patent
No. 9,626,421 ("'421 Patent"), which was filed on September 19, 2008, based on a provisional
application filed on September 21, 2007, issued on April 18, 2017, and is entitled "ETL-less
Zero-Redundancy System and Method for Reporting OLTP Data"; (b) U.S. Patent No. 8,214,321
("'321 Patent"), which was filed on May 27, 2004, claiming priority to a European patent
application filed May 28, 2003, issued on July 3, 2012, and is entitled "Systems and Methods for
Data Processing"; (c) U.S. Patent No. 7,421,437 ("'437 Patent"), which was filed on November
10, 2003, issued on September 2, 2008, and is entitled "System and Method for a Data
Dictionary Cache in a Distributed System"; (d) U.S. Patent No. 7,617,179 ("'179 Patent"), which
was filed on April 28, 2004, as a continuation-in-part of a patent application filed June 20, 2003
(in turn based on a provisional application filed on June 29, 2002), issued on November 10,
2009, and is entitled "System and Methodology for Cost-Based Subquery Optimization Using a
Left-Deep Tree Join Enumeration Algorithm"; and (e) U.S. Patent No. 7,437,516 ("'516
Patent"), which was filed on December 28, 2004, issued on October 14, 2008, and is entitled
"Programming Models for Eviction Policies."  SAP SE is the assignee and sole owner of all
right, title, and interest, including the right to damages for past infringements, in the '421 Patent,
'321 Patent, '437 Patent, '179 Patent, and '516 Patent (collectively "Patents-in-Suit").  Each of
the Patents-in-Suit is valid and enforceable.  A copy of the '421 Patent is attached as Exhibit A; a
copy of the '321 Patent is attached as Exhibit B; a copy of the '437 Patent is attached as Exhibit
C; a copy of the '179 Patent is attached as Exhibit D; and a copy of the '516 Patent is attached as
Exhibit E.

10.     The Patents-in-Suit demonstrate that SAP has its own intellectual property in the
areas of parallel processing of queries, data compression, efficient information handling, and
optimization of queries and analysis, including for example the '421 Patent, '321 Patent, '437
Patent, '179 Patent, and '516 Patent, which predate the SAP-Teradata Bridge Project.  SAP

1    developed this intellectual property wholly independently of Teradata in the course of SAP's

2    own decades-long innovation to develop its own proprietary SAP ERP, BW, and HANA

3    technology.  It is Teradata that needed and has infringed on SAP's intellectual property rights,

4    not the other way around.

5           11.    In particular, SAP SE's '179 Patent concerns query optimization, an area in which

6    Teradata falsely asserts that SAP has misappropriated Teradata's alleged trade secrets.  The '179

7    Patent (under its Publication No. US-2004/0220923 and its inventor Anisoara Nica) was cited

8    by, and acknowledged as a prior art to, at least 4 subsequently issued U.S. patents or pending

9    U.S. patent applications of Teradata.  *First*, SAP SE's '179 Patent was cited during the

10   prosecution of U.S. Patent No. 7,548,905 on February 10, 2009; U.S. Patent No. 7,548,905 was

11   assigned on March 18, 2008 to Counterclaim-Defendant Teradata Corporation.  *Second*, SAP

12   SE's '179 Patent was twice cited during the prosecution of U.S. Patent No. 7,860,858 on

13   February 5, 2010 (in the Non-Final Rejection) and on September 2, 2010; U.S. Patent No.

14   7,860,858 was assigned on March 18, 2008 to Teradata US, Inc., a wholly-owned subsidiary of

15   Counterclaim-Defendant Teradata Corporation.  *See* Dkt. 67 at ¶ 5.  *Third*, SAP SE's '179 Patent

16   was cited during the prosecution of U.S. Patent No. 8,868,545 on December 3, 2013 (in the Non-

17   Final Rejection); U.S. Patent No. 8,868,545 was assigned on January 5, 2012 to Counterclaim-

18   Defendant Teradata Corporation.  *Fourth*, SAP SE's '179 Patent was cited twice during the

19   prosecution of pending U.S. Patent Application No. 12/351,501, with its Publication No. U.S.

20   2010/0185603, on October 4, 2011 (in the Non-Final Rejection) and on June 16, 2017 (in the

21   Non-Final Rejection); U.S. Patent Application No. 12/351,501 was assigned on February 12,

22   2009 to Counterclaim-Defendant Teradata Corporation.

23          12.    Each of the Patents-in-Suit discloses technical enhancements to database

24   management systems that:  correspond to specific improvements to computer functionality and

25   the way computers operate, and include capabilities for, among other things, improving the way

26   computer database management systems store and retrieve data in memory.  Each of the Patents-

27   in-Suit discloses multiple inventive concepts and technical improvements to the operation and

28   capabilities of conventional database management systems.  For example, the '421 Patent

provides, among other things, an architecture for reporting on the most up-to-date data in a business intelligence system, which reports directly on top of online transactional processing ("OLTP") data and preserves the short response times of online analytical processing ("OLAP") systems by eliminating ETL procedures (*i.e.*, procedures to span the traditional dichotomy between OLTP systems and OLAP systems). The '321 Patent provides, among other things, particular combinations and mappings of computer technology data structures, data processes, classes, and data that together operate differently from conventional computer data processing systems and methods, to provide, for instance, for more efficient and flexible computer processing for both computer applications and a computer data warehouse, including the ability to combine traditional computer database tables with OLAP cubes at an application layer. The '437 Patent provides, among other things, computer technology data structures distributed over at least an application level and a data access level of a computer system, to provide, for example, faster and more efficient accessing of information cached in data structures accessed at the application level (indicating, for instance, definitions of data objects stored in the computer system's memory), per a particular cache management policy. The '179 Patent provides, among other things, a particular combination of specific data-query-optimization computer data structures and processes helping solve "a major challenge in database systems[:] to significantly reduce the amount of memory required to enable a database system to be run on small computing devices." The '179 Patent also considers the architecture and physical capabilities of a system as well as the physical storage locations and arrangements of database tables within the system in determining an efficient way for the particular system to execute a query request. The '516 Patent provides, among other things, particular methods of treating cached data objects, particular configurations of computer memory cache, and particular computer memory cache operation and management methods to improve computer operation and performance. In doing so, each of the Patents-in-Suit is directed to a specific implementation of a technical solution to a technical problem in the computer and software arts that is intrinsically tied to computer database management systems. As demonstrated by their frequent citation by the United States Patent and Trademark Office, and other patent offices around the world, in other later-issued patents and

pending patent applications involving database management systems, each of the Patents-in-Suit represents one or more fundamental technical improvements to database management systems. Specifically, the Patents-in-Suit (including published versions of the applications that became the Patents-in-Suit) have collectively been cited during the prosecution of at least 156 subsequently issued U.S. patents and pending U.S. patent applications, including 4 owned by or later assigned to Teradata Corporation or its wholly-owned subsidiary (as discussed in the preceding paragraph), as well as at least 22 subsequently issued non-U.S. patents and pending non-U.S. patent applications.

13.      No condition precedent bars or limits the damages recoverable by SAP SE for infringement of the Patents-in-Suit by Teradata Corporation and Teradata Operations, Inc.

### SAP'S INNOVATION

14.      SAP has long been a leader in developing systems that enable modern business. SAP has received numerous patents for its database management innovations from the United States Patent and Trademark Office.  Long before the 2008–2009 Bridge Project with Teradata, SAP had been focusing on many of the same technical areas at issue in this action.

15.      SAP has pioneered developments in the same spaces that Teradata claims trade secrets.  Yet many of SAP's pioneering developments came earlier than the Bridge Project, and SAP has diligently sought and obtained patents to protect its innovations and intellectual property.  The Patents-in-Suit, including their priority and filing dates, evidence both that Teradata Corporation and Teradata Operations, Inc. infringe SAP SE's patents and that many of the concepts that Teradata claims as trade secrets actually were used or invented by SAP SE before the commencement of the Bridge Project.

16.      For example, Teradata claims a variety of trade secrets relating to parallel processing of queries, data compression, efficient information handling, and optimization of queries and analysis, alleging that SAP learned those trade secrets during the Bridge Project.  But these are the very subjects of the Patents-In-Suit, all of which predate the Bridge Project.  For example, parallel processing of queries and data compression are the subjects of the '421 Patent, which describes approaches to fragmenting, compressing, and distributing data to facilitate

1   parallel processing of queries.  As another example, efficient information handling, such as by

2   using data migration, data dictionaries, and caching, is the subject of the '321 Patent, '437

3   Patent, and '516 Patent, respectively.  Similarly, Teradata alleges that it shared trade secrets

4   relating to query optimization with SAP during the Bridge Project, but the invention of the '179

5   Patent in the same field dates from years earlier.  It is Teradata that has used the inventions

6   claimed in SAP SE's Patents-in-Suit without authorization.

7       17.   When the Bridge Project ended, Teradata still needed a way to link its "Analytics

8   Platform" with SAP's industry-leading ERP software.  In addition, the Bridge Project had been

9   an avenue for Teradata to get access to SAP's customers who were using SAP's data warehouse

10  software, Business Warehouse ("BW").  Having no effective solution of its own to extract data

11  from ERP and BW, and intent on diverting SAP's customers from BW to Teradata's own

12  software, Teradata acquired a company called New Frontiers.  Before Teradata's acquisition of

13  New Frontiers, New Frontiers had been a partner of SAP and through that partnership, SAP

14  shared technical information with New Frontiers.  After Teradata's acquisition of New Frontiers,

15  Teradata implemented and built upon New Frontiers' technologies that contained, and had been

16  developed using, information learned from SAP.  In doing so, Teradata Corporation and Teradata

17  Operations, Inc. actually resorted to practicing claims of SAP SE's '321 Patent.  By way of an

18  example, Teradata Corporation and Teradata Operations, Inc. used the technologies acquired

19  from New Frontiers, along with knowledge obtained from SAP through the Bridge Project, to

20  develop one of the accused products called Teradata Analytics for SAP Solutions.  On

21  information and belief, Teradata was able to carry out this development because it staffed its

22  Teradata Analytics for SAP Solutions development team with veterans of the Bridge Project.

23      18.   Additionally, Teradata Corporation and Teradata Operations, Inc. used SAP's

24  innovations to develop and offer to customers an in-memory caching feature of its database

25  software, called Teradata Intelligent Memory, to purportedly compete with SAP HANA.  In

26  doing so, Teradata Corporation and Teradata Operations, Inc. resorted to practicing the claims of

27  SAP SE's '516 Patent without authorization.  On information and belief, Teradata was able to

28

1   carry out this development because it staffed its Teradata Intelligent Memory development team

2   with veterans of the Bridge Project.

3        19.    Some of the research work on HANA was done, in collaboration with SAP, at the

4   Hasso Plattner Institute ("HPI").  HPI is an institution founded by Professor Hasso Plattner (one

5   of SAP SE's cofounders and the current chairman of SAP SE's supervisory board).  HANA

6   evolved from earlier work on TREX dating back to the late 1990s.  The technology covered in

7   the '421 Patent, which is one of many patents obtained from the development of HANA, served

8   as an inflection point and stepping stone during the development of the HANA in-memory

9   database.  Tellingly, the '421 Patent was filed in 2007, which predates the 2008–2009 Bridge

10   Project.  Teradata Corporation and Teradata Operations, Inc. first added column partitioning and

11   column-based format features, which are part of the subject matter covered by the '421 Patent, to

12   their database management system software in 2011 (after the conclusion of the Bridge Project).

13   In doing so, Teradata Corporation and Teradata Operations, Inc. resorted to practicing the claims

14   of SAP SE's '421 Patent without authorization.

15        20.    In short, to the extent that Teradata has attempted to innovate, it has infringed on

16   SAP's intellectual property, which is the subject of the Patents-in-Suit.  In the end, SAP

17   customers choose their products because of SAP's innovative approach, reflected in part by the

18   many patents SAP SE has obtained.  Teradata Corporation and Teradata Operations, Inc. have

19   tried to compete by using SAP's technology, including, on information and belief, information

20   Teradata learned during the Bridge Project, in the process infringing at least the five SAP SE

21   Patents-in-Suit.  Specific infringement counterclaims are now set forth.

22   <u>**THE ACCUSED PRODUCTS**</u>

23        21.    Teradata Corporation and Teradata Operations, Inc. have been and are still

24   infringing, contributing to infringement, and/or inducing others to infringe the SAP SE Patents-

25   in-Suit at least by making, using, offering for sale, selling, or importing software, or products

26   containing such software, that practices the SAP SE Patents-in-Suit.  Specifically, Teradata

27   Corporation's and Teradata Operations, Inc.'s "Accused Products"—defined to include at least

28   Teradata Database (including without limitation version 16.20), Teradata Analytics for SAP

Solutions, Teradata OLAP Connector, Teradata's Business Model Extensions, and Teradata Intelligent Memory—practice one or more of the five SAP SE Patents-in-Suit. Teradata Analytics for SAP Solutions, Teradata OLAP Connector, Teradata's Business Model Extensions, and Teradata Intelligent Memory are software implemented in conjunction with Teradata Database. Teradata's Accused Products are used in implementing data warehouse computer systems that are used in many businesses.

22.      The allegations of patent infringement in these Counterclaims apply not only to Teradata's software specifically identified, but also to other Teradata software that has the same infringing structure and/or functionality as recited in the claims of the Patents-in-Suit.

## <u>COUNT I – INFRINGEMENT OF U.S. PATENT NO. 9,626,421</u>

23.      SAP SE realleges and incorporates by reference the foregoing paragraphs, as if fully set forth herein.

24.      Teradata Corporation and Teradata Operations, Inc. became aware of the '421 Patent at least as early as SAP SE's transmittal of the Counterclaims to Teradata Corporation and Teradata Operations, Inc. on May 21, 2019.

25.      Teradata Corporation and Teradata Operations, Inc. have been and are now directly infringing, contributing to infringement, and/or inducing others to infringe, the '421 Patent in this District and elsewhere in violation of 35 U.S.C. § 271 at least by making, using, selling, offering to sell, and/or importing into the United States software, or products containing such software, that practices one or more claims of the '421 Patent, including at least Teradata Database. On information and belief, Teradata Corporation and Teradata Operations, Inc. infringe the '421 Patent by providing demonstrations and testing of such software. Teradata Corporation and Teradata Operations, Inc. have committed infringing acts without the permission, consent, authorization, or license of SAP SE.

26.      Teradata Corporation's and Teradata Operations, Inc.'s infringement is literal or under the doctrine of equivalents, or both.

27.      On information and belief, Teradata Corporation and Teradata Operations, Inc., in addition to their own direct infringement, are currently actively inducing and encouraging

infringement of the '421 Patent, and, unless enjoined, will continue to actively induce and encourage infringement of the '421 Patent. Teradata Corporation and Teradata Operations, Inc. have known of the '421 Patent at least since the time of SAP SE's transmittal of the Counterclaims to Teradata Corporation and Teradata Operations, Inc. On information and belief, Teradata Corporation and Teradata Operations, Inc. nevertheless actively encourage others to infringe the '421 Patent. On information and belief, Teradata Corporation and Teradata Operations, Inc. knowingly induce infringement by others, including resellers, retailers, and end users of Teradata Database. For example, Teradata Corporation's and Teradata Operations, Inc.'s customers and end users test and/or operate Teradata Database in the United States in accordance with Teradata Corporation's and Teradata Operations, Inc.'s instructions contained in, for instance, its user manuals, thereby also performing the claimed methods and directly infringing the asserted claims of the '421 Patent reciting such operation. These facts give rise to a reasonable inference that Teradata Corporation and Teradata Operations, Inc. knowingly induce others, including resellers, retailers, and end users, to directly infringe the '421 Patent, and that Teradata Corporation and Teradata Operations, Inc. possess a specific intent to cause such infringement.

28.     Teradata Corporation and Teradata Operations, Inc. also contribute to infringement of the '421 Patent by offering to sell or selling within the United States or importing into the United States (i) Teradata Database or products containing such software, (ii) the non-staple constituent parts of such software, which are not suitable for substantial non-infringing use and which embody a material part of the invention claimed in the '421 Patent, and (iii) components of such software, which are not suitable for substantial non-infringing use and which embody a material part of the invention claimed in the '421 Patent. Such software is known by Teradata Corporation and Teradata Operations, Inc. to be especially made or especially adapted for use in the infringement of the '421 Patent. Specifically, on information and belief, Teradata Corporation and Teradata Operations, Inc. sell such software to resellers, retailers, and end users with knowledge that such software is used for infringement. End users of such software directly infringe the '421 Patent.

29.    As one example, Teradata Database infringes at least claim 1 of the '421 Patent.

30.    Independent claim 1 of the '421 Patent reads as follows (claim element enumeration added for convenience):

| Claim 1 | |
|---|---|
| [a] | A computer system storing a computer program for processing database information for both transacting and reporting, said computer program being executed by said computer system, the computer system comprising: |
| [b] | a processor; |
| [c] | a memory; |
| [d] | a relational database management system component, implemented by the computer system, wherein said relational database management component stores said database information in a row format; and |
| [e] | a column-oriented data processing component, implemented by the computer system, wherein said column-oriented data processing component stores said database information in a column format using vertical fragmentation, |
| [f] | in response to a database update request, said relational database management system component updates said database information stored in said row format, said relational database management system component notifies said column-oriented data processing component of said database update request, and said column-oriented data processing component updates said database information stored in said column format, whereby said relational database management system component and said column-oriented data processing component share a consistent view of said database information, and |
| [g] | in response to a query request to retrieve data, said column-oriented data processing component generates a query response based on said database information stored in said column format, wherein generating the query response accesses only one or more columns needed directly for generating the query response. |

31.    As one example, Teradata Database is a computer program, which is stored on and executed by a networked computer system, for processing database information for both

- 36 -

transacting and reporting.  For example, Teradata Database is software configured to run, and does run, on a networked computer system for processing database information for both transacting and reporting.  In typical configurations, the networked computer system includes multiple nodes at which Teradata Database software is installed and runs.

32.    The networked computer system that Teradata Database runs on contains a processor.  For example, the networked computer system includes one or more nodes (hardware platforms), with each node including multiple processors and having Teradata Database software installed thereon, for processing database information for both transacting and reporting.

33.    The networked computer system that Teradata Database runs on contains memory.  For example, the networked computer system includes one or more nodes (hardware platforms), with each node including memory and having Teradata Database software installed thereon, with the memory also storing database information.

34.    Teradata Database contains a relational database management system component, implemented by the networked computer system, wherein said relational database management component stores said database information in a row format.  For example, in typical usage scenarios, Teradata Database software executing on one or more nodes in a networked computer system is configured to store data in a base table that is row-partitioned, with the data stored in a row format.  For instance, Teradata Database software executing on a first node in the networked computer system is configured to store data of a row-partitioned base table in row format.  In practice, data of different partitions of a row-partitioned base table can be stored across multiple nodes in a networked computer system.

35.    Teradata Database contains a column-oriented data processing component, implemented by the networked computer system, wherein said column-oriented data processing component stores said database information in a column format using vertical fragmentation. For example, in some cases, Teradata Database software executing on one or more nodes in a networked computer system is configured to create a single-table join index from the base table. The join index is capable of being stored internally in column format as a table that is column partitioned, even where the base table is row-partitioned.  A column-partitioned join index can be

used to improve performance for certain workloads, while identical data (and not just pointers to the data) is concurrently maintained in a row-partitioned base table for workloads that are more efficiently processed using row-partitioned data. In typical usage scenarios, Teradata Database software executing on one or more nodes in a networked computer system is configured to store the data for a column-partitioned join index, by default, in column format. In other usage scenarios, Teradata Database software executing on one or more nodes in a networked computer system is configured to store the data for a column-partitioned join index in column format because the data is explicitly designated to be stored in column format. For instance, Teradata Database software executing on a second node in the networked computer system is configured to store data of a column-partitioned join index in column format. In practice, data of different partitions of a column-partitioned join index can be stored across multiple nodes in a networked computer system.

36.     In Teradata Database, in response to a database update request, said relational database management system component updates said database information stored in said row format, said relational database management system component notifies said column-oriented data processing component of said database update request, and said column-oriented data processing component updates said database information stored in said column format, whereby said relational database management system component and said column-oriented data processing component share a consistent view of said database information. For example, Teradata Database software executing on one or more nodes of a networked computer system is configured to, when data in the row-partitioned base table (stored in row format) is changed by an INSERT, DELETE, or UPDATE operation, automatically update the corresponding data in the column-partitioned join index (stored in column format). In this scenario, Teradata Database software executing on one or more nodes of a networked computer system is configured to exchange information within a node or between nodes as needed to update the join index. For instance, Teradata Database software executing on a first node in the networked computer system (storing data in row format for the row-partitioned base table) is configured to notify Teradata Database software executing on a second node in the networked computer system

1   (storing data in column format for the column-partitioned join index) of a change due to an

2   INSERT, DELETE, or UPDATE operation.  In this way, identical data can be maintained in the

3   column-partitioned join index (stored in column format) and row-partitioned base table (stored in

4   row format).

5         37.   In Teradata Database, in response to a query request to retrieve data, said column-

6   oriented data processing component generates a query response based on said database

7   information stored in said column format, wherein generating the query response accesses only

8   one or more columns needed directly for generating the query response.  For example, Teradata

9   Database software executing on one or more nodes in a networked computer system is

10   configured to, if a query only requires data in the join index, process the query by retrieving data

11   from the join index.  For various scenarios, Teradata Database uses a join index (instead of a

12   base table) when processing a query.

13         38.   Teradata Corporation's and Teradata Operations, Inc.'s acts of infringement have

14   injured and damaged SAP SE.  SAP SE will suffer additional damages and irreparable harm

15   unless Teradata Corporation and Teradata Operations, Inc. are enjoined from further

16   infringement.

17   **COUNT II – INFRINGEMENT OF U.S. PATENT NO. 8,214,321**

18         39.   SAP SE realleges and incorporates by reference the foregoing paragraphs, as if

19   fully set forth herein.

20         40.   Teradata Corporation and Teradata Operations, Inc. became aware of the '321

21   Patent at least as early as SAP SE's transmittal of the Counterclaims to Teradata Corporation and

22   Teradata Operations, Inc. on May 21, 2019.

23         41.   Teradata Corporation and Teradata Operations, Inc. have been and are now

24   directly infringing, contributing to infringement, and/or inducing others to infringe, the '321

25   Patent in this District and elsewhere in violation of 35 U.S.C. § 271 at least by making, using,

26   selling, offering to sell, and/or importing into the United States software, or products containing

27   such software, that practices one or more claims of the '321 Patent, including at least Teradata

28   Analytics for SAP Solutions, Teradata OLAP Connector, and Teradata's Business Model

1 Extensions.  On information and belief, Teradata Corporation and Teradata Operations, Inc. have

2 also infringed the '321 Patent by providing demonstrations and testing of such software.

3 Teradata Corporation and Teradata Operations, Inc. have committed infringing acts without the

4 permission, consent, authorization, or license of SAP SE.

5 42.    Teradata Corporation's and Teradata Operations, Inc.'s infringement is literal or

6 under the doctrine of equivalents, or both.

7 43.    On information and belief, Teradata Corporation and Teradata Operations, Inc., in

8 addition to their own direct infringement, are currently actively inducing and encouraging

9 infringement of the '321 Patent, and, unless enjoined, will continue to actively induce and

10 encourage infringement of the '321 Patent.  Teradata Corporation and Teradata Operations, Inc.

11 have known of the '321 Patent at least since the time of SAP SE's transmittal of the

12 Counterclaims to Teradata Corporation and Teradata Operations, Inc.  On information and belief,

13 Teradata Corporation and Teradata Operations, Inc. nevertheless actively encourage others to

14 infringe the '321 Patent.  On information and belief, Teradata Corporation and Teradata

15 Operations, Inc. knowingly induce infringement by others, including resellers, retailers, and end

16 users of Teradata Analytics for SAP Solutions, Teradata OLAP Connector, and Teradata's

17 Business Model Extensions.  For example, Teradata Corporation's and Teradata Operations,

18 Inc.'s customers and end users test and/or operate Teradata Analytics for SAP Solutions,

19 Teradata OLAP Connector, and Teradata's Business Model Extensions in the United States in

20 accordance with Teradata Corporation's and Teradata Operations, Inc.'s instructions contained

21 in, for instance, its user manuals, thereby also performing the claimed methods and directly

22 infringing the asserted claims of the '321 Patent reciting such operation.  These facts give rise to

23 a reasonable inference that Teradata Corporation and Teradata Operations, Inc. knowingly

24 induce others, including resellers, retailers, and end users, to directly infringe the '321 Patent,

25 and that Teradata Corporation and Teradata Operations, Inc. possess a specific intent to cause

26 such infringement.

27 44.    Teradata Corporation and Teradata Operations, Inc. also contribute to

28 infringement of the '321 Patent by offering to sell or selling within the United States or

1    importing into the United States (i) Teradata Analytics for SAP Solutions, Teradata OLAP

2    Connector, and Teradata's Business Model Extensions, or products containing such software, (ii)

3    the non-staple constituent parts of such software, which are not suitable for substantial

4    noninfringing use and which embody a material part of the invention claimed in the '321 Patent,

5    and (iii) components of such software, which are not suitable for substantial non-infringing use

6    and which embody a material part of the invention claimed in the '321 Patent.  Such software is

7    known by Teradata Corporation and Teradata Operations, Inc. to be especially made or

8    especially adapted for use in the infringement of the '321 Patent.  Specifically, on information

9    and belief, Teradata Corporation and Teradata Operations, Inc. sell such software to resellers,

10    retailers, and end users with knowledge that such software is used for infringement.  End users of

11    such software directly infringe the '321 Patent.

12        45.    As one example, Teradata Analytics for SAP Solutions, Teradata OLAP

13    Connector, and Teradata's Business Model Extensions infringe at least claim 1 of the '321

14    Patent.

15        46.    Independent claim 1 of the '321 Patent reads as follows (claim element

16    enumeration added for convenience):

| **Claim 1** | |
|---|---|
| [a] | A data processing method comprising: |
| [b] | providing a set of database tables in a data warehouse, each database table being assigned to an entity type and storing entities of its entity type; |
| [c] | providing a set of online analytical processing cubes in a data warehouse, each online analytical processing cube specifying a layout for transactional data storage; |
| [d] | providing at least one application program for processing at least one class of database tables and at least one class of online analytical processing cubes; |
| [e] | mapping a sub-set of the set of database tables to the at least one class of database tables, the sub-set of database tables comprising database tables of one or more entity types; |
| [f] | mapping a sub-set of the set of online analytical processing cubes to the at least one class of online analytical processing cubes; |

| [g] | invoking an online analytical processing component to fill the online analytical processing cubes with transactional data; |
|-----|-----|
| [h] | processing the entities stored in the sub-set of database tables and the transactional data stored in the sub-set of online analytical processing cubes by the application program; and |
| [i] | providing analysis of the entities and the transactional data processed by the application program to a user |

47.     As one example, Teradata Analytics for SAP Solutions, Teradata OLAP Connector, and Teradata's Business Model Extensions perform a data processing method.  For example, Teradata Analytics for SAP Solutions extracts, transforms, and loads SAP data, and Teradata Analytics for SAP Solutions comes with over 150 prebuilt reports that can be invoked by users.

48.     Teradata Analytics for SAP Solutions, Teradata OLAP Connector, and Teradata's Business Model Extensions perform the step of providing a set of database tables in a data warehouse, each database table being assigned to an entity type and storing entities of its entity type.  For example, Teradata Analytics for SAP Solutions provides tables of data, which can be obtained from an SAP ERP system, in the Teradata Analytics platform, including Teradata Database.  Each table of data is assigned to an entity type, such as product hierarchy name, invoice value, revenue by the current and previous year, and stores entities of its entity type, such as a customer's actual data entries (*e.g.*, records in the table) corresponding to these entity types. Teradata Analytics for SAP Solutions can use a set of tables of data in Teradata Database that were obtained by accessing (and later extracting, transforming, and loading) the ERP data and/or data from BW stored in SAP systems.  As another example, Teradata OLAP Connector provides such tables as stored in Teradata Database.

49.     Teradata Analytics for SAP Solutions, Teradata OLAP Connector, and Teradata's Business Model Extensions perform the step of providing a set of online analytical processing cubes in a data warehouse, each online analytical processing cube specifying a layout for transactional data storage.  For example, Teradata Analytics for SAP Solutions provides a set of

1   data structures called cubes that correspond to infocubes, which are online analytical processing

2   cubes (OLAP cubes).  On information and belief, the data structures (cubes) are defined with

3   respect to fact and dimension tables that specify the layout of the transactional data stored in the

4   cubes, including cubes produced in response to queries.  The transactional data can include

5   values calculated from database tables referenced by the cube, or values selected from tables

6   referenced by the cube.  As another example, Teradata OLAP Connector provides such a set of

7   such cubes, where cube definitions are stored in Teradata Database.

8          50.    Teradata Analytics for SAP Solutions, Teradata OLAP Connector, and Teradata's

9   Business Model Extensions perform the step of providing at least one application program for

10  processing at least one class of database tables and at least one class of online analytical

11  processing cubes.  For example, Teradata Analytics for SAP Solutions is a software suite that

12  includes functionality for processing classes of tables of data.  On information and belief,

13  Teradata Analytics for SAP Solutions provides, among other things, a revenue module, which is

14  one of 17 modules available for Teradata Analytics for SAP Solutions that is specifically

15  designed to process revenue data.  For instance, on information and belief, the revenue module

16  can be used to process tables of data mapped to a "revenue" class, which contains product

17  hierarchy and invoice value entities (*e.g.*, tables for those entity types), and at least one

18  "revenue" class cube defined with respect to the "revenue " class of tables.  As another example,

19  on information and belief, Teradata OLAP Connector is configured to process cubes and tables,

20  where the cubes and tables may be mapped to classes using Business Model Extensions.

21         51.    Teradata Analytics for SAP Solutions, Teradata OLAP Connector, and Teradata's

22  Business Model Extensions perform the step of mapping a sub-set of the set of database tables to

23  at least one class of database tables, the sub-set of database tables comprising database tables of

24  one or more entity types.  For example, Teradata Analytics for SAP Solutions maps a sub-set of

25  the set of the tables of data in Teradata Database, such as the product hierarchy name or invoice

26  value tables, to at least one class of database tables, such as to the "revenue" class.  The mapped

27  sub-set of the tables of data are of the entity types associated with such tables, such as tables

28  mapped to the "revenue" class including a table representing the product hierarchy name entity

- 43 -

1    and a table representing the invoice value entity.  Additionally, on information and belief,

2    Teradata Analytics for SAP Solutions allows users to select sub-sets of tables of data (or

3    elements of a cube definition that are defined with respect to sub-sets of tables of data, where

4    user selection of a cube element maps the associated table), such as the product hierarchy name

5    table and the invoice value table, and to map them, via dragging and dropping, to at least one

6    class of tables of data for processing, such as a class in the form of a custom report, having a

7    name or other identifier as the "class," being created by a user.  Teradata Analytics for SAP

8    Solution may also perform such mappings automatically without user involvement.  As another

9    example, Teradata Database allows users to map at least one class, as represented by a Business

10   Model Extension, of database tables to a sub-set of database tables stored in Teradata Database.

11          52.    Teradata Analytics for SAP Solutions, Teradata OLAP Connector, and Teradata's

12   Business Model Extensions perform the step of mapping a sub-set of the set of online analytical

13   processing cubes to at least one class of online analytical processing cubes.  For example, on

14   information and belief, Teradata Analytics for SAP Solutions allows users to select and map

15   (*e.g.*, via dropping and dragging) a sub-set of the set of the data structures (cubes) to the class of

16   the data structures (cubes) in substantially the same way as described in the preceding paragraph.

17   Similarly, Teradata Analytics for SAP Solution may also perform this mapping automatically

18   without users' involvement.  On information and belief, the report created by a user can also

19   define a cube, which is a subset of the cubes available in Teradata Database/Teradata Analytics

20   for SAP Solutions.  As another example, on information and belief, the prebuilt reports provided

21   by Teradata Analytics for SAP Solutions include definitions of OLAP cube, which definitions

22   are mapped to classes corresponding, for instance, to a report name or one of the 17 modules.  As

23   yet another example, on information and belief, Teradata Database allows users to map at least

24   one class, as represented by a Business Model Extension, of cubes to a sub-set of online

25   processing cubes defined in Teradata Database.

26          53.    Teradata Analytics for SAP Solutions, Teradata OLAP Connector, and Teradata's

27   Business Model Extensions perform the step of invoking an online analytical processing

28   component to fill the online analytical processing cubes with transactional data.  For example, on

1    information and belief, a prebuilt report in, or a custom report defined using, Teradata Analytics

2    for SAP Solutions defines a cube, which can be a subcube of another cube.  When the report is

3    executed, the cube is filled with transactional data, such as from tables used in the definition of

4    the cube (*e.g.*, as defined in a report, or filling all or a portion of a cube associated with a

5    module), or calculated or selected from data in such tables.  As another example, Teradata OLAP

6    Connector can receive or process MDX queries, where a MDX query uses a cube definition to

7    retrieve transactional data from the underlying database tables and fill a cube that represents

8    query results, which can be the cube defined by the cube definition or a subcube thereof.

9         54.    Teradata Analytics for SAP Solutions, Teradata OLAP Connector, and Teradata's

10   Business Model Extensions perform the step of processing the entities stored in the sub-set of

11   database tables and the transactional data stored in the sub-set of online analytical processing

12   cubes by the application program.  For example, on information and belief, Teradata Analytics

13   for SAP Solutions processes, using a prebuilt report or a custom report created using the touted

14   self-service BI capabilities, the entities stored in the sub-set of database tables used in the report,

15   such as the product hierarchy name and invoice value entity data for a "revenue" report, and

16   transactional data in a cube associated with the report, such as a cube generated and filled with

17   transactional data when the report is executed.  In another example, on information and belief,

18   Teradata OLAP Connector processes such entities and such cubes in response to an MDX query.

19        55.    Teradata Analytics for SAP Solutions, Teradata OLAP Connector, and Teradata's

20   Business Model Extensions perform the step of providing analysis of the entities and the

21   transactional data processed by the application program to a user.  For example, Teradata

22   Analytics for SAP Solutions displays results for one of the over 150 prebuilt reports (thus over

23   150 potential infringements of the '321 Patent) or a custom report (which may infringe the '321

24   Patent, and Teradata provides functionality for such infringement, and encourages customers to

25   engage in infringing activity) in the access layer or the presentation layer to a user.  By way of

26   another example, Teradata's Business Model Extensions allows users to map semantic "classes"

27   to database objects.  In another example, Teradata OLAP Connector sends query results to an

28   application to be displayed to a user.

1    56.    Teradata Corporation's and Teradata Operations, Inc.'s acts of infringement have

2    injured and damaged SAP SE.  SAP SE will suffer additional damages and irreparable harm

3    unless Teradata Corporation and Teradata Operations, Inc. are enjoined from further

4    infringement.

5              **COUNT III – INFRINGEMENT OF U.S. PATENT NO. 7,421,437**

6    57.    SAP SE realleges and incorporates by reference the foregoing paragraphs, as if

7    fully set forth herein.

8    58.    Teradata Corporation and Teradata Operations, Inc. became aware of the '437

9    Patent at least as early as SAP SE's transmittal of the Counterclaims to Teradata Corporation and

10   Teradata Operations, Inc. on May 21, 2019.

11   59.    Teradata Corporation and Teradata Operations, Inc. have been and are now

12   directly infringing, contributing to infringement, and/or inducing others to infringe, the '437

13   Patent in this District and elsewhere in violation of 35 U.S.C. § 271 at least by making, using,

14   selling, offering to sell, and/or importing into the United States software, or products containing

15   such software, that practices one or more claims of the '437 Patent, including at least Teradata

16   Database.  On information and belief, Teradata Corporation and Teradata Operations, Inc. have

17   also infringed the '437 patent by at least providing demonstrations and testing of such software.

18   Teradata Corporation and Teradata Operations, Inc. have committed infringing acts without the

19   permission, consent, authorization, or license of SAP SE.

20   60.    Teradata Corporation's and Teradata Operations, Inc.'s infringement is literal or

21   under the doctrine of equivalents, or both.

22   61.    On information and belief, Teradata Corporation and Teradata Operations, Inc., in

23   addition to their own direct infringement, are currently actively inducing and encouraging

24   infringement of the '437 Patent, and, unless enjoined, will continue to actively induce and

25   encourage infringement of the '437 Patent.  Teradata Corporation and Teradata Operations, Inc.

26   have known of the '437 Patent at least since the time of SAP SE's transmittal of the

27   Counterclaims to Teradata Corporation and Teradata Operations, Inc  On information and belief,

28   Teradata Corporation and Teradata Operations, Inc. nevertheless actively encourage others to

infringe the '437 Patent such as by promoting and/or encouraging the use of the user-defined type ("UDT") features described below. On information and belief, Teradata Corporation and Teradata Operations, Inc. knowingly induce infringement by others, including resellers, retailers, and end users of Teradata Database. For example, Teradata Corporation's and Teradata Operations, Inc.'s customers and end users test and/or operate Teradata Database, in the United States in accordance with Teradata Corporation's and Teradata Operations, Inc.'s instructions contained in, for instance, its user manuals, thereby also performing the claimed methods and directly infringing the asserted claims of the '437 Patent reciting such operation. These facts give rise to a reasonable inference that Teradata Corporation and Teradata Operations, Inc. knowingly induce others, including resellers, retailers, and end users, to directly infringe the '437 Patent, and that Teradata Corporation and Teradata Operations, Inc. possess a specific intent to cause such infringement.

62. Teradata Corporation and Teradata Operations, Inc. also contribute to infringement of the '437 Patent by offering to sell or selling within the United States or importing into the United States (i) Teradata Database or products containing such software, (ii) the non-staple constituent parts of such software, which are not suitable for substantial noninfringing use and which embody a material part of the invention claimed in the '437 Patent, and (iii) components of such software, which are not suitable for substantial non-infringing use and which embody a material part of the invention claimed in the '437 Patent. Such software is known by Teradata Corporation and Teradata Operations, Inc. to be especially made or especially adapted for use in the infringement of the '437 Patent. Specifically, on information and belief, Teradata Corporation and Teradata Operations, Inc. sell such software to resellers, retailers, and end users with knowledge that such software is used for infringement. End users of such software directly infringe the '437 Patent.

63. As one example, Teradata Database infringes at least claim 1 of the '437 Patent.

64. Independent claim 1 of the '437 Patent reads as follows (claim element enumeration added for convenience):

| **Claim 1** | |
| --- | --- |
| [a] | A computer-implemented method comprising: |
| [b] | receiving a request for system information, wherein the system information is associated with a data type, wherein the data type includes a scalar data type and a complex data type, wherein the scalar data type and the complex data type are organized hierarchically, the scalar data type including a single data object having an integer or a character, the complex data type including multiple data objects having one or more of structure data types, list data types, and tree data types; |
| [c] | referencing a plurality of data dictionary cache at an application level to obtain the data type associated with the system information; |
| [d] | determining whether the data type is stored in one or more of the plurality of data dictionary cache, wherein determining is preformed[1] based on a cache management policy to perform operations relating to reading, storing, and maintaining information of the plurality of data dictionary cache; |
| [e] | selecting a data dictionary cache from the plurality of data dictionary cache at the application level, if the data dictionary cache includes the data type; |
| [f] | obtaining the data type from the data dictionary cache having the data type; |
| [g] | obtaining the data type from a data dictionary at a data access level, if the data type is not found at the plurality of data dictionary cache, and creating a new data dictionary cache at the application layer to store the data type obtained from the data dictionary; and |
| [h] | providing the requested system information via the data type. |

65.     As one example, Teradata Database performs a computer-implemented method. For example, Teradata Database is software that runs on a computer that performs a method including various steps. Components of Teradata Database, such as the Parsing Engines, BYNET, access module processors ("AMPs"), and various storage media, are all implemented using computer technology.

---

[1] The Examiner in the May 1, 2008 Notice of Allowance understood and acknowledged this term – *preformed* – as "performed."

- 48 -

66.     In some cases, Teradata Database performs the step of receiving a request for system information, wherein the system information is associated with a data type, wherein the data type includes a scalar data type and a complex data type, wherein the scalar data type and the complex data type are organized hierarchically, the scalar data type including a single data object having an integer or a character, the complex data type including multiple data objects having one or more of structure data types, list data types, and tree data types. For example, Teradata Database has a Parsing Engine that includes a Structured Query Language ("SQL") Parser to handle all incoming SQL requests. The Parsing Engine is a process that runs on a node with processors and memory. The Parsing Engine performs query parsing, optimization, and dispatching. Teradata Database is designed so that it can be installed on multiple nodes, with each node running one or more Parsing Engines. A node caches data dictionary information in free memory. The cached data dictionary information is used by the Parsing Engines on the node. At a physical level, the cached data dictionary information is stored in separate memory segments. After the Parsing Engine checks the syntax of a request, dictionary information associated with one or more data types is requested. In some cases, the data type associated with requested dictionary information is a UDT, which can be a structured data type defined by a user. A UDT may itself be a composition of data types, including one or more scalar data types (such as INTEGER, CHAR) and one or more non-scalar data types (such as array, list, other UDT, complex data type). A structured UDT that includes a nested UDT is organized hierarchically. By of another example, in some cases, Teradata Database receives a request for various statistical and configuration data for use in one of the Parsing Engines, wherein the various statistical and configuration data is associated with a UDT definition stored in table header. For instance, configuration data is requested for the purpose of optimizing SQL queries. Among the configuration data is a UDT context stored in a table header. In some cases, the UDT definition includes a scalar attribute 1 that can be configured as an integer or character and a complex attribute 2 that can be configured as a nested structured UDT. Attribute 1 and attribute 2 are organized hierarchically as structured UDT or nested structure, whereas attribute 1 includes a single data object having an integer or a character such as INTEGER or VARCHAR, and the

attribute 2 includes multiple data objects such as structured UDT having an array structure, including one or more of structure data types, list data types, and tree data types. Teradata Database is designed to permit users to define UDTs that include both scalar data types, such as an integer or character, as well as complex data types including a nested structure. Structured UDTs with a nested structure are organized hierarchically.

67.    Teradata Database performs the step of referencing a plurality of data dictionary cache at an application level to obtain the data type associated with the system information. For example, different cached data dictionary information can be maintained by the Parsing Engines of Teradata Database, depending on which data dictionary information has been used by the respective Parsing Engines. Specifically, cached data dictionary information on a node is stored in free memory. At a physical level, separate memory segments store different chunks of data dictionary information. The size of dictionary cache segments is by default less than the overall size limit of the dictionary information to be cached. As used by Teradata Database, the multiple memory segments are multiple data dictionary caches. When a Parsing Engine uses data dictionary information that is not already cached, memory allocation for a segment (having the dictionary cache segment size) is requested, and the data dictionary information (after retrieval from persistent storage) is stored in the memory segment. Further, on information and belief, Teradata Database has a data structure or other mechanism that tracks which data types are stored in different memory segments, thereby associating the data types with locations of corresponding memory segments that cache data dictionary information for the respective data types. By way of another example, each of the Parsing Engines in Teradata Database references both a dictionary cache associated with non-demographic data and a statistics cache associated with demographic data. The dictionary cache and statistics cache both cache information obtained from a Data Dictionary. The UDT definition can be contained in the table header associated with various statistics configuration data.

68.    Teradata Database performs the step of determining whether the data type is stored in one or more of the plurality of data dictionary cache, wherein determining is performed based on a cache management policy to perform operations relating to reading, storing, and

1   maintaining information of the plurality of data dictionary cache.  For example, different cached

2   dictionary information can be maintained by the Parsing Engines of Teradata Database,

3   depending on which dictionary information has been used by the respective Parsing Engines.

4   The cached dictionary information is maintained according to a policy that controls, for instance,

5   when the cached dictionary information is purged.  The cache management policy may further

6   specify how cached dictionary information is checked to determine whether it includes the

7   dictionary information for the data type associated with the requested system information.  If an

8   SQL request modifies the contents of the data dictionary, Teradata Database sends a spoil

9   message to every Parsing Engine on the system, directing them to drop the previous definitions

10  from their respective dictionary changes.  Teradata Database purges the dictionary cache

11  periodically, one Parsing Engine at a time.  By way of another example, Teradata Database

12  determines whether the data type definition is stored in the dictionary cache and statistics cache

13  based on a non-demographic Data Dictionary Information that resides in the dictionary cache or

14  the demographic information that resides in the statistics cache.  In some instances, Teradata

15  Database can predetermine that statistical information resides in the statistics cache.  When one

16  of the Parsing Engines retrieves non-demographic information, such as a UDT definition stored

17  in a table header, it looks for the information in the dictionary cache.  Conversely, when the

18  Parsing Engine looks for demographic information—statistics—then the Parsing Engine looks in

19  the statistics cache.

20      69.    Teradata Database performs the step of selecting a data dictionary cache from the

21  plurality of data dictionary cache at the application level, if the data dictionary cache includes the

22  data type.  For example, Teradata Database selects a memory segment that stores cached

23  dictionary information, which is maintained on a node, if the dictionary information is part of the

24  cached dictionary information.  By way of another example, Teradata Database selects a

25  dictionary cache from either the dictionary cache or statistics cache if the table header is cached.

26  The Parsing Engine checks whether the table header is cached in the dictionary cache.  If the

27  table header is cached in the dictionary cache, data type definitions are retrieved from the cached

28  header.

70.     Teradata Database performs the step of obtaining the data type from the data dictionary cache having the data type.  For example, Teradata Database obtains the dictionary information for the data type associated with requested system information if the dictionary information is part of the cached dictionary information.  By way of another example, one of the Parsing Engines of Teradata Database obtains the data type definition stored in the table header or retrieves the table header from the dictionary cache.

71.     Teradata Database performs the step of obtaining the data type from a data dictionary at a data access level, if the data type is not found at the plurality of data dictionary cache, and creating a new data dictionary cache at the application layer to store the data type obtained from the data dictionary.  For example, in Teradata Database, if the data dictionary information for the data type associated with requested system information is not stored in a memory segment, the data dictionary information for the data type is obtained from the data dictionary on disk.  This might happen, for instance, if all memory segments (storing data dictionary information) on a node have been purged or if the data dictionary information has not been used by any Parsing Engine at the node.  A new memory segment is allocated, and the data dictionary information for the data type is stored in the new memory segment.  By way of another example, a Parsing Engine in Teradata Database would retrieve the table header from disk if the table header is not cached.  Teradata Database creates a new dictionary cache by allocating a new memory segment and storing the data dictionary information for the data type in the new memory segment, or by caching table header in the dictionary cache to store the UDT definition.  The dictionary cache stores non-demographic information, such as UDT definitions.

72.     Teradata Database performs the step of providing the requested system information via the data type.  For example, in Teradata Database, the dictionary information for the data type is provided regardless of whether the dictionary information for the data type was retrieved from the cached dictionary information or the disk.  By way of another example, Teradata Database returns the UDT definition.  The UDT definitions stored in the table header are provided in connection with transforming SQL requests into the AMP steps needed to process the requests.

1    73.    Teradata Corporation's and Teradata Operations, Inc.'s acts of infringement have

2    injured and damaged SAP SE.  SAP SE will suffer additional damages and irreparable harm

3    unless Teradata Corporation and Teradata Operations, Inc. are enjoined from further

4    infringement.

5    **COUNT IV – INFRINGEMENT OF U.S. PATENT NO. 7,617,179**

6    74.    SAP SE realleges and incorporates by reference the foregoing paragraphs, as if

7    fully set forth herein.

8    75.    Teradata Corporation and Teradata Operations, Inc. became aware of the '179

9    Patent at least as early as SAP SE's transmittal of the Counterclaims to Teradata Corporation and

10   Teradata Operations, Inc. on May 21, 2019.

11   76.    Teradata Corporation and Teradata Operations, Inc. have been and are now

12   directly infringing, contributing to infringement, and/or inducing others to infringe, the '179

13   Patent in this District and elsewhere in violation of 35 U.S.C. § 271 at least by making, using,

14   selling, offering to sell, and/or importing into the United States software, or products containing

15   such software, that practices one or more claims of the '179 Patent, including at least Teradata

16   Database.  On information and belief, Teradata Corporation and Teradata Operations, Inc. have

17   also infringed the '179 Patent by at least providing demonstrations and testing of such software.

18   Teradata Corporation and Teradata Operations, Inc. have committed infringing acts without the

19   permission, consent, authorization, or license of SAP SE.

20   77.    Teradata Corporation's and Teradata Operations, Inc.'s infringement is literal or

21   under the doctrine of equivalents, or both.

22   78.    On information and belief, Teradata Corporation and Teradata Operations, Inc.,

23   in addition to their own direct infringement, are currently actively inducing and encouraging

24   infringement of the '179 Patent, and, unless enjoined, will continue to actively induce and

25   encourage infringement of the '179 Patent.  Teradata Corporation and Teradata Operations, Inc.

26   have known of the '179 Patent at least since the time of SAP SE's transmittal of the

27   Counterclaims to Teradata Corporation and Teradata Operations, Inc.  On information and belief,

28   Teradata Corporation and Teradata Operations, Inc. nevertheless actively encourage others to

infringe the '179 Patent. On information and belief, Teradata Corporation and Teradata Operations, Inc. knowingly induce infringement by others, including resellers, retailers, and end users of Teradata Database. For example, Teradata Corporation's and Teradata Operations, Inc.'s customers and end users test and/or operate Teradata Database, in the United States in accordance with Teradata Corporation's and Teradata Operations, Inc.'s instructions contained in, for instance, its user manuals, thereby also performing the claimed methods and directly infringing the asserted claims of the '179 Patent reciting such operation. On information and belief, Teradata Corporation and Teradata Operations, Inc. knowingly induce others, including resellers, retailers, and end users, to directly infringe the '179 Patent, and that Teradata Corporation and Teradata Operations, Inc. possess a specific intent to cause such infringement.

79. Teradata Corporation and Teradata Operations, Inc. also contribute to infringement of the '179 Patent by offering to sell or selling within the United States or importing into the United States (i) Teradata Database or products containing such software, (ii) the non-staple constituent parts of such software, which are not suitable for substantial noninfringing use and which embody a material part of the invention claimed in the '179 Patent, and (iii) components of such software, which are not suitable for substantial non-infringing use and which embody a material part of the invention claimed in the '179 Patent. Such software is known by Teradata Corporation and Teradata Operations, Inc. to be especially made or especially adapted for use in the infringement of the '179 Patent. Specifically, on information and belief, Teradata Corporation and Teradata Operations, Inc. sell such software to resellers, retailers, and end users with knowledge that such software is used for infringement. End users of such software directly infringe the '179 Patent.

80. As one example, Teradata Database infringes at least claim 1 of the '179 Patent.

81. Independent claim 1 of the '179 Patent reads as follows (claim element enumeration added for convenience):

| Claim 1 |
|---|
| [a] In a database system, a method for optimizing a database query for execution by a processor, the method comprising: |

| | |
|---|---|
| [b] | receiving a database query including at least one subquery; |
| [c] | building a query optimization graph for each query block of the database query, the query optimization graph including plan nodes representing subqueries of each query block; |
| [d] | prior to optimization of a query block, identifying alternative strategies for evaluation of a subquery plan node of the query block based on subquery type and semantic properties of the database query; |
| [e] | for each alternative strategy, pre-computing a subquery access method and subquery join method for use during optimization of the query block, wherein the subquery access method includes an estimate of execution costs; |
| [f] | generating a set of access methods and join methods for other plan nodes of the query block; |
| [g] | optimizing each query block to determine an optimal access plan for the query block based upon selecting pre-computed subquery access methods and join methods for subquery plan nodes of the query block as well as access methods, join methods, and join order for other plan nodes of the query block having favorable execution costs, wherein each query block is optimized without transformation of the subqueries using the pre-computed access methods and join methods; and |
| [h] | constructing a detailed access plan for execution of the database query based upon the optimal access plan determined for each query block. |

82.    As one example, Teradata Database is software that, when executed on a computer system, performs a method for optimizing a database query for execution by a processor in a database system.  For example, Teradata Database includes a SQL Query Optimizer that determines an efficient way to process and answer an SQL query request.

83.    Teradata Database performs the step of receiving a database query including at least one subquery.  For example, in Teradata Database, the Query Optimizer, or a component that includes the Query Optimizer as well as other components such as a Parser and Query

Rewriter, is able to receive a database query. The queries processed by Teradata Database can include subqueries.

84.    Teradata Database performs the step of building a query optimization graph for each query block of the database query, the query optimization graph including plan nodes representing subqueries of each query block. For example, Teradata Database does optimization on a block-by-block basis. A query block is a unit for which the Optimizer attempts to build a join plan. The Optimizer in Teradata Database represents SQL requests using various internal data structures, such as a variety of parse trees. A parse tree is a particular type of acyclic graph: a type of data structure that represents an input code set in terms of nodes and edges, with each arc in the tree specified by a pair of nodes. On information and belief, one or more of the Optimizer's internal data structures includes nodes representing subqueries.

85.    Teradata Database performs the step of, prior to optimization of a query block, identifying alternative strategies for evaluation of a subquery plan node of the query block based on subquery type and semantic properties of the database query. For example, prior to the optimization of the query block, the Incremental Planning and Execution ("IPE") functionality of the Teradata Database generates one or more plans based on a static plan for executing the query request in various stages, including processing correlated subqueries and processing non-correlated scalar subqueries.

86.    Teradata Database performs the step of, for each alternative strategy, pre-computing a subquery access method and subquery join method for use during optimization of the query block, wherein the subquery access method includes an estimate of execution costs. For example, on information and belief, the static plans and/or the plans generated by the IPE functionality for processing various types of subqueries involve determining access methods and join methods for executing the subqueries. These plans also include cost estimates for the access methods. Teradata Database includes a Plan Exploration Space, which is a workspace where various query and join plans and subplans are generated and costed. Teradata Database also includes a Costing Engine, which compares the costs of the various plans and subplans generated in the Plan Exploration Space and returns the least costly plan from a given evaluation set. The

1   Costing Engine primarily uses cardinality estimates based on summary demographic

2   information, whether derived from collected statistics or from dynamic AMP sample estimates,

3   on the set of relations being evaluated to produce its choice of a given best plan.

4         87.    Teradata Database performs the step of generating a set of access methods and

5   join methods for other plan nodes of the query block.  For example, the Optimizer in Teradata

6   Database produces access plans, join plans, and execution plans.  The Optimizer then uses

7   whatever statistical information it has, whether complete or sampled, to determine which access

8   paths or plans are to be used.  Teradata Database, again, includes the Plan Exploration Space,

9   which is a workspace where various query and join plans and subplans are generated and costed.

10  Teradata Database, again, also includes the Costing Engine, which compares the costs of the

11  various plans and subplans generated in the Plan Exploration Space and returns the least costly

12  plan from a given evaluation set.

13        88.    Teradata Database performs the step of optimizing each query block to determine

14  an optimal access plan for the query block based upon selecting pre-computed subquery access

15  methods and join methods for subquery plan nodes of the query block as well as access methods,

16  join methods, and join order for other plan nodes of the query block having favorable execution

17  costs, wherein each query block is optimized without transformation of the subqueries using the

18  pre-computed access methods and join methods.  For example, the optimization processes in the

19  Optimizer of Teradata Database include determining if the optimization steps are to be executed

20  in series or in parallel, and if they are to be individual or common processing steps.  The parse

21  tree is further fleshed out with the optimized access paths, join plans, and aggregation, and the

22  Optimizer selects the best plan based on the available derived statistics and costing data it has.

23        89.    Teradata Database performs the step of constructing a detailed access plan for

24  execution of the database query based upon the optimal access plan determined for each query

25  block.  For example, the Optimizer in Teradata Database further transforms the parse tree by

26  determining an optimal plan, and, when appropriate, determining table join orders and join plans

27  before passing the resulting parse tree on to a Generator for further processing.  At this point, the

28  original request tree has been discarded and replaced by an entirely new parse tree that contains

1    instructions for performing the request.  The parse tree is now an operation tree, which is a

2    textual form of the parse tree.

3        90.    Teradata Corporation's and Teradata Operations, Inc.'s acts of infringement have

4    injured and damaged SAP SE.  SAP SE will suffer additional damages and irreparable harm

5    unless Teradata Corporation and Teradata Operations, Inc. are enjoined from further

6    infringement.

7        **COUNT V – INFRINGEMENT OF U.S. PATENT NO. 7,437,516**

8        91.    SAP SE realleges and incorporates by reference the foregoing paragraphs, as if

9    fully set forth herein.

10       92.    Teradata Corporation and Teradata Operations, Inc. became aware of the '516

11   Patent at least as early as SAP SE's transmittal of the Counterclaims to Teradata Corporation and

12   Teradata Operations, Inc. on May 21, 2019.

13       93.    Teradata Corporation and Teradata Operations, Inc. have been and are now

14   directly infringing, contributing to infringement, and/or inducing others to infringe, the '516

15   Patent in this District and elsewhere in violation of 35 U.S.C. § 271 at least by making, using,

16   selling, offering to sell, and/or importing into the United States software, or products containing

17   such software, that practices one or more claims of the '516 Patent, including at least Teradata

18   Database, when Teradata Intelligent Memory is included.  On information and belief, Teradata

19   Corporation and Teradata Operations, Inc. infringe the '516 Patent by providing demonstrations

20   and testing of such software.  Teradata Corporation and Teradata Operations, Inc. have

21   committed infringing acts without the permission, consent, authorization, or license of SAP SE.

22       94.    Teradata Corporation's and Teradata Operations, Inc.'s infringement is literal or

23   under the doctrine of equivalents, or both.

24       95.    On information and belief, Teradata Corporation and Teradata Operations, Inc., in

25   addition to their own direct infringement, are currently actively inducing and encouraging

26   infringement of the '516 Patent, and, unless enjoined, will continue to actively induce and

27   encourage infringement of the '516 Patent.  Teradata Corporation and Teradata Operations, Inc.

28   have known of the '516 Patent at least since the time of SAP SE's transmittal of the

- 58 -

1   Counterclaims to Teradata Corporation and Teradata Operations, Inc.  On information and belief,

2   Teradata Corporation and Teradata Operations, Inc. nevertheless actively encourage others to

3   infringe the '516 Patent.  On information and belief, Teradata Corporation and Teradata

4   Operations, Inc. knowingly induce infringement by others, including resellers, retailers, and end

5   users of Teradata Database, when Teradata Intelligent Memory is included.  For example,

6   Teradata Corporation's and Teradata Operations, Inc.'s customers and end users test and/or

7   operate Teradata Database, when Teradata Intelligent Memory is included, in the United States

8   in accordance with Teradata Corporation's and Teradata Operations, Inc.'s instructions contained

9   in, for instance, its user manuals, thereby also performing the claimed methods and directly

10  infringing the asserted claims of the '516 Patent reciting such operation.  These facts give rise to

11  a reasonable inference that Teradata Corporation and Teradata Operations, Inc. knowingly

12  induce others, including resellers, retailers, and end users, to directly infringe the '516 Patent,

13  and that Teradata Corporation and Teradata Operations, Inc. possess a specific intent to cause

14  such infringement.

15          96.     Teradata Corporation and Teradata Operations, Inc. also contribute to

16  infringement of the '516 Patent by offering to sell or selling within the United States or

17  importing into the United States (i) Teradata Database, when Teradata Intelligent Memory is

18  included, or products containing such software, (ii) the non-staple constituent parts of such

19  software, which are not suitable for substantial non-infringing use and which embody a material

20  part of the invention claimed in the '516 Patent, and (iii) components of such software, which are

21  not suitable for substantial non-infringing use and which embody a material part of the invention

22  claimed in the '516 Patent.  Such software is known by Teradata Corporation and Teradata

23  Operations, Inc. to be especially made or especially adapted for use in the infringement of the

24  '516 Patent.  Specifically, on information and belief, Teradata Corporation and Teradata

25  Operations, Inc. sell such software to resellers, retailers, and end users with knowledge that such

26  software is used for infringement.  End users of such software directly infringe the '516 Patent.

27          97.     As one example, Teradata Database, when Teradata Intelligent Memory is

28  included, infringes at least claim 9 of the '516 Patent.

98.    Independent claim 9 of the '516 Patent reads as follows (claim element enumeration added for convenience):

| Claim 9 |
|---|
| [a] An article of manufacture comprising program code which when processed by a machine causes a method to be performed, said method comprising: |
| [b] configuring a first eviction policy plug-in by selecting a first sorting component from amongst a plurality of sorting components, said first sorting component having program code to implement a first sorting method, said first eviction policy plug-in also having a first eviction timing component, said first eviction timing component having program code to implement a first eviction timing method; |
| [c] configuring a second eviction policy plug-in by selecting a second sorting component, said second sorting component having program code to implement a second sorting method, said second eviction policy plug-in also having a second eviction timing component, said second eviction timing component having program code to implement a second eviction timing method, wherein said first and second sorting methods are different and said first and second timing methods are different; |
| [d] configuring respective first and second cache portions by plugging said first and second eviction policy plug-ins into a cache management software program and plugging respective first and second storage plug-ins into said cache management software program; and, |
| [e] performing said first and second sorting methods and said first and second timing methods by processing their respective program code from their respective eviction policy plug-ins and performing first and second storage methods by processing their respective program code from their respective storage plug-ins. |

99.    As one example, Teradata Database, when Teradata Intelligent Memory is included, is software stored on an article of manufacture comprising program code which when processed by a machine causes a method to be performed. For example, Teradata Database, when Teradata Intelligent Memory is included, is a software program with code that runs on a

- 60 -

1   machine (*e.g.*, computer) with a processor (capable of processing) and performs a method

2   including various steps.

3        100.    Teradata Database, when Teradata Intelligent Memory is included, performs the

4   step of configuring a first eviction policy plug-in by selecting a first sorting component from

5   amongst a plurality of sorting components, said first sorting component having program code to

6   implement a first sorting method, said first eviction policy plug-in also having a first eviction

7   timing component, said first eviction timing component having program code to implement a

8   first eviction timing method.  For example, Teradata Database, when Teradata Intelligent

9   Memory is included, uses a selected first eviction policy logic to manage the Teradata Intelligent

10  Memory cache ("TIM cache") for one or more AMPs.  The selected first eviction policy logic

11  includes code to implement a first sorting method via the TIM cache, according to a list of most

12  frequently used ("MFU") data.  The TIM cache sorts based on temperature and buffers MFU

13  data.  The first eviction policy plug-in is configured by selecting the first sorting component

14  (*e.g.*, selecting use of an optional TIM cache, with sorting based on temperature) from amongst a

15  plurality of sorting components, including, for instance, sorting based on temperature (the

16  approach used by a cache configured as a TIM cache) and sorting based on most-recently used

17  data (the approach used by a cache configured as a file segment ("FSG") cache).  The first

18  eviction policy logic also includes code to implement a first eviction timing method, which

19  purges less frequently used data from the TIM cache.  TIM cache policy is temperature based:

20  MFU data is maintained based on tracking of very hot data over a period of time.  The hottest

21  (MFU) data is placed and maintained in the TIM cache and is aged out as it cools (as it becomes

22  the least frequently used ("LFU") data within the cache).  On information and belief, the TIM

23  cache is updated and data is evicted from the TIM cache on a time scale that depends on how

24  often temperature measurements are propagated through the system, such as periodically at

25  predetermined times or when significant changes in data temperature occur.

26       101.    Teradata Database, when Teradata Intelligent Memory is included, performs the

27  step of configuring a second eviction policy plug-in by selecting a second sorting component,

28  said second sorting component having program code to implement a second sorting method, said

second eviction policy plug-in also having a second eviction timing component, said second eviction timing component having program code to implement a second eviction timing method, wherein said first and second sorting methods are different and said first and second timing methods are different.  For example, Teradata Database, when Teradata Intelligent Memory is included, uses a second eviction policy logic to manage an FSG cache for one or more AMPs. The second eviction policy logic includes code to implement a second sorting method via the FSG cache, which sorts data based on, *inter alia*, how recently it was used, from most recently used ("MRU") to least recently used ("LRU").  The FSG cache buffers MRU data to temporarily store data required for current queries, and purges LRU data.  The second eviction policy plug-in is configured by selecting the second sorting component (*e.g.*, determining what portion of the cache will be configured as an FSG cache, with sorting based on how recently data was used (MRU/LRU)).  The second eviction policy logic also includes code to implement a second eviction timing method, which operates over short periods of time to purge LRU data as needed to add new data to the FSG cache.  The sorting method of the FSG cache (based on LRU) and sorting method of TIM cache (based on temperature) are different.  Upon information and belief, the timing method of the FSG cache and the TIM cache are different; they use different time windows to operate and/or they make eviction determinations on different schedules.  For instance, on information and belief, unlike the FSG cache that may be updated every request, eviction from the TIM cache takes place less frequently as temperature measurements used for eviction from the TIM cache are only propagated through the system periodically at predetermined times or when a significant change in data temperatures occurs.  Further, no object is stored in both the FSG cache and the TIM cache at the same time.  The FSG cache and the TIM cache can be flushed separately.  The TIM cache's preload feature, which uses different timing than that of the FSG cache, can be disabled.

102.    Teradata Database, when Teradata Intelligent Memory is included, performs the step of configuring respective first and second cache portions by plugging said first and second eviction policy plug-ins into a cache management software program and plugging respective first and second storage plug-ins into said cache management software program.  For example, on

1   information and belief, in Teradata Database, when Teradata Intelligent Memory is included, the

2   Teradata Database file system and/or Parallel Database Extensions (PDE) serve as a cache

3   management software into which the plug-ins plug.  Specifically, on information and belief, in

4   Teradata Database, the FSG cache is controlled by, *inter alia*, one or more components of the

5   PDE, which generally handles low-level functionality for the Teradata Database, and/or the

6   Teradata Database file system.  On information and belief, PDE and/or Teradata Database file

7   system control the TIM cache as well.  Both the FSG and TIM caches interact with each other,

8   for instance, by ensuring that only one copy of a data block is stored across the FSG and TIM

9   caches.  The storage functionality of the TIM cache, together with the TIM cache as a whole, can

10  be added or removed/disabled.  Components of the FSG cache and the TIM cache serve as the

11  storage plug-ins, which cause the FSG and TIM caches to be read from and written to.  On

12  information and belief, the FSG cache's and TIM cache's storage methods are implemented in

13  modular form using software modules containing "program code."

14          103.    Teradata Database, when Teradata Intelligent Memory is included, implements

15  the step of performing said first and second sorting methods and said first and second timing

16  methods by processing their respective program code from their respective eviction policy plug-

17  ins and performing first and second storage methods by processing their respective program code

18  from their respective storage plug-ins.  For example, Teradata Database, when Teradata

19  Intelligent Memory is included, manages the TIM cache and the FSG cache according to the first

20  eviction policy logic, second eviction policy logic, and storage logic as discussed above.

21          104.    Teradata Corporation's and Teradata Operations, Inc.'s acts of infringement have

22  injured and damaged SAP SE.  SAP SE will suffer additional damages and irreparable harm

23  unless Teradata Corporation and Teradata Operations, Inc. are enjoined from further

24  infringement.

25                              **PRAYER FOR RELIEF**

26          WHEREFORE, Defendants request:

27  a)      SAP's costs of defending this action and SAP SE's costs of prosecuting its

28  counterclaims, including attorney's fees and expenses to the full extent permitted by law;

- 63 -

1    b)    Judgment in SAP's favor in all claims against SAP;

2    c)    Judgment in SAP SE's favor on all counterclaims against Teradata Corporation

3    and Teradata Operations, Inc.;

4    d)    An award of damages to SAP SE based on its counterclaims in an amount to be

5    proven at trial, including lost profits but in no event less than a reasonable royalty for its

6    infringement including pre-judgment and post-judgment interest at the maximum rate permitted

7    by law;

8    e)    Factual findings supporting and enhancement of any damages awarded to SAP SE

9    by virtue of the exceptional nature of this case under 35 U.S.C. § 285;

10    f)    Issuance of permanent injunctive relief against Teradata Corporation and Teradata

11    Operations, Inc. based on SAP SE's counterclaims; and

12    g)    Such other relief as the Court deems just and proper.

13                                    **<u>JURY DEMAND</u>**

14    Defendants demand a trial by jury of all issues so triable.

15    Dated: May __, 2019                    Respectfully submitted,

16                                            Jones Day

17                                            By:    /s Tharan Gregory Lanier

18                                                   Tharan Gregory Lanier

19                                            *Counsel for Defendants*
                                             *SAP SE, SAP AMERICA, INC., AND SAP*
20                                           *LABS, LLC*

21

22

23

24

25

26

27

28

- 64 -

# EXHIBIT 5



Suite 3300
920 Fifth Avenue
Seattle, WA  98104-1610

**Benjamin J. Byer**
206-757-8105 tel
206-757-7105 fax

benbyer@dwt.com

June 12, 2020

VIA EMAIL – mkaiser@mofo.com

Mary G. Kaiser
Morrison & Foerster
2000 Pennsylvania Ave., NW
Washington, DC 20006-1888

  Re: Teradata Corp., et al. v. SAP, et. al., No. 3:18-cv-3670-WHO (N.D. Cal.)

Dear Ms. Kaiser:

   I write on behalf of Microsoft Corporation ("Microsoft") in response to the Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action ("the Subpoena") dated and served on Microsoft on May 22, 2020, on behalf of your clients Teradata US, Inc., Teradata Corporation and Teradata Operations, Inc. ("Teradata") in the above-referenced civil action.

   As a threshold matter, the Subpoena fails to allow a reasonable time for compliance (particularly in view of the breadth and overbreadth) of the discovery sought.  Microsoft repeatedly requested the courtesy of a two-week extension of time to respond, noting that counsel needed time to analyze the numerous requests, and needed to do so amidst the challenges of the current COVID-19 crisis.  Inexplicably, Teradata refused, granting Microsoft a single additional week.  Teradata compounds the prejudice by providing a cover letter without any explanation of the alleged relevance of the information the Subpoena requests.  Teradata alleges merely that it seeks information "to prosecute its claims against SAP and to rebut SAP's counterclaims."  Teradata thus places Microsoft in the untenable position of attempting to analyze the 155 paragraphs Teradata alleges in its 38-page complaint, as well as the 104 paragraphs that SAP alleges in its 65-page answer and counterclaim, and attempting to divine on its own (and without the additional time it requested) why Teradata believes the information is relevant.

   Despite this, Microsoft remains willing to work with Teradata in a good faith attempt to reach agreement regarding the appropriate scope of, response to, and timing for the Subpoena.  In the meantime, Microsoft responds and objects to the Subpoena as follows.

**DWT.COM**

Anchorage | Bellevue | Los Angeles | New York
Portland | San Francisco | Seattle | Washington, D.C.
4818-2491-8462v.4 0050033-001744

Mary G. Kaiser
Morrison & Foerster
June 12, 2020
Page 2

## **Microsoft's Objections to Definitions and Instructions**

1.      **"Microsoft," "You," and "Your."**  Microsoft objects to the definition of the terms "Microsoft," "You," and "Your" in the Subpoena as overly broad, unduly burdensome, and confusing; Teradata should identify by name any person or entity it believes (based on a reasonable and articulated investigation) currently to have relevant and responsive information and currently to be within Microsoft's control.  Further, this definition as drafted includes persons or entities that are not under Microsoft's control.  Microsoft further objects to the definition to the extent it calls for discovery of matter protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or similar immunity or protection. Microsoft will limit its responses to documents and information currently known to be in its possession, custody, or control, and in this regard, will interpret these defined terms as referring solely to Microsoft Corporation.

2.      **"Teradata" or "Plaintiffs."**  Microsoft objects to the definition of the terms "Teradata" or "Plaintiffs" in the Subpoena as overly broad, unduly burdensome, and confusing; Teradata should identify by name any person or entity of interest and should not expect Microsoft to divine on its own what particular persons or entities Teradata intends to encompass within the definition of "Teradata."  Microsoft will interpret the terms "Teradata" or "Plaintiffs" in the Subpoena to refer only to Teradata Corporation, Teradata US, Inc., and Teradata Operations, Inc.

3.      **"SAP" or "Defendants."**  Microsoft objects to the definition of the term "SAP" or "Defendants" in the Subpoena as overly broad, unduly burdensome, and confusing; Teradata should identify by name any person or entity of interest and should not expect Microsoft to divine on its own what particular persons or entities Teradata intends to encompass within the definition of "SAP" or "Defendants."  Microsoft will interpret the terms "SAP" or "Defendants" in the Subpoena to refer only to SAP SE, SAP America Inc., and SAP Labs, LLC.

4.      **"Concerning," "concern," "relating to," "relate to," and "related to."** Microsoft objects to the definition of the terms "concerning," "concern," "relating to," "relate to," and "related to" in the Subpoena as overly broad, unduly burdensome, and requiring Microsoft to draw a legal conclusion or to engage in undue factual or legal analysis to ascertain the Subpoena's meaning or scope.  Microsoft will interpret the terms to refer only to "describing," "discussing," or "containing."

5.      **"EDAW Product."**  Microsoft objects to the definition of the terms "EDAW Product" in the Subpoena as overly broad, unduly burdensome, open-ended, and confusing; indeed, as drafted the definition of "EDAW Product" would potentially sweep in the bulk of Microsoft's products.  Teradata should not expect Microsoft to divine on its own what products Teradata contends "provide data storage, warehousing, and analytic functionality" and then somehow identify "any and all competing products."  Microsoft will interpret the term "EDAW

Mary G. Kaiser
Morrison & Foerster
June 12, 2020
Page 3

Product" in the Subpoena to refer only to the particular products and versions, if any, the subpoena identifies by name.

6.      **"ERP Application."**  Microsoft objects to the definition of the terms "ERP Application" in the Subpoena as overly broad, unduly burdensome, open-ended, and confusing; Teradata should not expect Microsoft to divine on its own what products Teradata contends "allow companies to gather and manage data required to conduct day-to-day operations across many aspects of a business enterprise, including, but not limited to, sales and inventory transactions, financial and accounting transactions, and human-resource transactions," and then somehow identify "any and all competing products."  Microsoft will interpret the term "ERP Application" in the Subpoena to refer only to the particular products and versions, if any, the subpoena identifies by name.

7.      **"Named Product(s)."**  Microsoft objects to the definition of the terms "Named Product(s)" in the Subpoena as overly broad and unduly burdensome because the terms as defined are open-ended and lack any date or version restrictions.

8.      **"S/4HANA."**  Microsoft objects to the definition of the term "S/4HANA" in the Subpoena as vague, ambiguous, overly burdensome because it requires Microsoft to determine "SAP's most recent ERP Application."  Microsoft should not be required to identify what products and versions, if any, Teradata believes meets this definition.  Microsoft will interpret the term "S/4HANA" in the Subpoena to refer only to the particular products and versions, if any, the Subpoena identifies by name.

9.      **"SAP HANA."**  Microsoft objects to the definition of the terms "SAP HANA" in the Subpoena as overly broad and unduly burdensome because it is open-ended; Microsoft will interpret the term "SAP HANA" in the Subpoena to refer only to the particular products and versions, if any, the subpoena identifies by name.

## Microsoft's Objections to Requests for Production

### REQUEST FOR PRODUCTION NO. 1:

Documents comprising or reflecting Your product roadmaps, promotional materials, product development plans, and marketing plans for each of the ERP Applications or EDAW Products and related services that You offer.

### OBJECTION TO RFP NO. 1:

Microsoft objects to this Request because it seeks trade secret, confidential, and commercially sensitive research, development, and other material, and it does so from a third-party, with no interest in this litigation.  Microsoft will not produce any such material absent an appropriate protective order.  Microsoft also objects to the Request because the terms "product roadmaps," "promotional materials," "product development plans," "marketing plans," and

Mary G. Kaiser
Morrison & Foerster
June 12, 2020
Page 4

"related services that You offer" are vague and ambiguous, as it is unclear what Teradata means by any of these terms or what it is looking for with them. Microsoft also objects to this Request as over broad, unduly burdensome, expensive, and not proportional to the needs of the Action because it includes no reasonable date restrictions; makes no attempt to identify what specifically Teradata seeks, making it impossible for Microsoft to determine relevance or responsiveness; is broad enough to encompass information that may be protected by a privilege or the work-product doctrine; and misuses Rule 45. Rather than seeking specific and targeted, non-privileged information found uniquely in Microsoft's possession, this Request attempts to use Rule 45 to force Microsoft to generally build Teradata's claims simply because Teradata appears to believe Microsoft participates in the market. Microsoft is not a party to this lawsuit. Rule 45 does not permit Teradata to shift the burden of conducting its own market analysis, hiring its own expert witnesses, and prosecuting its claims against SAP onto Microsoft, a non-party to Teradata's lawsuit. Microsoft therefore objects that this Request calls for discovery of matters that can be obtained more conveniently, with less burden or with less expense, from sources other than Microsoft, e.g., from publicly available sources or parties in this lawsuit. Teradata and its counsel have not taken reasonable steps to avoid imposing undue burden or expense on Microsoft.

Microsoft also objects to this Request to the extent it calls for discovery of electronically stored information from sources that are not reasonably accessible because Microsoft is not able to retrieve information from many of these sources, or even confirm with certainty whether any responsive information in fact exists on the sources, without incurring substantial undue burden or cost. Known, difficult-to-access sources that may contain potentially responsive information (others may exist and become apparent once the scope of the information sought by the Subpoena is properly defined), but which Microsoft is neither searching, preserving nor producing because they are not reasonably accessible without undue burden, fall under the following categories: current disaster recovery media, obsolete back up media, legacy systems, sources requiring computer forensics to access, databases that are structured to hold or report information in certain formats and which cannot readily provide different data or data in different configurations and source code (other than as may be retained in centralized source code archives).

Based on these objections and Microsoft's objections to the relevant definitions, Microsoft will not respond further to this Request. Microsoft, however, is willing to meet and confer with Teradata to understand its position and what it is looking for with this Request.

## REQUEST FOR PRODUCTION NO. 2:

Documents reflecting or concerning any assessment or evaluation of competition between or among Microsoft, Oracle, IBM, Teradata, and SAP for ERP Applications and/or EDAW Products and all data underlying or evaluated in such assessments or evaluations.

Mary G. Kaiser
Morrison & Foerster
June 12, 2020
Page 5

**OBJECTION TO RFP NO. 2:**

Microsoft objects to this Request because it seeks trade secret, confidential, and commercially sensitive research, development, and other material, and it does so from a third-party, with no interest in this litigation. Microsoft will not produce any such material absent an appropriate protective order. Microsoft objects that the request contains vague and ambiguous terms such as "assessment or evaluation of competition" and "all data underlying or evaluated in such assessments or evaluations," as Microsoft does not know what Teradata means or is looking for by using these terms. Microsoft also objects to this request as over broad, unduly burdensome, expensive, and not proportional to the needs of the Action because it includes no reasonable date restrictions; makes no attempt to identify what specifically Teradata seeks, making it impossible for Microsoft to determine relevance or responsiveness; is broad enough to encompass information that may be protected by a privilege or the work-product doctrine; and misuses Rule 45, including by requesting "all data underlying or evaluated in such assessments or evaluations." Rather than seeking specific and targeted, non-privileged information found uniquely in Microsoft's possession, this request attempts to use Rule 45 to force Microsoft to generally build Teradata's claims simply because Teradata appears to believe Microsoft participates in the market. Microsoft is not a party to this lawsuit. Rule 45 does not permit Teradata to shift the burden of conducting its own market analysis, hiring its own expert witnesses, and prosecuting its claims against SAP onto Microsoft, a non-party to Teradata's lawsuit. Microsoft therefore objects that this request calls for discovery of matters that can be obtained more conveniently, with less burden or with less expense from sources other than Microsoft, e.g., from publicly available sources or parties in this lawsuit. Teradata and its counsel have not taken reasonable steps to avoid imposing undue burden or expense on Microsoft.

Microsoft also objects to this request to the extent it calls for discovery of electronically stored information from sources that are not reasonably accessible because Microsoft is not able to retrieve information from many of these sources, or even confirm with certainty whether any responsive information in fact exists on the sources, without incurring substantial undue burden or cost. Known, difficult-to-access sources that may contain potentially responsive information (others may exist and become apparent once the scope of the information sought by the Subpoena is properly defined), but which Microsoft is neither searching, preserving nor producing because they are not reasonably accessible without undue burden, fall under the following categories: current disaster recovery media, obsolete back up media, legacy systems, sources requiring computer forensics to access, databases that are structured to hold or report information in certain formats and which cannot readily provide different data or data in different configurations and source code (other than as may be retained in centralized source code archives).

Based on these objections and Microsoft's objections to the relevant definitions, Microsoft will not respond further to this Request. Microsoft, however, is willing to meet and confer with Teradata to understand its position and what it is looking for with this Request.

Mary G. Kaiser
Morrison & Foerster
June 12, 2020
Page 6

**REQUEST FOR PRODUCTION NO. 3:**

Documents reflecting Microsoft's wins and losses of sales of ERP Applications and EDAW Products in competition with Oracle, IBM, Teradata, or SAP, including for each win and loss an identification of the product and supplier the customer switched away from and identification of the product and supplier it switched to.

**OBJECTION TO RFP NO. 3:**

Microsoft objects to this Request because it seeks trade secret, confidential, and commercially sensitive research, development, and other material, and it does so from a third-party, with no interest in this litigation. Microsoft will not produce any such material absent an appropriate protective order. Microsoft objects that the request contains vague and ambiguous terms such as "wins and losses of sales," "switched away from," and "switched to," as Microsoft does not know what Teradata means or is looking for by using these terms. . Microsoft also objects to this Request because it appears to require Microsoft to create documents that do not otherwise exist, as the Request not only asks for "Documents reflecting," but also asks Microsoft to provide "for each win and loss an identification of the product and supplier the customer switched away from and identification of the product and supplier it switched to." Teradata may not disguise an interrogatory as a request for production under Rule 45, which does not permit interrogatories against third parties. Microsoft objects to this request as over broad, unduly burdensome, expensive, and not proportional to the needs of the Action because it includes no reasonable date restrictions; makes no attempt to identify what specifically Teradata seeks, making it impossible for Microsoft to determine relevance or responsiveness and requiring Microsoft to engage in undue factual analysis to ascertain what the request actually seeks; and misuses Rule 45. Rather than seeking specific and targeted information found uniquely in Microsoft's possession, this request attempts to use Rule 45 to force Microsoft to generally build Teradata's claims simply because Teradata appears to believe Microsoft participates in the market. Microsoft is not a party to this lawsuit. Rule 45 does not permit Teradata to shift the burden of conducting its own market analysis, hiring its own expert witnesses, and prosecuting its claims against SAP onto Microsoft, a non-party to Teradata's lawsuit. Microsoft therefore objects that this request calls for discovery of matters that can be obtained more conveniently, with less burden or with less expense from sources other than Microsoft, e.g., from publicly available sources or parties in this lawsuit. Teradata and its counsel have not taken reasonable steps to avoid imposing undue burden or expense on Microsoft.

Microsoft also objects to this request to the extent it calls for discovery of electronically stored information from sources that are not reasonably accessible because Microsoft is not able to retrieve information from many of these sources, or even confirm with certainty whether any responsive information in fact exists on the sources, without incurring substantial undue burden or cost. Known, difficult-to-access sources that may contain potentially responsive information (others may exist and become apparent once the scope of the information sought by the Subpoena is properly defined), but which Microsoft is neither searching, preserving nor producing because they are not reasonably accessible without undue burden, fall under the

Mary G. Kaiser
Morrison & Foerster
June 12, 2020
Page 7

following categories: current disaster recovery media, obsolete back up media, legacy systems, sources requiring computer forensics to access, databases that are structured to hold or report information in certain formats and which cannot readily provide different data or data in different configurations and source code (other than as may be retained in centralized source code archives).

Microsoft objects to the Request to the extent it calls for discovery of matter protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or similar immunity or protection.

Based on these objections and Microsoft's objections to the relevant definitions, Microsoft will not respond further to this Request. Microsoft, however, is willing to meet and confer with Teradata to understand its position and what it is looking for with this Request.

## REQUEST FOR PRODUCTION NO. 4:

Documents sufficient to identify Your top 100 customers by revenue for each of the ERP- and EDAW-based products or services You offer, the specific Microsoft ERP- or EDAW-based products or services that each such customer purchases, the amounts paid annually by each such customer for each of those ERP- or EDAW-based products or services, and when each such customer began using and stopped using (for any that stopped) each of those ERP- or EDAW-based products or services.

## OBJECTION TO RFP NO. 4:

Microsoft objects to this Request because it seeks trade secret, confidential, and commercially sensitive research, development, and other material, and it does so from a third-party, with no interest in this litigation. Microsoft will not produce any such material absent an appropriate protective order. Microsoft objects that the request contains vague and ambiguous terms such as "top 100 customers by revenue" without identifying a time period and sufficiently particular metric to determine the "top 100." Microsoft further objects that the request fails to describe the documents sought with sufficient particularity to enable Microsoft to conduct a reasonable search, but instead seeks "Documents sufficient to identify" its "top 100 customers by revenue for each of the ERP- and EDAW-based products or services [it offers], the specific Microsoft ERP- or EDAW-based products or services that each such customer purchases, the amounts paid annually by each such customer for each of those ERP- or EDAW-based products or services, and when each such customer began using and stopped using (for any that stopped) each of those ERP- or EDAW-based products or services." This requires Microsoft to engage in undue factual analysis to ascertain the documents the request actually seeks.

Microsoft also objects to this request as over broad, unduly burdensome, expensive, and not proportional to the needs of the Action because it includes no reasonable date restrictions, makes no attempt to identify what specifically Teradata seeks, making it impossible for Microsoft to determine relevance or responsiveness, and misuses Rule 45. Rather than seeking specific and targeted information found uniquely in Microsoft's possession, this request attempts

Mary G. Kaiser
Morrison & Foerster
June 12, 2020
Page 8

to use Rule 45 to force Microsoft to generally build Teradata's claims simply because Teradata appears to believe Microsoft participates in the market. Microsoft is not a party to this lawsuit. Rule 45 does not permit Teradata to shift the burden of conducting its own market analysis, hiring its own expert witnesses, and prosecuting its claims against SAP onto Microsoft, a non-party to Teradata's lawsuit. Microsoft therefore objects that this request calls for discovery of matters that can be obtained more conveniently, with less burden or with less expense from sources other than Microsoft, e.g., from publicly available sources or parties in this lawsuit. Teradata and its counsel have not taken reasonable steps to avoid imposing undue burden or expense on Microsoft.

Microsoft also objects to this request to the extent it calls for discovery of electronically stored information from sources that are not reasonably accessible because Microsoft is not able to retrieve information from many of these sources, or even confirm with certainty whether any responsive information in fact exists on the sources, without incurring substantial undue burden or cost. Known, difficult-to-access sources that may contain potentially responsive information (others may exist and become apparent once the scope of the information sought by the Subpoena is properly defined), but which Microsoft is neither searching, preserving nor producing because they are not reasonably accessible without undue burden, fall under the following categories: current disaster recovery media, obsolete back up media, legacy systems, sources requiring computer forensics to access, databases that are structured to hold or report information in certain formats and which cannot readily provide different data or data in different configurations and source code (other than as may be retained in centralized source code archives).

Based on these objections and Microsoft's objections to the relevant definitions, Microsoft will not respond further to this Request. Microsoft, however, is willing to meet and confer with Teradata to understand its position and what it is looking for with this Request.

## REQUEST FOR PRODUCTION NO. 5:

Documents comprising or relating to any communication between Microsoft and SAP regarding HANA or S/4HANA, including but not limited to any changes to Microsoft's or SAP's business practices or the business relationship between SAP and Microsoft relating to HANA or S/4HANA or restrictions on the ability of users of S/4HANA to transfer, export, or copy data derived, created, or processed by S/4HANA into a Named Product.

## OBJECTION TO RFP NO. 5:

Microsoft objects to the extent that this request calls for disclosure of documents containing trade secret or other confidential research, development, or commercial information (any such documents will be produced only pursuant to the terms of an appropriate protective order). Microsoft objects that the request contains vague and ambiguous terms such as "relating to any communications," "changes to Microsoft's or SAP's business practices," "business

Mary G. Kaiser
Morrison & Foerster
June 12, 2020
Page 9

relationship between SAP and Microsoft relating to HANA or S/4HANA," and "restrictions on the ability of users of S/4HANA to transfer, export, or copy data derived, created, or processed by S/4HANA into a Named Product." Indeed, the phrase "relating to" is presumptively overbroad, fatally vague, and insufficiently specific to allow Microsoft to locate such documents through a reasonable search, and Microsoft cannot possibly discern what Teradata means by phrases as sweeping as "changes to … business practices" and "business relationship." Microsoft also objects to this request as over broad, unduly burdensome, expensive, and not proportional to the needs of the Action because it includes no date restrictions, makes no attempt to identify what specifically Teradata seeks, making it impossible for Microsoft to determine relevance or responsiveness; is broad enough to encompass information that may be protected by a privilege or the work-product doctrine; and misuses Rule 45. This request therefore requires Microsoft to engage in undue factual analysis to ascertain the documents the request actually seeks, making it impossible for Microsoft to determine relevance or responsiveness. Rather than seeking specific and targeted, non-privileged information found uniquely in Microsoft's possession, this request attempts to use Rule 45 to force Microsoft to generally build Teradata's claims simply because Teradata appears to believe Microsoft participates in the market. Microsoft is not a party to this lawsuit. Rule 45 does not permit Teradata to shift the burden of conducting its own market analysis, hiring its own expert witnesses, and prosecuting its claims against SAP onto Microsoft, a non-party to Teradata's lawsuit. Microsoft therefore objects that this request calls for discovery of matters that can be obtained more conveniently, with less burden or with less expense from sources other than Microsoft, e.g., from publicly available sources or parties in this lawsuit. Indeed, SAP would be in possession of its communications with Microsoft and therefore, is the appropriate source to which to direct this Request. Teradata and its counsel have not taken reasonable steps to avoid imposing undue burden or expense on Microsoft.

To the extent that the requests purports to require Microsoft to conduct a search of all files in its possession, custody or control or to locate documents comprising or relating to "any" responsive communication between Microsoft and SAP, Microsoft objects that the Subpoena is overly broad, unduly burdensome, expensive and seeks discovery that is not proportional to the needs of the case because Microsoft does not maintain enterprise-wide subject matter files.

Microsoft also objects to this request to the extent it calls for discovery of electronically stored information from sources that are not reasonably accessible because Microsoft is not able to retrieve information from many of these sources, or even confirm with certainty whether any responsive information in fact exists on the sources, without incurring substantial undue burden or cost. Known, difficult-to-access sources that may contain potentially responsive information (others may exist and become apparent once the scope of the information sought by the Subpoena is properly defined), but which Microsoft is neither searching, preserving nor producing because they are not reasonably accessible without undue burden, fall under the following categories: current disaster recovery media, obsolete back up media, legacy systems, sources requiring computer forensics to access, databases that are structured to hold or report information

Mary G. Kaiser
Morrison & Foerster
June 12, 2020
Page 10

in certain formats and which cannot readily provide different data or data in different
configurations and source code (other than as may be retained in centralized source code
archives).

Based on these objections and Microsoft's objections to the relevant definitions,
Microsoft will not respond further to this Request.  Microsoft, however, is willing to meet and
confer with Teradata to understand its position and what it is looking for with this Request.

## REQUEST FOR PRODUCTION NO. 6:

Documents comprising or relating to any communication between Microsoft and SAP
concerning Teradata.

## OBJECTION TO RFP NO. 6:

Microsoft objects to the extent that this request calls for disclosure of documents
containing trade secret or other confidential research, development or commercial information
(any such documents will be produced only pursuant to the terms of an appropriate protective
order).  Microsoft objects to this request as over broad, unduly burdensome, fatally vague, and
insufficiently specific to allow Microsoft to locate such documents through a reasonable search
because it purports to seek "documents … relating to any communication. . . ."  This is
especially the case here, where Teradata directs this Request to a third-party under Rule 45.
Microsoft also objects to this Request as overly broad, unduly burdensome, and disproportionate
to the needs of the case, and as seeking irrelevant information, because it fails to include any
reasonable date or subject matter restrictions; makes no attempt to identify what specifically
Teradata seeks, making it impossible for Microsoft to determine relevance or responsiveness; is
broad enough to encompass information that may be protected by a privilege or the work-product
doctrine;, and misuses Rule 45.  Rather than seeking specific and targeted, non-privileged
information found uniquely in Microsoft's possession, this request attempts to use Rule 45 to
force Microsoft to generally build Teradata's claims simply because Teradata appears to believe
Microsoft participates in the market.  Microsoft is not a party to this lawsuit.  Rule 45 does not
permit Teradata to shift the burden of conducting its own market analysis, hiring its own expert
witnesses, and prosecuting its claims against SAP onto Microsoft, a non-party to Teradata's
lawsuit.  Microsoft therefore objects that this request calls for discovery of matters that can be
obtained more conveniently, with less burden or with less expense from sources other than
Microsoft, e.g., from publicly available sources or parties in this lawsuit.  Indeed, SAP would be
in possession of its communications with Microsoft, and therefore, is the appropriate source to
which to direct this Request.  Teradata and its counsel have not taken reasonable steps to avoid
imposing undue burden or expense on Microsoft.

To the extent that the requests purports to require Microsoft to conduct a search
of all files in its possession, custody, or control, or to locate "any" responsive
communication between Microsoft and SAP, Microsoft objects that the Subpoena is
overly broad, unduly burdensome, expensive, and seeks discovery that is not

Mary G. Kaiser
Morrison & Foerster
June 12, 2020
Page 11

proportional to the needs of the case because Microsoft does not maintain enterprise-wide subject matter files.

Microsoft also objects to this request to the extent it calls for discovery of electronically stored information from sources that are not reasonably accessible because Microsoft is not able to retrieve information from many of these sources, or even confirm with certainty whether any responsive information in fact exists on the sources, without incurring substantial undue burden or cost. Known, difficult-to-access sources that may contain potentially responsive information (others may exist and become apparent once the scope of the information sought by the Subpoena is properly defined), but which Microsoft is neither searching, preserving nor producing because they are not reasonably accessible without undue burden, fall under the following categories: current disaster recovery media, obsolete back up media, legacy systems, sources requiring computer forensics to access, databases that are structured to hold or report information in certain formats and which cannot readily provide different data or data in different configurations and source code (other than as may be retained in centralized source code archives).

Based on these objections and Microsoft's objections to the relevant definitions, Microsoft will not respond further to this Request. Microsoft, however, is willing to meet and confer with Teradata to understand its position and what it is looking for with this Request.

## REQUEST FOR PRODUCTION NO. 7:

Documents comprising or relating to any communication between Microsoft and SAP, any other competitor, any customer, or any government authority concerning any restrictions or prohibitions imposed by SAP on exporting, extracting, or transferring data derived, created, or processed by any SAP ERP Applications for use with an EDAW Product not offered by SAP.

## OBJECTION TO RFP NO. 7:

Microsoft objects to this Request because it seeks trade secret, confidential, and commercially sensitive research, development, and other material, and it does so from a third-party, with no interest in this litigation. Microsoft will not produce any such material absent an appropriate protective order. Microsoft objects that the request contains vague and ambiguous terms such as "relating to any communications," "any other competitor," "any customer," and "any government authority," and "concerning any restrictions or prohibitions imposed by SAP on exporting, extracting, or transferring data derived, created, or processed by any SAP ERP Applications for use with an EDAW Product not offered by SAP." This request therefore requires Microsoft to engage in undue factual analysis to ascertain the documents the request actually seeks making it impossible for Microsoft to determine relevance or responsiveness,. Indeed, the term "relating to" is presumptively overbroad, fatally vague, and insufficiently specific to allow Microsoft to locate such documents through a reasonable search, and the sweeping nature of this Request is so overly broad and unduly burdensome as to potentially

Mary G. Kaiser
Morrison & Foerster
June 12, 2020
Page 12

encompass every communication anyone anywhere in Microsoft has had "concerning restrictions or prohibitions imposed by SAP on exporting, extracting, or transferring data derived, created, or processed by any SAP ERP Applications for use with an EDAW Product not offered by SAP." The request is also broad enough to encompass documents protected by a privilege, immunity, or other similar doctrine. Put simply, this Request is an abuse of Rule 45. Rather than seeking specific and targeted, non-privileged information found uniquely in Microsoft's possession, this request attempts to use Rule 45 to force Microsoft to generally build Teradata's claims simply because Teradata appears to believe Microsoft participates in the market. Microsoft is not a party to this lawsuit. Rule 45 does not permit Teradata to shift the burden of conducting its own market analysis, hiring its own expert witnesses, and prosecuting its claims against SAP onto Microsoft, a non-party to Teradata's lawsuit. Microsoft therefore objects that this request calls for discovery of matters that can be obtained more conveniently, with less burden or with less expense from sources other than Microsoft, e.g., from publicly available sources or parties in this lawsuit. Indeed, SAP would be in possession of its communications with Microsoft and is therefore the appropriate source for such communications. Teradata and its counsel have not taken reasonable steps to avoid imposing undue burden or expense on Microsoft.

To the extent that the requests purports to require Microsoft to conduct a search of all files in its possession, custody or control or to locate "any" responsive communication between Microsoft and SAP, Microsoft objects that the Subpoena is overly broad and unduly burdensome and expensive and seeks discovery that is not proportional to the needs of the case because Microsoft does not maintain enterprise-wide subject matter files.

Microsoft also objects to this request to the extent it calls for discovery of electronically stored information from sources that are not reasonably accessible because Microsoft is not able to retrieve information from many of these sources, or even confirm with certainty whether any responsive information in fact exists on the sources, without incurring substantial undue burden or cost. Known, difficult-to-access sources that may contain potentially responsive information (others may exist and become apparent once the scope of the information sought by the Subpoena is properly defined), but which Microsoft is neither searching, preserving nor producing because they are not reasonably accessible without undue burden, fall under the following categories: current disaster recovery media, obsolete back up media, legacy systems, sources requiring computer forensics to access, databases that are structured to hold or report information in certain formats and which cannot readily provide different data or data in different configurations and source code (other than as may be retained in centralized source code archives).

Based on these objections and Microsoft's objections to the relevant definitions, Microsoft will not respond further to this Request. Microsoft, however, is willing to meet and confer with Teradata to understand its position and what it is looking for with this Request.

Mary G. Kaiser
Morrison & Foerster
June 12, 2020
Page 13

**REQUEST FOR PRODUCTION NO. 8:**

Documents sufficient to show the existence of any restrictions or prohibitions imposed by SAP on the interoperability or the integration of Microsoft ERP Applications or data derived, created, or processed by such Microsoft ERP Applications with SAP HANA.

**OBJECTION TO RFP NO. 8:**

Microsoft objects to the extent that this request calls for disclosure of documents containing trade secret or other confidential research, development or commercial information (any such documents will be produced only pursuant to the terms of an appropriate protective order).  Microsoft objects that the request contains vague and ambiguous terms such as "any restrictions or prohibitions," "interoperability or the integration," and "data derived, created, or processed by such Microsoft ERP Applications with SAP HANA."  This Request makes no attempt to explain what Teradata means by those terms in any meaningful way, leaving Microsoft to guess as to what might or might not be relevant or responsive.  Microsoft further objects that the request fails to describe the documents sought with sufficient particularity to enable Microsoft to conduct a reasonable search, but instead seeks "Documents sufficient to show" the alleged "existence of any restrictions or prohibitions imposed by SAP on the interoperability or the integration of Microsoft ERP Applications or data derived, created, or processed by such Microsoft ERP Applications with SAP HANA."  This requires Microsoft to engage in undue factual analysis to ascertain the documents the request actually seeks.

Microsoft also objects to this request as over broad, unduly burdensome, expensive, and not proportional to the needs of the Action because it includes no reasonable date restrictions and misuses Rule 45.  Rather than seeking specific and targeted information found uniquely in Microsoft's possession, this request attempts to use Rule 45 to force Microsoft to generally build Teradata's claims simply because Teradata appears to believe Microsoft participates in the market.  Microsoft is not a party to this lawsuit.  Rule 45 does not permit Teradata to shift the burden of conducting its own market analysis, hiring its own expert witnesses, and prosecuting its claims against SAP onto Microsoft, a non-party to Teradata's lawsuit. Microsoft therefore objects that this request calls for discovery of matters that can be obtained more conveniently, with less burden or with less expense from sources other than Microsoft, e.g., from publicly available sources or parties in this lawsuit.  Indeed, SAP would be in possession of its documents showing the existence of any restrictions or prohibitions it imposed, making SAP the appropriate source for this information, not Microsoft.  Teradata and its counsel have not taken reasonable steps to avoid imposing undue burden or expense on Microsoft.

Microsoft also objects to this request to the extent it calls for discovery of electronically stored information from sources that are not reasonably accessible because Microsoft is not able to retrieve information from many of these sources, or even confirm with certainty whether any responsive information in fact exists on the sources, without incurring substantial undue burden or cost.  Known, difficult-to-access sources that may contain potentially

Mary G. Kaiser
Morrison & Foerster
June 12, 2020
Page 14

responsive information (others may exist and become apparent once the scope of the information sought by the Subpoena is properly defined), but which Microsoft is neither searching, preserving nor producing because they are not reasonably accessible without undue burden, fall under the following categories: current disaster recovery media, obsolete back up media, legacy systems, sources requiring computer forensics to access, databases that are structured to hold or report information in certain formats and which cannot readily provide different data or data in different configurations and source code (other than as may be retained in centralized source code archives).

Microsoft objects to the Request to the extent it calls for discovery of matter protected by the attorney-client privilege, work-product doctrine or any other applicable privilege or similar immunity or protection.

Based on these objections and Microsoft's objections to the relevant definitions, Microsoft will not respond further to this Request. Microsoft, however, is willing to meet and confer with Teradata to understand its position and what it is looking for with this Request.

## REQUEST FOR PRODUCTION NO. 9:

Documents sufficient to show the existence of any restrictions or prohibitions imposed by SAP on the ability of users of any SAP ERP Application to transfer, export, or extract data derived, created, or processed by such SAP ERP Applications for use or storage in a Named Product.

## OBJECTION TO RFP NO. 9:

Microsoft objects to the extent that this request calls for disclosure of documents containing trade secret or other confidential research, development or commercial information (any such documents will be produced only pursuant to the terms of an appropriate protective order). Microsoft objects that the request contains vague and ambiguous terms such as "the ability of users of any SAP ERP Application to transfer, export, or extract data derived, created, or processed by such SAP ERP Applications for use or storage in a Named Product." This Request makes no attempt to explain what Teradata means by those terms in any meaningful way, leaving Microsoft to guess as to what might or might not be relevant or responsive. Microsoft further objects that the request fails to describe the documents sought with sufficient particularity to enable Microsoft to conduct a reasonable search, but instead seeks "Documents sufficient to show" the alleged the "existence of any restrictions or prohibitions imposed by SAP on the ability of users of any SAP ERP Application to transfer, export, or extract data derived, created, or processed by such SAP ERP Applications for use or storage in a Named Product." This requires Microsoft to engage in undue factual analysis to ascertain the documents the request actually seeks.

Microsoft also objects to this request as over broad, unduly burdensome, expensive, and not proportional to the needs of the Action because it includes no reasonable date restrictions and misuses Rule 45. Rather than seeking specific and targeted information found uniquely in Microsoft's possession, this request attempts to use Rule 45 to force Microsoft to generally

Mary G. Kaiser
Morrison & Foerster
June 12, 2020
Page 15

build Teradata's claims simply because Teradata appears to believe Microsoft participates in the market. Microsoft is not a party to this lawsuit. Rule 45 does not permit Teradata to shift the burden of conducting its own market analysis, hiring its own expert witnesses, and prosecuting its claims against SAP onto Microsoft, a non-party to Teradata's lawsuit. Microsoft therefore objects that this request calls for discovery of matters that can be obtained more conveniently, with less burden or with less expense from sources other than Microsoft, e.g., from publicly available sources or parties in this lawsuit. Indeed, SAP would be in possession of its documents showing the existence of any restrictions or prohibitions it imposed, making it the appropriate source for this information, not Microsoft. Teradata and its counsel have not taken reasonable steps to avoid imposing undue burden or expense on Microsoft.

Microsoft also objects to this request to the extent it calls for discovery of electronically stored information from sources that are not reasonably accessible because Microsoft is not able to retrieve information from many of these sources, or even confirm with certainty whether any responsive information in fact exists on the sources, without incurring substantial undue burden or cost. Known, difficult-to-access sources that may contain potentially responsive information (others may exist and become apparent once the scope of the information sought by the Subpoena is properly defined), but which Microsoft is neither searching, preserving nor producing because they are not reasonably accessible without undue burden, fall under the following categories: current disaster recovery media, obsolete back up media, legacy systems, sources requiring computer forensics to access, databases that are structured to hold or report information in certain formats and which cannot readily provide different data or data in different configurations and source code (other than as may be retained in centralized source code archives).

Microsoft objects to the Request to the extent it calls for discovery of matter protected by the attorney-client privilege, work-product doctrine or any other applicable privilege or similar immunity or protection.

Based on these objections and Microsoft's objections to the relevant definitions, Microsoft will not respond further to this Request. Microsoft, however, is willing to meet and confer with Teradata to understand its position and what it is looking for with this Request.

## REQUEST FOR PRODUCTION NO. 10:

Documents sufficient to show the operation of each of the Named Products — including but not limited to user manuals, technical guides, developer instructions, and internal reports — that was sold or on sale between May 1998 and May 2003, inclusive.

## OBJECTION TO RFP NO. 10:

Microsoft objects this Request because it seeks trade secret, confidential, and commercially sensitive research, development, and other material, and it does so from a third-

Mary G. Kaiser
Morrison & Foerster
June 12, 2020
Page 16

party, with no interest in this litigation.  Microsoft will not produce any such material absent an appropriate protective order.  Microsoft objects to this request as over broad, unduly burdensome, expensive and confusing, and not relevant or proportional to the needs of the Action because it includes no restrictions on the relevant functionality, and uses vague and ambiguous terms, such as "operation," "technical guides," "developer instructions," and "internal reports."  Microsoft further objects that the request fails to describe the documents sought with sufficient particularity to enable Microsoft to conduct a reasonable search, but instead seeks "Documents sufficient to show" the operation of each of the Named Products.  This requires Microsoft to engage in undue factual analysis to ascertain the documents the request actually seeks.  Microsoft objects that the request seeks information having no relevance to the lawsuit and that new discovery into potential prior art would be improper at this point in view of the case schedule.

Microsoft also objects to this request to the extent it calls for discovery of electronically stored information from sources that are not reasonably accessible because Microsoft is not able to retrieve information from many of these sources, or even confirm with certainty whether any responsive information in fact exists on the sources, without incurring substantial undue burden or cost.  Known, difficult-to-access sources that may contain potentially responsive information (others may exist and become apparent once the scope of the information sought by the Subpoena is properly defined), but which Microsoft is neither searching, preserving nor producing because they are not reasonably accessible without undue burden, fall under the following categories: current disaster recovery media, obsolete back up media, legacy systems, sources requiring computer forensics to access, databases that are structured to hold or report information in certain formats and which cannot readily provide different data or data in different configurations and source code (other than as may be retained in centralized source code archives).

Subject to these objections, Microsoft will conduct a reasonable search for user manuals it published between May 1998 and May 2003 for a reasonable set of the Named Products that Teradata identifies by name and version number.

## REQUEST FOR PRODUCTION NO. 11:

Documents sufficient to establish that each of the Named Products was sold or on sale in the United States between May 1998 and May 2003, inclusive, including at least the earliest time in this period during which each version or release of each Named Product was sold or on sale.

## OBJECTION TO RFP NO. 11:

Microsoft objects to the extent that this request calls for disclosure of documents containing trade secret or other confidential research, development or commercial information (any such documents will be produced only pursuant to the terms of an appropriate protective order).  Microsoft objects to this request as over broad, unduly burdensome, confusing, not

Mary G. Kaiser
Morrison & Foerster
June 12, 2020
Page 17

relevant, and not proportional to the needs of the Action, including the fact that this request
includes no restrictions on the relevant functionality and to the extent the Request seeks to
require Microsoft to provide information in the form of a written response.  Microsoft objects
that the request seeks information having no relevance to the lawsuit and that new discovery into
potential prior art would be improper at this point in view of the case schedule.  Microsoft further
objects that the request fails to describe the documents sought with sufficient particularity to
enable Microsoft to conduct a reasonable search, but instead seeks "Documents sufficient to
establish" that each of the Named Products was sold or on sale in the United States between May
1998 and May 2003, inclusive, including at least the earliest time in this period during which
each version or release of each Named Product was sold or on sale.  This requires Microsoft to
engage in undue factual analysis to ascertain the documents the request actually seeks.

Microsoft also objects to this request to the extent it calls for discovery of electronically
stored information from sources that are not reasonably accessible because Microsoft is not able
to retrieve information from many of these sources, or even confirm with certainty whether any
responsive information in fact exists on the sources, without incurring substantial undue burden
or cost.  Known, difficult-to-access sources that may contain potentially responsive information
(others may exist and become apparent once the scope of the information sought by the
Subpoena is properly defined), but which Microsoft is neither searching, preserving nor
producing because they are not reasonably accessible without undue burden, fall under the
following categories: current disaster recovery media, obsolete back up media, legacy systems,
sources requiring computer forensics to access, databases that are structured to hold or report
information in certain formats and which cannot readily provide different data or data in different
configurations and source code (other than as may be retained in centralized source code
archives).

Subject to these objections, Microsoft will conduct a reasonable search for
documentation, if any, showing the earliest records it locates after conducting a reasonable
search for sales that might have occurred between May 1998 and May 2003 of a reasonable set
of the Named Products that Teradata identifies by name and version number.

Very truly yours,

Davis Wright Tremaine LLP

Benjamin J. Byer

cc:      Microsoft Corporation

# EXHIBIT 6

| | |
|---|---|
| **From:** | Grothouse, David E. |
| **To:** | "Byer, Ben"; Cross, David D. |
| **Cc:** | Maas, David |
| **Subject:** | RE: Teradata subpoena to Microsoft - Update |
| **Date:** | Friday, August 21, 2020 12:10:18 PM |
| **Attachments:** | Ex. 1 to Joint Motion for Protective Order (Stipulated Protective Order) (amended).DOCX |
| | Ex. 1 to Joint Motion for Protective Order (Stipulated Protective Order) (redline).DOCX |

Ben,

See attached an amended protective order that creates an outside-counsel-only designation for non-parties, along with a redline against the current order. We'll need to address this with SAP, but we wanted to confirm this is what you are looking for before we approach them.

Please let us know if you have any questions or concerns,

Dave

---

**From:** Byer, Ben <BenByer@dwt.com>
**Sent:** Thursday, August 20, 2020 6:00 PM
**To:** Cross, David D. <DCross@mofo.com>; Kaiser, Mary <MKaiser@mofo.com>
**Cc:** Maas, David <DavidMaas@dwt.com>; Grothouse, David E. <DGrothouse@mofo.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

---

**External Email**

---

David,

Thank you for agreeing to withdraw requests 6 and 8. This leaves requests 5 and 9. We appreciate that you've limited request 5 to "restrictive licensing practices for S/4HANA and HANA" but the request seeks "Documents comprising or relating to any communication between Microsoft and SAP." Regardless of subject, communications with SAP should be available from SAP. If they are not, please explain. Similarly, request 9 seeks documents showing "the existence of any restriction or prohibitions imposed by SAP." Restrictions and prohibitions imposed by SAP are available from SAP. If they are not, please explain.

On the other requests, we have produced responsive materials to you, been diligently researching whether and what we have in terms of additional responsive materials to the overlapping requests from Teradata and SAP, and provided you a plan forward two weeks ago—which you claim to have just found in your "spam box." Our actions and emails speak for themselves so I am not going to respond to your mischaracterization of the record and will instead focus on next steps. Please provide a proposed amended protective order and we'll review and comment. Please also confirm you will reimburse us for the time and expense of scanning the hardcopy material, and we'll begin that process. We continue to interview Microsoft employees who are searching for additional documents. We will circle back as soon as they've completed searching. In the meantime, please let us know if you have any imminent case deadlines.

Thanks,
Ben

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8105 | Fax: (206) 757-7105

Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

**From:** Cross, David D. <DCross@mofo.com>
**Sent:** Wednesday, August 19, 2020 7:55 AM
**To:** Byer, Ben <BenByer@dwt.com>; Kaiser, Mary <MKaiser@mofo.com>
**Cc:** Maas, David <DavidMaas@dwt.com>; Grothouse, David E. <DGrothouse@mofo.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

Ben —

I just found this email in my spam box. Please include Dave Grothouse on all communications. Mary is out on maternity leave and has been for a while.

For the boxes you offered for inspection, please produce copies electronically given the health risks with us sending someone to your office to inspect them and given today's travel restrictions. Please let us know when we can expect these.

To your last paragraph, we've responded to all your questions. Claiming otherwise is neither true nor productive. Moreover, as we've explained many times, Requests 5-9 are not limited to materials that SAP has. They include highly relevant materials that only Microsoft has, such as internal Microsoft communications and communications with its customers.  In any event, as I believe we discussed before, we're willing to table Requests 6 and 8, and we're willing to limit Request 5 to communications regarding SAP's restrictive licensing practices for S/4HANA and HANA. Regarding the protective order, this is the first I recall you raising any concern with that order. Nevertheless, we're fine with an outside-counsel-only designation for appropriately confidential documents and will treat any such documents accordingly until—and of course after—an amended protective order is entered.

We've patiently tried for three months to work out an agreement with you regarding the subpoena. You promised a plan a month ago but have provided none. We're at the point where we need to seek help from the Court.

Best,
DC

**From:** Byer, Ben <BenByer@dwt.com>
**Sent:** Friday, August 7, 2020 8:10 PM
**To:** Kaiser, Mary <MKaiser@mofo.com>; Cross, David D. <DCross@mofo.com>
**Cc:** Maas, David <DavidMaas@dwt.com>
**Subject:** Teradata subpoena to Microsoft - Update

**External Email**

David and Mary,

A few updates on Microsoft's response to the subpoena.  We have identified both electronic and physical documents we're ready to produce in response to requests 10-11.  The electronic documents are being processed by our vender now and will be ready in the next couple days.  Given the age of the material those

requests seek, much of what we have located exists only in hardcopy. We have located about two and half banker's boxes of books. Those are available for your inspection at DWT's Seattle office. Alternatively, please let us know if you'd prefer we process and produce (at Teradata's expense) this material electronically.

With respect to the antitrust requests, you still have not responded to our questions regarding any efforts to obtain material from SAP. We therefore cannot agree to search for and produce documents in response to requests 5-9. We're continuing to interview individuals in the business unit to identify what we can reasonably locate and produce in response to requests 1-4, and are working hard and juggling summary vacations. We're hoping to have that pinned down next week. But before we can produce anything there, we will need to amend the protective order to add a category for an outside counsel only designation. In the interest of time, can you please provide a proposed amendment to the protective order for our review? Getting this in place now will help speed any production.

Thanks,
Ben

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8105 | Fax: (206) 757-7105
Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

=====================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.

# EXHIBIT 7

| | |
|---|---|
| **From:** | Cross, David D. |
| **To:** | Byer, Ben; Kaiser, Mary |
| **Cc:** | Maas, David; Grothouse, David E. |
| **Subject:** | RE: Teradata Corp., et al. v. SAP, et. al., No. 3:18-cv-3670-WHO (N.D. Cal.) |
| **Date:** | Monday, July 27, 2020 5:56:01 PM |

Ben -

Your first sentence is an obvious and disappointing mischaracterization of my email, as is your characterization of our efforts to cooperate and further narrow our requests. There has been no name calling or threats by us, just observations of what's occurred and the seeming contradiction between what you've represented Microsoft can (or can't) do and its reputation as a leading software company. The only threat has been yours to seek fees and costs for responding to a motion to compel, which we both know is an empty threat given we served the subpoena over two months ago with no documents produced.

It's unfortunately become clear that you're more interested in obstruction and laying blame than in finding a path forward. If you have a proposal you'd like us to consider, please send it. Otherwise we'll have to seek help from the court. Again, that's not a threat. It's merely the fact of where we are since we need this discovery and it appears we won't get it without the court's assistance. You've made no proposal of any kind regarding our antitrust requests in the more than two months since we served the subpoena.

Best.
DC

---

**From:** Byer, Ben <BenByer@dwt.com>
**Date:** Thursday, Jul 23, 2020, 2:02 PM
**To:** Cross, David D. <DCross@mofo.com>, Kaiser, Mary <MKaiser@mofo.com>
**Cc:** Maas, David <DavidMaas@dwt.com>, Grothouse, David E. <DGrothouse@mofo.com>
**Subject:** RE: Teradata Corp., et al. v. SAP, et. al., No. 3:18-cv-3670-WHO (N.D. Cal.)

**- External Email -**

---

David,

We're doing our best to move as quickly as possible during these hard times, but name calling and threats to use "public filings in motion practice" to damage the reputation of Microsoft does nothing to move the ball forward. As we explained, we're pulling materials from physical archives and shipping them across the country for review in response to your patent requests and speaking with the business unit in response to your antitrust requests. But you haven't given us much to work with by failing to meaningfully target your requests or respond to our questions. We'll do our best but if you want to speed the process please consider limiting the number of products, versions, and relevant time period and answer the questions we've posed below.

Thank you,
Ben

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8105 | Fax: (206) 757-7105
Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

**From:** Cross, David D. <DCross@mofo.com>
**Sent:** Tuesday, July 21, 2020 8:19 PM
**To:** Byer, Ben <BenByer@dwt.com>; Kaiser, Mary <MKaiser@mofo.com>
**Cc:** Maas, David <DavidMaas@dwt.com>; Grothouse, David E. <DGrothouse@mofo.com>
**Subject:** RE: Teradata Corp., et al. v. SAP, et. al., No. 3:18-cv-3670-WHO (N.D. Cal.)

Ben -

With respect, your response is unhelpful and characteristic of the foot-dragging with which you've
approached this from the beginning. Claiming we delayed two years to serve the subpoena is not only
facially unreasonable, but it directly contradicts your argument that we should get some of this from
SAP, which is still producing many documents, including categories requested long ago. It also is
inconsistent with your argument that ample time remains for us to obtain this discovery.

I don't think it's productive to spend time debating where things stand or how we got here. You asked a
question about our timing. I answered it. The reality is that we're rapidly approaching a point where we'll
need help from the court to get the discovery we need.

Your threat to seek fees and costs is as insulting as it is baseless. I doubt that the court will view a motion
as premature where you've not produced even one document in two months or even agreed to produce
any specific categories of documents at all in response to our antitrust-related request. It's also difficult to
understand how one of the most sophisticated software companies in the world cannot efficiently and
effectively search its own electronic documents internally as you claim. I imagine that will be quite the
revelation in public filings in motion practice, and one that seems contrary to a reputation that Microsoft
has cultivated over many years as a leading software company.

In any event, we've tried in many calls and emails to reach some agreed-upon scope, with no progress or
proposal from you at all. We've asked many times for you to let us know what you're willing to produce
and when — and we've received nothing but more delay. We have no desire to involve the court. But if
we can't get a meaningful and reasonable proposal from you soon, we'll need to get help from the court
to get what we need.

Best,
DC

---

**From:** Byer, Ben <BenByer@dwt.com>
**Date:** Tuesday, Jul 21, 2020, 8:26 PM
**To:** Cross, David D. <DCross@mofo.com>, Kaiser, Mary <MKaiser@mofo.com>
**Cc:** Maas, David <DavidMaas@dwt.com>, Grothouse, David E. <DGrothouse@mofo.com>
**Subject:** RE: Teradata Corp., et al. v. SAP, et. al., No. 3:18-cv-3670-WHO (N.D. Cal.)

**- External Email -**

---

Hi David,

Thanks for helping to provide some more color here.  We understand you'd prefer the documents immediately,
but Teradata's delay created your predicament.  Teradata delayed serving this subpoena until two years after
initiating this case.  Further, although our initial response explained that we need the identity of the product
versions you are interested in, and although you agreed to do that during our meet and confers, you did not
send that until last week.  And when you did, you failed to target your request.  Instead, you've identified 28
products by version number, three products without version numbers, and failed to narrow your date range,

insisting that we search for responsive material spanning nearly 10 years.  Four days later, your team sent the below email threatening to go to the court.

You have also yet to adequately explain why you need Microsoft to search for communications with SAP and restrictions SAP imposes on its products, which you can get directly from SAP.  You told us that SAP has claimed limits on certain eDiscovery but that doesn't explain why you can't get documents if they're truly relevant.  Please tell us what efforts you have taken to get these documents from SAP so that we can assess the reasonableness of seeking them from Microsoft.

We are continuing to assess whether Microsoft has responsive documents, which we cannot simply pull from a readily available database.  We are instead in the process of working with the business unit to determine what is possible and what isn't; where the burden lies and where it doesn't based on the information you sent last week.  With folks working remotely, this takes more time than it typically would.  We also need to understand and account for SAP's subpoena, to which we have not yet even responded.  Your proposal that we conduct two searches ignores that doing a compressive search dramatically reduces the burden on Microsoft because both parties' requests appear to seek the same material for overlapping but different sets customers.  For example, please take a look at your requests 2 and 3, and SAP's requests 1 and 2 and let me know if you see no overlap.  Conversely, you've identified no prejudice to Teradata if Microsoft takes the far more efficient approach—just a general claim that this is "just one part of a broader discovery strategy."

We continue to search for materials respective to your patent requests and are in the process of pulling physical materials from Microsoft's archives.  We have made arrangements to ship these materials to attorneys' residences for individualized review.  Due to COVID, things simply cannot happen as quickly as they might under better circumstances with a full staff at Microsoft's able to pull material from archives and outside counsel working in offices.  Nonetheless, we continue to move forward and expect to complete this review in the coming weeks.

Finally, please consider whether you are able to narrow your requests to a more reasonable set of products and identify the version of "EDAW" products you are interested in.  Happy to discuss if you have any questions or suggestions to speed this process.  In the meantime, we believe motion practice would be premature and would seek fees and costs if that's how you proceed.

Thank you,
Ben

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8105 | Fax: (206) 757-7105
Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

---

**From:** Cross, David D. <DCross@mofo.com>
**Sent:** Monday, July 20, 2020 5:59 PM
**To:** Byer, Ben <BenByer@dwt.com>; Kaiser, Mary <MKaiser@mofo.com>
**Cc:** Maas, David <DavidMaas@dwt.com>; Grothouse, David E. <DGrothouse@mofo.com>
**Subject:** RE: Teradata Corp., et al. v. SAP, et. al., No. 3:18-cv-3670-WHO (N.D. Cal.)

Hi Ben —

While we appreciate that a plan is forthcoming, the timing is problematic. Two more weeks even to get a proposed plan from you will have us approaching three months since we served the subpoena, and without any documents produced. To answer your question, the timing issue you're missing, respectfully, is that — as Mary

noted – this subpoena and the discovery we're seeking is just one part of a broader discovery strategy that will be informed and guided in part by the discovery we receive from you as a major player in the industry. We served the subpoena when we did – well before the close of fact discovery – for that very reason. We've been patient in trying to negotiate an agreeable scope and to try to avoid involving the Court, but unfortunately we're running out of time for that. I don't see why you'd need another two weeks simply to send us a plan for what you will produce and when. If you can't send us that by the end of this week, then regrettably we'll need to get help from the Court. We especially can't afford to lose two more weeks only to find that we're at impasse on important categories of discovery and/or on timing for completing production. If we can't agree on the plan, then we should determine that now so we can promptly obtain help from the Court.

Regarding SAP's subpoena, we of course appreciate the burden your client bears in this litigation as a third party, which is why we've spent the last couple months trying to reach agreement with you on scope and timing for production. Hopefully you can appreciate the unfairness and prejudice our client would suffer if those efforts were to suddenly get delayed or derailed simply because SAP chose to serve its own subpoena well after we served ours. The way I've handled such situations in the past was to complete negotiations with the first party to serve the subpoena, for which the other party will receive the same documents, and then to separately negotiate with the other party any additional narrow discovery that would be necessary and appropriate. I don't see why this approach wouldn't work here. In any event, SAP's subpoena doesn't change your client's obligations to timely produce documents responsive to our subpoena, and we need to complete that relatively soon—ideally without involving the Court.

We remain available to discuss any of these issues as needed and to try to reach agreement on the path forward.

Thanks very much.
DC

---

**From:** Byer, Ben <BenByer@dwt.com>
**Sent:** Monday, July 20, 2020 8:41 PM
**To:** Kaiser, Mary <MKaiser@mofo.com>
**Cc:** Maas, David <DavidMaas@dwt.com>; Cross, David D. <DCross@mofo.com>; Grothouse, David E. <DGrothouse@mofo.com>
**Subject:** RE: Teradata Corp., et al. v. SAP, et. al., No. 3:18-cv-3670-WHO (N.D. Cal.)

- External Email -

---

Hi Mary,

Thanks for explaining.  We're in the process of investigating how we can efficiently locate documents in response to both subpoenas.  We expect to have a plan within two weeks and will be back in touch with both parties with a proposal.  Given that the only deadline you identified comes in 2021, we don't see any harm this efficient plan would cause Teradata.  Conversely, forcing Microsoft to run multiple, overlapping searches just weeks apart would needlessly impose undue burden on a non-party.  Please let me know if you see some timing issue I am missing here.

Thanks,
Ben

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104

Tel: (206) 757-8105 | Fax: (206) 757-7105
Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

---

**From:** Kaiser, Mary <MKaiser@mofo.com>
**Sent:** Monday, July 20, 2020 12:59 PM
**To:** Byer, Ben <BenByer@dwt.com>
**Cc:** Maas, David <DavidMaas@dwt.com>; Cross, David D. <DCross@mofo.com>; Grothouse, David E.
<DGrothouse@mofo.com>
**Subject:** RE: Teradata Corp., et al. v. SAP, et. al., No. 3:18-cv-3670-WHO (N.D. Cal.)

Hi Ben,

The deadline for fact discovery is January 15, 2021. However, this does not affect Microsoft's obligation to timely produce documents in response to a subpoena that has been pending for two months. Given Microsoft's significance in the industry at issue, we need its documents to help inform other discovery efforts in the case. We, therefore, need a complete production from Microsoft well before the end of fact discovery, hence the timing of the subpoena. Please let us know whether Microsoft will commit to a reasonable and firm date for production. Otherwise, as we have said, we will have to seek relief from the court.

Thanks,
Mary

---

**From:** Byer, Ben <BenByer@dwt.com>
**Sent:** Friday, July 17, 2020 7:11 PM
**To:** Kaiser, Mary <MKaiser@mofo.com>
**Cc:** Maas, David <DavidMaas@dwt.com>; Cross, David D. <DCross@mofo.com>; Grothouse, David E.
<DGrothouse@mofo.com>
**Subject:** RE: Teradata Corp., et al. v. SAP, et. al., No. 3:18-cv-3670-WHO (N.D. Cal.)

**- External Email -**

---

Hi Mary,

The parties' failure to coordinate third-party discovery does not create a requirement for Microsoft to run multiple searches for the same material simply because one party fired off its subpoena a few weeks before the other.  Nonetheless, I understand you'd prefer information sooner rather than later.  Additional background here would help.  When does discovery close and what upcoming deadlines do you have?

Thanks,
Ben

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8105 | Fax: (206) 757-7105
Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

---

**From:** Kaiser, Mary <MKaiser@mofo.com>
**Sent:** Friday, July 17, 2020 8:47 AM
**To:** Byer, Ben <BenByer@dwt.com>
**Cc:** Maas, David <DavidMaas@dwt.com>; Cross, David D. <DCross@mofo.com>; Grothouse, David E.

<DGrothouse@mofo.com>
**Subject:** RE: Teradata Corp., et al. v. SAP, et. al., No. 3:18-cv-3670-WHO (N.D. Cal.)

Hi Ben,

Teradata served its subpoena to Microsoft 8 weeks ago on May 22. SAP's decision to serve a subpoena now does not change or affect Microsoft's obligation to timely produce discovery in response to our long-outstanding subpoena. We have been patient in waiting this long, and in trying to narrow the scope of the requests and provide guidance for the types of documents sought and potential custodians. Microsoft either needs to commit to a reasonable and firm date for production or we will have to seek relief from the court. We remain available for a call to the extent it would be helpful, but need a prompt response regarding the timing of a production.

Thanks,
Mary

**MARY KAISER**
Associate | Morrison & Foerster LLP
2000 Pennsylvania Avenue, NW | Washington, DC 20006-1888
**P:** +1 (202) 887-6952
mofo.com | LinkedIn | Twitter

---

**From:** Byer, Ben <BenByer@dwt.com>
**Sent:** Thursday, July 16, 2020 7:37 PM
**To:** Kaiser, Mary <MKaiser@mofo.com>
**Cc:** Maas, David <DavidMaas@dwt.com>; Cross, David D. <DCross@mofo.com>; Grothouse, David E. <DGrothouse@mofo.com>
**Subject:** RE: Teradata Corp., et al. v. SAP, et. al., No. 3:18-cv-3670-WHO (N.D. Cal.)

**- External Email -**

---

Hi Mary,

Earlier today SAP served us a subpoena in this matter that at least partially overlaps with your requests.  As you can imagine, we cannot run multiple searches for the same information.  Your below email compounds the issue by not meaningfully narrowing your subpoena or addressing the issues we raised during our meet and confers.  This places us in an tough position.  We are now looking at both subpoenas, trying to identify the overlap, and working on a way that we can efficiently respond to both.  We'll circle back soon when we have more, but this new subpoena obviously throws a wrench into the works.  This does not, however, affect our ongoing efforts on your patent requests, as we don't see overlap there.  We are continuing our search for documents responsive to those requests.  But because of the age of the material you seek and COVID restrictions, we're having to pull from archives and ship materials for review, which takes some time.

Thanks,
Ben

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8105 | Fax: (206) 757-7105
Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

**From:** Kaiser, Mary <MKaiser@mofo.com>
**Sent:** Thursday, July 16, 2020 9:08 AM
**To:** Byer, Ben <BenByer@dwt.com>
**Cc:** Maas, David <DavidMaas@dwt.com>; Cross, David D. <DCross@mofo.com>; Grothouse, David E. <DGrothouse@mofo.com>
**Subject:** RE: Teradata Corp., et al. v. SAP, et. al., No. 3:18-cv-3670-WHO (N.D. Cal.)

Hi Ben,

Following up on my email below, please let us know when you are available for a call to discuss any remaining issues with the scope and timing of Microsoft's production.

Thanks,
Mary

**From:** Kaiser, Mary
**Sent:** Monday, July 13, 2020 9:41 AM
**To:** 'Byer, Ben' <BenByer@dwt.com>
**Cc:** Maas, David <DavidMaas@dwt.com>; Cross, David D. <DCross@mofo.com>; Grothouse, David E. <DGrothouse@mofo.com>
**Subject:** RE: Teradata Corp., et al. v. SAP, et. al., No. 3:18-cv-3670-WHO (N.D. Cal.)

Hi Ben,

Thank you for the update on the patent requests. As you know, we have already limited our antitrust-related requests (Requests 1-9) to 4 products and their predecessors that were sold during the relevant time frame. For ERP Applications, we believe all relevant product and versions include:

- Microsoft Dynamics 365
- Microsoft Dynamics CRM 2011
- Microsoft Dynamics CRM 2013
- Microsoft Dynamics CRM 2015
- Microsoft Dynamics CRM 2016
- Microsoft Dynamics GP 2010 R2 (11.0 SP2)
- Microsoft Dynamics GP 2013 (12.0)
- Microsoft Dynamics GP 2013 R2 (12.0)
- Microsoft Dynamics GP 2015 (14.0)
- Microsoft Dynamics GP 2015 R2 (14.0)
- Microsoft Dynamics GP 2016 (16.0)
- Microsoft Dynamics GP 2016 R2 (16.0)
- Microsoft Dynamics GP 2018 (18.0)
- Microsoft Dynamics GP 2018 R2 (18.0)
- Microsoft Dynamics GP 2018 (18.2)
- Microsoft Dynamics AX 2012
- Microsoft Dynamics AX 2012 R2
- Microsoft Dynamics AX 2012 R3
- Microsoft Dynamics AX ("AX7")

- Microsoft Dynamics NAV 2013
- Microsoft Dynamics NAV 2013 R2
- Microsoft Dynamics NAV 2015
- Microsoft Dynamics NAV 2016
- Microsoft Dynamics NAV 2017
- Microsoft Dynamics NAV 2018
- Microsoft Dynamics SL 2011
- Microsoft Dynamics SL 2015
- Microsoft Dynamics SL 2018

For EDAW Products, we request information regarding all versions of SQL Server Enterprise Edition, Azure Data Warehouse, and Azure SQL Database that were sold between January 1, 2011 and present.

We need to resolve any remaining disputes over the scope and timing of Microsoft's production this week. Please let us know when you are available for a call.

Thanks,
Mary

---

**From:** Byer, Ben <BenByer@dwt.com>
**Sent:** Thursday, July 9, 2020 7:05 PM
**To:** Kaiser, Mary <MKaiser@mofo.com>
**Cc:** Cross, David D. <DCross@mofo.com>; Maas, David <DavidMaas@dwt.com>
**Subject:** RE: Teradata Corp., et al. v. SAP, et. al., No. 3:18-cv-3670-WHO (N.D. Cal.)

**- External Email -**

---

Hi Mary,

When we spoke last you agreed to provide us a list of specific product versions and more limited date range. We're still waiting on that. Once we have that, we'll take another look at the requests and re-evaluate the objections we laid out in our letter and discussed on our calls. Can you please give us a status update? In the meantime, we've completed doc collection on the patent requests and have loaded those documents into our database. We're in the process of doing doc review now and expect to produce in the next few weeks.

Thanks,
Ben

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8105 | Fax: (206) 757-7105
Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

**From:** Kaiser, Mary <MKaiser@mofo.com>
**Sent:** Thursday, July 9, 2020 9:24 AM
**To:** Byer, Ben <BenByer@dwt.com>
**Cc:** Cross, David D. <DCross@mofo.com>; Maas, David <DavidMaas@dwt.com>
**Subject:** RE: Teradata Corp., et al. v. SAP, et. al., No. 3:18-cv-3670-WHO (N.D. Cal.)

Ben,

Following up on my email below, please let us know today when we can expect a response or when you are available to discuss the subpoena response.

Thanks,
Mary

---

**From:** Kaiser, Mary <<u>MKaiser@mofo.com</u>>
**Date:** Friday, Jul 03, 2020, 12:53 PM
**To:** Byer, Ben <<u>BenByer@dwt.com</u>>
**Cc:** Cross, David D. <<u>DCross@mofo.com</u>>, Maas, David <<u>DavidMaas@dwt.com</u>>
**Subject:** RE: Teradata Corp., et al. v. SAP, et. al., No. 3:18-cv-3670-WHO (N.D. Cal.)

Ben,

We have identified three Microsoft employees who had many communications with SAP during the relevant time period and may potentially have helpful information and/or documents responsive to Teradata's requests. While Microsoft is responsible for determining the right custodians for these requests since we have limited insight into employee responsibilities there, these look like possible leads.

- Arnie Mondloch - Microsoft's SAP Global Partner Alliance Director
- Todd Kemmerly – Miscrosoft's SAP Partner Development Manager
- Jeurgen Thomas – Principal Program Manager for SAP on Azure

Can you please let us know when we can expect to hear from you about what Microsoft is prepared to produce in response to the subpoena and when?

Thanks,
Mary

---

**From:** Kaiser, Mary
**Sent:** Monday, June 29, 2020 8:50 AM
**To:** 'Byer, Ben' <<u>BenByer@dwt.com</u>>
**Cc:** Cross, David D. <<u>DCross@mofo.com</u>>; 'Maas, David' <<u>DavidMaas@dwt.com</u>>
**Subject:** RE: Teradata Corp., et al. v. SAP, et. al., No. 3:18-cv-3670-WHO (N.D. Cal.)

Hi Ben,

Following up on our call last week, Teradata believes that the versions of the Microsoft Named Products that are relevant to Requests 10 and 11 are as follows:

- Microsoft SQL Server 2000
- Microsoft SQL Server 2000 Analysis Services
- Microsoft Commerce Server 2000
- Microsoft Commerce Server 2002

We will follow up with you on the remaining requests this week.

Thanks,
Mary

---

**From:** Kaiser, Mary
**Sent:** Monday, June 22, 2020 8:56 AM
**To:** 'Maas, David' <DavidMaas@dwt.com>; Cross, David D. <DCross@mofo.com>
**Cc:** Byer, Ben <BenByer@dwt.com>
**Subject:** RE: Teradata Corp., et al. v. SAP, et. al., No. 3:18-cv-3670-WHO (N.D. Cal.)

Hi David,

The Thursday time works for us. Look forward to speaking with you then.

Thanks,
Mary

---

**From:** Maas, David <DavidMaas@dwt.com>
**Sent:** Sunday, June 21, 2020 8:33 PM
**To:** Kaiser, Mary <MKaiser@mofo.com>; Cross, David D. <DCross@mofo.com>
**Cc:** Byer, Ben <BenByer@dwt.com>
**Subject:** RE: Teradata Corp., et al. v. SAP, et. al., No. 3:18-cv-3670-WHO (N.D. Cal.)

**- External Email -**

---

Mary and David,

Hope you're having a nice weekend.  Ben and I are available to continue our meet and confer this coming Thursday (6/25) from 8:30-9:15 a.m. PST or Friday (6/26) from 11:30-12:30 PST.  Let us know if either of those times work for you.

Best,

David

**David Maas** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98177
Tel: (206) 757-8184 | Fax: (206) 757-7174
Email: davidmaas@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

---

**From:** Byer, Ben <BenByer@dwt.com>
**Sent:** Tuesday, June 16, 2020 9:54 AM
**To:** Kaiser, Mary <MKaiser@mofo.com>
**Cc:** Cross, David D. <DCross@mofo.com>; Maas, David <DavidMaas@dwt.com>
**Subject:** RE: Teradata Corp., et al. v. SAP, et. al., No. 3:18-cv-3670-WHO (N.D. Cal.)

Hi Mary,

I'm working with David Maas on this, and looking into dates we're both available.  I hope to be back to you today.

Thanks,
Ben

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8105 | Fax: (206) 757-7105
Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

---

**From:** Kaiser, Mary <MKaiser@mofo.com>
**Sent:** Tuesday, June 16, 2020 8:20 AM
**To:** Byer, Ben <BenByer@dwt.com>
**Cc:** Cross, David D. <DCross@mofo.com>
**Subject:** RE: Teradata Corp., et al. v. SAP, et. al., No. 3:18-cv-3670-WHO (N.D. Cal.)

Hi Ben,

Following up on my email below, please let us know when you are available for a call.

Thanks,
Mary

---

**From:** Kaiser, Mary
**Sent:** Friday, June 12, 2020 9:26 PM
**To:** Byer, Ben <BenByer@dwt.com>
**Cc:** Cross, David D. <DCross@mofo.com>
**Subject:** RE: Teradata Corp., et al. v. SAP, et. al., No. 3:18-cv-3670-WHO (N.D. Cal.)

Hi Ben,

Please let us know your availability for a call to discuss the subpoena and objections on Monday or Tuesday next week.

Thanks,
Mary

---

**From:** Merritt, Lisa <LisaMerritt@dwt.com>
**Sent:** Friday, June 12, 2020 7:22 PM
**To:** Kaiser, Mary <MKaiser@mofo.com>
**Cc:** Byer, Ben <BenByer@dwt.com>
**Subject:** Teradata Corp., et al. v. SAP, et. al., No. 3:18-cv-3670-WHO (N.D. Cal.)

---

**- External Email -**

---

Dear Ms. Kaiser,

Attached please find Microsoft's objections to the subpoena served by Teradata in this matter.

Best regards,

Lisa

**Lisa Merritt** | Davis Wright Tremaine LLP
Executive Legal Assistant to Stuart Dunwoody, Brendan Mangan, Ben Byer and Rachel Herd
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104-1610
Tel: (206) 757-8490 | Fax: (206) 757-7700
Email: lisamerritt@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

========================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.

========================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.

========================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.

========================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.

========================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.

========================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.

========================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.

# EXHIBIT 8

| | |
|---|---|
| **From:** | Kaiser, Mary |
| **To:** | Byer, Ben |
| **Cc:** | Cross, David D. |
| **Subject:** | RE: Teradata Subpoena |
| **Date:** | Tuesday, June 2, 2020 2:46:37 PM |

Hi Ben,

We agree to a 1-week extension on objections, which would be until next Friday, June 12. We would be willing to revisit that date if you need more time and will work with us between now and next Friday regarding the scope and timing of a production.

Thanks,
Mary

---

**From:** Byer, Ben <BenByer@dwt.com>
**Sent:** Tuesday, June 2, 2020 12:32 PM
**To:** Kaiser, Mary <MKaiser@mofo.com>
**Cc:** Cross, David D. <DCross@mofo.com>
**Subject:** RE: Teradata Subpoena

---

**- External Email -**

---

Mary,

Understood.  Thank you.  To confirm, you agree our objections, if any, are due June 22?

Thanks,
Ben

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8105 | Fax: (206) 757-7105
Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

**From:** Kaiser, Mary <MKaiser@mofo.com>
**Sent:** Tuesday, June 2, 2020 7:52 AM
**To:** Byer, Ben <BenByer@dwt.com>
**Cc:** Cross, David D. <DCross@mofo.com>
**Subject:** RE: Teradata Subpoena

Hi Ben,

The subpoena response date is not until June 22, three weeks from yesterday. We think that should give you ample time to consult with your client and let us know if Microsoft intends to make a significant production in response to the subpoena. In the meantime, we are more than happy to discuss the scope or timing of that response. Please let us know if and when that would be fruitful. We're also happy to revisit the deadline as it approaches, should you need more time. We understand these are unusual times and we don't mean to put you or your client in a jam. Let's schedule a call once you've discussed the parameters of a production with your client.

Thanks,
Mary

---

**From:** Byer, Ben <BenByer@dwt.com>
**Sent:** Monday, June 1, 2020 6:23 PM
**To:** Kaiser, Mary <MKaiser@mofo.com>
**Cc:** Cross, David D. <DCross@mofo.com>
**Subject:** RE: Teradata Subpoena

**- External Email -**

Mary,

The subpoena response is a few days out and I've just been retained.  I'm not in a position to make any commitments for what we can do here--I haven't even opened up a matter for this on my end.  If you're not willing to grant me a courtesy extension, we can obviously deal with that.  I just don't think that approach helps either of us or our clients.  Please let me know if you're willing to grant us a two week courtesy extension on our response.  If you need to talk, I can but mornings aren't good for me.

Thanks,
Ben

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8105 | Fax: (206) 757-7105
Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

---

**From:** Kaiser, Mary <MKaiser@mofo.com>
**Sent:** Monday, June 1, 2020 3:16 PM
**To:** Byer, Ben <BenByer@dwt.com>
**Cc:** Cross, David D. <DCross@mofo.com>
**Subject:** RE: Teradata Subpoena

Hi Ben,

We are both familiar with part-time teacher and childcare responsibilities right now and understand. In order to agree to an extension, we would need a commitment from you that Microsoft is going to make a reasonable production in response to the subpoena and the extension is intended to work with us to negotiate the scope and timing. If your client is going to object and decline to produce anything, we need to move the process forward now so we can resolve it without delaying the underlying litigation. Please let us know.

Thanks,
Mary

---

**From:** Byer, Ben <BenByer@dwt.com>
**Sent:** Monday, June 1, 2020 4:40 PM
**To:** Kaiser, Mary <MKaiser@mofo.com>
**Cc:** Cross, David D. <DCross@mofo.com>
**Subject:** RE: Teradata Subpoena

**- External Email -**

Hi Mary,

I'm just looking at this now, that's why I'm asking for the extension. Mornings are hard for me—I play part-time teacher for my kids these days. What information do you need from me?

Thanks,
ben

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8105 | Fax: (206) 757-7105
Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

**From:** Kaiser, Mary <MKaiser@mofo.com>
**Sent:** Monday, June 1, 2020 1:37 PM
**To:** Byer, Ben <BenByer@dwt.com>
**Cc:** Cross, David D. <DCross@mofo.com>
**Subject:** RE: Teradata Subpoena

Hi Ben,

We would like to get some information from you before we agree to an extension. We are both tied up this evening. Could we try for tomorrow as early in the day as possible?

Thanks,
Mary

**From:** Byer, Ben <BenByer@dwt.com>
**Sent:** Monday, June 1, 2020 4:06 PM
**To:** Kaiser, Mary <MKaiser@mofo.com>
**Cc:** Cross, David D. <DCross@mofo.com>
**Subject:** RE: Teradata Subpoena

**- External Email -**

Hi Mary,

How's 4pm Pacific today? In the meantime, can you please confirm whether you can agree to a 2 week extension?

Thanks,
Ben

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8105 | Fax: (206) 757-7105
Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

**From:** Kaiser, Mary <MKaiser@mofo.com>

**Sent:** Monday, June 1, 2020 12:49 PM
**To:** Byer, Ben <BenByer@dwt.com>
**Cc:** Cross, David D. <DCross@mofo.com>
**Subject:** RE: Teradata Subpoena

Hi Ben,

Following up on my email below, please let us know if there is a good time this afternoon or tomorrow to discuss the Teradata subpoena.

Thanks,
Mary

---

**From:** Kaiser, Mary
**Sent:** Friday, May 29, 2020 8:17 PM
**To:** 'benbyer@dwt.com' <benbyer@dwt.com>
**Cc:** Cross, David D. <DCross@mofo.com>
**Subject:** Teradata Subpoena

Hi Ben,

I'm sorry I missed your call this afternoon. Are you available for a call on Monday? I'm free before 1:00 ET and between 2:30 and 5:00.

Thanks,
Mary

===================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.

===================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.

===================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.

===================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.