1
2
3
4
5

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

6
7

| TERADATA CORPORATION, TERADATA US, INC., and TERADATA OPERATIONS, INC. | MISC NO. 2.20-mc-00074-RSM |
|---|---|
| Plaintiffs, | **DECLARATION OF DAVID D. CROSS IN SUPPORT OF TERADATA'S MOTION TO COMPEL DISCOVERY FROM MICROSOFT** |
| v. | |
| SAP SE, SAP AMERICA, INC., and SAP LABS, LLC, | |
| Defendants. | |

I, David D. Cross, declare as follows:

1.      I am a partner at the law firm of Morrison & Foerster LLP, counsel for Plaintiffs Teradata USA, Inc., Teradata Corporation, and Teradata Operations, Inc. ("Teradata").  I am duly licensed to practice in the courts of the State of New York and the District of Columbia.   I have personal knowledge of the facts set forth herein, and if called as a witness could competently testify thereto.

2.      I submit this declaration in support of Teradata's Local Civil Rule ("LCR") 37 Motion to Compel Microsoft Corp.'s compliance with Teradata's Federal Rules of Civil Procedure ("FRCP") 45 Subpoena.

DECLARATION OF DAVID D. CROSS IN SUPPORT OF TERADATA'S MOTION TO COMPEL DISCOVERY FROM MICROSOFT -1

MISC. NO. 2.20-MC-00074-RSM

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

3.      The parties conferred extensively over the last seven months regarding Teradata's subpoena to Microsoft in effort to narrow or resolve any disputes without court action, including for example:

| Date | Manner | Participants |
|---|---|---|
| June 1-2, 2020 | E-mail | Mary Kaiser & David Cross (Teradata); Ben Byer (Microsoft) |
| June 19, 2020 | Telephone | Mary Kaiser & David Cross (Teradata); Ben Byer (Microsoft) |
| June 25, 2020 | Telephone | Mary Kaiser & David Cross (Teradata); Ben Byer & David Maas (Microsoft) |
| June 29, 2020 | E-mail | Mary Kaiser & David Cross (Teradata); Ben Byer & David Maas (Microsoft) |
| July 3, 2020 | E-mail | Mary Kaiser & David Cross (Teradata); Ben Byer & David Maas (Microsoft) |
| July 9, 2020 | E-mail | Mary Kaiser & David Cross (Teradata); Ben Byer & David Maas (Microsoft) |
| July 13, 2020 | E-mail | Mary Kaiser, David Cross & David Grothouse (Teradata); Ben Byer & David Maas (Microsoft) |
| July 16-27, 2020 | E-mail | Mary Kaiser, David Cross & David Grothouse (Teradata); Ben Byer & David Maas (Microsoft) |
| August 7-September 3, 2020 | E-mail | Mary Kaiser, David Cross, & David Grothouse (Teradata); Ben Byer & David Maas (Microsoft) |
| August 7-October 30, 2020 | E-mail | Mary Kaiser, David Cross, David Grothouse, and Diana Siri Breaux (Teradata); Ben Byer & David Maas (Microsoft) |
| September 4, 2020 | Telephone | Diana Siri Breaux (Teradata); Ben Byer (Microsoft) |
| October 29, 2020 | Telephone | David Grothouse (Teradata); Ben Byer (Microsoft) |
| November 6 - December 21, 2020 | E-mail | David Cross, David Grothouse, and Diana Siri Breaux (Teradata); Ben Byer & David Maas (Microsoft) |
| December 18, 2020 | Telephone | David Cross, David Grothouse, and Diana Siri Breaux (Teradata); Ben Byer (Microsoft) |

DECLARATION OF DAVID D. CROSS IN SUPPORT OF
TERADATA'S MOTION TO COMPEL DISCOVERY FROM
MICROSOFT -2
MISC. NO. 2.20-MC-00074-RSM

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

4.      During these communications, Teradata repeatedly offered to limit its requests, including by narrowing and tabling certain requests and providing a list of product versions and custodians for various requests.  For example, Teradata agreed to limit Request No. 1 by agreeing not to request product roadmaps and development plans.

5.      During the three months following Teradata's service of its subpoena, Microsoft failed to respond meaningfully to Teradata's offers and did not offer any proposals.  On July 20, two months after receiving the subpoena, Microsoft agreed to provide a proposed plan within two weeks.  Unfortunately, Microsoft did not provide the promised plan or any proposal at all.

6.      On August 7, Microsoft offered about 2.5 boxes of documents for inspection at its counsel's office, all of which evidently concern the patent-related requests in the subpoena (Request Nos. 10 and 11), which are not at issue in this Motion.  It reiterated its refusal to produce any documents in response to antitrust-related Request Nos. 5-9 and again offered no proposal for producing documents in response to antitrust-related Request Nos. 1-4, indicating for the first time that it finally had contacted Microsoft business personnel regarding those requests.  It also requested an amendment to the Protective Order for the first time, after months of negotiations.

7.      On August 18, 2020, Microsoft made its first production of documents, consisting of a total of only 22 pages.  Microsoft produced eight short, public, press releases from 1999-2002 (which it encrypted despite their public availability).  Microsoft had still produced no documents responsive to the antitrust-related requests at issue or offered any proposal for doing so.

8.      On August 27, 2020, Teradata filed a motion to compel discovery from Microsoft. Microsoft filed its opposition on September 14, 2020.  In its opposition, Microsoft claimed it would complete its collection and review of documents responsive to Teradata's antitrust requests within a week and be ready to produce those documents within two weeks, pending an appropriate protective order.  Relying on Microsoft's representation and believing that protective order issues would be resolved quickly, Teradata withdrew its motion.

DECLARATION OF DAVID D. CROSS IN SUPPORT OF
TERADATA'S MOTION TO COMPEL DISCOVERY FROM
MICROSOFT -3
MISC. NO. 2.20-MC-00074-RSM

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

9. Teradata then worked with Microsoft and SAP to amend the existing protective order to resolve Microsoft's requests. Microsoft dragged this process out for months. For example, in order to resolve an issue as to whether Microsoft's sensitive materials could be disclosed to experts that Teradata and SAP had already agreed upon, Teradata sent disclosure information for those experts for approval by Microsoft. The intent was to resolve the issue quickly so that the amended protective order could be entered as soon as possible without having to address the issue of existing experts. It took Microsoft 9 days after Teradata had sent the last of those materials to respond with two follow-up questions about Teradata's experts. (Exhibit 9 at 4, October 7, 2020 email from David Grothouse to Ben Byer; October 16, 2020 email from Ben Byer to David Grothouse.) Teradata answered those questions the same day, but it took Microsoft an additional 5 days, and another two emails from Teradata, to respond with another follow-up question. (Exhibit 9 at 1-3, October 16, 2020 email from David Grothouse to Ben Byer; October 19, 2020 and October 21, 2020 emails from David Grothouse to Ben Byer; October 21, 2020 email from Ben Byer to David Grothouse). Teradata responded a couple of days later to answer that question and again asked Microsoft whether it approved Teradata's experts. Microsoft responded 6 days later, finally giving approval. (Exhibit 9 at 1, October 24, 2020 email from David Grothouse to Ben Byer; October 30, 2020 email from Ben Byer to David Grothouse). All told, it took over three weeks for SAP to ask three follow-up questions and approve four of Teradata's experts. This far exceeds the fourteen days provided to third parties to object to additional experts under the amended protective order to which Microsoft agreed, demonstrating how Microsoft failed to follow the reasonable time frame to approve experts to which it agreed.

10. Teradata also tried to expedite the process by offering to file a protective order in the Western District of Washington (WDWA) that would apply only to Microsoft's productions. This was in hopes that it would allow for more flexibility to address Microsoft's confidentiality issues without creating broader issues in the litigation given other third parties had not taken the same positions as Microsoft regarding the protective order. As Teradata's counsel explained to

DECLARATION OF DAVID D. CROSS IN SUPPORT OF
TERADATA'S MOTION TO COMPEL DISCOVERY FROM
MICROSOFT -4

MISC. NO. 2.20-MC-00074-RSM

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

Microsoft multiple times, we did this for third parties in another antitrust case to address specific confidentiality issues raised by specific third parties. Teradata introduced this idea to Microsoft on October 19 to try to finally resolve the protective order issues. Microsoft responded a couple of days later, and Teradata and Microsoft continued to exchange emails on the topic over the next two and a half weeks, including Teradata responding to Microsoft's request for the legal authority for such a protective order. Microsoft then asked for a draft of a protective order that would be filed in this Court. (Exhibit 9 at 12, November 6, 2020 email from Ben Byer to David Grothouse and David Cross.)

11.     Pursuant to Microsoft's request, Teradata spent the next two weeks drafting a protective order that would align with the model protective order in this Court and address Microsoft's issue, while also coordinating with SAP to ensure they would agree to the intended protective order. After spending the time and expense to draft a protective order to file in this Court, as Microsoft requested, Teradata sent a draft to Microsoft on November 24. Microsoft responded, for the first time, that it would not agree to a protective order filed in this Court, even though this is not an uncommon practice and this Court clearly would have had jurisdiction to address Microsoft's confidentiality concerns regarding the subpoena that this Court is authorized to address. (Exhibit 9 at 11, November 24, 2020 email from Ben Byer to David Grothouse and David Cross.) This was over a month after Teradata had proposed this option to Microsoft, and after Teradata had taken the time and effort to draft the protective order at Microsoft's request. Teradata responded the same day that it disagreed with Microsoft's view and asked Microsoft to reconsider in light of our experience doing the same thing in another antitrust matter. (Exhibit 9 at 10-11, November 24, 2020 email from David Cross to Ben Byer.) Microsoft waited another week before insisting that it would not agree to join a protective order filing in this Court. (Exhibit 9 at 10, December 1, 2020 email from Ben Byer to David Cross.)

12.     Teradata quickly revived its effort to amend the existing protective order in the underlying action in the Northern District of California and sent it to Microsoft three days after

DECLARATION OF DAVID D. CROSS IN SUPPORT OF
TERADATA'S MOTION TO COMPEL DISCOVERY FROM
MICROSOFT -5

MISC. NO. 2.20-MC-00074-RSM

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1    Microsoft's objection to filing a protective order in this Court. (Exhibit 10 at 9-10, December 4,

2    2020 email from David Grothouse to Ben Byer.) Microsoft provided comments three days later,

3    and a stipulated protective order was finally filed and entered on December 9. (Exhibit 9 at 9,

4    December 7, 2020 email from Ben Byer to David Grothouse.) Thus, it took almost three months

5    to resolve protection order issues, largely due to Microsoft's delayed responses and lack of

6    cooperation. Microsoft finally made its first production in response to Teradata's antitrust

7    requests on December 10, some seven months after Teradata issued its subpoena.

8        13.    What Microsoft represented in its filing with this Court in September as its

9    complete response to Teradata's antitrust requests is severely lacking. Teradata met and conferred

10   with Microsoft again on December 18 in an attempt to resolve the deficiencies in its production,

11   but Microsoft simply repeated the same objections and arguments that Teradata has addressed

12   many times in its many meet-and-confers with Microsoft and even in Teradata's previous motion

13   file with this Court. Microsoft claimed that Teradata was raising new issues that it would need to

14   further consider, but this claim contradicts the record of the parties' extensive negotiations and the

15   briefing on Teradata's prior motion to compel. This claim was not well taken and is indicative of

16   how Microsoft has consistently sought to drag out negotiations and impede Teradata's ability to

17   obtain much-needed relief from the Court to break the longstanding logjam between the parties.

18       14.    As Teradata was preparing to file this motion, it received a letter from Microsoft's

19   outside counsel, Benjamin Byer. In the letter, Mr. Byer indicated that Microsoft would *commence*

20   the search for documents responsive to Teradata's Request Nos. 1, 5, 7 and 9. That is, seven

21   months after receiving Teradata's subpoena, Microsoft finally suggested it might in the new year

22   finally search for and find responsive documents and at some future, unspecified date thereafter

23   actually produce such documents to Teradata. This letter highlights Microsoft's longstanding

24   refusal to cooperate and the lack of support for its longstanding, boilerplate burden objections, per

25   its admission it has not even searched for documents responsive to most of the requests at issue

26   before now. Although Teradata has and will continue to work with Microsoft in good faith, after

DECLARATION OF DAVID D. CROSS IN SUPPORT OF
TERADATA'S MOTION TO COMPEL DISCOVERY FROM
MICROSOFT -6

MISC. NO. 2.20-MC-00074-RSM

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

seven months of delay Microsoft's vague and shifting promises to conduct some sort of inquiries now are not reliable and do not resolve the disputes between the parties or otherwise obviate the need for help from the Court. For example, Microsoft claims to have searched for documents responsive to Request Nos. 2 and 3, but it has produced little or no documents for those requests and refused to explain the searches it purportedly conducted. Given Microsoft's delay tactics and refusal to commit to any meaningful production seven months after receiving the subpoena—and given fast-approaching discovery deadlines in the underlying action with SAP—Teradata cannot afford to wait any longer. The deadline to complete document production is January 15, 2021. The deadline to complete third-party fact discovery is February 26, 2021.

15.    Attached as **Exhibit 1** is a true and correct copy of Teradata's Notice of Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action to Microsoft Corporation, served on May 22, 2020.

16.    Attached as **Exhibit 2** is a true and correct copy of Teradata's Second Amended Complaint against SAP SE, SAP America, Inc., and SAP Labs, LLC ("SAP").

17.    Attached to as **Exhibit 3** is a true and correct copy of Chief Magistrate Joseph C. Spero's Order Granting in Part Teradata's motion to compel discovery from Oracle.

18.    Attached as **Exhibit 4** is a true and correct copy of Microsoft's June 12, 2020 Objections to Teradata's Subpoena.

19.    Attached as **Exhibit 5** is a true and correct copy of a set of correspondences between counsel for Teradata and counsel for Microsoft, ending with September 3, 2020 email from Ben Byer "Re: Teradata subpoena to Microsoft – Update."

20.    Attached as **Exhibit 6** is a true and correct copy of an additional set of correspondences between counsel for Teradata and counsel for Microsoft, ending with a July 27, 2020 Email from David Cross "Re: Teradata Subpoena."

DECLARATION OF DAVID D. CROSS IN SUPPORT OF
TERADATA'S MOTION TO COMPEL DISCOVERY FROM
MICROSOFT -7
MISC. NO. 2.20-MC-00074-RSM

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

21.     Attached as **Exhibit 7** is a true and correct copy of the additional correspondences between counsel for Teradata and counsel for Microsoft, ending with a June 2, 2020 Email from Mary Kaiser "Re: Teradata Subpoena."

22.     Attached as **Exhibit 8** is a true and correct copy of the additional correspondences between counsel for Teradata and counsel for Microsoft, ending with a October 30, 2020 Email from Ben Byer "RE:  Teradata subpoena to Microsoft – Update."

23.     Attached as **Exhibit 9** is a true and correct copy of the additional correspondences between counsel for Teradata and counsel for Microsoft, ending with a December 21, 2020 Email from David Grothouse "RE:  Teradata subpoena to Microsoft – Update."

24.     Attached as **Exhibit 10** is a true and correct copy of a letter from Microsoft's counsel, Benjamin Byer, dated December 23, 2020.

25.     Attached as **Exhibit 11** is a true and correct copy of Teradata's email response to Microsoft's letter of December 24, 2020.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 24th day of December, 2020, in Washington, D.C.


_/s David D. Cross_
David D. Cross

DECLARATION OF DAVID D. CROSS IN SUPPORT OF
TERADATA'S MOTION TO COMPEL DISCOVERY FROM
MICROSOFT -8

MISC. NO. 2.20-MC-00074-RSM

# EXHIBIT 1

1    MARK L. WHITAKER (admitted *Pro Hac Vice*)    BRYAN WILSON (CA BAR NO. 138842)
    MWhitaker@mofo.com                       BWilson@mofo.com
2    DANIEL P. MUINO (CA BAR NO. 209624)    MORRISON & FOERSTER LLP
    DMuino@mofo.com                         755 Page Mill Road
3    G. BRIAN BUSEY (admitted *Pro Hac Vice*)    Palo Alto, California 94304-1018
    GBusey@mofo.com                        Telephone:    (650) 813-5600
4    BRADLEY S. LUI (CA BAR NO. 143088)     Facsimile:     (650) 494-0792
    BLui@mofo.com
5    MARY PRENDERGAST (CA BAR NO.       WENDY RAY (CA BAR NO. 226269)
    272737)                               WRay@mofo.com
6    MPrendergast@mofo.com            MORRISON & FOERSTER LLP
    FAHD H. PATEL (admitted *Pro Hac Vice*)    707 Wilshire Boulevard, Suite 6000
7    FPatel@mofo.com                        Los Angeles, California  90017-3543
    MORRISON & FOERSTER LLP        Telephone:    (213) 892-5200
8    2000 Pennsylvania Avenue, NW        Facsimile:     (213) 892-5454
    Washington, D.C. 20006-1888
9    Telephone:    (202) 887-1500       JACK W. LONDEN (CA BAR NO. 85776)
    Facsimile:     (202) 887-0763       JLonden@mofo.com
10                                   WESLEY E. OVERSON (CA BAR NO.
    Attorneys for Plaintiffs              154737)
11    TERADATA CORPORATION,         WOverson@mofo.com
    TERADATA US, INC., and           MORRISON & FOERSTER LLP
12    TERADATA OPERATIONS, INC.        425 Market Street
                                 San Francisco, California 94105

13

14                        UNITED STATES DISTRICT COURT

15                     NORTHERN DISTRICT OF CALIFORNIA

16

17

18    TERADATA US, INC.,

        Plaintiff,

19    and

20    TERADATA CORPORATION and TERADATA
    OPERATIONS, INC.,

21

        Plaintiffs/Counterclaim-Defendants,

22

     v.

23    SAP SE,

24        Defendant/Counterclaim-Plaintiff,

25    and

26    SAP AMERICA, INC. and
    SAP LABS, LLC,
27
        Defendants.
28

Case No. 3:18-CV-03670-WHO

**TERADATA'S NOTICE OF SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION TO MICROSOFT CORPORATION**

Teradata's Notice of Subpoena To Produce Documents, Information, or Objects or To Permit Inspection of Premises In A Civil Action To Microsoft Corporation
Case No. 3:18-cv-03670-who
ny-1920694

1        PLEASE TAKE NOTICE that, pursuant to Federal Rule of Civil Procedure 45, Plaintiff

2   and Counter-Defendant Teradata U.S., Inc. provides notice of the following subpoena to be

3   served upon Microsoft Corporation for the production of documents as described in Schedule A

4   to the subpoena.

5   

6     Dated: May 21, 2020              MORRISON & FOERSTER LLP

7   

8                      By:   */s/ Bradley S. Lui*

                         Bradley S. Lui

9                            TERADATA CORPORATION,
                         TERADATA US, INC., and

10                           TERADATA OPERATIONS, INC.

11  

12  

13  

14  

15  

16  

17  

18  

19  

20  

21  

22  

23  

24  

25  

26  

27  

28

1

## CERTIFICATE OF SERVICE

2

I declare that I am employed with the law firm of Morrison & Foerster LLP, whose
address is 250 West 55th Street, New York, NY 10019-9601. I am not a party to the within

3

cause, and I am over the age of eighteen years.

4

I further declare that on the date hereof, I served a copy of:

5

- **TERADATA'S NOTICE OF SUBPOENA TO PRODUCE DOCUMENTS,**

6

**INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF
PREMISES IN A CIVIL ACTION TO MICROSOFT CORPORATION**

7

**BY ELECTRONIC SERVICE [Fed. Rule Civ. Proc. rule 5(b)]** by electronically

8

mailing a true and correct copy through Morrison & Foerster LLP's electronic mail
system to the e-mail address(es) set forth below, or as stated on the attached service

9

list per agreement in accordance with Federal Rules of Civil Procedure rule 5(b).

10

Tharan Gregory Lanier                Kenneth A. Gallo
Nathaniel P. Garrett                 David J. Ball

11

Joshua L. Fuchs                      William B. Michael
Joseph M. Beauchamp                  PAUL, WEISS, RIFKIND, WHARTON, &

12

JONES DAY                            GARRISON LLP
555 California Street, 26th Floor     2001 K Street NW

13

San Francisco, CA  94104             Washington, DC  20006-1047

14

Email:  tglanier@JonesDay.com        Email:  kgallo@paulweiss.com

15

ngarrett@JonesDay.com                        dball@paulweiss.com
jlfuchs@JonesDay.com                         wmichael@paulweiss.com

16

jbeauchamp@JonesDay.com                      grp-sap-td@paulweiss.com

17

SAP-Teradata@JonesDay.com

18

Kristin L. Cleveland

19

J. Christopher Carraway
John D. Vandenberg

20

Klarquist Sparkman, LLP
121 SW Salmon Street, Suite 1600

21

Portland, OR 97204

22

Email:     Kristin.cleveland@klarquist.com
Chris.carraway@klarquist.com

23

john.vandenberg@klarquist.com
KS-SAP-Teradata@klarquist.com

24

25

26

27

28

Teradata's Notice Of Subpoena To Produce Documents, Information, Or Objects Or To Permit
Inspection Of Premises In A Civil Action To Microsoft Corporation
Case No. 3:18-CV-03670-WHO

ny-1920694

1    I declare under penalty of perjury that the foregoing is true and correct.

2    Executed at New York, New York, this 21st Day of May, 2020.

3

4    | Michael Curtis | /s/ Michael Curtis |
     | (typed) | (signature) |

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TERADATA'S NOTICE OF SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT
INSPECTION OF PREMISES IN A CIVIL ACTION TO MICROSOFT CORPORATION
CASE NO. 3:18-CV-03670-WHO

3

ny-1920694

**MORRISON | FOERSTER**

2000 PENNSYLVANIA AVE., NW
WASHINGTON, D.C.
20006-1888

TELEPHONE: 202.887.1500
FACSIMILE: 202.887.0763

WWW.MOFO.COM

MORRISON & FOERSTER LLP

BEIJING, BERLIN, BOSTON,
BRUSSELS, DENVER, HONG KONG,
LONDON, LOS ANGELES, NEW YORK,
NORTHERN VIRGINIA, PALO ALTO,
SAN DIEGO, SAN FRANCISCO, SHANGHAI
SINGAPORE, TOKYO, WASHINGTON, D.C.

May 22, 2020

Writer's Direct Contact
+1 (202) 887.6952
MKaiser@mofo.com

**Confidential**

By Hand Delivery

Microsoft Corp.,
c/o PTSGE Corp.,
925 Fourth Ave., Ste 2900,
Seattle,
WA 98104-1158

Re:    Teradata Corp. et al. v. SAP et al., No. 3:18-cv-3670-WHO (N.D. Cal.)

To Whom It May Concern:

　　　Pursuant to Rule 45 of the Federal Rules of Civil Procedure, attached is a Subpoena to Produce Documents or Electronically Stored Information in the above-captioned matter. Schedule A to the subpoena identifies the categories of information that Teradata needs in order to prosecute its claims against SAP and to rebut SAP's counterclaims. Teradata is cognizant of the burden that subpoenas can impose on entities that are not parties to a lawsuit. We are prepared to discuss ways to alleviate any burden as best we can. In addition, Attachment B to the subpoena is a copy of the protective order in this case, which allows non-parties to designate materials that qualify under the appropriate standards as protected, and ensures that such protected materials will be used in connection with this case only.

Sincerely,

*/s/ Mary G. Kaiser*

Mary G. Kaiser

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

### for the
Northern District of California

TERADATA US, INC., TERADATA
CORPORATION and TERADATA OPERATIONS,
INC.

_____  )
*Plaintiff*                                      )
v.                                             )    Civil Action No. 3:18-CV-03670-WHO
                                               )
SAP SE, SAP AMERICA, INC. and                  )
SAP LABS, LLC                                  )
_____  )
*Defendant*                                      )

### SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
### OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:  MICROSOFT CORPORATION

_____
*(Name of person to whom this subpoena is directed)*

☒ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:
See SCHEDULE A

| Place: Buell Realtime Reporting<br>         1325 Fourth Avenue Suite 1840<br>         Seattle, WA<br>         98101 | Date and Time:<br>6/22/2020 9:30 a.m. |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

    The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 5/22/2020

        *CLERK OF COURT*
                                     OR

_____    _____
    *Signature of Clerk or Deputy Clerk*                   *Attorney's signature*
                              Bradley S. Lui

  The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Plaintiff
TERADATA US, INC., TERADATA CORPORATION and
TERADATA OPERATIONS, INC.
_____ , who issues or requests this subpoena, are:
Bradley Lui, Morrison & Foerster LLP, 2000 Pennsylvania Avenue, NW, Washington, D.C., 20006-1888, (202) 887-8766, BLui@mofo.com

ny-1920733


American LegalNet, Inc.
www.FormsWorkFlow.com

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).


American LegalNet, Inc.
www.FormsWorkFlow.com

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 2:18-CV-01481 DDP (JEMx)

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 _____

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:


American LegalNet, Inc.
www.FormsWorkFlow.com

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
**(i)** is a party or a party's officer; or
**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
**(i)** fails to allow a reasonable time to comply;
**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
**(iv)** subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
**(i)** expressly make the claim; and
**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).


American LegalNet, Inc.
www.FormsWorkFlow.com

Attachment A

**SCHEDULE A**

**DEFINITIONS**

1.      **"And"** as well as **"Or"** are to be construed either disjunctively or conjunctively as necessary to bring within the scope of the Requests all Documents or other information that might otherwise be construed to be outside their scope.

2.      **"Any"** means each and every.

3.      **"Communication"** shall mean any transmission of information by any means, including without limitation: (a) any written letter, memorandum, or other Document of any kind by mail, courier, other delivery services, telecopy, facsimile, telegraph, electronic mail, voicemail, or any other means; (b) any telephone call, whether or not such call was by chance or prearranged, formal or informal; and (c) any conversation or meeting between two or more persons, whether or not such contact was by chance or prearranged, formal or informal.

4.      **"Concerning, "Concern," "Relating to," "Relate to," and "Related to,"** and any variation of these terms, shall mean concerning, relating to, involving, discussing, regarding, pertaining to, mentioning, commenting on, connected with, describing, depicting, demonstrating, analyzing, explaining, summarizing, showing, evidencing, reflecting, identifying, setting forth, dealing with, embodying, comprising, consisting of, containing, constituting, supporting, refuting, contradicting, resulting from, recording, or in any way relevant to a particular subject, directly or indirectly, in whole or in part.

5.      **"Document(s)"** or **"Thing(s)"** shall have the same meaning and scope as in Rule 34 of the Federal Rules of Civil Procedure and shall include any written, printed, recorded, or graphic matter that is or has been in Microsoft's actual or constructive possession or control, regardless of the medium on which it is produced, reproduced, or stored, including without

limitation anything that can be classified as a "writing," "original," or "duplicate."  Any
document bearing marks, including without limitation initials, stamped indicia, comments, or
notations not a part of the original text or photographic reproduction thereof, is a separate
document.

6.       **"EDAW Product"** means products that provide data storage, warehousing, and
analytic functionality, including, but not limited to, Azure SQL Data Warehouse, Microsoft SQL
Server, Teradata Database, SAP HANA, SAP Business Warehouse (BW), SAP B/W4HANA,
and any and all competing products.

7.       **"ERP Applications"** means those products that allow companies to gather and
manage data required to conduct day-to-day operations across many aspects of a business
enterprise, including, but not limited to, sales and inventory transactions, financial and
accounting transactions, and human-resource transactions, such as, but not limited to, SAP ERP,
SAP Customer Relationship Management, SAP Supply Chain Management, SAP Supplier
Relationship Management, SAP S/4HANA, SAP ECC, Oracle ERP,  Microsoft Dyanmics 365,
all current and/or legacy versions of such products sold throughout the Relevant Time Period,
and any and all competing products.

8.       **"Including"** means including without limitation.

9.       **"Microsoft," "You," or "Your"** means Microsoft Corporation and its
predecessors, successors, or anyone acting on its behalf.

10.      "**Named Product(s)**" means all versions and releases of Microsoft SQL Server,
Microsoft SQL Server Analysis Services, Microsoft Commerce Server, and any other or prior
versions of these products.

11.     **"Person"** means natural persons and formal or informal entities and organizations, including, but not limited to, public and private corporations, partnerships, professional corporations, limited liability companies, business trusts, banking institutions, associations, firms, joint ventures, commissions, bureaus, departments, and any other legal entity, including any divisions, subsidiaries, departments, and other units thereof.

12.     **"Relevant Time Period"** is defined to include any time between January 1, 2011 and present, inclusive.

13.     **"SAP" or "Defendants"** mean collectively and individually: SAP SE, SAP America Inc., and SAP Labs, LLC, their predecessors, and their successors, or anyone acting on their behalf.

14.     **"SAP HANA"** means BW on SAP HANA, SAP B/W4HANA, SAP HANA, and any predecessor product, including prototypes during development and before release of the first version of SAP HANA.

15.     **"S/4HANA"** means SAP's most recent ERP Application.

16.     **"Teradata" or "Plaintiffs"** means Teradata Corporation, Teradata US, Inc., and Teradata Operations, Inc., their predecessors, and their successors, or anyone acting on their behalf.

<u>**INSTRUCTIONS**</u>

1.     In complying with the Subpoena, You are required to produce all documents described below that are in Your possession, custody, or control, including any hard copies or electronically stored information.

2.     If any portion of a document or communication is responsive to any Request, the entire document or communication should be produced.

3.      If You object to any Request, in whole or in part, state the grounds of Your objection with specificity and produce documents responsive to the remainder of the Request.

4.      If, in answering this Subpoena, You encounter any ambiguities when construing a request, instruction, or definition, Your response shall set forth the matter deemed ambiguous and the construction used in responding.

5.      Where a claim of privilege or other protection from discovery is asserted in objecting to any Request, You should identify the nature of the privilege or protection (including work product protection) that is being claimed.  In such case, You should also indicate, as to the information requested, whether (a) any documents exist, and (b) describe the nature of the withheld Document(s) in a "privileged documents log" or similar format that meets the requirements of Federal Rule of Civil Procedure 45(e)(2)(A).

6.      Unless otherwise noted, the Subpoena and the Requests contained herein call for the search for, collection, and production of all responsive documents created, obtained, or retained by You during the Relevant Time Period, as defined in the "Definitions" section.

7.      Documents produced pursuant to this Subpoena should be produced as they are kept in the ordinary course of business, including electronically stored information.  Electronic materials, information, and data that are electronically searchable should be produced in a form that does not remove or degrade this feature.

8.      The following rules of construction apply: (i) the singular includes the plural and vice versa; (ii) the terms "and" and "or" should be read either disjunctively or conjunctively as necessary to bring within the scope of the Subpoena all Documents that might otherwise be construed to be outside of its scope; (iii) the words "include" and "including" should be read to mean including without limitation; (iv) the present tense should be construed to include the past

tense and vice versa; and (v) references to employees, officers, directors, or agents include both current and former employees, officers, directors, and agents.

9.      If Your response to a particular Request is a statement that You lack the ability to comply fully and completely with that Request, You must answer each such Request to the fullest extent You deem possible; specify the portion of each Request that You claim to be unable to answer fully and completely; state what efforts were made to obtain the requested information and the facts upon which You rely to support Your contention that You are unable to answer the Request fully and completely; and state what knowledge, information, or belief You have concerning the unanswered portion of each such Request.  Additionally, if no Documents exist for a particular Request, You must so state.

## <u>REQUESTS</u>

1.      Documents comprising or reflecting Your product roadmaps, promotional materials, product development plans, and marketing plans for each of the ERP Applications or EDAW Products and related services that You offer.

2.      Documents reflecting or concerning any assessment or evaluation of competition between or among Microsoft, Oracle, IBM, Teradata, and SAP for ERP Applications and/or EDAW Products and all data underlying or evaluated in such assessments or evaluations.

3.      Documents reflecting Microsoft's wins and losses of sales of ERP Applications and EDAW Products in competition with Oracle, IBM, Teradata, or SAP, including for each win and loss an identification of the product and supplier the customer switched away from and identification of the product and supplier it switched to.

4.      Documents sufficient to identify Your top 100 customers by revenue for each of the ERP- and EDAW-based products or services You offer, the specific Microsoft ERP- or

EDAW-based products or services that each such customer purchases, the amounts paid annually by each such customer for each of those ERP- or EDAW-based products or services, and when each such customer began using and stopped using (for any that stopped) each of those ERP- or EDAW-based products or services.

5.    Documents comprising or relating to any communication between Microsoft and SAP regarding HANA or S/4HANA, including but not limited to any changes to Microsoft's or SAP's business practices or the business relationship between SAP and Microsoft relating to HANA or S/4HANA or restrictions on the ability of users of S/4HANA to transfer, export, or copy data derived, created, or processed by S/4HANA into a Named Product.

6.    Documents comprising or relating to any communication between Microsoft and SAP concerning Teradata.

7.    Documents comprising or relating to any communication between Microsoft and SAP, any other competitor, any customer, or any government authority concerning any restrictions or prohibitions imposed by SAP on exporting, extracting, or transferring data derived, created, or processed by any SAP ERP Applications for use with an EDAW Product not offered by SAP.

8.    Documents sufficient to show the existence of any restrictions or prohibitions imposed by SAP on the interoperability or the integration of Microsoft ERP Applications or data derived, created, or processed by such Microsoft ERP Applications with SAP HANA.

9.    Documents sufficient to show the existence of any restrictions or prohibitions imposed by SAP on the ability of users of any SAP ERP Application to transfer, export, or extract data derived, created, or processed by such SAP ERP Applications for use or storage in a Named Product.

10.    Documents sufficient to show the operation of each of the Named Products —
including but not limited to user manuals, technical guides, developer instructions, and internal
reports — that was sold or on sale between May 1998 and May 2003, inclusive.

11.    Documents sufficient to establish that each of the Named Products was sold or on
sale in the United States between May 1998 and May 2003, inclusive, including at least the
earliest time in this period during which each version or release of each Named Product was sold
or on sale.

Attachment B

Mark L. Whitaker (*Pro Hac Vice*)
MWhitaker@mofo.com
Daniel P. Muino (CA SBN 209624)
DMuino@mofo.com
G. Brian Busey (*Pro Hac Vice*)
GBusey@mofo.com
Mary Prendergast (CA SBN 272737)
MPrendergast@mofo.com
Fahd H. Patel (*Pro Hac Vice*)
FPatel@mofo.com
Corinna J. Alanis (CA SBN 287164)
CAlanis@mofo.com
MORRISON & FOERSTER LLP
2000 Pennsylvania Ave., NW
Washington, D.C. 20006-1888
Telephone: 202.887.1500
Facsimile: 202.887.0763

Bryan Wilson (CA SBN 138842)
BWilson@mofo.com
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, California 94304-1018
Telephone: 650.813.5600
Facsimile: 650.494.0792

Attorneys for Plaintiffs
TERADATA CORPORATION,
TERADATA US, INC., AND
TERADATA OPERATIONS, INC.

Tharan Gregory Lanier (State Bar No. 138784)
tglanier@JonesDay.com
Nathaniel P. Garrett (State Bar No. 248211)
ngarrett@JonesDay.com
Joshua L. Fuchs (Pro Hac Vice)
jlfuchs@JonesDay.com
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104
Telephone: +1.415.626.3939
Facsimile: +1.415.875.5700

Kenneth A. Gallo (Pro Hac Vice)
kgallo@paulweiss.com
David J. Ball (Pro Hac Vice)
dball@paulweiss.com
William B. Michael (Pro Hac Vice)
wmichael@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
2001 K Street NW
Washington, DC 20006-1047
Telephone: +1.202.223.7356
Facsimile: +1.202.204.7356

Attorneys for Defendants
SAP SE,
SAP AMERICA, INC., AND
SAP LABS, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| TERADATA CORPORATION, TERADATA US, INC., and TERADATA OPERATIONS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> SAP SE, SAP AMERICA, INC., and SAP LABS, LLC, <br><br> Defendants. | Case No. 3:18-cv-03670-WHO (EDL) <br><br> **STIPULATED [PROPOSED] PROTECTIVE ORDER** |

1.     PURPOSES AND LIMITATIONS

Disclosure and discovery activity in this action are likely to involve production of confidential, proprietary, or private information for which special protection from public disclosure and from use for any purpose other than prosecuting this litigation may be warranted. Accordingly, the parties hereby stipulate to and petition the court to enter the following Stipulated Protective Order. The parties acknowledge that this Order does not confer blanket protections on all disclosures or responses to discovery and that the protection it affords from public disclosure and use extends only to the limited information or items that are entitled to confidential treatment under the applicable legal principles. The parties further acknowledge, as set forth in Section 13.4, below, that this Stipulated Protective Order does not entitle them to file confidential information under seal; Civil Local Rule 79-5 sets forth the procedures that must be followed and the standards that will be applied when a party seeks permission from the court to file material under seal.

2.     DEFINITIONS

2.1     Challenging Party: a Party or Non-Party that challenges the designation of information or items under this Order.

2.2     "CONFIDENTIAL" Information or Items: information (regardless of how it is generated, stored or maintained) or tangible things that qualify for protection under Federal Rule of Civil Procedure 26(c).

2.3     Counsel (without qualifier): Outside Counsel of Record and House Counsel (as well as their support staff).

2.4     Designated House Counsel: House Counsel who seek access to "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" information in this matter who have signed the "Acknowledgment and Agreement to Be Bound."  Each side (Plaintiffs on one hand and Defendants on the other) may designate up to—but no more than—four (4) House Counsel as Designated House Counsel in this litigation.

2.5     Designating Party: a Party or Non-Party that designates information or items that it produces in disclosures or in responses to discovery as "CONFIDENTIAL" or "HIGHLY

CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE".

2.6     <u>Disclosure or Discovery Material</u>: all items or information, regardless of the medium or manner in which it is generated, stored, or maintained (including, among other things, testimony, transcripts, and tangible things), that are produced or generated in disclosures or responses to discovery in this matter.

2.7     <u>Expert</u>: a person with specialized knowledge or experience in a matter pertinent to the litigation who (1) has been retained by a Party or its counsel to serve as an expert witness or as a consultant in this action, (2) is not a current employee of a Party or of a Party's competitor (for avoidance of doubt this subsection (2) applies only to a current employee and not to a current consultant of a Party's competitor), and (3) at the time of retention, is not anticipated to become an employee of a Party or of a Party's competitor.

2.8     <u>"HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" Information or Items</u>: extremely sensitive "Confidential Information or Items," disclosure of which to another Party or Non-Party would create a substantial risk of serious harm that could not be avoided by less restrictive means.

2.9     <u>"HIGHLY CONFIDENTIAL – SOURCE CODE" Information or Items</u>: extremely sensitive "Confidential Information or Items" representing computer code, or detailed descriptions of computer code that might reveal the substance of computer code, that define or otherwise describe in detail the algorithms or structure of software or hardware designs, disclosure of which to another Party or Non-Party would create a substantial risk of serious harm that could not be avoided by less restrictive means.

2.10     <u>House Counsel</u>: attorneys who are employees of a party to this action. House Counsel does not include Outside Counsel of Record or any other outside counsel.

2.11     <u>Non-Party</u>: any natural person, partnership, corporation, association, or other legal entity not named as a Party to this action.

2.12    Outside Counsel of Record: attorneys who are not employees of a party to this action but are retained to represent or advise a party to this action and have appeared in this action on behalf of that party or are affiliated with a law firm which has appeared on behalf of that party.

2.13    Party: any party to this action, including all of its officers, directors, employees, consultants, retained experts, predecessors in interest, successors, subrogors, subsidiaries, parent entities, affiliates, divisions, and Outside Counsel of Record (and their support staffs).

2.14    Producing Party: a Party or Non-Party that produces Disclosure or Discovery Material in this action.

2.15    Professional Vendors: persons or entities that provide litigation support services (e.g., photocopying, videotaping, translating, preparing exhibits or demonstrations, and organizing, storing, or retrieving data in any form or medium) and their employees and subcontractors.

2.16    Protected Material: any Disclosure or Discovery Material that is designated as "CONFIDENTIAL," as "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," or as "HIGHLY CONFIDENTIAL – SOURCE CODE."

2.17    Receiving Party: a Party that receives Disclosure or Discovery Material from a Producing Party.

3.    SCOPE

The protections conferred by this Stipulation and Order cover not only Protected Material (as defined above), but also (1) any information copied or extracted from Protected Material that might reveal Protected Material; (2) all copies, excerpts, summaries, or compilations of Protected Material that might reveal Protected Material; and (3) any testimony, conversations, or presentations by Parties or their Counsel that might reveal Protected Material. However, the protections conferred by this Stipulation and Order do not cover the following information: (a) any information that is in the public domain at the time of disclosure to a Receiving Party or becomes part of the public domain after its disclosure to a Receiving Party as a result of publication not involving a violation of this Order, including becoming part of the public record through trial or otherwise; and (b) any information known to the Receiving Party prior to the

disclosure or obtained by the Receiving Party after the disclosure from a source who obtained the information lawfully and under no obligation of confidentiality to the Designating Party. Further, nothing in this Stipulation and Order shall limit Outside Counsel of Record or Designated House Counsel for a Party from providing general advice that does not disclose specific details of the Protected Material. Any use of Protected Material at trial shall be governed by a separate agreement or order.

4.      DURATION

Even after final disposition of this litigation, the confidentiality obligations imposed by this Order shall remain in effect until a Designating Party agrees otherwise in writing or a court order otherwise directs. The Court shall retain jurisdiction after final disposition of this matter to hear and resolve any disputes arising out of this Stipulated Protective Order. Final disposition shall be deemed to be the later of (1) dismissal of all claims and defenses in this action, with or without prejudice; and (2) final judgment herein after the completion and exhaustion of all appeals, rehearings, remands, trials, or reviews of this action, including the time limits for filing any motions or applications for extension of time pursuant to applicable law.

5.      DESIGNATING PROTECTED MATERIAL

5.1      Exercise of Restraint and Care in Designating Material for Protection. Each Party or Non-Party that designates information or items for protection under this Order must take care to limit any such designation to specific material that qualifies under the appropriate standards.

Mass, indiscriminate, or routinized designations are prohibited. Designations that are shown to be clearly unjustified or that have been made for an improper purpose (e.g., to unnecessarily encumber or retard the case development process or to impose unnecessary expenses and burdens on other parties) expose the Designating Party to sanctions.

If it comes to a Designating Party's attention that information or items that it designated for protection do not qualify for protection at all or do not qualify for the level of protection initially asserted, that Designating Party must promptly notify all other parties that it is withdrawing the mistaken designation.

5.2 <u>Manner and Timing of Designations</u>. Except as otherwise provided in this Order (see, e.g., second paragraph of section 5.2(a) below), or as otherwise stipulated or ordered, Disclosure or Discovery Material that qualifies for protection under this Order must be clearly so designated before the material is disclosed or produced.

Designation in conformity with this Order requires:

(a) <u>For information in documentary form</u> (e.g., paper or electronic documents, but excluding transcripts of depositions or other pretrial or trial proceedings), that the Producing Party affix the legend "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," or "HIGHLY CONFIDENTIAL – SOURCE CODE" to each document that contains Protected Material.

A Party or Non-Party that makes original documents or materials available for inspection need not designate them for protection until after the inspecting Party has indicated which material it would like copied and produced. During the inspection and before the designation, all of the material made available for inspection shall be deemed "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY." After the inspecting Party has identified the documents it wants copied and produced, the Producing Party must determine which documents, or portions thereof, qualify for protection under this Order. Then, before producing the specified documents, the Producing Party must affix the appropriate legend ("CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," or "HIGHLY CONFIDENTIAL – SOURCE CODE") to each document that contains Protected Material.

(b) for testimony given in deposition or in other pretrial or trial proceedings, that the Designating Party may identify on the record, before the close of the deposition, hearing, or other proceeding, all protected testimony and may further specify any portions of the testimony that qualify as "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," or "HIGHLY CONFIDENTIAL – SOURCE CODE." Alternatively, within 30 days of receipt of a transcript or recording of a deposition or other pretrial or trial proceeding, the Designating Party may designate such transcript or recording or any portion thereof as "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," or "HIGHLY CONFIDENTIAL

– SOURCE CODE" by notifying all Parties, in writing, of the specific pages and lines of the transcript or recording that should be treated as "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," or "HIGHLY CONFIDENTIAL – SOURCE CODE." All transcripts or recordings of depositions or other pretrial or trial proceedings shall be treated as "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" for 30 days after receipt of the transcript or recording, or until written notice of a designation is received, whichever occurs first. In the case of a Non-Party witness, testimony can be designated as "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," or "HIGHLY CONFIDENTIAL – SOURCE CODE" by a Party, the Non-Party witness, or upon agreement of the Parties.

Transcript pages containing Protected Material must be separately bound by the court reporter, who must affix to the top of each such page the legend "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," or "HIGHLY CONFIDENTIAL – SOURCE CODE" as instructed by the Designating Party. In the event that the deposition is videotaped, the original and all copies of the videotape shall be marked by the video technician to indicate that the content of the videotape is subject to this Stipulated Protective Order, substantially along the lines of "This videotape contains confidential testimony used in this case and is not to be viewed or the contents thereof to be displayed or revealed except pursuant to the terms of the operative Stipulated Protective Order in this matter or pursuant to the written stipulation of the Parties."

Parties shall give the other parties notice if they reasonably expect a deposition, hearing or other proceeding to include Protected Material so that the other parties can ensure that only authorized individuals who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A) are present at those proceedings. The use of a document as an exhibit at a deposition shall not in any way affect its designation as "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," or "HIGHLY CONFIDENTIAL – SOURCE CODE."

(c) for electronic files and documents produced in native electronic format, that the Designating Party append to the file names or designators information indicating whether the file contains "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY"

material, or shall use any other reasonable method for so designating the Protected Material produced in native electronic format. When electronic files or documents produced in native electronic format are printed for use at deposition, a court proceeding, a court filing, or for provision to an Expert, the Party printing the electronic files or documents shall affix a legend to the printed file or document corresponding to the appropriate designation and including the production number and designation associated with the native file.

(d) for information produced in some form other than documentary and for any other tangible items, that the Producing Party affix in a prominent place on the exterior of the container or containers in which the information or item is stored the legend "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," or "HIGHLY CONFIDENTIAL – SOURCE CODE." If only a portion or portions of the information or item warrant protection, the Producing Party, to the extent practicable, shall identify the protected portion(s) and specify the level of protection being asserted.

5.3     Inadvertent Failures to Designate. If timely corrected upon discovery of an inadvertent failure to mark information as qualified information, an inadvertent failure to designate qualified information or items does not, standing alone, waive the Designating Party's right to secure protection under this Order for such material. Upon timely correction of a designation, the Receiving Party must make reasonable efforts to assure that the material is treated in accordance with the provisions of this Order.

6.     CHALLENGING CONFIDENTIALITY DESIGNATIONS

6.1     Timing of Challenges. Any Party or Non-Party may challenge a designation of confidentiality at any time. A Party does not waive its right to challenge a confidentiality designation by electing not to mount a challenge promptly after the original designation is disclosed.

6.2     Meet and Confer. The Challenging Party shall initiate the dispute resolution process by providing written notice of each designation it is challenging and describing the basis for each challenge. To avoid ambiguity as to whether a challenge has been made, the written notice must recite that the challenge to confidentiality is being made in accordance with this

specific paragraph of the Protective Order. The parties shall attempt to resolve each challenge in good faith and must begin the process by conferring directly (in voice to voice dialogue; other forms of communication are not sufficient) within 14 days of the date of service of notice. In conferring, the Challenging Party must explain the basis for its belief that the confidentiality designation was not proper and must give the Designating Party an opportunity to review the designated material, to reconsider the circumstances, and, if no change in designation is offered, to explain the basis for the chosen designation. A Challenging Party may proceed to the next stage of the challenge process only if it has engaged in this meet and confer process first or establishes that the Designating Party is unwilling to participate in the meet and confer process in a timely manner.

6.3   Judicial Intervention. If the Parties cannot resolve a challenge without court intervention, the Designating Party shall file and serve a motion to retain confidentiality under Civil Local Rule 7 (and in compliance with Civil Local Rule 79-5, if applicable) within 14 days of the parties agreeing that the meet and confer process will not resolve their dispute. Each such motion must be accompanied by a competent declaration affirming that the movant has complied with the meet and confer requirements imposed in the preceding paragraph. Failure by the Designating Party to make such a motion including the required declaration within the applicable time shall automatically waive the confidentiality designation for each challenged designation. In addition, the Challenging Party may file a motion challenging a confidentiality designation at any time if there is good cause for doing so, including a challenge to the designation of a deposition transcript or any portions thereof. Any motion brought pursuant to this provision must be accompanied by a competent declaration affirming that the movant has complied with the meet and confer requirements imposed by the preceding paragraph.

The burden of persuasion in any such challenge proceeding shall be on the Designating Party. Frivolous challenges and those made for an improper purpose (e.g., to harass or impose unnecessary expenses and burdens on other parties) may expose the Challenging Party to sanctions. Unless the Designating Party has waived the confidentiality designation by failing to file a motion to retain confidentiality as described above, all parties shall continue to afford the

material in question the level of protection to which it is entitled under the Producing Party's designation until the court rules on the challenge.

7.     ACCESS TO AND USE OF PROTECTED MATERIAL

7.1     Basic Principles. A Receiving Party may use Protected Material that is disclosed or produced by another Party or by a Non-Party in connection with this case only for prosecuting, defending, or attempting to settle this litigation.  A Receiving Party may not use Protected Material for any other purpose, including but not limited to the preparation or prosecution of patents and patent applications, challenging a patent before a domestic or foreign agency (including, but not limited to, a reissue protest, ex parte reexamination, or inter partes review proceeding), or in connection with any other litigation or agency proceeding.  Such Protected Material may be disclosed only to the categories of persons and under the conditions described in this Order. When the litigation has been terminated, a Receiving Party must comply with the provisions of section 14 below (FINAL DISPOSITION).

Protected Material must be stored and maintained by a Receiving Party with a vendor in the United States and in a secure manner that ensures that access is limited to the persons authorized under this Stipulated Protective Order.  Protected Material may be accessed and reviewed outside of the United States.

7.2     Disclosure of "CONFIDENTIAL" Information or Items. Unless otherwise ordered by the court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated "CONFIDENTIAL" only to:

(a) the Receiving Party's Outside Counsel of Record in this action, as well as employees of said Outside Counsel of Record to whom it is reasonably necessary to disclose the information for this litigation;

(b) the officers, directors, and employees (including House Counsel) of the Receiving Party to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(c) Experts (as defined in this Order) of the Receiving Party to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(d) the Court and its personnel;

(e) court reporters or videographers retained to record testimony taken in this action, and their respective staff;

(f) Professional jury or trial consultants, mock jurors, and Professional Vendors to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(g) during their depositions, witnesses in the action to whom disclosure is reasonably necessary, unless otherwise agreed by the Designating Party or ordered by the Court. Pages of transcribed deposition testimony or exhibits to depositions that reveal Protected Material must be separately bound by the court reporter and may not be disclosed to anyone except as permitted under this Stipulated Protective Order.

(h) any mutually agreed upon mediator or settlement officer, and his or her supporting personnel;

(i) the author or recipient of a document containing the information or a custodian or other person who otherwise possessed or knew the information; and

(j) any other person upon Court order or upon prior written consent of the Designating Party.

7.3     Disclosure of "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" and "HIGHLY CONFIDENTIAL – SOURCE CODE" Information or Items. Unless otherwise ordered by the court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" only to:

(a) the Receiving Party's Outside Counsel of Record in this action, as well as employees of said Outside Counsel of Record to whom it is reasonably necessary to disclose the information for this litigation;

(b) Designated House Counsel of the Receiving Party (i) to whom disclosure is reasonably necessary for this litigation, (ii) who has signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A), and (iii) as to whom the procedures set forth in paragraph 7.4(a)-(c), below, have been followed;[1]

(c) Experts of the Receiving Party (1) to whom disclosure is reasonably necessary for this litigation, (2) who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A), and (3) as to whom the procedures set forth in paragraph 7.4(a)-(c), below, have been followed;

(d) the Court and its personnel;

(e) court reporters or videographers retained to record testimony taken in this action and their respective staff,

(f) professional jury or trial consultants, mock jurors, and Professional Vendors to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(g) the author or recipient of a document containing the information or a custodian or other person who otherwise possessed or knew the information; and

(h) any other person upon Court order or upon prior written consent of the Designating Party.

7.4     Procedures for Approving or Objecting to Disclosure of "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" Information or Items to Designated House Counsel or Experts.

(a) Unless otherwise ordered by the court or agreed to in writing by the Designating Party, a Receiving Party that seeks to disclose to Designated House Counsel or an Expert (as defined in this Order) any information or item that has been designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE

---

[1] This Order contemplates that Designated House Counsel shall not have access to any information or items designated "HIGHLY CONFIDENTIAL – SOURCE CODE" with the exception of source code incorporated into expert reports and court filings.

CODE" pursuant to paragraph 7.3(c) first must make a written request to the Designating Party that (1) identifies the general categories of "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" information that the Receiving Party seeks permission to disclose to Designated House Counsel or the Expert, (2) sets forth the full name of the Designated House Counsel or Expert and the city and state of his or her primary residence, (3) for an Expert attaches a copy of the Expert's current resume, (4) for an Expert identifies the Expert's current employer(s), (5) for an Expert identifies each person or entity from whom the Expert has received compensation or funding for work in his or her areas of expertise or to whom the expert has provided professional services, including in connection with a litigation, at any time during the preceding five years,[2] and (6) for an Expert identifies (by name and number of the case, filing date, and location of court) any litigation in connection with which the Expert has offered expert testimony, including through a declaration, report, or testimony at a deposition or trial, during the preceding five years.

(b) A Party that makes a request and provides the information specified in Paragraph (a) may disclose the subject Protected Material to the identified Designated House Counsel or Expert unless, within 14 days of delivering the request, the Party receives a written objection from the Designating Party. Any such objection must set forth in detail the grounds on which it is based.

(c) A Party that receives a timely written objection under Paragraph (b) must meet and confer with the Designating Party (through direct voice to voice dialogue) to try to resolve the matter by agreement within seven days of the written objection. If no agreement is reached, the Party seeking to make the disclosure to the Designated House Counsel or Expert may file a motion as provided in Civil Local Rule 7 (and in compliance with Civil Local Rule 79-5, if applicable) seeking permission from the court to do so. Any such motion must describe the circumstances with specificity, set forth in detail the reasons why the disclosure to the Designated

---

[2] If the Expert believes any of this information is subject to a confidentiality obligation to a third-party, then the Expert should provide whatever information the Expert believes can be disclosed without violating any confidentiality agreements, and the Party seeking to disclose to the Expert shall be available to meet and confer with the Designating Party regarding any such engagement.

House Counsel or Expert is reasonably necessary, assess the risk of harm that the disclosure would entail, and suggest any additional means that could be used to reduce that risk. In addition, any such motion must be accompanied by a competent declaration describing the parties' efforts to resolve the matter by agreement (i.e., the extent and the content of the meet and confer discussions) and setting forth the reasons advanced by the Designating Party for its refusal to approve the disclosure.

In any such proceeding, the Party opposing disclosure to the Designated House Counsel or Expert shall bear the burden of proving that the risk of harm that the disclosure would entail (under the safeguards proposed) outweighs the Receiving Party's need to disclose the Protected Material to its Designated House Counsel or Expert.

7.5     <u>Disclosure of Statements Pursuant to Cal. Civ. Code section 2019.210.</u> Notwithstanding any other provision of this Stipulated Protective Order, Defendants may disclose, to four non-attorney employees of Defendants to be identified, with the appropriate technical and product background to assist in defense of Teradata's claims and who have agreed to the "Acknowledgment and Agreement to Be Bound" (Exhibit A), the following: "Plaintiffs Teradata Corporation, Teradata US, Inc., and Teradata Operations, Inc.'s List of Asserted Trade Secrets Pursuant to Cal. Cod. Civ. Proc. Section 2019.210" served on December 21, 2018, any subsequent disclosure by Plaintiffs pursuant to section 2019.210, and any documents or text explicitly referenced in the Section 2019.210 List, including Teradata's Orange Books.  Defendants shall identify each such non-attorney employee to Plaintiffs at least 14 days in advance of disclosure to that employee, and if Plaintiffs object, the procedure set forth in section 7.4 of this Protective Order shall apply; provided, however, that involvement of the employee in developing what Teradata believes are competing products shall not by itself be a ground for objection.  Should Defendants subsequently believe that disclosure to additional non-attorney employees is warranted, both sides will discuss in good faith adding a proportionate and reasonable number of additional non-attorney employees.  To the extent an agreement cannot be reached, the parties will seek guidance from the Court.

8.     SOURCE CODE

        (a) A Producing Party may designate source code as "HIGHLY CONFIDENTIAL - SOURCE CODE" for any information or items identified in Paragraph 2.9 if they comprise or include confidential, proprietary, or trade secret source code.

        (b) Protected Material designated as "HIGHLY CONFIDENTIAL – SOURCE CODE" shall be subject to all of the protections afforded to "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" information and may be disclosed only to the individuals to whom "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" information may be disclosed, as set forth in Paragraphs 7.3 and 7.4.

        (c) Protected Material designated as "HIGHLY CONFIDENTIAL – SOURCE CODE" shall be made available for inspection during normal business hours or at other mutually agreeable times at two offices of the Producing Party's counsel or at other mutually agreed upon locations, in a format allowing it to be reasonably reviewed and searched.  Such material shall be made available for inspection in a secured room on a secured computer without Internet access or network access to other computers, and the Receiving Party shall not copy, remove, or otherwise transfer any portion of the source code onto any recordable media or recordable device. The Producing Party may visually monitor the activities of the Receiving Party's representatives during any HIGHLY CONFIDENTIAL – SOURCE CODE review, but only to ensure that there is no unauthorized recording, copying, or transmission of the information designated as HIGHLY CONFIDENTIAL – SOURCE CODE.[3]

        (d) The Receiving Party may request paper copies of limited portions of source code that are reasonably necessary in this action for the preparation of court filings, pleadings, expert reports, or other papers, or for deposition or trial, but shall not request paper copies for the purposes of reviewing the source code other than electronically as set forth in paragraph (c) in the

---

[3] It may be appropriate under certain circumstances to require the Receiving Party to keep a paper log indicating the names of any individuals inspecting the HIGHLY CONFIDENTIAL – SOURCE CODE information and dates and times of inspection, and the names of any individuals to whom paper copies of portions of source code are provided.

first instance.  The Producing Party may challenge the amount of source code requested in hard copy form pursuant to the dispute resolution procedure and timeframes set forth in Paragraph 6 whereby the Producing Party is the "Challenging Party" and the Receiving Party is the "Designating Party" for purposes of dispute resolution.  The Producing Party shall print the identified source code on yellow (or other non-white) colored paper.  The Producing Party shall clearly label each page with bates numbers and the label "HIGHLY CONFIDENTIAL - SOURCE CODE."

(e) The Receiving Party shall maintain a record of any individual who has inspected any portion of the source code in electronic or paper form. The Receiving Party shall maintain all paper copies of any printed portions of the source code in a secured, locked area. The Receiving Party shall not create any electronic or other images of the paper copies and shall not convert the paper copies into an electronic format. The Receiving Party may be permitted to include short excerpts of source code (20 lines or less) in court filings or expert reports so long as these documents are designated "HIGHLY CONFIDENTIAL – SOURCE CODE." The Receiving Party shall only make additional paper copies if such additional copies are (1) necessary to prepare court filings, pleadings, or other papers (including a testifying expert's expert report), (2) necessary for deposition, or (3) otherwise necessary for the preparation of its case. Any paper copies used during a deposition shall be retrieved by the Producing Party at the end of each day and must not be given to or left with a court reporter or any other unauthorized individual.[4] The Receiving Party may request that the Producing Party bring a source code computer to a deposition; the Producing Party shall comply unless its compliance would be unduly burdensome.

9.      PROTECTED MATERIAL SUBPOENAED OR ORDERED PRODUCED IN OTHER LITIGATION

If a Party is served with a subpoena or a court order issued in other litigation that compels

---

[4] The nature of the information designated as "HIGHLY CONFIDENTIAL – SOURCE CODE" at issue in a particular case may warrant additional protections or restrictions, For example, it may be appropriate under certain circumstances to require the Receiving Party to provide notice to the Producing Party before including "HIGHLY CONFIDENTIAL – SOURCE CODE" information in a court filing, pleading, or expert report.

disclosure of any information or items designated in this action as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" that Party must:

(a) promptly notify in writing the Designating Party. Such notification shall include a copy of the subpoena or court order;

(b) promptly notify in writing the party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena or order is subject to this Protective Order. Such notification shall include a copy of this Stipulated Protective Order; and

(c) cooperate with respect to all reasonable procedures sought to be pursued by the Designating Party whose Protected Material may be affected.[5]

If the Designating Party timely seeks a protective order, the Party served with the subpoena or court order shall not produce any information designated in this action as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" before a determination by the court from which the subpoena or order issued, unless the Party has obtained the Designating Party's permission. The Designating Party shall bear the burden and expense of seeking protection in that court of its confidential material – and nothing in these provisions should be construed as authorizing or encouraging a Receiving Party in this action to disobey a lawful directive from another court.

10.    A NON-PARTY'S PROTECTED MATERIAL SOUGHT TO BE PRODUCED IN THIS LITIGATION

(a) The terms of this Order are applicable to information produced by a Non-Party in this action and designated as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE." Such information produced

---

[5] The purpose of imposing these duties is to alert the interested parties to the existence of this Protective Order and to afford the Designating Party in this case an opportunity to try to protect its confidentiality interests in the court from which the subpoena or order issued.

by Non-Parties in connection with this litigation is protected by the remedies and relief provided by this Stipulated Protective Order. Nothing in these provisions should be construed as prohibiting a Non-Party from seeking additional protections.

(b) In the event that a Party is required, by a valid discovery request, to produce a Non-Party's confidential information in its possession, and the Party is subject to an agreement with the Non-Party not to produce the Non-Party's confidential information, then the Party shall:

1.    promptly notify in writing the Requesting Party and the Non-Party that some or all of the information requested is subject to a confidentiality agreement with a Non-Party;

2.    promptly provide the Non-Party with a copy of the Stipulated Protective Order in this litigation, the relevant discovery request(s), and a reasonably specific description of the information requested; and

3.    make the information requested available for inspection by the Non-Party.

(c) If the Non-Party fails to object or seek a protective order from this court within 14 days of receiving the notice and accompanying information, the Receiving Party may produce the Non-Party's confidential information responsive to the discovery request. If the Non-Party timely seeks a protective order, the Receiving Party shall not produce any information in its possession or control that is subject to the confidentiality agreement with the Non-Party before a determination by the court. Absent a court order to the contrary, the Non-Party shall bear the burden and expense of seeking protection in this court of its Protected Material.

11.    UNAUTHORIZED DISCLOSURE OF PROTECTED MATERIAL

If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed Protected Material to any person or in any circumstance not authorized under this Stipulated Protective Order, the Receiving Party must immediately (a) notify in writing the Designating Party of the unauthorized disclosures, (b) use its best efforts to retrieve all unauthorized copies of the Protected Material, (c) inform the person or persons to whom unauthorized disclosures were made of all the terms of this Order, and (d) request such person or persons to execute the "Acknowledgment and Agreement to Be Bound" that is attached hereto as Exhibit A.

Unauthorized or inadvertent disclosure does not change the status of Protected Material or waive the right to maintain the disclosed document or information as Protected Material.

12.    <u>PRODUCTION OF PRIVILEGED OR OTHERWISE PROTECTED MATERIAL</u>

Nothing in this Stipulated Protective Order shall require disclosure of information which is protected by the attorney-client privilege, work product immunity, or other privilege or immunity. The production of privileged or work-product-protected documents, electronically stored information ("ESI") or information is not a waiver of the privilege or protection from discovery in this case or in any other federal or state proceeding, except when the producing party provides notice that it is intentionally and knowingly waiving a privilege or immunity, that privilege or immunity shall be waived as to this case. This Order shall be interpreted to provide the maximum protection allowed by Federal Rule of Evidence 502(d). For the avoidance of any doubt and for purposes of the application of this paragraph, the parties agree that Federal Rule of Evidence 502(b) does not apply.

To promote the just, speedy, and inexpensive determination of this action pursuant to Federal Rule of Civil Procedure 1, the parties agree to use best efforts to comply with the following standard: If a Receiving Party, upon review of Disclosure or Discovery Material produced to it, becomes aware that any portion of such Disclosure or Discovery Material is protected by the attorney-client privilege, work product immunity, or other privilege or immunity, the Receiving Party shall promptly notify the Producing Party of the specific Materials which could be so considered and will not use such Materials for any purpose until the issue has been resolved by agreement of the Parties or by order of the Court. Inadvertent failure to comply with this standard shall not be grounds for relief.

When a Producing Party gives notice to a Receiving Party that certain inadvertently produced Disclosure or Discovery Material is subject to a claim of privilege or other protection, the obligations of the Receiving Party are those set forth in Federal Rule of Civil Procedure 26(b)(5)(B). Each Receiving Party must immediately return such Disclosure or Discovery Material and all copies to the Producing Party, except for any pages containing privileged markings by the Receiving Party, which shall instead be destroyed and certified as such by the

Receiving Party to the Producing Party.

Nothing contained herein is intended to or shall serve to limit a party's right to conduct a review of documents, ESI, or information (including metadata) for relevance, responsiveness and/or segregation of privileged and/or protected information before production. This provision is not intended to modify whatever procedure may be established in an e-discovery order that provides for production without prior privilege review.

13.   MISCELLANEOUS

13.1   Right to Further Relief. Nothing in this Order abridges the right of any person to seek its modification by the court in the future.

13.2   Right to Assert Other Objections. By stipulating to the entry of this Protective Order no Party waives any right it otherwise would have to object to disclosing or producing any information or item on any ground not addressed in this Stipulated Protective Order. Similarly, no Party waives any right to object on any ground to use in evidence of any of the material covered by this Protective Order.

13.3   Export Control. Disclosure of Protected Material shall be subject to all applicable laws and regulations relating to the export of technical data contained in such Protected Material, including the release of such technical data to foreign persons or nationals in the United States or elsewhere. The Producing Party shall be responsible for identifying any such controlled technical data, and the Receiving Party shall take measures necessary to ensure compliance.

13.4   Filing Protected Material. Without written permission from the Designating Party or a court order secured after appropriate notice to all interested persons, a Party may not file in the public record in this action any Protected Material. A Party that seeks to file under seal any Protected Material must comply with Civil Local Rule 79-5. Protected Material may only be filed under seal pursuant to a court order authorizing the sealing of the specific Protected Material at issue. Pursuant to Civil Local Rule 79-5, a sealing order will issue only upon a request establishing that the Protected Material at issue is privileged, protectable as a trade secret, or otherwise entitled to protection under the law. If a Receiving Party's request to file Protected Material under seal pursuant to Civil Local Rule 79-5(e) is denied by the court, then the

Receiving Party may file the Protected Material in the public record pursuant to Civil Local Rule 79-5(e)(2) unless otherwise instructed by the court.

13.5    Computation of Time:   The computation of any period of time prescribed or allowed by this Stipulated Protective Order shall be governed by the provisions for computing time in Federal Rule of Civil Procedure 6 except as otherwise provided in Civil Local Rule 7.

13.6    Successors:   This Stipulated Protective Order shall be binding upon the Parties hereto, their Counsel, and their successors, executors, heirs, assigns, and employees.

13.7    Fact of Designation Not Admissible:   The fact of designation or failure to designate Disclosure or Discovery Material as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" pursuant to this Stipulated Protective Order shall not be admissible for any purpose in a trial on the merits or at any other proceeding other than a proceeding arising from or related to this Stipulated Protective Order.

14.    FINAL DISPOSITION

Within 60 days after the final disposition of this action, as defined in paragraph 4, each Receiving Party must return all Protected Material to the Producing Party or destroy such material. As used in this subdivision, "all Protected Material" includes all copies, abstracts, compilations, summaries, and any other format reproducing or capturing any of the Protected Material. Whether the Protected Material is returned or destroyed, the Receiving Party must submit a written certification to the Producing Party (and, if not the same person or entity, to the Designating Party) by the 60-day deadline that (1) identifies (by category, where appropriate) all the Protected Material that was returned or destroyed and (2) affirms that the Receiving Party has not retained any copies, abstracts, compilations, summaries or any other format reproducing or capturing any of the Protected Material. Notwithstanding this provision, Counsel are entitled to retain an archival copy of all pleadings, motion papers, trial, deposition, and hearing transcripts, legal memoranda, correspondence, deposition and trial exhibits, expert reports, attorney work product, and consultant and expert work product, even if such materials contain Protected Material. Any such archival copies that contain or constitute Protected Material remain subject to

this Protective Order as set forth in Section 4 (DURATION).

15.  <u>DATA SECURITY</u>

Any Party in possession of Discovery Material designated as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" shall maintain a written information security program that includes reasonable administrative, technical and physical safeguards designed to protect the security and confidentiality of such information, protect against any reasonably anticipated threats or hazards to the security of such information, and protect against unauthorized access to or use of such information.  To the extent a Party does not have an information security program they may comply with this provision by having the "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" Discovery Material managed by and/or stored with eDiscovery vendors or claims administrators that maintain such an information security program.  If the Receiving Party discovers a breach of security, including any actual or suspected unauthorized access, relating to another party's "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" Discovery Material, the Receiving Party shall: (1) promptly provide written notice to Designating Party of such breach; (2) investigate and make reasonable efforts to remediate the effects of the breach, and provide Designating Party with assurances reasonably satisfactory to Designating Party that such breach shall not recur; and (3) provide sufficient information about the breach that the Designating Party can reasonably ascertain the size and scope of the breach.  If required by any judicial or governmental request, requirement or order to disclose such information, the Receiving Party shall take all reasonable steps to give the Designating Party sufficient prior notice in order to contest such request, requirement or order through legal means.  The Receiving Party agrees to cooperate with the Designating Party or law enforcement in investigating any such security incident.  In any event, the Receiving Party shall promptly take all necessary and appropriate corrective action to terminate the unauthorized access.

IT IS SO STIPULATED, THROUGH COUNSEL OF RECORD.

DATED: May 13, 2019                 /s/ Mark Whitaker
                                    MORRISON & FOERSTER LLP

                                    Attorneys for Plaintiffs
                                    TERADATA CORP.,
                                    TERADATA US, INC., and
                                    TERADATA OPERATIONS, INC.

DATED: May 13, 2019                 /s/ Tharan Gregory Lanier
                                    JONES DAY
                                    PAUL, WEISS, RIFKIND, WHARTON &
                                    GARRISON LLP

                                    Attorneys for Defendants
                                    SAP SE,
                                    SAP AMERICA, INC., and
                                    SAP LABS LLC

PURSUANT TO STIPULATION, IT IS SO ORDERED.

DATED:  May 14, 2019        _____

                            Magistrate Judge Elizabeth B. LaPorte
                            United States ~~District~~ Judge
                                          Magistrate

**ATTESTATION OF E-FILED SIGNATURE**

I, Mark L. Whitaker, am the ECF User whose ID and password are being used to file this Stipulated Proposed Protective Order.  In compliance with Local Rule 5-1(i)(3), I hereby attest that the concurrence to the filing of this document has been obtained from each signatory hereto. Executed this 13th day of May 2019

*/s Mark Whitaker*
Mark Whitaker

<u>EXHIBIT A</u>

<u>ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND</u>

I, _____ [print or type full name], of _____ [print or type full address], declare under penalty of perjury that I have read in its entirety and understand the Stipulated Protective Order that was issued by the United States District Court for the Northern District of California on _____ [date] in the case of *Teradata Corporation, et al. v. SAP SE, et al.* Case No. 3:18-cv-03670-WHO (N.D. Cal.). I agree to comply with and to be bound by all the terms of this Stipulated Protective Order and I understand and acknowledge that failure to so comply could expose me to sanctions and punishment in the nature of contempt. I solemnly promise that I will not disclose in any manner any information or item that is subject to this Stipulated Protective Order to any person or entity except in strict compliance with the provisions of this Order.

I further agree to submit to the jurisdiction of the United States District Court for the Northern District of California for the purpose of enforcing the terms of this Stipulated Protective Order, even if such enforcement proceedings occur after termination of this action.

I hereby appoint _____ [print or type full name] of _____ [print or type full address and telephone number] as my California agent for service of process in connection with this action or any proceedings related to enforcement of this Stipulated Protective Order.


Date: _____

City and State where sworn and signed: _____

Printed name: _____


Signature: _____

# EXHIBIT 2

Mark L. Whitaker (admitted *Pro Hac Vice*)
MWhitaker@mofo.com
Daniel P. Muino (CA BAR NO. 209624)
DMuino@mofo.com
G. Brian Busey (admitted *Pro Hac Vice*)
GBusey@mofo.com
Bradley S. Lui (CA BAR NO. 143088)
BLui@mofo.com
Mary Prendergast (CA BAR NO. 272737)
MPrendergast@mofo.com
Fahd H. Patel (admitted *Pro Hac Vice*)
FPatel@mofo.com
Corinna J. Alanis (CA BAR NO. 287164)
CAlanis@mofo.com
MORRISON & FOERSTER LLP
2000 Pennsylvania Avenue, NW
Washington, District of Columbia 20006-1888
Telephone:     (202) 887-1500
Facsimile:     (202) 887-0763

Bryan Wilson (CA BAR NO. 138842)
BWilson@mofo.com
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, California 94304-1018
Telephone:     (650) 813-5600
Facsimile:     (650) 494-0792

Wendy Ray (CA SBN 226269)
WRay@mofo.com
MORRISON & FOERSTER LLP
707 Wilshire Boulevard, Suite 6000
Los Angeles, California  90017-3543
Telephone:     (213) 892.5200
Facsimile:     (213) 892.5454

Attorneys for Plaintiffs
TERADATA CORPORATION,
TERADATA US, INC., and
TERADATA OPERATIONS, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TERADATA CORPORATION, TERADATA US, INC., and TERADATA OPERATIONS, INC.<br><br>Plaintiffs,<br><br>v.<br><br>SAP SE, SAP AMERICA, INC., and SAP LABS, LLC<br><br>Defendants. | Case No. 3:18-CV-03670-WHO<br><br>**SECOND AMENDED COMPLAINT FOR TRADE SECRET MISAPPROPRIATION, COPYRIGHT INFRINGEMENT, VIOLATION OF SHERMAN ACT § 1, VIOLATION OF CLAYTON ACT § 3, VIOLATION OF SHERMAN ACT § 2**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Teradata Corporation, Teradata US, Inc., and Teradata Operations, Inc. (collectively, "Teradata") complain and allege as follows against Defendants SAP SE, SAP America, Inc., and SAP Labs, LLC (collectively, "SAP").

## THE NATURE OF THE ACTION

1.      This case is about SAP's campaign of anticompetitive conduct directed at Teradata.  Over at least the last decade, SAP has used its powerful position in Enterprise Resource Planning ("ERP") Applications to gain entrance to and quickly grab market share in the Enterprise Data Analytics and Warehousing ("EDAW") market, in which it previously had essentially no presence.  SAP's strategy began in 2008, when SAP leveraged its position in ERP Applications to lure Teradata into a purported joint venture in order to gain access to Teradata's valuable intellectual property.  The purpose of the joint venture—a purpose which Teradata now knows was a false one on SAP's part—was to combine SAP's ERP Applications suite and Business Warehouse reporting tool (SAP BW) with Teradata's industry-leading "massively parallel processing" (MPP) architecture for EDAW.  SAP then stole Teradata's trade secrets (accumulated by Teradata over the course of four decades in the EDAW space), and used them to quickly develop and introduce a competing (though inferior) product: SAP HANA.

2.      Upon release of its new product, SAP promptly terminated the parties' joint venture, and it is now attempting to coerce its customers into using HANA only, to the exclusion of Teradata, by forcing its customers to adopt HANA in exchange for upgrading their ERP Applications.  Moreover, and on information and belief, SAP has begun significantly restricting Teradata's ability to access customers' SAP-derived data.  Through this conduct, SAP has deliberately sought to exploit its large, existing ERP customer base to the detriment of Teradata and its customers.  Given the extremely high costs of switching ERP providers, SAP's ERP customers are effectively locked-in to using SAP's ERP Applications, and SAP is now attempting to lock them into using only HANA in the EDAW market as well.

3.      SAP could not have so quickly developed and marketed HANA in the first place without its theft of Teradata's trade secrets.  Now, using the fruits of that theft and its position in ERP Applications, SAP is attempting to foreclose Teradata from supplying EDAW solutions to

many of the largest corporations in the world. SAP's anticompetitive strategy has resulted in irreparable and ongoing harm to Teradata in the form of lost customer relationships and opportunities, lost profits, and continued erosion of market share in the very industry Teradata pioneered. Teradata therefore is entitled to an injunction barring SAP's illegal conduct, monetary damages, and all other legal and equitable relief available under law and which the court may deem proper.

## PARTIES

4.      Teradata Corporation is organized under the laws of Delaware. Its global headquarters is currently located at 10000 Innovation Drive, Miamisburg, Ohio 45342, with an announced move to 17095 Via del Campo, San Diego, California 92127, in late 2018. Teradata Corporation, either itself or through one or more of its subsidiaries, conducts research, development, engineering, and other technical operations related to its EDAW products at its facilities at 17095 Via del Campo, San Diego, California 92127.

5.      Teradata US, Inc., a wholly-owned subsidiary of Teradata Corporation, is a corporation organized under the laws of Delaware, with its current headquarters at 10000 Innovation Drive, Miamisburg, Ohio 45342. Teradata US, Inc. will also be moving its headquarters to San Diego in late 2018. Teradata US, Inc. is the owner of all Teradata intellectual property worldwide.

6.      Teradata Operations, Inc., a wholly-owned subsidiary of Teradata Corporation, is a corporation organized under the laws of Delaware, with its current headquarters at 10000 Innovation Drive, Miamisburg, Ohio 45342. Teradata Operations, Inc. will also be moving its headquarters to San Diego in late 2018. Teradata Operations, Inc. is responsible for conducting all of Teradata's business operations in the United States, including product development and sales.

7.      Defendant SAP SE is a European company. Its principal place of business is located at Dietmar-Hopp-Allee 16, Walldorf, Germany, 69190. SAP SE converted from a German "AG" corporation to an "SE" European company in 2014.

8.      Defendant SAP America, Inc. ("SAP America"), a wholly-owned subsidiary of SAP SE, is a Delaware corporation.  Its principal place of business is 3999 West Chester Pike, Newtown Square, PA 19073, and it also has a place of business located in this District, at 1999 Harrison Street, Suite 675, Oakland, CA 94612.  SAP America is responsible for sales, marketing, distribution, technical support, and customer service related to SAP HANA occurring in the United States, including throughout this District.

9.      Defendant SAP Labs, LLC ("SAP Labs"), a wholly owned subsidiary of SAP America, is a Delaware limited liability company.  SAP Labs has places of business in Palo Alto and San Francisco, California, including its Co-Innovation Lab ("COIL") facility located at 3410 Hillview Avenue, Palo Alto, CA 94304.  COIL housed a development, analysis, and testing environment for the SAP-Teradata joint venture discussed herein (known as the "Bridge Project") and featured customer demonstrations of the integrated solution jointly developed by SAP and Teradata (referred to as "Teradata Foundation").  SAP Labs conducts research, development, and engineering activities related to SAP HANA.

**JURISDICTION**

10.      This Court has subject matter jurisdiction under 18 U.S.C. § 1836(c) and 28 U.S.C. §§ 1331, 1337(a), 1338(a), and 1367.

11.      This Court has personal jurisdiction over SAP SE, SAP America, and SAP Labs (collectively, "SAP").  This Court has personal jurisdiction over SAP SE because it has committed acts of misappropriation and infringement within this District.  SAP SE used its power in the ERP Applications market to enter into agreements with Teradata and gain access to Teradata's technology and know-how, including through installation of Teradata software at the COIL facility in this District.  SAP SE then used these activities to misappropriate Teradata's trade secrets and infringe Teradata's copyrighted software in this District.  In addition, SAP SE, directly or through intermediaries, sells or offers for sale infringing products and services in this District.  This Court also has personal jurisdiction over SAP SE, SAP America, and SAP Labs for the purpose of Teradata's antitrust claims pursuant to 15 U.S.C. § 22.

12.     This Court has personal jurisdiction over SAP America because it has committed acts of infringement and misappropriation in this District.  SAP America has sufficient minimum contacts with this District because, for example, SAP America's wholly owned subsidiary, SAP Labs, is located within this District.  SAP America also has a place of business in this district.  In addition, SAP America, directly or through intermediaries, sells or offers for sale infringing products and services in this District.

13.     This Court has personal jurisdiction over SAP Labs because it has a place of business located within this District.  Further, SAP's misappropriation and infringement of Teradata's intellectual property was carried out, at least in part, at SAP Labs' COIL facility in this District.

**VENUE AND INTRADISTRICT ASSIGNMENT**

14.     Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred or a substantial part of property that is the subject of the action is situated in this District.  Additionally, venue is proper under 28 U.S.C. § 1400(a) and 15 U.S.C. § 22 for the copyright and antitrust claims, respectively, because SAP Labs and SAP America (and SAP SE, through its subsidiaries) may be found and transact business in this district.

15.     This is an Intellectual Property and Antitrust Action to be assigned on a district-wide basis pursuant to Local Rule 3-2(c).

**BACKGROUND**

**A.     Teradata Is One of the World's Leading Technology Companies and a Pioneer of EDAW Products, Including MPP Database Systems.**

16.     Teradata's flagship product, and the cornerstone of all of its enterprise-analytics offerings, is Teradata Database.  Teradata Database is a massively parallel relational database management system (RDBMS) specifically designed for Enterprise Data Analytics and Warehousing (EDAW).  EDAW involves the centralized storage and integration of vast amounts of data collected from numerous sources across an entire business enterprise in its day-to-day operations, giving the business a complete "enterprise view" of its operational activities.  In

addition to data storage, EDAW is especially valuable in helping the world's largest companies (most of whom serve millions or even billions of customers and/or process millions or billions of transactions or data-generating events every day) analyze and fully understand the entirety of their business operations, including how events happening in one area of the business impact operations in other areas. EDAW also assists these companies in making the strategic and tactical decisions, often in real-time, which allow them to operate as efficiently and profitably as possible.

17.    Teradata has been a leading provider of EDAW products for nearly 40 years. Teradata pioneered and was the first commercial EDAW vendor to employ the highly scalable computing architecture known as "massively parallel processing" (MPP). Teradata's MPP architecture is designed specifically for executing high volumes of complex analytical queries (tens of thousands at a time) on the massive amounts of data generated by EDAW customers. As the term MPP suggests, Teradata's architecture accomplishes this by dividing equally both the data and the analytical workload across dozens, hundreds, or (in many cases) thousands of parallel processor units, and executing the analytical tasks concurrently across these parallel units.

18.    A Teradata system does this with "linear-performance scalability," meaning that the system can grow to fit each customer's needs, taking on as many additional parallel processor units and data-storage devices as necessary to accommodate whatever amount of data and whatever type of analytics workload the customer can throw at it. As the customer's data volumes and workload demands increase, the Teradata system can grow to accommodate them with the simple addition of parallel units and (if necessary) redistribution of data and workload across the expanded system. The Teradata system is unique in its ability to accommodate this type of growth without diminishing the returns or sacrificing the processing power or efficiency of any of its parallel units.

19.    Teradata's MPP technology grew out of research conducted at the California Institute of Technology. After starting the company in a garage in Marina Del Rey, California, the founders obtained funding in mid-1979 and Teradata was born on July 13, 1979. The founders chose the name "Teradata" to symbolize the ability of their flagship database to manage trillions of bytes of data, an unimaginable amount of data at that time.

20. Teradata released the first commercial system incorporating its MPP architecture in the early 1980s and has spent the last *four decades* expanding and improving its technology, generating substantial trade secrets and other intellectual property in the process. In 1983, Teradata received the seminal patent on first-generation MPP design for data analytics (hardware-based parallelism; U.S. No. 4,412,285, "Multiprocessor Interconnection System and Method"). Eleven years later it also received the seminal patent on second-generation MPP design (software-based parallelism; U.S. No. 5,640,584, "Virtual Processor Method and Apparatus for Enhancing Parallelism and Availability in Computer Systems"), technology that continues to distinguish Teradata's systems from those of its competitors today. It is access to this experience and innovation that SAP sought and received through the joint venture with Teradata and then ultimately unlawfully used to Teradata's detriment, both through its development and release of HANA and through its subsequent attempts to monopolize the EDAW Market, which encompasses SAP's customers in the Top-Tier ERP Applications Market (defined below).

21. In the 25 years since its early breakthroughs, Teradata has continued in its role as the pioneer for massively parallel analytics, developing and patenting technologies that remain the gold standard in a wide variety of technology areas. For example, in 2012, Teradata released its Unified Data Architecture (UDA), which allows a customer to collect and analyze all of its data no matter the type (including, *e.g.*, traditional "structured" data along with "unstructured" data like audio and video content) in a single analytical environment. In 2017, Teradata released IntelliCloud, which provides EDAW capabilities in a secured cloud-services environment. Today, Teradata has over 10,000 employees globally, including over 1450 employees based in California at Teradata's San Diego, Santa Clara, San Francisco, and El Segundo facilities. On June 6, 2018, Teradata announced that it will be moving its headquarters from Miamisburg, Ohio, to its campus in San Diego.

22. Teradata serves the world's largest enterprise customers operating in a diverse range of industries. Its customers include all 17 of the top telecommunications companies, 17 of the top 20 global and commercial savings banks, 16 of the top 20 travel and transportation companies, 15 of the top 20 global retailers, 10 of the top 15 pharmaceutical companies, and 12

of the top 20 manufacturing companies, among others.  Teradata also serves a variety of

customers in the nonprofit and public sectors.  Teradata's customer base primarily consists of

companies with data collected from millions of daily transactions from many data sources across

a wide variety of enterprise applications, business lines, and geographic locations.  These

companies present the most complex data-analytics challenges and require the scalability and

sophistication for which Teradata's EDAW technologies were specifically designed.

23.     Since the release of its first database product in the early 1980s, Teradata and its

products repeatedly have been recognized as standouts in the high-tech industry and within the

business community in general.  Fortune magazine named Teradata's database system its

"Product of the Year" in 1986, and Gartner named Teradata the "Leader in Commercial Parallel

Processing" in 1994.  Intelligent Enterprise magazine named Teradata the best global data

warehouse and business intelligence appliance vendor in 2007, and Forrester Research rated

Teradata number one in its first-ever enterprise data warehousing report in 2009.  Forbes named

Teradata one of the world's 100 most innovative companies in 2013, and just a few months ago

Thompson Reuters named Teradata a Top 100 Global Technology Leader.  Finally, the

Ethisphere Institute consistently has recognized Teradata as one of the World's Most Ethical

Companies, awarding this distinction to Teradata in 2018 for the ninth consecutive time.

**B.      Teradata Scrupulously Protects Its Intellectual Property.**

24.     Over its nearly 40-year history of innovation, Teradata has developed extensive

intellectual property related to its database and data-analytics technologies, obtaining more than

1000 patents.  Teradata's intellectual property includes confidential techniques related to the

ingestion and management of massive amounts of data and the concurrent execution of large

numbers of highly complex analytical queries against that data.  Teradata safeguards these

optimization techniques, which provide Teradata a significant advantage over its competitors, as

among its most valuable and confidential information.

25.     Teradata's proprietary and highly valuable data-analytics techniques are not

known outside the company except under strict duties of non-disclosure, and Teradata

scrupulously maintains these techniques in confidence through many safeguards, including but

not limited to non-disclosure agreements, confidentiality provisions, password protection, express licenses for end users, and secure infrastructure.

26.     When Teradata was initially spun-off from its parent company NCR in 2007, each employee was required to sign a contract containing a strict non-disclosure provision.  When any new employee joins Teradata, that employee is required to sign an agreement acknowledging the duty to keep strictly confidential and treat as trade secret any information learned during the course of employment related to the business or activities of Teradata.  The employment agreement also states that, upon termination, the employee will comply with this non-disclosure agreement, and will surrender any Teradata information in the employee's possession upon leaving the company.  Additionally, upon their departure from Teradata, employees are required to sign exit agreements reminding them they have a continuing obligation not to use or disclose, or directly or indirectly aid others in using or disclosing, any of the proprietary information or data they may have learned while employed at Teradata.

27.     Teradata also requires third-party contractors, distributors, vendors, and development partners to enter into non-disclosure agreements that strictly limit the use and disclosure of any confidential information obtained in the course of their relationships with Teradata.  In those agreements, Teradata controls what resources a given partner or contractor can access, how they can be accessed (often via specific passwords), and which specific personnel can access those resources.

28.     Any time Teradata is considering joint development with a third party, it requires an NDA be signed before any confidential information can be exchanged as part of those initial discussions.  With respect to end users, Teradata protects its intellectual property by providing access to its software tools and technical information only to persons who agree to the terms of Teradata's end-user license agreements.  Teradata also employs secure computing infrastructure for its source code, design documents, and other proprietary and confidential information.

29.     Teradata owns the copyright in the software associated with Teradata Database.  U.S. Copyright Registration Numbers for Teradata Database are provided below:

| Work | Case Number | Effective Date of Registration (Date Submitted) | Registration Number |
|------|-------------|------------------------------------------------|---------------------|
| Teradata Database 12.0 | 1-6668876091 | June 19, 2018 | TXu 2-091-495 |
| Teradata Database 13.0 | 1-6668993302 | June 19, 2018 | TXu 2-091-496 |
| Teradata Database 13.1 | 1-6668993339 | June 19, 2018 | TXu 2-091-497 |
| Teradata Database 14.0 | 1-6668993374 | June 19, 2018 | TXu 2-091-498 |
| Teradata Database 14.1 | 1-6668993409 | June 19, 2018 | TXu 2-091-500 |
| Teradata Database 15.0 | 1-6668993464 | June 19, 2018 | TXu 2-091-501 |
| Teradata Database 15.1 | 1-6668983602 | June 19, 2018 | TXu 2-091-493 |

**C.     Teradata and SAP Enter into the Bridge Project.**

30.     SAP is the dominant provider of ERP (Enterprise Resource Planning) software ("ERP Applications") in the market comprised of the world's most complex, large-scale business enterprises (the "Top-Tier ERP Applications Market"). This market is more fully defined in Paragraphs 59 through 61 below. ERP Applications allow companies to gather and manage the data required to conduct their day-to-day operations across many aspects of the business enterprise, including sales and inventory transactions, financial and accounting transactions, human-resource transactions, and the like. ERP Applications typically are designed around a relational database that acts as a common repository for all the data used and managed by the ERP Applications in carrying out the entity's business transactions. This database, known as a "transactional database," ensures that all users of the entity's ERP Applications have access to a uniform and current set of data, so that a given transaction will yield the same result no matter which of the users performs the transaction. Examples of commonly used transactional databases are the Oracle Database, IBM Db2, and Microsoft SQL Server.

31.     Teradata traditionally has focused its development activities on the EDAW products and services consumed by the same complex, large-scale enterprises that form the Top-Tier ERP Applications Market (the "EDAW Market"). SAP, on the other hand, has traditionally focused on ERP Applications and, to a lesser extent, "business intelligence" (BI) tools (including the SAP BW tool) that allow ERP users to generate reports using their ERP-derived data. In the mid-2000s, SAP's Top-Tier ERP Applications customers were fully reliant on third parties like Teradata to provide the analytical database and data-analytics backbone necessary to meet their

EDAW needs. Recognizing the potential synergies in integrating and marketing their technologies to a common customer base, in 2008 Teradata and SAP entered into a partnership to develop a solution that would "bridge" SAP's Top-Tier ERP Applications customers to an analytic solution based on Teradata's market-leading EDAW product, which would be accessed through the interface of the SAP BW tool (the "Bridge Project").

32.     Teradata sharply limited SAP's use of information, software, tools, and other materials that it provided during the Bridge Project. The parties entered into a mutual non-disclosure agreement (MNDA) in December 2008 and a further MNDA in June 2009. These NDAs limited the disclosure and use of the parties' "Confidential Information," including both parties' "software and related documentation," stating that such information "shall not be reproduced in any form except as required to accomplish the intent of this Agreement." On February 27, 2009, SAP and Teradata entered into a Software Development Cooperation Agreement (SDCA) and a a Technology Partner Agreement (TPA) related to the Bridge Project. These agreements restricted disclosure of the parties' confidential information and included prohibitions on reverse engineering.

33.     A key challenge of the Bridge Project was to ensure fast and efficient interoperation between SAP's front-end systems and Teradata's EDAW product. Subject to the strict non-disclosure agreements that limited the use of any confidential Teradata information to the Bridge Project only, Teradata shared its valuable trade secret and proprietary techniques for optimizing the integration and analysis of massive amounts of data at an enterprise-wide scale. Using those techniques, Teradata and SAP succeeded in jointly developing and putting into production an integrated solution called "Teradata Foundation," which would enable SAP's Top-Tier ERP Applications customers to use Teradata as the underlying analytical database for EDAW activities. SAP and Teradata brought Teradata Foundation to market, as they installed and finalized Foundation on site at one major customer's facilities and developed business opportunities for numerous other potential customers, a business projected at hundreds of millions of dollars annually.

### D. Teradata Shares Trade Secret Information with SAP

34.     During the Bridge Project, subject to the terms of the parties' agreements, Teradata provided to SAP proprietary, confidential, and trade secret information acquired through decades of research and development.  Upon information and belief, SAP improperly used this information to develop its own EDAW products.  The intellectual property that Teradata made available to SAP in connection with the Bridge Project is discussed below, and a detailed list of trade secrets is attached as sealed Exhibit A.

### 1. Teradata Provides SAP with Confidential Orange Books

35.     As part of the Bridge Project, Teradata permitted SAP to access Teradata's proprietary technical manuals called "Orange Books," which contain extensive trade secret information concerning Teradata's MPP database technology.  Teradata has always taken measures to protect the secrecy of the trade secrets contained in the Orange Books, including limiting their dissemination to customers and partners, and requiring that each customer and partner sign a non-disclosure agreement before accessing the Orange Books.  The Orange Books themselves plainly state that the documents are intended for use by Teradata customers and dissemination or copying of the documents without Teradata's consent is prohibited.  Nearly all of the Orange Books include the following notice or similar language:  "[This document] may only be used by you for the exclusive purpose of facilitating your internal Teradata-authorized use of the Teradata product(s) described in this document to the extent that you have separately acquired a written license from Teradata for such product(s)."  Additionally, nearly all of the Orange Books include "Teradata Confidential" at the bottom of each page.  Teradata prohibits readers of the Orange Book from using its contents for any activities that were not authorized by Teradata.

36.     The Orange Books provided to SAP included numerous trade secrets pertaining to MPP databases that Teradata developed over its many years as the world's leading supplier of MPP database systems.  This technology included, for example, novel techniques for managing database statistics, partitioning data across multiple processors, cost-based query optimization, data compression, and other MPP database technologies.  Teradata's long experience developing

MPP databases gave Teradata unique insight into the challenges of designing and operating such systems, for which Teradata developed optimal solutions. Teradata's insights and know-how are reflected in its confidential Orange Books. For instance, the Orange Books describe techniques for managing database statistics that are uniquely applicable to the complex environment of MPP databases. Likewise, methods discussed in the Orange Books for data compression and cost-based optimization are tailored for use in an MPP environment.

37.   In contrast with Teradata's pioneering experience in the MPP database field over decades, SAP had never purported to offer an MPP database prior to the introduction of HANA. Accordingly, Teradata's Orange Books and other proprietary information would have been immensely valuable to SAP in its efforts to develop its own competing MPP database. This information would have given SAP a short-cut to avoiding years of development work. By studying Teradata's insights into and solutions to the design and operational challenges of MPP databases, SAP would have saved itself the long, hard work of independently developing its own MPP technology. Instead of having to figure out optimal solutions for database statistics, data partitioning, cost-based query optimization, and other technical challenges of MPP databases, SAP could simply have helped itself to Teradata's accumulated wisdom on these technical subjects. Upon information and belief, that is precisely what SAP did—it utilized proprietary techniques learned from Teradata's Orange Books to develop SAP's own EDAW products, without authorization from Teradata, thereby advancing the development and commercialization of HANA by many years.

### 2.   Teradata Shares Other Trade Secret Information with SAP During the Bridge Project

38.   Teradata engineers also collaborated with SAP during the Bridge Project in the highly technical areas of product testing, evaluation, and development related to the creation of the integrated solution. During these activities, Teradata's engineers provided extensive trade secret information on the design and optimization of Teradata's MPP architecture and the execution of analytical queries in such systems. This information was subject to various confidentiality and limited use provisions in the agreements identified in paragraph 32 above.

Thus, SAP was not permitted to use the information learned from Teradata engineers for activities outside the Bridge Project.

39. Teradata engineers provided SAP with trade secrets to advance the Bridge Project and yield a workable integrated solution that could be marketed and sold. SAP partnered with Teradata because SAP did not understand the MPP architecture or how to design an analytical database that could efficiently handle massive amounts of information. As part of the collaboration among the parties, Teradata engineers identified certain inefficiencies in SAP's software that prevented SAP from leveraging the power and parallel-processing capabilities of the Teradata Database. In a series of emails from 2008 to 2010 between SAP and Teradata employees, for example, Teradata identified the causes of these inefficiencies and suggested solutions based on its own decades-long experience with MPP databases and the confidential and proprietary solutions it implemented in its own product offerings. These solutions included Teradata trade secrets related to restructuring database queries to take advantage of an MPP architecture handling massive amounts of information. The solutions also involved reducing inefficiencies associated with inaccurate statistics, improved techniques of cost-based query optimization, and improved architecture of virtual processors. In addition, Teradata conveyed numerous other trade secrets to SAP during the Bridge Project, including innovative techniques for optimizing the speed and efficiency of (a) the concurrent execution of many analytical queries and (b) the distribution of vast amounts of data and complex analytical workloads across massively parallel processing units.

40. Teradata provided protected intellectual property to SAP in other ways during the Bridge Project. For example, Teradata conducted training sessions on Teradata's database solutions for SAP developers working on the Bridge Project and the training sessions were subject to confidentiality agreements. Teradata also provided SAP with access to its database systems for experimental and research purposes in connection with the Bridge Project. For example, Teradata installed its database system at SAP's COIL facility in Palo Alto, California, and at SAP's research center in Walldorf, Germany. Teradata also provided SAP's developers with access to Teradata Express, a fully functional trial version of Teradata Database, pursuant to

Teradata's standard end user license.  Among other things, SAP's use of the Teradata Database installations at COIL and in Walldorf and its use of Teradata Express were conditioned on SAP's agreement not to perform any reverse-engineering or to disclose any test or evaluation results without Teradata's prior written consent.

**E.    SAP Quickly Develops and Releases HANA, SAP's Flagship Database Offering, by Misappropriating Teradata's Intellectual Property.**

41.    While it was actively partnering with Teradata on the Bridge Project, SAP also was developing its own competing database solution—SAP HANA.  In the summer of 2009, just months after the Bridge Project formally began, SAP co-founder Hasso Plattner and then-CTO Dr. Vishal Sikka announced their goal of revitalizing SAP's lackluster and outdated product offerings by developing a new, faster database architecture.  Dr. Sikka quickly restructured SAP's engineering teams to develop and deploy SAP HANA in less than a year, an extremely short time frame for a project of such magnitude.

42.    In November 2010, Dr. Sikka announced at SAP's annual user conference, SAPPHIRE, that SAP had begun shipping its HANA product.  In May 2011, again at SAP's SAPPHIRE conference, an SAP customer demonstrated HANA for SAP BW to create what purported to be an EDAW-type environment.  SAP's CTO described this version of SAP HANA as incorporating a "massively parallel" database "with various data processing engines"—a similar type of database architecture as that pioneered by Teradata and used in Teradata Database. SAP announced general availability of SAP HANA in June 2011.

43.    Two months later, on August 19, 2011, after the parties had been working on the Bridge Project for nearly three years, SAP unilaterally terminated the project and stopped supporting, selling, or marketing Teradata Foundation.  Just days later in September 2011, SAP announced HANA for SAP BW, which combined front-end software with the back-end database engine (HANA) for the purpose of creating an EDAW solution—the same thing Teradata Foundation was intended to achieve.

44.    Initial success of HANA (including HANA for SAP BW) was limited, in part because, despite SAP's statements to the contrary, BW was ill-equipped to generate reports using

data from any other source besides SAP's ERP Applications. Nonetheless, SAP HANA use eventually took off (aided by SAP's anticompetitive conduct discussed below), with HANA revenue reaching $2 billion by 2016. SAP HANA has also led to hundreds of millions of dollars in additional licensing sales. Dr. Sikka was lauded in the industry as the "father" and "mastermind" of SAP HANA, and was credited with reversing SAP's stagnant product offerings.

45. Like SAP and Teradata's jointly developed solution, SAP's HANA product combines a database solution with integrated software to perform data analytics. HANA purports to serve as both types of database required by the large-scale, complex enterprises that make up the Top-Tier ERP Applications Market and the EDAW Market: (1) a transactional database that allows for the processing of transactional data in real-time; and (2) EDAW functionality that SAP claims can enable enterprise analytics similar to those offered by Teradata. Thus, with HANA (and BW on HANA), SAP now positions itself as a direct competitor in the EDAW market, which Teradata essentially created, and in which Teradata has operated for almost forty years.

46. In developing HANA, SAP faced the same challenges which Teradata and SAP faced during the Bridge Project and which Teradata engineers solved — the speed, efficiency, and effectiveness of interoperation between SAP's front-end software and an MPP database engine as it attempted to store and analyze massive amounts of data. On information and belief, to overcome this challenge during HANA development, the HANA developers, at the direction of Dr. Sikka, utilized the same solution developed by Teradata's engineers and developers during the Bridge Project — using Teradata's trade-secret techniques for optimizing the execution of analytical queries and the speed of data storage and retrieval in large-scale databases.

47. Among other instances of misappropriation, SAP used Teradata trade secrets to optimize the processing of certain Open SQL queries for large volumes of data, enabling improved performance speed and opportunities for parallel processing and other enhancements on SAP's HANA. On information and belief, key SAP employees, including Dr. Sikka, the so-called "mastermind" of HANA, were aware of and supported SAP's misappropriation of Teradata's trade secrets during the development of HANA.

48.     SAP also was able to carry out this repurposing because it staffed its HANA development team with veterans of the Bridge Project.  In some cases, SAP engineers were working on both HANA development and the Bridge Project simultaneously, despite the requirements in SAP and Teradata's agreements that confidential Teradata information provided to SAP for the Bridge Project was to be used only for that purpose.  In addition, a number of Teradata employees working on the Bridge Project left Teradata and went to SAP, where they worked on HANA, despite agreeing not to disclose any confidential and trade secret information learned during their time at Teradata.  At the time, Teradata was not aware of this cross-pollination between SAP's Bridge Project and HANA development teams.

49.     In addition, on information and belief, SAP developers further infringed Teradata's copyrighted software, Teradata Express, which includes a fully functional copy of Teradata Database, by reverse engineering the software in violation of Teradata's end-user license.  Specifically, Teradata has reason to believe that SAP engineers downloaded Teradata Express and ran debugging or other tools against the software to circumvent Teradata's protections and uncover Teradata confidential and proprietary techniques for database processing and analytics.

**F.      Teradata Discovers SAP's Theft of Teradata's IP.**

50.     As Teradata would later learn (well after SAP's termination of the Bridge Project), SAP was able to develop and bring HANA to market so quickly because SAP stole and misused Teradata's intellectual property.  On September 4, 2015, *Der Spiegel* published an article reporting that an internal SAP auditor (later identified as Dr. Thomas Waldbaum) concluded that SAP misappropriated proprietary and confidential information from Teradata that SAP engineers obtained during the Bridge Project.

51.     The article explained that the auditor dug deep "into the evolutionary history of HANA" and "focuse[d] on the Bridge Project."  In October 2012, according to *Der Spiegel*, Dr. Waldbaum conducted interviews with SAP developers who worked with Teradata on the Bridge Project.  Although SAP executives initially met with Dr. Waldbaum to hear his allegations, SAP's attorneys terminated their investigation by May 2013.

52.     In January 2014, Dr. Waldbaum drew renewed attention to the issue, sending an email to SAP's supervisory board stating that SAP improperly used the intellectual property of a number of competitors, including Teradata, in its HANA product, and demanding that SAP take action.  On February 12, 2014, SAP fired Dr. Waldbaum.  Teradata has reason to believe Dr. Waldbaum has knowledge of additional information demonstrating SAP's theft of Teradata's intellectual property.

53.     In May 2014, less than two months after Dr. Waldbaum's termination, Dr. Sikka left SAP for "personal reasons."  Various media outlets noted that Dr. Sikka's departure was sudden and unexpected, as the industry considered him a "star executive" who had been the "face of SAP" and "a potential future leader of the company."  Neither SAP nor Dr. Sikka has explained the reasons for his departure.

54.     Despite being in possession of Dr. Waldbaum's audit reports for nearly three years, SAP concealed the investigation and its findings from Teradata and the public until it was exposed by *Der Spiegel* in September 2015.  As a result of *Der Spiegel*'s probe and the resulting article, Teradata began investigating these allegations, which led to the discoveries culminating in this lawsuit.  For example, Teradata learned that several SAP employees working on the Bridge Project, who therefore had access to and used confidential Teradata information, were simultaneously working on HANA.  Later, many of these employees would be assigned to HANA full-time.  Teradata also learned that SAP had incorporated Teradata's proprietary and confidential information into HANA, solving HANA's speed and efficiency problems using the same solutions that Teradata employees developed using Teradata's trade-secret techniques during the Bridge Project.

55.     Unbeknownst to Teradata at the time, SAP stole Teradata's trade secrets related to optimizing data storage and retrieval (including query execution) in an MPP environment, without authority incorporated them into HANA, and otherwise used them to aid development of HANA, which has become SAP's flagship database product.  Unlike Teradata, which has spent four decades developing its EDAW technologies, SAP managed an initial release of its competing HANA product after spending mere months in development.  It has become clear to Teradata that

SAP was able to go to market so quickly only because SAP entered into an agreement with Teradata under the false pretense of integrating the two companies' technologies, stole key Teradata trade secrets, and then incorporated them into and used them to develop HANA. Despite SAP's public statements denying any wrongdoing, SAP's misuse has continued unabated to the present.

56.     SAP's theft of Teradata's intellectual property has irretrievably harmed Teradata. By unilaterally terminating the Bridge Project and ceasing support for Teradata Foundation in favor of HANA, SAP killed an important line of business for Teradata—one in which Teradata had invested considerable time, effort, and resources.  SAP's actions also have effectively blocked Teradata from developing relationships with the SAP customers that could most benefit from Teradata's EDAW products, and have otherwise hampered Teradata's ability to sell and market its own database management and business analytics technologies.  The harm to Teradata has only increased as a result of SAP's exploitation of its dominance in the market for Top-Tier ERP Applications and its improper use of HANA in an attempt to eliminate Teradata as a competitor (discussed below).

57.     SAP, on the other hand, has capitalized on its unlawful use of Teradata's IP and its anticompetitive conduct to the tune of billions of dollars in revenue.  Just two years after the launch of HANA, SAP's estimated annual revenue for HANA alone was over $1 billion, and SAP estimates it had over 18,000 HANA customers in 2017.  In February 2018, SAP estimated that over 50% of its ERP client base would be using HANA by 2020.  Recent industry research indicates that 60% of SAP's Top-Tier ERP Applications customers, and perhaps in excess of 80%, are employing or preparing to employ HANA.  Furthermore, SAP has generated billions of dollars in additional revenue from the SAP applications that HANA users have also purchased.

## G.     SAP's Unlawful Efforts to Restrain Competition.

58.     As outlined above, HANA is the product of theft.  However, rather than merely attempting to compete on the merits with a tainted product, SAP has engaged in conduct designed to eliminate competition in the EDAW market for SAP Top-Tier ERP Applications customers. The growth and revenue information cited above is not the result of SAP's business acumen,

innovation, or skill, but instead is the direct result of SAP's anticompetitive efforts. SAP has carried out its plan through a previously undisclosed change to its long-standing sales practices that leaves its locked-in Top-Tier ERP Applications customers with little choice but to adopt HANA to the exclusion of Teradata's EDAW products: tying upgrades of customers' ERP Applications to customers' adoption of HANA (while ending support for older versions of ERP Applications). On information and belief, SAP has also begun significantly restricting Teradata's ability to access customers' SAP ERP data stored in HANA (which is necessary for the functional use of Teradata's EDAW products), thereby ensuring the success of its tying arrangement in coercing customers to adopt HANA.

### 1. Relevant Markets and SAP's Market Power.

59. As outlined above, there is a separate, relevant product market for ERP Applications, such as SAP's S/4HANA and SAP's predecessor ERP programs, used by large-scale, complex enterprises (the "Top-Tier ERP Applications Market").

60. Market participants recognize the distinct needs of these types of customers and may refer to ERP Applications for customers with the above characteristics as "Tier 1" ERP Applications. As it is understood in the industry, the customer base for "Tier 1" ERP Applications generally consists of the largest companies in the world, such as Fortune 1000 companies in the United States, FTSE 100 companies in Europe, and similarly-sized privately-held entities.

61. Top-Tier ERP Applications constitute a relevant product market because these products provide unique, specialized tools and functionality at a scale that is designed to meet the needs of customers with extremely high data volumes and complex sources of data. These customers possess some or all of the following characteristics: (1) millions of transactions and/or data-generating events on a daily basis; (2) multiple and distinct business lines; (3) diverse geographic locations for operations; (4) multiple and disparate sources and formats of data related to distributors, suppliers, competitors, customers, and/or employees; and (5) revenues typically exceeding $1 billion. These characteristics result in customer demand for highly customizable and flexible software that is readily scalable.

62.     Given the critical importance of a customer's ERP Applications to its business, customers of Top-Tier ERP Applications will migrate to the most recent version of their provider's ERP Applications to have access to the latest features and functionality, most robust support, and most recent security and software updates.  Where, as here, a Top-Tier ERP Applications vendor announces the end, or "sunset," of prior versions of its ERP Applications, Top-Tier ERP Applications customers have no choice but to upgrade.

63.     There are no reasonable or adequate economic substitutes for upgrades of SAP ERP Applications for the vast majority of Top-Tier ERP Applications customers because they are locked-in to their current ERP application provider as a result of the information disparity at the time of purchase and enormously high costs of switching, as set forth below.

64.     Customers are unable to perform detailed cost analyses for the lifecycle of their ERP Applications at the time of purchase.  It is difficult for customers to obtain the necessary information among competing ERP Applications with respect to maintenance costs, upgrade timelines (or the costs of such upgrades), as well as any disruption in service that may occur over the life of the product.  Such pre-purchase analyses also cannot account for any post-sale changes in policy or practice such as SAP's changes set forth below.  This creates an information disparity between Top-Tier ERP Applications customers and providers.

65.     Severe switching costs associated with changing a customers' Top-Tier ERP Applications provider effectively preclude the vast majority of customers from changing their ERP Applications.  These switching costs include both direct financial costs and indirect costs at every stage of the switching process.  Initially, Top-Tier ERP Application customers devote substantial resources to evaluating ERP Applications.  This process can take several years to complete, given the need to thoroughly examine the functionality of ERP Applications and measure that functionality against the unique needs of a particular customer.

66.     After the evaluation process, customers spend significant sums on the actual licensing, development, and implementation of ERP Applications within their specific business environments.  An individual customer may spend tens of millions of dollars on its ERP

1  Applications in a given year, depending upon the complexity and customization of its ERP

2  Applications, the number of users, and other factors.

3        67.    Implementing ERP Applications involves extensive costs and substantial devotion

4  of resources, including but not limited to training employees on how to properly use those ERP

5  Applications, troubleshooting problems, and realigning business practices with the selected

6  provider.  In addition to employee-focused change management, implementation involves major

7  costs associated with migrating data, testing and deployment of specific software developed for

8  each customer, and technical implementation that occurs during this time period.

9        68.    Accordingly, changing Top-Tier ERP Applications providers is not a task

10  completed in days or weeks but over a period of months or years, from the date a license

11  agreement is signed, through development, testing, and training, to the actual deployment.

12        69.    These switching costs, coupled with the information disparity between provider

13  and customer as to future changes in policy or practice, mean that Top-Tier ERP Applications

14  customers are locked-in to their current providers and thus may be exploited by a change in

15  policy or practice from their provider that was not known at the time customers made their initial

16  choice of ERP Applications provider.

17        70.    SAP has held and continues to hold a dominant position in the Top-Tier ERP

18  Applications Market, and possesses a market share that ranges, on information and belief, from

19  60% to 90% depending on the industry in which the customer operates.  Oracle is the only other

20  significant competitor for these Top-Tier customers, but industry research indicates that Oracle's

21  market share has historically been less than SAP's with respect to the number of installed Top-

22  Tier ERP Applications customers.

23        71.    As outlined above, there is also a separate relevant product market for EDAW

24  products (the "EDAW Market"), which enable Top-Tier ERP Applications customers to retain,

25  and more importantly to perform complex analytical operations on, vast amounts of data from a

26  wide variety of data streams (*i.e.*, the companies' ERP Applications and numerous other sources).

27        72.    EDAW products are separate and distinct products from ERP Applications.

28  EDAW products are also separate and distinct products from transactional databases, which are

used primarily for the storage and processing of transactional data. EDAW products have historically been designed for their specialized purpose and sold separately from ERP Applications and transactional databases, and each of these three products serves different functions for customers.

73. Teradata's EDAW products include tools that were developed to copy a customer's ERP Applications data from the customer's transactional database for incorporation into Teradata's EDAW system, where a customer can run complex analytical functions against all the data the customer collects from its business enterprise, including its ERP data and data from other sources. Teradata's EDAW tools also allow for extraction of historical data from the customer's transactional system and storage of that historical data in the EDAW system. As a general rule, ERP Applications like SAP's do not perform well when historical data is kept in the underlying transactional database, and use of an EDAW system allows the customer to purge the data from the transactional system and warehouse it elsewhere.

74. For all Teradata customers, regardless of the transactional database a customer is using, Teradata's tools copy ERP Application data from the transactional database by reading the transaction-log files maintained in that database. The Teradata tools do this with a read-only operation from the transaction log and do not manipulate the actual data within the transactional database in any way. These tools are designed to understand the structure of the stored data and copy it in a way that is accurate/consistent with the customer's ERP Applications but without the risk of corrupting the integrity of the ERP data. Teradata then incorporates a customer's ERP data with data from other sources in its EDAW system to perform a wide variety of analytical functions. Teradata utilizes its software on a variety of transactional databases deployed with a variety of ERP Applications.

75. Most Top-Tier ERP Applications customers also use EDAW products. Multinational companies with diverse product lines, complex supply chains, and large workforces require the ability to quickly analyze and understand historical and incoming real-time data to inform current and future business decisions. EDAW products are indispensable for these companies. SAP itself has recognized the evolving analytic needs of these companies, which

influenced SAP to engage Teradata, under the guise of a partnership, in order to steal Teradata's intellectual property and develop a competing EDAW product.

76.    SAP developed HANA to function as both a transactional database for managing ERP Applications data and an analytical database with EDAW functionality. Teradata Database is designed primarily for use as an EDAW product but can also process analytical workloads with transactional components. Thus, SAP has positioned itself as a direct competitor to Teradata in the EDAW Market within its Top-Tier ERP Applications customer base. However, HANA also serves as a potential source of data (specifically, a customer's SAP ERP data) for its Top-Tier ERP Applications customers who want the performance and linear-scalability offered only by Teradata's EDAW products.

77.    As discussed above, to copy the data generated by a specific application (such as an ERP Application), EDAW products require software specifically designed for and tailored to that application. Providers of EDAW products make substantial investments in developing products that can successfully and reliably copy a customer's data derived from a specific ERP Application. The software used to accurately replicate data derived from a provider's ERP Applications, such as SAP's ERP Applications, is not reasonably interchangeable with software used to copy data derived from another provider's ERP Application absent significant development work.

78.    Because EDAW products serve as "back-end" systems for the storage and analysis of data from various streams across the entire business enterprise, these products are dependent upon other sources, such as ERP Applications, to obtain the data that is then uploaded and analyzed. EDAW products providers, such as Teradata, must be able to access these data sources in a way that permits the efficient and accurate copying of data in order to serve as a viable option for their customers. This dependence of EDAW products upon other sources of data and the need to develop the ability to efficiently and accurately obtain that data constitute barriers to entry, and are particularly acute here, where SAP's anticompetitive conduct effectively prevents other companies from offering viable EDAW products for SAP's Top-Tier ERP Applications customers.

79.     The relevant geographic markets are the sale of Top-Tier ERP Applications and EDAW products on a worldwide basis, given the multi-national nature of the market participants, as further described herein.

### 2.     Historically, SAP's Top-Tier ERP Applications Customers Could Freely Select Their EDAW Product of Choice.

80.     SAP's Top-Tier ERP Applications customers historically were able to use the EDAW products of their choosing, knowing that their EDAW product could access and obtain data that was created in their SAP ERP Applications and then stored in a transactional database. SAP previously did not offer a competitive EDAW product or transactional database with the requisite functionality and scalability for SAP's Top-Tier ERP Applications customers.  Thus, a Top-Tier ERP SAP Applications customer could select a separate transactional database vendor other than SAP and select a separate EDAW product vendor, such as Teradata.

81.     This arrangement permitted SAP's Top-Tier ERP Applications customers to create ecosystems that best fit their needs.  For example, historically, nearly all of the customers who used SAP's ERP Applications would run the applications on an Oracle, IBM, or Microsoft transactional database, and a very high percentage of those Top-Tier ERP Applications customers would use Teradata for their EDAW needs.

82.     Teradata made substantial investments to create software that could reliably and accurately take extremely large amounts of a customer's SAP-derived data and copy it into Teradata's systems to perform data analytics within this ecosystem.  For example, after SAP ended the Bridge Project in 2011, Teradata was forced to find other ways to meet consumer demand for accessing SAP-derived data for use in Teradata's EDAW systems.  Teradata spent tens of millions of dollars to acquire a company with existing technology in this area, and invested additional millions annually to develop and optimize that solution for Teradata and bring it to market.

83.     SAP was aware of and supported this arrangement.  SAP knew that Teradata was obtaining customers' SAP-derived data for use in Teradata's EDAW products via the replication method described above.  This arrangement between SAP and Teradata was mutually beneficial

for both parties: Teradata's ability to efficiently access a customer's SAP-derived data increased the marketability and desirability of Teradata's EDAW products, and the ability of SAP's ERP-derived data to be integrated into Teradata's EDAW products increased the marketability and desirability of SAP's ERP Applications.

84.     At the time HANA was first released in 2010, and up through the introduction of S/4HANA in February 2015, SAP continued to allow its ERP customers to choose their own database solutions, including their transactional databases and EDAW products. Teradata did not actively attempt to integrate with HANA during this time period because there was little to no demand for integration among its customers, who, because of the size and complexity of their database needs, were not in a position to adopt HANA.

85.     Thus, Teradata continued to serve its SAP customers by accessing log files of customers' SAP-derived data and importing them into Teradata's systems for storage and analysis. SAP customers made their ERP Application choices with the understanding that they would be able to use the EDAW providers that best suited their needs.

### 3.     SAP Ties Upgrades of its ERP Application Product to HANA.

86.     Notwithstanding SAP's theft of Teradata's intellectual property, early iterations of HANA did not have widespread success among SAP's large-scale ERP Applications customers because of HANA's deficiencies in functionality and lack of true linear-performance scalability, and because (even when operating with SAP's BW reporting tool) it was ill-suited for integration of enterprise data from third-party sources.

87.     Following the release of HANA, mutual SAP-Teradata customers still overwhelmingly preferred Teradata's EDAW products to HANA. Even as customers began evaluating whether to adopt HANA for their transactional database functionality, customers also approached Teradata and encouraged it to develop an integration for HANA.

88.     It stands to reason that SAP was well-aware that its largest SAP ERP customers would likely maintain their current software ecosystems rather than adopt HANA. Thus, SAP concluded the only possible way to gain widespread acceptance of HANA among its largest ERP

1   Applications customers was to exert control over its locked-in ERP Applications customers and

2   force them to adopt HANA.

3       89.     SAP first carried out this plan by tying SAP ERP upgrades to the adoption of

4   HANA.  Specifically, SAP launched the latest version of its ERP Application, SAP S/4HANA, in

5   February 2015.  SAP describes S/4HANA as being "built on" and "natively written" for HANA.

6   This marketing language attempts to conceal the fact that, in an abrupt change to past practice,

7   SAP S/4HANA is wholly incompatible with other transactional databases and can only run on

8   HANA.  Thus, in order to upgrade to SAP's newest ERP Application, customers must now also

9   adopt HANA.

10      90.     In addition to making S/4HANA incompatible with any other transactional

11  database (unlike prior versions of its ERP Applications), SAP has combined the two distinct

12  products, its ERP Application and HANA, into a single offering (in contrast to its prior sales

13  practice of offering both products separately).  Moreover, and on information and belief, SAP's

14  licensing agreements further restrict the ability of customers to read and copy S/4HANA ERP

15  data to any other database.

16      91.     The facts demonstrate SAP's decision to combine these two products as a single

17  product offering was done for the sole purpose of forcing its locked-in, Top-Tier ERP

18  Applications customers to adopt HANA and to restrain competition.  There is no technological or

19  other justification for SAP's drastic change in sales practice, and any such justification is greatly

20  outweighed by the anticompetitive effect of SAP's actions on both customers and competitors.

21      92.     SAP has also announced that it is ending support for prior versions of its ERP

22  Applications by 2025.  SAP has thus forced its current customers into upgrading to S/4HANA,

23  and, by extension, adopting HANA as their database solution, by setting a deadline on the support

24  of their non-HANA-based SAP ERP Applications.  On information and belief, SAP knows that

25  the vast majority of its customers will not be able to evaluate, select, and implement an alternative

26  ERP provider in this time period.  These customers therefore will be forced to adopt HANA when

27  they upgrade their ERP Application.

28

93.     SAP's conditioning ERP upgrades on customers' adoption of HANA as the database underlying their ERP Applications is a previously undisclosed reversal in its sales practices.  HANA had been on the market for approximately five years before the release of S/4HANA.  SAP had not previously conditioned customers' use of SAP's ERP Applications on their adoption of HANA.  SAP's ERP customers could not have reasonably anticipated when they entered into their license agreements with SAP that they would be subject to such an undisclosed, future reversal of practice.

94.     On information and belief, SAP has made substantial efforts to force its customers to adopt HANA sooner rather than later by limiting updates for legacy SAP Applications and limiting the release of new features to S/4HANA.

95.     The purpose and impact of SAP's change in practice is clear: whereas previously SAP's Top-Tier ERP Applications customers were free to choose how to manage their data needs, those locked-in customers will now be forced to adopt HANA.  Given the costs of licensing, implementing, and maintaining EDAW products, the vast majority of large-scale customers will have no choice but to abandon their prior EDAW providers because they cannot support dual EDAW providers.  Thus, because HANA purports to offer some or all of the functionality offered by Teradata, SAP is effectively coercing its customers into leaving Teradata and adopting the full stack of SAP products (including HANA).

96.     On information and belief, SAP has also more recently begun significantly restricting Teradata's ability to access customers' SAP ERP data stored in HANA for use in Teradata's EDAW products, thereby ensuring that SAP's Top-Tier ERP Applications customers utilize HANA (and only HANA) for all of their database needs.

97.     SAP's unreasonable restrictions and limitations on Teradata's ability to access customers' SAP-derived data have heightened the success of SAP's unlawful tie at the expense of SAP's Top-Tier ERP Applications customers and Teradata.

98.     A number of existing Teradata customers have threatened to terminate their relationship with Teradata if Teradata cannot properly access their SAP ERP data from HANA. Moreover, prospective SAP Top-Tier ERP Applications customers will not license Teradata's

EDAW products if Teradata cannot properly access their SAP ERP data from HANA or will otherwise be limited in its ability to incorporate SAP ERP data into its EDAW products.

99.     As a direct consequence of this calculated anticompetitive conduct, Teradata has been harmed and continues to be harmed in its business and in its ability to provide products to its SAP Top-Tier ERP Applications customers and prospective customers who are already utilizing SAP ERP Applications.

100.     SAP's conduct has no legitimate business rationale and is directly contrary to the practices of other ERP Applications and database solutions providers.  These providers understand the value-add of allowing customers to choose the software components that best suit their needs.  For example, Teradata currently provides EDAW products to customers using other ERP Applications (including those who also offer EDAW products).  As the market operates under a more open environment, SAP is conspicuously moving in the other direction.

101.     As the above demonstrates, after stealing Teradata's intellectual property to create HANA, SAP has used HANA as a weapon to eliminate competition for EDAW products among its locked-in ERP customers by forcing customers to use HANA in order to upgrade their ERP Applications (which customers must do) while simultaneously tightening restrictions on Teradata's ability to access customers' SAP data stored in HANA.

102.     SAP's intentional, unfair, and unlawful attempts to eliminate competition create a dangerous probability that SAP will succeed and, as a result, will be in a position to raise prices, reduce innovation, unreasonably restrain customer choice, and reduce innovation and output among its locked-in customer base.

## COUNT I
### (Trade Secret Misappropriation Under the Defend Trade Secrets Act
### (18 U.S.C. § 1836, *et seq.*))

103.     Teradata hereby restates and re-alleges the allegations set forth in paragraphs 1 through 102 above and incorporates them by reference.

104.     Teradata's confidential information relating to Teradata Database, including Teradata's proprietary and confidential techniques for optimizing the speed of data storage and retrieval in large-scale, massively parallel databases, constitutes information that has independent

economic value because it is not generally known to, and is not readily ascertainable through proper means, by individuals or entities outside of Teradata. This confidential information is crucial to the operation of Teradata's business, and, if available to others, would enable them to compete with Teradata to Teradata's detriment. Teradata has taken reasonable measures to keep such information secret. Confidential information related to Teradata Database therefore qualifies as a trade secret within the meaning of 18 U.S.C. § 1839.

105. SAP disclosed, used and continues to use Teradata's trade secrets without express or implied consent, and SAP knew or had reason to know at the time of such disclosure and use that the knowledge of the trade secrets was acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secrets or limit the use of the trade secrets.

106. Additionally, without consent, authorization, approval, or license, SAP knowingly, willingly, and unlawfully acquired, disclosed, and/or used or intended to use Teradata's trade secrets through improper means and continues to use Teradata's trade secrets without consent.

107. SAP's misappropriation of Teradata's trade secrets is and has been willful and malicious, such that Teradata is entitled to exemplary damages and its reasonable attorney's fees.

108. SAP has realized unjust profits, gains, and advantages as a proximate result of its trade secret misappropriation.

109. SAP will continue to realize unjust profits, gains, and advantages as a proximate result of its trade secret misappropriation as long as such misappropriation is permitted to continue.

110. Teradata is entitled to an injunction restraining SAP from engaging in continuing and further acts of trade secret misappropriation. Unless SAP is enjoined and prohibited from disclosing or using Teradata's trade secrets and all materials disclosing or derived from the misappropriated information are seized, SAP will continue to misappropriate Teradata's trade secrets.

111. As a direct and proximate result of SAP's misappropriation of Teradata's trade secrets, Teradata has suffered, and will continue to suffer, monetary loss to its business, reputation, and goodwill. Teradata is entitled to recover from SAP, in an amount to be

determined at trial, the damages Teradata has sustained and will sustain, for its actual losses and any unjust enrichment obtained by SAP as a result of its misappropriation of Teradata's trade secrets.

## COUNT II

**(Trade Secret Misappropriation Under the California Uniform Trade Secrets Act (Cal. Civil Code § 3426, *et seq.*))**

112.    Teradata hereby restates and re-alleges the allegations set forth in paragraphs 1 through 111 above and incorporates them by reference.

113.    Teradata's confidential information relating to Teradata Database, including Teradata's proprietary and confidential techniques for optimizing the speed of data storage and retrieval in large-scale databases, constitutes information that has independent economic value because it is unknown to others and is the subject of reasonable efforts to maintain its secrecy or limit its use. It therefore qualifies as a trade secret within the meaning of California Civil Code Section 3426, *et seq*.

114.    SAP disclosed, used and continues to use Teradata's trade secrets without express or implied consent, and SAP knew or had reason to know at the time of such disclosure and use that the knowledge of the trade secrets was acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secrets or limit the use of the trade secrets.

115.    Additionally, without consent, authorization, approval, or license, SAP knowingly, willingly, and unlawfully acquired, disclosed, and/or used or intended to use Teradata's trade secrets through improper means and continues to use Teradata's trade secrets without consent.

116.    SAP's misappropriation of Teradata's trade secrets is and has been willful and malicious, such that Teradata is entitled to exemplary damages and its reasonable attorney's fees and costs.

117.    SAP has realized unjust profits, gains, and advantages as a proximate result of its trade secret misappropriation.

118.    SAP will continue to realize unjust profits, gains, and advantages as a proximate result of its trade secret misappropriation as long as such misappropriation is permitted to continue.

119.    Teradata is entitled to an injunction restraining SAP from engaging in further acts of trade secret misappropriation.  Unless SAP is enjoined and prohibited from disclosing or using Teradata's trade secrets and all materials disclosing or derived from the misappropriated information are seized, SAP will continue to misappropriate Teradata's trade secrets.

120.    As a direct and proximate result of SAP's misappropriation of Teradata's trade secrets, Teradata has suffered, and will continue to suffer, monetary loss to its business, reputation, and goodwill.  Teradata is entitled to recover from SAP, in an amount to be determined at trial, the damages Teradata has sustained and will sustain, for its actual losses and any unjust enrichment obtained by SAP as a result of its misappropriation of Teradata's trade secrets.

## COUNT III
### (Copyright Infringement (17 U.S.C. § 501))

121.    Teradata hereby restates and re-alleges the allegations set forth in paragraphs 1 through 120 above and incorporates them by reference.

122.    Teradata owns the copyright in the software associated with Teradata Database. U.S. Copyright Registration Numbers for Teradata Database are provided below:

| Work | Case Number | Effective Date of Registration (Date Submitted) | Registration Number |
|------|-------------|------------------------------------------------|---------------------|
| Teradata Database 12.0 | 1-6668876091 | June 19, 2018 | TXu 2-091-495 |
| Teradata Database 13.0 | 1-6668993302 | June 19, 2018 | TXu 2-091-496 |
| Teradata Database 13.1 | 1-6668993339 | June 19, 2018 | TXu 2-091-497 |
| Teradata Database 14.0 | 1-6668993374 | June 19, 2018 | TXu 2-091-498 |
| Teradata Database 14.1 | 1-6668993409 | June 19, 2018 | TXu 2-091-500 |
| Teradata Database 15.0 | 1-6668993464 | June 19, 2018 | TXu 2-091-501 |
| Teradata Database 15.1 | 1-6668983602 | June 19, 2018 | TXu 2-091-493 |

123.    The Teradata Express simulator, which contains a fully functional version of Teradata Database, contains a substantial amount of original material that is copyrightable subject matter under the Copyright Act, 17 U.S.C. § 101 *et seq*.

124.    Without consent, authorization, approval, or license, SAP knowingly, willingly, and unlawfully copied Teradata's copyrighted work, including by loading unauthorized copies of

Teradata Express into RAM for reverse-engineering and other purposes prohibited by Teradata's end-user license.

125.     SAP was aware of Teradata's copyrights of its Teradata Database (and therefore its Teradata Express) software.  SAP's infringement therefore was knowing and willful.

126.     By its unlawful copying and distribution, SAP has violated Teradata's exclusive rights under 17 U.S.C. § 106.

127.     SAP has realized unjust profits, gains, and advantages as a proximate result of its infringement.

128.     SAP will continue to realize unjust profits, gains, and advantages as a proximate result of its infringement as long as such infringement is permitted to continue.

129.     Teradata is entitled to an injunction restraining SAP from engaging in any further acts in violation of the United States copyright laws.  Unless SAP is enjoined and prohibited from infringing Teradata's copyrights and unless all infringing products and advertising materials are seized, SAP will continue to intentionally infringe Teradata's copyrights.

130.     As a direct and proximate result of SAP's direct willful copyright infringement, Teradata has suffered, and will continue to suffer, monetary loss to its business.  Teradata is entitled to recover from SAP, in an amount to be determined at trial, the damages it has sustained and will sustain, and any gains, profits, and advantages obtained by SAP as a result of its acts of infringement and use of the copied materials.  Alternatively, Teradata is entitled to an award of statutory damages for SAP's infringement of Teradata's registered copyrights.

## COUNT IV
### (Unlawful Tying, SAP Top-Tier ERP Applications and EDAW Products for SAP Top-Tier ERP Applications Customers (15 U.S.C. §§ 1, 14))

131.     Teradata hereby restates and re-alleges the allegations set forth in paragraphs 1 through 130 above and incorporates them by reference.

132.     SAP's Top-Tier ERP Applications (the tying product) are a separate and distinct product and market from the market for SAP's HANA product (the tied product) and the overall market for EDAW products for SAP Top-Tier ERP Applications, including Teradata EDAW

products.  HANA unquestionably possesses EDAW product functionality, which is largely the result of SAP's theft of Teradata's intellectual property.

133.    SAP is coercing its current Top-Tier ERP Application customers into adopting HANA, to the exclusion of other EDAW products, through a previously undisclosed reversal in practice, that is, conditioning upgrades of SAP's ERP Applications on customers' adoption of HANA.

134.    As set forth above, SAP has sufficient economic power in the market for Top-Tier ERP Applications to (a) coerce its current Top-Tier ERP Applications customers into adopting HANA through its previously undisclosed reversal in practice and (2) effectively preclude customers from purchasing competitive EDAW products (including Teradata's EDAW products), given the fact that these customers know they must adopt SAP's HANA in order to upgrade their mission-critical ERP Applications.  Further, SAP's economic power is derived from severe information and switching costs.  SAP Top-Tier ERP Applications customers are locked-in to their SAP ERP Applications and are now being exploited by SAP.

135.    SAP has effectively entered into arrangements with current and prospective Teradata customers in order to restrain a not insubstantial amount of interstate commerce.

136.    SAP's unlawful tying is economically irrational conduct that has no legitimate business justification and only serves to foreclose competition in the EDAW Market for SAP's Top-Tier ERP Applications customers.  Any justification SAP could offer is either pretextual or is else far outweighed by the anticompetitive effects.

137.    By reason of the foregoing, SAP's arrangements with its current Top-Tier ERP Applications customers constitute unlawful agreements or combinations in restraint of trade, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 3 of the Clayton Act, 15 U.S.C. § 14.

138.    SAP's tying is per se unlawful given the high degree of market power SAP possesses in the market for Top-Tier ERP Applications and the power it exercises over its current Top-Tier ERP Applications customers.  Competition in the EDAW Market has been and is appreciably restrained as a consequence of SAP's conduct.

139. Alternatively, even if SAP's tying is not a per se violation, SAP's tying unreasonably restrains competition in the tied product market and constitutes a rule of reason violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 3 of the Clayton Act, 15 U.S.C. § 14.

140. SAP's conduct affects far more than a not insubstantial amount of commerce in the EDAW Market. The amount of business affected by SAP's tying arrangement is in the millions and will only continue to increase.

141. Teradata has been harmed and will continue to suffer irreparable harm as a consequence of SAP's conduct. Teradata is entitled to an injunction restraining SAP from engaging in the unlawful tying of upgrades to its ERP Applications with HANA. Unless and until SAP is enjoined, SAP will continue to engage in the unlawful tying set forth above.

142. By reason of the foregoing, Teradata is entitled to injunctive and monetary relief, including treble damages and attorneys' fees, pursuant to 15 U.S.C. §§ 15 and 26.

## COUNT V
### (Attempted Monopolization of EDAW Market for SAP Top-Tier ERP Applications Customers (15 U.S.C. § 2))

143. Teradata hereby restates and re-alleges the allegations set forth in paragraphs 1 through 142 above and incorporates them by reference.

144. SAP provides Top-Tier ERP Applications and EDAW products.

145. As set forth above, EDAW products for SAP's Top-Tier ERP Applications customers constitutes a relevant product market.

146. SAP has acted with the specific intent to monopolize the EDAW Market for SAP's Top-Tier ERP Applications customers through its exclusionary conduct, specifically, tying upgrades of SAP's Top-Tier ERP Applications to the adoption of HANA, as set forth above.

147. The impact of the above-described exclusionary conduct has been heightened by SAP's attempts to significantly restrict Teradata's ability to access customers' SAP ERP-derived data stored in HANA.

148. SAP was able to engage in the exclusionary practice described above through its misappropriation of Teradata's trade secrets.

149. As set forth above, SAP's Top-Tier ERP Application customers could not have known that SAP would restrict their ability to utilize their EDAW products of choice and force them to adopt HANA at the time they entered into their agreements with SAP. Further, SAP's abrupt reversal in its practices after years of permitting customers to use competing EDAW products demonstrates that SAP's conduct lacks any legitimate business purpose, and serves solely to foreclose competition.

150. Given SAP's power over its Top-Tier ERP Applications customers and the extent to which SAP's anticompetitive conduct precludes competition in the EDAW Market, there is a dangerous probability that SAP will acquire monopoly power in the EDAW Market for SAP's Top-Tier ERP Applications customers.

151. SAP has already begun to enjoy the fruits of its anticompetitive conduct, as an estimated 60% of SAP's largest ERP Applications customers (and perhaps more than 80%), are employing or preparing to employ HANA. This rate will only rise more rapidly as more customers upgrade to S/4 HANA and are foreclosed from either licensing alternative EDAW products or accessing their SAP ERP data for use with Teradata's EDAW products. Rather than being the product of skill, business acumen, or luck, much of HANA's adoption rate is the direct result of SAP's anticompetitive conduct.

152. Moreover, SAP's conduct has immediate and significant anticompetitive effects. As set forth above, customers cannot justify paying for EDAW products with substantially overlapping functionality. As the result of this conduct, Teradata and similarly situated vendors will be forced to exit the market.

153. As a result of SAP's conduct, SAP's Top-Tier ERP Applications customers have suffered and will continue to suffer from a reduction in choice in the EDAW Market. SAP's conduct will also have the effect of higher prices, reduced quality, and lower innovation and output in the EDAW Market for SAP's Top-Tier ERP Applications customers.

154. The conduct set forth above constitutes unreasonable and anti-competitive means by which SAP is attempting to monopolize the EDAW Market for SAP Top-Tier ERP Applications customers, in violation of the Sherman Antitrust Act, 15 U.S.C. § 2.

155.    Teradata has suffered direct and tangible injury as a result of SAP's anticompetitive conduct and the damage it has caused to free and fair competition in the EDAW Market for SAP Top-Tier ERP Applications customers.  By reason of the foregoing, Teradata is entitled to injunctive and monetary relief, including treble damages and attorneys' fees, pursuant to 15 U.S.C. §§ 15 and 26.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Teradata respectfully requests the following relief:

A.    A preliminary injunction prohibiting SAP, its officers, agents, servants, employees, attorneys, and affiliated companies, its assigns and successors in interest, and those persons in active concert or participation with them, from continued acts of (1) misappropriation of Teradata's trade secrets, (2) infringement of the Teradata copyrights at issue in this litigation, and (3) violation of antitrust laws;

B.    A permanent injunction prohibiting SAP, its officers, agents, servants, employees, attorneys, and affiliated companies, its assigns and successors in interest, and those persons in active concert or participation with them, from continued acts of (1) misappropriation of Teradata's trade secrets, (2) infringement of the Teradata copyrights at issue in this litigation, and (3) violations of antitrust laws;

C.    Entry of judgment holding SAP liable for infringing the Teradata copyrights at issue in this litigation;

D.    A permanent injunction prohibiting SAP, its officers, agents, servants, employees, attorneys, and affiliated companies, its assigns and successors in interest, and those persons in active concert or participation with them, from disclosing, exploiting, or continuing to utilize Teradata's confidential information relating to Teradata Database, including but not limited to Teradata Database source code;

E.    Entry of judgment holding SAP liable for misappropriating Teradata's trade secrets;

F.    Entry of judgment holding SAP liable for violating the Sherman and Clayton Acts;

G.    An order that all copies made or used in violation of Teradata's copyrights or trade

secrets, and all means by which such copies may be reproduced, be impounded and destroyed or otherwise reasonably disposed of;

H.      An order awarding damages, together with pre-judgment and post-judgment interest, to compensate Teradata for SAP's copyright infringement and acts of trade secret misappropriation, including actual and exemplary damages and lost profits, or in the alternative for copyright infringement, statutory damages under 17 U.S.C. § 504(c);

I.      An order awarding treble damages, along with reasonable attorney's fees, pre-judgment and post-judgment interest, for SAP's violation of the antitrust laws;

J.      An order awarding Teradata its costs and attorney's fees; and

K.      Any and all other legal and equitable relief as may be available under law and which the court may deem proper.

## JURY DEMAND

Teradata hereby demands TRIAL BY JURY of all claims and issues presented in this Second Amended Complaint so triable.

Dated:    December 21, 2018          MORRISON & FOERSTER LLP

                                      By:   _/s/ Mark Whitaker_____
                                            Mark Whitaker

                                            Attorneys for Plaintiffs
                                            TERADATA CORPORATION,
                                            TERADATA US, INC., and
                                            TERADATA OPERATIONS, INC.

# EXHIBIT 3

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| TERADATA CORPORATION, et al.,<br><br>             Plaintiffs,<br><br>      v.<br><br>SAP SE, et al.,<br><br>             Defendants. | Case No. 18-cv-03670-WHO (JCS)<br><br>**ORDER GRANTING IN PART DISCOVERY MOTION**<br><br>Re: Dkt. No. 291 |

Teradata and nonparty Oracle have jointly filed a letter describing discovery matters which remain in dispute (the "Motion"). Dkt. 291. The court held a hearing on October 9, 2020, and for good cause the Motion is GRANTED IN PART follows:

1. Re: Request 1: In addition to searching its other repositories, Oracle must search the electronically stored information of the heads of marketing (and the heads of marketing for each product, if one exists or existed) since 2011 and produce responsive documents for the seven products discussed at the hearing (as to which Teradata narrowed its subpoena as reflected in the joint letter at page 3).

2. Re: Request 2: Oracle must search the repositories of its Competitive Intelligence Group and produce responsive documents with respect to the seven products.

3. Re: Request 3: Oracle must query its customer relationship management databases for information sought in the Request for each of the seven products since 2011 and produce that information.

4. Re: Request 4: For each of the seven products for each year since 2011, Oracle must produce annual revenue information for each of its top 25 customers by annual revenue per product

5. Re: Requests 5–6: Oracle must search Mr. Kuppler's electronically stored information and produce responsive documents.

6. Re: Request 7: For three products to be determined by Teradata, Oracle must identify its customer relationship manager(s) for each of its top 25 customers by annual revenue per product since 2011. Oracle must search these employees' electronically stored information and produce responsive documents.

7. Teradata is not required to reimburse Oracle for its costs incurred in connection with this production.

8. The parties and Oracle shall meet and confer and agree upon a procedure by which Oracle may designate confidential material and object prior to the public disclosure of any such material at a hearing or at trial.

**IT IS SO ORDERED.**

Dated: October 10, 2020

_____
JOSEPH C. SPERO
Chief Magistrate Judge

# EXHIBIT 4



Suite 3300
920 Fifth Avenue
Seattle, WA  98104-1610

**Benjamin J. Byer**
206-757-8105 tel
206-757-7105 fax

benbyer@dwt.com

June 12, 2020

VIA EMAIL – mkaiser@mofo.com


Mary G. Kaiser
Morrison & Foerster
2000 Pennsylvania Ave., NW
Washington, DC 20006-1888

  Re: Teradata Corp., et al. v. SAP, et. al., No. 3:18-cv-3670-WHO (N.D. Cal.)

Dear Ms. Kaiser:

  I write on behalf of Microsoft Corporation ("Microsoft") in response to the Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action ("the Subpoena") dated and served on Microsoft on May 22, 2020, on behalf of your clients Teradata US, Inc., Teradata Corporation and Teradata Operations, Inc. ("Teradata") in the above-referenced civil action.

  As a threshold matter, the Subpoena fails to allow a reasonable time for compliance (particularly in view of the breadth and overbreadth) of the discovery sought.  Microsoft repeatedly requested the courtesy of a two-week extension of time to respond, noting that counsel needed time to analyze the numerous requests, and needed to do so amidst the challenges of the current COVID-19 crisis.  Inexplicably, Teradata refused, granting Microsoft a single additional week.  Teradata compounds the prejudice by providing a cover letter without any explanation of the alleged relevance of the information the Subpoena requests.  Teradata alleges merely that it seeks information "to prosecute its claims against SAP and to rebut SAP's counterclaims."  Teradata thus places Microsoft in the untenable position of attempting to analyze the 155 paragraphs Teradata alleges in its 38-page complaint, as well as the 104 paragraphs that SAP alleges in its 65-page answer and counterclaim, and attempting to divine on its own (and without the additional time it requested) why Teradata believes the information is relevant.

  Despite this, Microsoft remains willing to work with Teradata in a good faith attempt to reach agreement regarding the appropriate scope of, response to, and timing for the Subpoena. In the meantime, Microsoft responds and objects to the Subpoena as follows.

Anchorage | Bellevue | Los Angeles | New York
Portland | San Francisco | Seattle | Washington, D.C.
4818-2491-8462v.4 0050033-001744

Mary G. Kaiser
Morrison & Foerster
June 12, 2020
Page 2

## **Microsoft's Objections to Definitions and Instructions**

1.      **"Microsoft," "You," and "Your."**  Microsoft objects to the definition of the terms "Microsoft," "You," and "Your" in the Subpoena as overly broad, unduly burdensome, and confusing; Teradata should identify by name any person or entity it believes (based on a reasonable and articulated investigation) currently to have relevant and responsive information and currently to be within Microsoft's control.  Further, this definition as drafted includes persons or entities that are not under Microsoft's control.  Microsoft further objects to the definition to the extent it calls for discovery of matter protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or similar immunity or protection.  Microsoft will limit its responses to documents and information currently known to be in its possession, custody, or control, and in this regard, will interpret these defined terms as referring solely to Microsoft Corporation.

2.      **"Teradata" or "Plaintiffs."**  Microsoft objects to the definition of the terms "Teradata" or "Plaintiffs" in the Subpoena as overly broad, unduly burdensome, and confusing; Teradata should identify by name any person or entity of interest and should not expect Microsoft to divine on its own what particular persons or entities Teradata intends to encompass within the definition of "Teradata."  Microsoft will interpret the terms "Teradata" or "Plaintiffs" in the Subpoena to refer only to Teradata Corporation, Teradata US, Inc., and Teradata Operations, Inc.

3.      **"SAP" or "Defendants."**  Microsoft objects to the definition of the term "SAP" or "Defendants" in the Subpoena as overly broad, unduly burdensome, and confusing; Teradata should identify by name any person or entity of interest and should not expect Microsoft to divine on its own what particular persons or entities Teradata intends to encompass within the definition of "SAP" or "Defendants."  Microsoft will interpret the terms "SAP" or "Defendants" in the Subpoena to refer only to SAP SE, SAP America Inc., and SAP Labs, LLC.

4.      **"Concerning," "concern," "relating to," "relate to," and "related to."**  Microsoft objects to the definition of the terms "concerning," "concern," "relating to," "relate to," and "related to" in the Subpoena as overly broad, unduly burdensome, and requiring Microsoft to draw a legal conclusion or to engage in undue factual or legal analysis to ascertain the Subpoena's meaning or scope.  Microsoft will interpret the terms to refer only to "describing," "discussing," or "containing."

5.      **"EDAW Product."**  Microsoft objects to the definition of the terms "EDAW Product" in the Subpoena as overly broad, unduly burdensome, open-ended, and confusing; indeed, as drafted the definition of "EDAW Product" would potentially sweep in the bulk of Microsoft's products.  Teradata should not expect Microsoft to divine on its own what products Teradata contends "provide data storage, warehousing, and analytic functionality" and then somehow identify "any and all competing products."  Microsoft will interpret the term "EDAW

Mary G. Kaiser
Morrison & Foerster
June 12, 2020
Page 3

Product" in the Subpoena to refer only to the particular products and versions, if any, the subpoena identifies by name.

6.    **"ERP Application."**  Microsoft objects to the definition of the terms "ERP Application" in the Subpoena as overly broad, unduly burdensome, open-ended, and confusing; Teradata should not expect Microsoft to divine on its own what products Teradata contends "allow companies to gather and manage data required to conduct day-to-day operations across many aspects of a business enterprise, including, but not limited to, sales and inventory transactions, financial and accounting transactions, and human-resource transactions," and then somehow identify "any and all competing products."  Microsoft will interpret the term "ERP Application" in the Subpoena to refer only to the particular products and versions, if any, the subpoena identifies by name.

7.    **"Named Product(s)."**  Microsoft objects to the definition of the terms "Named Product(s)" in the Subpoena as overly broad and unduly burdensome because the terms as defined are open-ended and lack any date or version restrictions.

8.    **"S/4HANA."**  Microsoft objects to the definition of the term "S/4HANA" in the Subpoena as vague, ambiguous, overly burdensome because it requires Microsoft to determine "SAP's most recent ERP Application."  Microsoft should not be required to identify what products and versions, if any, Teradata believes meets this definition.  Microsoft will interpret the term "S/4HANA" in the Subpoena to refer only to the particular products and versions, if any, the Subpoena identifies by name.

9.    **"SAP HANA."**  Microsoft objects to the definition of the terms "SAP HANA" in the Subpoena as overly broad and unduly burdensome because it is open-ended; Microsoft will interpret the term "SAP HANA" in the Subpoena to refer only to the particular products and versions, if any, the subpoena identifies by name.

## Microsoft's Objections to Requests for Production

### REQUEST FOR PRODUCTION NO. 1:

Documents comprising or reflecting Your product roadmaps, promotional materials, product development plans, and marketing plans for each of the ERP Applications or EDAW Products and related services that You offer.

### OBJECTION TO RFP NO. 1:

Microsoft objects to this Request because it seeks trade secret, confidential, and commercially sensitive research, development, and other material, and it does so from a third-party, with no interest in this litigation.  Microsoft will not produce any such material absent an appropriate protective order.  Microsoft also objects to the Request because the terms "product roadmaps," "promotional materials," "product development plans," "marketing plans," and

Mary G. Kaiser
Morrison & Foerster
June 12, 2020
Page 4

"related services that You offer" are vague and ambiguous, as it is unclear what Teradata means by any of these terms or what it is looking for with them. Microsoft also objects to this Request as over broad, unduly burdensome, expensive, and not proportional to the needs of the Action because it includes no reasonable date restrictions; makes no attempt to identify what specifically Teradata seeks, making it impossible for Microsoft to determine relevance or responsiveness; is broad enough to encompass information that may be protected by a privilege or the work-product doctrine; and misuses Rule 45. Rather than seeking specific and targeted, non-privileged information found uniquely in Microsoft's possession, this Request attempts to use Rule 45 to force Microsoft to generally build Teradata's claims simply because Teradata appears to believe Microsoft participates in the market. Microsoft is not a party to this lawsuit. Rule 45 does not permit Teradata to shift the burden of conducting its own market analysis, hiring its own expert witnesses, and prosecuting its claims against SAP onto Microsoft, a non-party to Teradata's lawsuit. Microsoft therefore objects that this Request calls for discovery of matters that can be obtained more conveniently, with less burden or with less expense, from sources other than Microsoft, e.g., from publicly available sources or parties in this lawsuit. Teradata and its counsel have not taken reasonable steps to avoid imposing undue burden or expense on Microsoft.

Microsoft also objects to this Request to the extent it calls for discovery of electronically stored information from sources that are not reasonably accessible because Microsoft is not able to retrieve information from many of these sources, or even confirm with certainty whether any responsive information in fact exists on the sources, without incurring substantial undue burden or cost. Known, difficult-to-access sources that may contain potentially responsive information (others may exist and become apparent once the scope of the information sought by the Subpoena is properly defined), but which Microsoft is neither searching, preserving nor producing because they are not reasonably accessible without undue burden, fall under the following categories: current disaster recovery media, obsolete back up media, legacy systems, sources requiring computer forensics to access, databases that are structured to hold or report information in certain formats and which cannot readily provide different data or data in different configurations and source code (other than as may be retained in centralized source code archives).

Based on these objections and Microsoft's objections to the relevant definitions, Microsoft will not respond further to this Request. Microsoft, however, is willing to meet and confer with Teradata to understand its position and what it is looking for with this Request.

## REQUEST FOR PRODUCTION NO. 2:

Documents reflecting or concerning any assessment or evaluation of competition between or among Microsoft, Oracle, IBM, Teradata, and SAP for ERP Applications and/or EDAW Products and all data underlying or evaluated in such assessments or evaluations.

Mary G. Kaiser
Morrison & Foerster
June 12, 2020
Page 5

## OBJECTION TO RFP NO. 2:

Microsoft objects to this Request because it seeks trade secret, confidential, and commercially sensitive research, development, and other material, and it does so from a third-party, with no interest in this litigation. Microsoft will not produce any such material absent an appropriate protective order. Microsoft objects that the request contains vague and ambiguous terms such as "assessment or evaluation of competition" and "all data underlying or evaluated in such assessments or evaluations," as Microsoft does not know what Teradata means or is looking for by using these terms. Microsoft also objects to this request as over broad, unduly burdensome, expensive, and not proportional to the needs of the Action because it includes no reasonable date restrictions; makes no attempt to identify what specifically Teradata seeks, making it impossible for Microsoft to determine relevance or responsiveness; is broad enough to encompass information that may be protected by a privilege or the work-product doctrine; and misuses Rule 45, including by requesting "all data underlying or evaluated in such assessments or evaluations." Rather than seeking specific and targeted, non-privileged information found uniquely in Microsoft's possession, this request attempts to use Rule 45 to force Microsoft to generally build Teradata's claims simply because Teradata appears to believe Microsoft participates in the market. Microsoft is not a party to this lawsuit. Rule 45 does not permit Teradata to shift the burden of conducting its own market analysis, hiring its own expert witnesses, and prosecuting its claims against SAP onto Microsoft, a non-party to Teradata's lawsuit. Microsoft therefore objects that this request calls for discovery of matters that can be obtained more conveniently, with less burden or with less expense from sources other than Microsoft, e.g., from publicly available sources or parties in this lawsuit. Teradata and its counsel have not taken reasonable steps to avoid imposing undue burden or expense on Microsoft.

Microsoft also objects to this request to the extent it calls for discovery of electronically stored information from sources that are not reasonably accessible because Microsoft is not able to retrieve information from many of these sources, or even confirm with certainty whether any responsive information in fact exists on the sources, without incurring substantial undue burden or cost. Known, difficult-to-access sources that may contain potentially responsive information (others may exist and become apparent once the scope of the information sought by the Subpoena is properly defined), but which Microsoft is neither searching, preserving nor producing because they are not reasonably accessible without undue burden, fall under the following categories: current disaster recovery media, obsolete back up media, legacy systems, sources requiring computer forensics to access, databases that are structured to hold or report information in certain formats and which cannot readily provide different data or data in different configurations and source code (other than as may be retained in centralized source code archives).

Based on these objections and Microsoft's objections to the relevant definitions, Microsoft will not respond further to this Request. Microsoft, however, is willing to meet and confer with Teradata to understand its position and what it is looking for with this Request.

Mary G. Kaiser
Morrison & Foerster
June 12, 2020
Page 6

## REQUEST FOR PRODUCTION NO. 3:

Documents reflecting Microsoft's wins and losses of sales of ERP Applications and
EDAW Products in competition with Oracle, IBM, Teradata, or SAP, including for each win
and loss an identification of the product and supplier the customer switched away from and
identification of the product and supplier it switched to.

## OBJECTION TO RFP NO. 3:

Microsoft objects to this Request because it seeks trade secret, confidential, and
commercially sensitive research, development, and other material, and it does so from a third-
party, with no interest in this litigation.  Microsoft will not produce any such material absent an
appropriate protective order.  Microsoft objects that the request contains vague and ambiguous
terms such as "wins and losses of sales," "switched away from," and "switched to," as Microsoft
does not know what Teradata means or is looking for by using these terms.  .  Microsoft also
objects to this Request because it appears to require Microsoft to create documents that do not
otherwise exist, as the Request not only asks for "Documents reflecting," but also asks Microsoft
to provide "for each win and loss an identification of the product and supplier the customer
switched away from and identification of the product and supplier it switched to."  Teradata may
not disguise an interrogatory as a request for production under Rule 45, which does not permit
interrogatories against third parties.  Microsoft objects to this request as over broad, unduly
burdensome, expensive, and not proportional to the needs of the Action because it includes no
reasonable date restrictions; makes no attempt to identify what specifically Teradata seeks,
making it impossible for Microsoft to determine relevance or responsiveness and requiring
Microsoft to engage in undue factual analysis to ascertain what the request actually seeks; and
misuses Rule 45.  Rather than seeking specific and targeted information found uniquely in
Microsoft's possession, this request attempts to use Rule 45 to force Microsoft to generally build
Teradata's claims simply because Teradata appears to believe Microsoft participates in the
market.  Microsoft is not a party to this lawsuit.  Rule 45 does not permit Teradata to shift the
burden of conducting its own market analysis, hiring its own expert witnesses, and prosecuting
its claims against SAP onto Microsoft, a non-party to Teradata's lawsuit.  Microsoft therefore
objects that this request calls for discovery of matters that can be obtained more conveniently,
with less burden or with less expense from sources other than Microsoft, e.g., from publicly
available sources or parties in this lawsuit.  Teradata and its counsel have not taken reasonable
steps to avoid imposing undue burden or expense on Microsoft.

Microsoft also objects to this request to the extent it calls for discovery of electronically
stored information from sources that are not reasonably accessible because Microsoft is not able
to retrieve information from many of these sources, or even confirm with certainty whether any
responsive information in fact exists on the sources, without incurring substantial undue burden
or cost.  Known, difficult-to-access sources that may contain potentially responsive information
(others may exist and become apparent once the scope of the information sought by the
Subpoena is properly defined), but which Microsoft is neither searching, preserving nor
producing because they are not reasonably accessible without undue burden, fall under the

Mary G. Kaiser
Morrison & Foerster
June 12, 2020
Page 7

following categories: current disaster recovery media, obsolete back up media, legacy systems, sources requiring computer forensics to access, databases that are structured to hold or report information in certain formats and which cannot readily provide different data or data in different configurations and source code (other than as may be retained in centralized source code archives).

Microsoft objects to the Request to the extent it calls for discovery of matter protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or similar immunity or protection.

Based on these objections and Microsoft's objections to the relevant definitions, Microsoft will not respond further to this Request. Microsoft, however, is willing to meet and confer with Teradata to understand its position and what it is looking for with this Request.

**REQUEST FOR PRODUCTION NO. 4:**

Documents sufficient to identify Your top 100 customers by revenue for each of the ERP- and EDAW-based products or services You offer, the specific Microsoft ERP- or EDAW-based products or services that each such customer purchases, the amounts paid annually by each such customer for each of those ERP- or EDAW-based products or services, and when each such customer began using and stopped using (for any that stopped) each of those ERP- or EDAW-based products or services.

**OBJECTION TO RFP NO. 4:**

Microsoft objects to this Request because it seeks trade secret, confidential, and commercially sensitive research, development, and other material, and it does so from a third-party, with no interest in this litigation. Microsoft will not produce any such material absent an appropriate protective order. Microsoft objects that the request contains vague and ambiguous terms such as "top 100 customers by revenue" without identifying a time period and sufficiently particular metric to determine the "top 100." Microsoft further objects that the request fails to describe the documents sought with sufficient particularity to enable Microsoft to conduct a reasonable search, but instead seeks "Documents sufficient to identify" its "top 100 customers by revenue for each of the ERP- and EDAW-based products or services [it offers], the specific Microsoft ERP- or EDAW-based products or services that each such customer purchases, the amounts paid annually by each such customer for each of those ERP- or EDAW-based products or services, and when each such customer began using and stopped using (for any that stopped) each of those ERP- or EDAW-based products or services." This requires Microsoft to engage in undue factual analysis to ascertain the documents the request actually seeks.

Microsoft also objects to this request as over broad, unduly burdensome, expensive, and not proportional to the needs of the Action because it includes no reasonable date restrictions, makes no attempt to identify what specifically Teradata seeks, making it impossible for Microsoft to determine relevance or responsiveness, and misuses Rule 45. Rather than seeking specific and targeted information found uniquely in Microsoft's possession, this request attempts

Mary G. Kaiser
Morrison & Foerster
June 12, 2020
Page 8

to use Rule 45 to force Microsoft to generally build Teradata's claims simply because Teradata appears to believe Microsoft participates in the market. Microsoft is not a party to this lawsuit. Rule 45 does not permit Teradata to shift the burden of conducting its own market analysis, hiring its own expert witnesses, and prosecuting its claims against SAP onto Microsoft, a non-party to Teradata's lawsuit. Microsoft therefore objects that this request calls for discovery of matters that can be obtained more conveniently, with less burden or with less expense from sources other than Microsoft, e.g., from publicly available sources or parties in this lawsuit. Teradata and its counsel have not taken reasonable steps to avoid imposing undue burden or expense on Microsoft.

Microsoft also objects to this request to the extent it calls for discovery of electronically stored information from sources that are not reasonably accessible because Microsoft is not able to retrieve information from many of these sources, or even confirm with certainty whether any responsive information in fact exists on the sources, without incurring substantial undue burden or cost. Known, difficult-to-access sources that may contain potentially responsive information (others may exist and become apparent once the scope of the information sought by the Subpoena is properly defined), but which Microsoft is neither searching, preserving nor producing because they are not reasonably accessible without undue burden, fall under the following categories: current disaster recovery media, obsolete back up media, legacy systems, sources requiring computer forensics to access, databases that are structured to hold or report information in certain formats and which cannot readily provide different data or data in different configurations and source code (other than as may be retained in centralized source code archives).

Based on these objections and Microsoft's objections to the relevant definitions, Microsoft will not respond further to this Request. Microsoft, however, is willing to meet and confer with Teradata to understand its position and what it is looking for with this Request.

## REQUEST FOR PRODUCTION NO. 5:

Documents comprising or relating to any communication between Microsoft and SAP regarding HANA or S/4HANA, including but not limited to any changes to Microsoft's or SAP's business practices or the business relationship between SAP and Microsoft relating to HANA or S/4HANA or restrictions on the ability of users of S/4HANA to transfer, export, or copy data derived, created, or processed by S/4HANA into a Named Product.

## OBJECTION TO RFP NO. 5:

Microsoft objects to the extent that this request calls for disclosure of documents containing trade secret or other confidential research, development, or commercial information (any such documents will be produced only pursuant to the terms of an appropriate protective order). Microsoft objects that the request contains vague and ambiguous terms such as "relating to any communications," "changes to Microsoft's or SAP's business practices," "business

Mary G. Kaiser
Morrison & Foerster
June 12, 2020
Page 9

relationship between SAP and Microsoft relating to HANA or S/4HANA," and "restrictions on the ability of users of S/4HANA to transfer, export, or copy data derived, created, or processed by S/4HANA into a Named Product." Indeed, the phrase "relating to" is presumptively overbroad, fatally vague, and insufficiently specific to allow Microsoft to locate such documents through a reasonable search, and Microsoft cannot possibly discern what Teradata means by phrases as sweeping as "changes to … business practices" and "business relationship." Microsoft also objects to this request as over broad, unduly burdensome, expensive, and not proportional to the needs of the Action because it includes no date restrictions, makes no attempt to identify what specifically Teradata seeks, making it impossible for Microsoft to determine relevance or responsiveness; is broad enough to encompass information that may be protected by a privilege or the work-product doctrine; and misuses Rule 45. This request therefore requires Microsoft to engage in undue factual analysis to ascertain the documents the request actually seeks, making it impossible for Microsoft to determine relevance or responsiveness. Rather than seeking specific and targeted, non-privileged information found uniquely in Microsoft's possession, this request attempts to use Rule 45 to force Microsoft to generally build Teradata's claims simply because Teradata appears to believe Microsoft participates in the market. Microsoft is not a party to this lawsuit. Rule 45 does not permit Teradata to shift the burden of conducting its own market analysis, hiring its own expert witnesses, and prosecuting its claims against SAP onto Microsoft, a non-party to Teradata's lawsuit. Microsoft therefore objects that this request calls for discovery of matters that can be obtained more conveniently, with less burden or with less expense from sources other than Microsoft, e.g., from publicly available sources or parties in this lawsuit. Indeed, SAP would be in possession of its communications with Microsoft and therefore, is the appropriate source to which to direct this Request. Teradata and its counsel have not taken reasonable steps to avoid imposing undue burden or expense on Microsoft.

To the extent that the requests purports to require Microsoft to conduct a search of all files in its possession, custody or control or to locate documents comprising or relating to "any" responsive communication between Microsoft and SAP, Microsoft objects that the Subpoena is overly broad, unduly burdensome, expensive and seeks discovery that is not proportional to the needs of the case because Microsoft does not maintain enterprise-wide subject matter files.

Microsoft also objects to this request to the extent it calls for discovery of electronically stored information from sources that are not reasonably accessible because Microsoft is not able to retrieve information from many of these sources, or even confirm with certainty whether any responsive information in fact exists on the sources, without incurring substantial undue burden or cost. Known, difficult-to-access sources that may contain potentially responsive information (others may exist and become apparent once the scope of the information sought by the Subpoena is properly defined), but which Microsoft is neither searching, preserving nor producing because they are not reasonably accessible without undue burden, fall under the following categories: current disaster recovery media, obsolete back up media, legacy systems, sources requiring computer forensics to access, databases that are structured to hold or report information

Mary G. Kaiser
Morrison & Foerster
June 12, 2020
Page 10

in certain formats and which cannot readily provide different data or data in different
configurations and source code (other than as may be retained in centralized source code
archives).

Based on these objections and Microsoft's objections to the relevant definitions,
Microsoft will not respond further to this Request.  Microsoft, however, is willing to meet and
confer with Teradata to understand its position and what it is looking for with this Request.

## REQUEST FOR PRODUCTION NO. 6:

Documents comprising or relating to any communication between Microsoft and SAP
concerning Teradata.

## OBJECTION TO RFP NO. 6:

Microsoft objects to the extent that this request calls for disclosure of documents
containing trade secret or other confidential research, development or commercial information
(any such documents will be produced only pursuant to the terms of an appropriate protective
order).  Microsoft objects to this request as over broad, unduly burdensome, fatally vague, and
insufficiently specific to allow Microsoft to locate such documents through a reasonable search
because it purports to seek "documents … relating to any communication. . . ."  This is
especially the case here, where Teradata directs this Request to a third-party under Rule 45.
Microsoft also objects to this Request as overly broad, unduly burdensome, and disproportionate
to the needs of the case, and as seeking irrelevant information, because it fails to include any
reasonable date or subject matter restrictions; makes no attempt to identify what specifically
Teradata seeks, making it impossible for Microsoft to determine relevance or responsiveness; is
broad enough to encompass information that may be protected by a privilege or the work-product
doctrine;, and misuses Rule 45.  Rather than seeking specific and targeted, non-privileged
information found uniquely in Microsoft's possession, this request attempts to use Rule 45 to
force Microsoft to generally build Teradata's claims simply because Teradata appears to believe
Microsoft participates in the market.  Microsoft is not a party to this lawsuit.  Rule 45 does not
permit Teradata to shift the burden of conducting its own market analysis, hiring its own expert
witnesses, and prosecuting its claims against SAP onto Microsoft, a non-party to Teradata's
lawsuit.  Microsoft therefore objects that this request calls for discovery of matters that can be
obtained more conveniently, with less burden or with less expense from sources other than
Microsoft, e.g., from publicly available sources or parties in this lawsuit.  Indeed, SAP would be
in possession of its communications with Microsoft, and therefore, is the appropriate source to
which to direct this Request.  Teradata and its counsel have not taken reasonable steps to avoid
imposing undue burden or expense on Microsoft.

To the extent that the requests purports to require Microsoft to conduct a search
of all files in its possession, custody, or control, or to locate "any" responsive
communication between Microsoft and SAP, Microsoft objects that the Subpoena is
overly broad, unduly burdensome, expensive, and seeks discovery that is not

Mary G. Kaiser
Morrison & Foerster
June 12, 2020
Page 11

proportional to the needs of the case because Microsoft does not maintain enterprise-wide subject matter files.

Microsoft also objects to this request to the extent it calls for discovery of electronically stored information from sources that are not reasonably accessible because Microsoft is not able to retrieve information from many of these sources, or even confirm with certainty whether any responsive information in fact exists on the sources, without incurring substantial undue burden or cost. Known, difficult-to-access sources that may contain potentially responsive information (others may exist and become apparent once the scope of the information sought by the Subpoena is properly defined), but which Microsoft is neither searching, preserving nor producing because they are not reasonably accessible without undue burden, fall under the following categories: current disaster recovery media, obsolete back up media, legacy systems, sources requiring computer forensics to access, databases that are structured to hold or report information in certain formats and which cannot readily provide different data or data in different configurations and source code (other than as may be retained in centralized source code archives).

Based on these objections and Microsoft's objections to the relevant definitions, Microsoft will not respond further to this Request. Microsoft, however, is willing to meet and confer with Teradata to understand its position and what it is looking for with this Request.

## REQUEST FOR PRODUCTION NO. 7:

Documents comprising or relating to any communication between Microsoft and SAP, any other competitor, any customer, or any government authority concerning any restrictions or prohibitions imposed by SAP on exporting, extracting, or transferring data derived, created, or processed by any SAP ERP Applications for use with an EDAW Product not offered by SAP.

## OBJECTION TO RFP NO. 7:

Microsoft objects to this Request because it seeks trade secret, confidential, and commercially sensitive research, development, and other material, and it does so from a third-party, with no interest in this litigation. Microsoft will not produce any such material absent an appropriate protective order. Microsoft objects that the request contains vague and ambiguous terms such as "relating to any communications," "any other competitor," "any customer," and "any government authority," and "concerning any restrictions or prohibitions imposed by SAP on exporting, extracting, or transferring data derived, created, or processed by any SAP ERP Applications for use with an EDAW Product not offered by SAP." This request therefore requires Microsoft to engage in undue factual analysis to ascertain the documents the request actually seeks making it impossible for Microsoft to determine relevance or responsiveness,. Indeed, the term "relating to" is presumptively overbroad, fatally vague, and insufficiently specific to allow Microsoft to locate such documents through a reasonable search, and the sweeping nature of this Request is so overly broad and unduly burdensome as to potentially

Mary G. Kaiser
Morrison & Foerster
June 12, 2020
Page 12

encompass every communication anyone anywhere in Microsoft has had "concerning restrictions or prohibitions imposed by SAP on exporting, extracting, or transferring data derived, created, or processed by any SAP ERP Applications for use with an EDAW Product not offered by SAP." The request is also broad enough to encompass documents protected by a privilege, immunity, or other similar doctrine. Put simply, this Request is an abuse of Rule 45. Rather than seeking specific and targeted, non-privileged information found uniquely in Microsoft's possession, this request attempts to use Rule 45 to force Microsoft to generally build Teradata's claims simply because Teradata appears to believe Microsoft participates in the market. Microsoft is not a party to this lawsuit. Rule 45 does not permit Teradata to shift the burden of conducting its own market analysis, hiring its own expert witnesses, and prosecuting its claims against SAP onto Microsoft, a non-party to Teradata's lawsuit. Microsoft therefore objects that this request calls for discovery of matters that can be obtained more conveniently, with less burden or with less expense from sources other than Microsoft, e.g., from publicly available sources or parties in this lawsuit. Indeed, SAP would be in possession of its communications with Microsoft and is therefore the appropriate source for such communications. Teradata and its counsel have not taken reasonable steps to avoid imposing undue burden or expense on Microsoft.

To the extent that the requests purports to require Microsoft to conduct a search of all files in its possession, custody or control or to locate "any" responsive communication between Microsoft and SAP, Microsoft objects that the Subpoena is overly broad and unduly burdensome and expensive and seeks discovery that is not proportional to the needs of the case because Microsoft does not maintain enterprise-wide subject matter files.

Microsoft also objects to this request to the extent it calls for discovery of electronically stored information from sources that are not reasonably accessible because Microsoft is not able to retrieve information from many of these sources, or even confirm with certainty whether any responsive information in fact exists on the sources, without incurring substantial undue burden or cost. Known, difficult-to-access sources that may contain potentially responsive information (others may exist and become apparent once the scope of the information sought by the Subpoena is properly defined), but which Microsoft is neither searching, preserving nor producing because they are not reasonably accessible without undue burden, fall under the following categories: current disaster recovery media, obsolete back up media, legacy systems, sources requiring computer forensics to access, databases that are structured to hold or report information in certain formats and which cannot readily provide different data or data in different configurations and source code (other than as may be retained in centralized source code archives).

Based on these objections and Microsoft's objections to the relevant definitions, Microsoft will not respond further to this Request. Microsoft, however, is willing to meet and confer with Teradata to understand its position and what it is looking for with this Request.

Mary G. Kaiser
Morrison & Foerster
June 12, 2020
Page 13

## REQUEST FOR PRODUCTION NO. 8:

Documents sufficient to show the existence of any restrictions or prohibitions imposed by SAP on the interoperability or the integration of Microsoft ERP Applications or data derived, created, or processed by such Microsoft ERP Applications with SAP HANA.

## OBJECTION TO RFP NO. 8:

Microsoft objects to the extent that this request calls for disclosure of documents containing trade secret or other confidential research, development or commercial information (any such documents will be produced only pursuant to the terms of an appropriate protective order). Microsoft objects that the request contains vague and ambiguous terms such as "any restrictions or prohibitions," "interoperability or the integration," and "data derived, created, or processed by such Microsoft ERP Applications with SAP HANA." This Request makes no attempt to explain what Teradata means by those terms in any meaningful way, leaving Microsoft to guess as to what might or might not be relevant or responsive. Microsoft further objects that the request fails to describe the documents sought with sufficient particularity to enable Microsoft to conduct a reasonable search, but instead seeks "Documents sufficient to show" the alleged "existence of any restrictions or prohibitions imposed by SAP on the interoperability or the integration of Microsoft ERP Applications or data derived, created, or processed by such Microsoft ERP Applications with SAP HANA." This requires Microsoft to engage in undue factual analysis to ascertain the documents the request actually seeks.

Microsoft also objects to this request as over broad, unduly burdensome, expensive, and not proportional to the needs of the Action because it includes no reasonable date restrictions and misuses Rule 45. Rather than seeking specific and targeted information found uniquely in Microsoft's possession, this request attempts to use Rule 45 to force Microsoft to generally build Teradata's claims simply because Teradata appears to believe Microsoft participates in the market. Microsoft is not a party to this lawsuit. Rule 45 does not permit Teradata to shift the burden of conducting its own market analysis, hiring its own expert witnesses, and prosecuting its claims against SAP onto Microsoft, a non-party to Teradata's lawsuit. Microsoft therefore objects that this request calls for discovery of matters that can be obtained more conveniently, with less burden or with less expense from sources other than Microsoft, e.g., from publicly available sources or parties in this lawsuit. Indeed, SAP would be in possession of its documents showing the existence of any restrictions or prohibitions it imposed, making SAP the appropriate source for this information, not Microsoft. Teradata and its counsel have not taken reasonable steps to avoid imposing undue burden or expense on Microsoft.

Microsoft also objects to this request to the extent it calls for discovery of electronically stored information from sources that are not reasonably accessible because Microsoft is not able to retrieve information from many of these sources, or even confirm with certainty whether any responsive information in fact exists on the sources, without incurring substantial undue burden or cost. Known, difficult-to-access sources that may contain potentially

Mary G. Kaiser
Morrison & Foerster
June 12, 2020
Page 14

responsive information (others may exist and become apparent once the scope of the information sought by the Subpoena is properly defined), but which Microsoft is neither searching, preserving nor producing because they are not reasonably accessible without undue burden, fall under the following categories: current disaster recovery media, obsolete back up media, legacy systems, sources requiring computer forensics to access, databases that are structured to hold or report information in certain formats and which cannot readily provide different data or data in different configurations and source code (other than as may be retained in centralized source code archives).

Microsoft objects to the Request to the extent it calls for discovery of matter protected by the attorney-client privilege, work-product doctrine or any other applicable privilege or similar immunity or protection.

Based on these objections and Microsoft's objections to the relevant definitions, Microsoft will not respond further to this Request. Microsoft, however, is willing to meet and confer with Teradata to understand its position and what it is looking for with this Request.

## REQUEST FOR PRODUCTION NO. 9:

Documents sufficient to show the existence of any restrictions or prohibitions imposed by SAP on the ability of users of any SAP ERP Application to transfer, export, or extract data derived, created, or processed by such SAP ERP Applications for use or storage in a Named Product.

## OBJECTION TO RFP NO. 9:

Microsoft objects to the extent that this request calls for disclosure of documents containing trade secret or other confidential research, development or commercial information (any such documents will be produced only pursuant to the terms of an appropriate protective order). Microsoft objects that the request contains vague and ambiguous terms such as "the ability of users of any SAP ERP Application to transfer, export, or extract data derived, created, or processed by such SAP ERP Applications for use or storage in a Named Product." This Request makes no attempt to explain what Teradata means by those terms in any meaningful way, leaving Microsoft to guess as to what might or might not be relevant or responsive. Microsoft further objects that the request fails to describe the documents sought with sufficient particularity to enable Microsoft to conduct a reasonable search, but instead seeks "Documents sufficient to show" the alleged the "existence of any restrictions or prohibitions imposed by SAP on the ability of users of any SAP ERP Application to transfer, export, or extract data derived, created, or processed by such SAP ERP Applications for use or storage in a Named Product." This requires Microsoft to engage in undue factual analysis to ascertain the documents the request actually seeks.

Microsoft also objects to this request as over broad, unduly burdensome, expensive, and not proportional to the needs of the Action because it includes no reasonable date restrictions and misuses Rule 45. Rather than seeking specific and targeted information found uniquely in Microsoft's possession, this request attempts to use Rule 45 to force Microsoft to generally

Mary G. Kaiser
Morrison & Foerster
June 12, 2020
Page 15

build Teradata's claims simply because Teradata appears to believe Microsoft participates in the market. Microsoft is not a party to this lawsuit. Rule 45 does not permit Teradata to shift the burden of conducting its own market analysis, hiring its own expert witnesses, and prosecuting its claims against SAP onto Microsoft, a non-party to Teradata's lawsuit. Microsoft therefore objects that this request calls for discovery of matters that can be obtained more conveniently, with less burden or with less expense from sources other than Microsoft, e.g., from publicly available sources or parties in this lawsuit. Indeed, SAP would be in possession of its documents showing the existence of any restrictions or prohibitions it imposed, making it the appropriate source for this information, not Microsoft. Teradata and its counsel have not taken reasonable steps to avoid imposing undue burden or expense on Microsoft.

Microsoft also objects to this request to the extent it calls for discovery of electronically stored information from sources that are not reasonably accessible because Microsoft is not able to retrieve information from many of these sources, or even confirm with certainty whether any responsive information in fact exists on the sources, without incurring substantial undue burden or cost. Known, difficult-to-access sources that may contain potentially responsive information (others may exist and become apparent once the scope of the information sought by the Subpoena is properly defined), but which Microsoft is neither searching, preserving nor producing because they are not reasonably accessible without undue burden, fall under the following categories: current disaster recovery media, obsolete back up media, legacy systems, sources requiring computer forensics to access, databases that are structured to hold or report information in certain formats and which cannot readily provide different data or data in different configurations and source code (other than as may be retained in centralized source code archives).

Microsoft objects to the Request to the extent it calls for discovery of matter protected by the attorney-client privilege, work-product doctrine or any other applicable privilege or similar immunity or protection.

Based on these objections and Microsoft's objections to the relevant definitions, Microsoft will not respond further to this Request. Microsoft, however, is willing to meet and confer with Teradata to understand its position and what it is looking for with this Request.

## REQUEST FOR PRODUCTION NO. 10:

Documents sufficient to show the operation of each of the Named Products — including but not limited to user manuals, technical guides, developer instructions, and internal reports — that was sold or on sale between May 1998 and May 2003, inclusive.

## OBJECTION TO RFP NO. 10:

Microsoft objects this Request because it seeks trade secret, confidential, and commercially sensitive research, development, and other material, and it does so from a third-

Mary G. Kaiser
Morrison & Foerster
June 12, 2020
Page 16

party, with no interest in this litigation.  Microsoft will not produce any such material absent an appropriate protective order.  Microsoft objects to this request as over broad, unduly burdensome, expensive and confusing, and not relevant or proportional to the needs of the Action because it includes no restrictions on the relevant functionality, and uses vague and ambiguous terms, such as "operation," "technical guides," "developer instructions," and "internal reports."  Microsoft further objects that the request fails to describe the documents sought with sufficient particularity to enable Microsoft to conduct a reasonable search, but instead seeks "Documents sufficient to show" the operation of each of the Named Products.  This requires Microsoft to engage in undue factual analysis to ascertain the documents the request actually seeks.  Microsoft objects that the request seeks information having no relevance to the lawsuit and that new discovery into potential prior art would be improper at this point in view of the case schedule.

Microsoft also objects to this request to the extent it calls for discovery of electronically stored information from sources that are not reasonably accessible because Microsoft is not able to retrieve information from many of these sources, or even confirm with certainty whether any responsive information in fact exists on the sources, without incurring substantial undue burden or cost.  Known, difficult-to-access sources that may contain potentially responsive information (others may exist and become apparent once the scope of the information sought by the Subpoena is properly defined), but which Microsoft is neither searching, preserving nor producing because they are not reasonably accessible without undue burden, fall under the following categories: current disaster recovery media, obsolete back up media, legacy systems, sources requiring computer forensics to access, databases that are structured to hold or report information in certain formats and which cannot readily provide different data or data in different configurations and source code (other than as may be retained in centralized source code archives).

Subject to these objections, Microsoft will conduct a reasonable search for user manuals it published between May 1998 and May 2003 for a reasonable set of the Named Products that Teradata identifies by name and version number.

## REQUEST FOR PRODUCTION NO. 11:

Documents sufficient to establish that each of the Named Products was sold or on sale in the United States between May 1998 and May 2003, inclusive, including at least the earliest time in this period during which each version or release of each Named Product was sold or on sale.

## OBJECTION TO RFP NO. 11:

Microsoft objects to the extent that this request calls for disclosure of documents containing trade secret or other confidential research, development or commercial information (any such documents will be produced only pursuant to the terms of an appropriate protective order).  Microsoft objects to this request as over broad, unduly burdensome, confusing, not

Mary G. Kaiser
Morrison & Foerster
June 12, 2020
Page 17

relevant, and not proportional to the needs of the Action, including the fact that this request
includes no restrictions on the relevant functionality and to the extent the Request seeks to
require Microsoft to provide information in the form of a written response.  Microsoft objects
that the request seeks information having no relevance to the lawsuit and that new discovery into
potential prior art would be improper at this point in view of the case schedule.  Microsoft further
objects that the request fails to describe the documents sought with sufficient particularity to
enable Microsoft to conduct a reasonable search, but instead seeks "Documents sufficient to
establish" that each of the Named Products was sold or on sale in the United States between May
1998 and May 2003, inclusive, including at least the earliest time in this period during which
each version or release of each Named Product was sold or on sale.  This requires Microsoft to
engage in undue factual analysis to ascertain the documents the request actually seeks.

Microsoft also objects to this request to the extent it calls for discovery of electronically
stored information from sources that are not reasonably accessible because Microsoft is not able
to retrieve information from many of these sources, or even confirm with certainty whether any
responsive information in fact exists on the sources, without incurring substantial undue burden
or cost.  Known, difficult-to-access sources that may contain potentially responsive information
(others may exist and become apparent once the scope of the information sought by the
Subpoena is properly defined), but which Microsoft is neither searching, preserving nor
producing because they are not reasonably accessible without undue burden, fall under the
following categories: current disaster recovery media, obsolete back up media, legacy systems,
sources requiring computer forensics to access, databases that are structured to hold or report
information in certain formats and which cannot readily provide different data or data in different
configurations and source code (other than as may be retained in centralized source code
archives).

Subject to these objections, Microsoft will conduct a reasonable search for
documentation, if any, showing the earliest records it locates after conducting a reasonable
search for sales that might have occurred between May 1998 and May 2003 of a reasonable set
of the Named Products that Teradata identifies by name and version number.

Very truly yours,

Davis Wright Tremaine LLP

Benjamin J. Byer

cc:    Microsoft Corporation

# EXHIBIT 5

| | |
|---|---|
| **From:** | Byer, Ben |
| **To:** | Cross, David D.; Grothouse, David E. |
| **Cc:** | Maas, David |
| **Subject:** | RE: Teradata subpoena to Microsoft - Update |
| **Date:** | Thursday, September 3, 2020 12:28:34 PM |

**External Email**

Exactly.  We just want a chance to object to the experts.

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8105 | Fax: (206) 757-7105
Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

**From:** Cross, David D. <DCross@mofo.com>
**Sent:** Thursday, September 3, 2020 9:23 AM
**To:** Byer, Ben <BenByer@dwt.com>; Grothouse, David E. <DGrothouse@mofo.com>
**Cc:** Maas, David <DavidMaas@dwt.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

What if we disclose our experts to you before we share any OCO information you produce and you have an opportunity to object to his or her access to specific documents you produce? I just don't want to be in a position to have to identify specific documents we'd select for our experts because of the WP issues.

**From:** Byer, Ben <BenByer@dwt.com>
**Date:** Thursday, Sep 03, 2020, 12:16 PM
**To:** Cross, David D. <DCross@mofo.com>, Grothouse, David E. <DGrothouse@mofo.com>
**Cc:** Maas, David <DavidMaas@dwt.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

**External Email**

On the first one, we're fine limiting OCO-as-default to nonparties.  On second issue, we just want the standard opportunity to object to an expert we don't think should get our info.

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8105 | Fax: (206) 757-7105
Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

**From:** Cross, David D. <DCross@mofo.com>
**Sent:** Thursday, September 3, 2020 9:12 AM
**To:** Byer, Ben <BenByer@dwt.com>; Grothouse, David E. <DGrothouse@mofo.com>
**Cc:** Maas, David <DavidMaas@dwt.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

On the first one, your change would make OCO the default designation for party inspections too, not just non parties. I'm okay with this if it's just non parties. I have to check with the client though.

Maybe I misunderstood what you were proposing re experts. It read to me like you're saying we have to get your permission to share any OCO materials with our experts. That would require us to divulge WP since the documents we choose to share with our experts from discovery bears the highest level of WP protection. Am I misunderstanding your proposal?

---

**From:** Byer, Ben <BenByer@dwt.com>
**Date:** Thursday, Sep 03, 2020, 12:07 PM
**To:** Cross, David D. <DCross@mofo.com>, Grothouse, David E. <DGrothouse@mofo.com>
**Cc:** Maas, David <DavidMaas@dwt.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

**External Email**

---

David,

Thanks for turning this around. Can you please explain your first comment ("This won't work because it applies to parties too. Needs to be limited to non-parties.")? Same issue on the second. I don't understand your objection or what you're proposing.

Can you please explain this comment ("I've never seen such a provision, and it would require us to share attorney work product. Don't think we can agree to this. And given experts are subject to the PO and not party employees, don't see the need for this.")? Here, we are asking for a provision that allows us the opportunity to approve or object to disclosure of our OCO info to experts. I don't see why other parties would get to object to disclosure to experts but we couldn't simply because we used a more protective designation. But maybe I'm missing something here.

On your last two comments, we might be able to agree to something along the lines you described but aren't clear what you're proposing. Can you please edit the document to show what you're able to do on those paragraphs. May make sense to wait a round to do this since the document may also need edits to address the above issues.

Thanks,
Ben

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8105 | Fax: (206) 757-7105
Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

**From:** Cross, David D. <DCross@mofo.com>
**Sent:** Thursday, September 3, 2020 8:45 AM
**To:** Byer, Ben <BenByer@dwt.com>; Grothouse, David E. <DGrothouse@mofo.com>
**Cc:** Maas, David <DavidMaas@dwt.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

Ben –

Thanks for the response. The attachment contains our reactions to the proposed edits. Happy to discuss.

DC

---

**From:** Byer, Ben <BenByer@dwt.com>
**Sent:** Thursday, September 3, 2020 11:12 AM
**To:** Grothouse, David E. <DGrothouse@mofo.com>
**Cc:** Maas, David <DavidMaas@dwt.com>; Cross, David D. <DCross@mofo.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

**External Email**

---

Dave,

Thanks for sending this.  I'm attaching our proposed redlines.  Can you please also update section 7.4 to address outside counsel only info, or add another section just for that (which might be easier since right now 7.4 allows disclosure to in-house counsel).  Please let me know if these work and what you propose on section 7.4.

Thanks,
Ben

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8105 | Fax: (206) 757-7105
Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

---

**From:** Grothouse, David E. <DGrothouse@mofo.com>
**Sent:** Friday, August 21, 2020 9:14 AM
**To:** Byer, Ben <BenByer@dwt.com>; Cross, David D. <DCross@mofo.com>
**Cc:** Maas, David <DavidMaas@dwt.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

Ben,

See attached an amended protective order that creates an outside-counsel-only designation for non-parties, along with a redline against the current order.  We'll need to address this with SAP, but we wanted to confirm this is what you are looking for before we approach them.

Please let us know if you have any questions or concerns,

Dave

---

**From:** Byer, Ben <BenByer@dwt.com>
**Sent:** Thursday, August 20, 2020 6:00 PM
**To:** Cross, David D. <DCross@mofo.com>; Kaiser, Mary <MKaiser@mofo.com>
**Cc:** Maas, David <DavidMaas@dwt.com>; Grothouse, David E. <DGrothouse@mofo.com>

**Subject:** RE: Teradata subpoena to Microsoft - Update

<mark>**External Email**</mark>

---

David,

Thank you for agreeing to withdraw requests 6 and 8.  This leaves requests 5 and 9.  We appreciate that you've limited request 5 to "restrictive licensing practices for S/4HANA and HANA" but the request seeks "Documents comprising or relating to any communication between Microsoft and SAP."  Regardless of subject, communications with SAP should be available from SAP.  If they are not, please explain.  Similarly, request 9 seeks documents showing "the existence of any restriction or prohibitions imposed by SAP."  Restrictions and prohibitions imposed by SAP are available from SAP.  If they are not, please explain.

On the other requests, we have produced responsive materials to you, been diligently researching whether and what we have in terms of additional responsive materials to the overlapping requests from Teradata and SAP, and provided you a plan forward two weeks ago—which you claim to have just found in your "spam box."  Our actions and emails speak for themselves so I am not going to respond to your mischaracterization of the record and will instead focus on next steps.  Please provide a proposed amended protective order and we'll review and comment.  Please also confirm you will reimburse us for the time and expense of scanning the hardcopy material, and we'll begin that process.  We continue to interview Microsoft employees who are searching for additional documents.  We will circle back as soon as they've completed searching.  In the meantime, please let us know if you have any imminent case deadlines.

Thanks,
Ben

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8105 | Fax: (206) 757-7105
Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

---

**From:** Cross, David D. <DCross@mofo.com>
**Sent:** Wednesday, August 19, 2020 7:55 AM
**To:** Byer, Ben <BenByer@dwt.com>; Kaiser, Mary <MKaiser@mofo.com>
**Cc:** Maas, David <DavidMaas@dwt.com>; Grothouse, David E. <DGrothouse@mofo.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

Ben –

I just found this email in my spam box. Please include Dave Grothouse on all communications. Mary is out on maternity leave and has been for a while.

For the boxes you offered for inspection, please produce copies electronically given the health risks with us sending someone to your office to inspect them and given today's travel restrictions. Please let us know when we can expect these.

To your last paragraph, we've responded to all your questions. Claiming otherwise is neither true nor productive. Moreover, as we've explained many times, Requests 5-9 are not limited to materials that SAP has.

They include highly relevant materials that only Microsoft has, such as internal Microsoft communications and communications with its customers.  In any event, as I believe we discussed before, we're willing to table Requests 6 and 8, and we're willing to limit Request 5 to communications regarding SAP's restrictive licensing practices for S/4HANA and HANA. Regarding the protective order, this is the first I recall you raising any concern with that order. Nevertheless, we're fine with an outside-counsel-only designation for appropriately confidential documents and will treat any such documents accordingly until—and of course after—an amended protective order is entered.

We've patiently tried for three months to work out an agreement with you regarding the subpoena. You promised a plan a month ago but have provided none. We're at the point where we need to seek help from the Court.

Best,
DC

**From:** Byer, Ben <BenByer@dwt.com>
**Sent:** Friday, August 7, 2020 8:10 PM
**To:** Kaiser, Mary <MKaiser@mofo.com>; Cross, David D. <DCross@mofo.com>
**Cc:** Maas, David <DavidMaas@dwt.com>
**Subject:** Teradata subpoena to Microsoft - Update

<mark>External Email</mark>

David and Mary,

A few updates on Microsoft's response to the subpoena.  We have identified both electronic and physical documents we're ready to produce in response to requests 10-11.  The electronic documents are being processed by our vender now and will be ready in the next couple days.  Given the age of the material those requests seek, much of what we have located exists only in hardcopy.  We have located about two and half banker's boxes of books.  Those are available for your inspection at DWT's Seattle office.  Alternatively, please let us know if you'd prefer we process and produce (at Teradata's expense) this material electronically.

With respect to the antitrust requests, you still have not responded to our questions regarding any efforts to obtain material from SAP.  We therefore cannot agree to search for and produce documents in response to requests 5-9.  We're continuing to interview individuals in the business unit to identify what we can reasonably locate and produce in response to requests 1-4, and are working hard and juggling summary vacations.  We're hoping to have that pinned down next week.  But before we can produce anything there, we will need to amend the protective order to add a category for an outside counsel only designation.  In the interest of time, can you please provide a proposed amendment to the protective order for our review?  Getting this in place now will help speed any production.

Thanks,
Ben

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8105 | Fax: (206) 757-7105
Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

======================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.

======================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.

======================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.

======================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.

======================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.

# EXHIBIT 6

| | |
|---|---|
| **From:** | Cross, David D. |
| **To:** | Byer, Ben; Kaiser, Mary |
| **Cc:** | Maas, David; Grothouse, David E. |
| **Subject:** | RE: Teradata Corp., et al. v. SAP, et. al., No. 3:18-cv-3670-WHO (N.D. Cal.) |
| **Date:** | Monday, July 27, 2020 5:56:01 PM |

Ben -

Your first sentence is an obvious and disappointing mischaracterization of my email, as is your characterization of our efforts to cooperate and further narrow our requests. There has been no name calling or threats by us, just observations of what's occurred and the seeming contradiction between what you've represented Microsoft can (or can't) do and its reputation as a leading software company. The only threat has been yours to seek fees and costs for responding to a motion to compel, which we both know is an empty threat given we served the subpoena over two months ago with no documents produced.

It's unfortunately become clear that you're more interested in obstruction and laying blame than in finding a path forward. If you have a proposal you'd like us to consider, please send it. Otherwise we'll have to seek help from the court. Again, that's not a threat. It's merely the fact of where we are since we need this discovery and it appears we won't get it without the court's assistance. You've made no proposal of any kind regarding our antitrust requests in the more than two months since we served the subpoena.

Best.
DC

---

**From:** Byer, Ben <BenByer@dwt.com>
**Date:** Thursday, Jul 23, 2020, 2:02 PM
**To:** Cross, David D. <DCross@mofo.com>, Kaiser, Mary <MKaiser@mofo.com>
**Cc:** Maas, David <DavidMaas@dwt.com>, Grothouse, David E. <DGrothouse@mofo.com>
**Subject:** RE: Teradata Corp., et al. v. SAP, et. al., No. 3:18-cv-3670-WHO (N.D. Cal.)

- External Email -

David,

We're doing our best to move as quickly as possible during these hard times, but name calling and threats to use "public filings in motion practice" to damage the reputation of Microsoft does nothing to move the ball forward. As we explained, we're pulling materials from physical archives and shipping them across the country for review in response to your patent requests and speaking with the business unit in response to your antitrust requests. But you haven't given us much to work with by failing to meaningfully target your requests or respond to our questions. We'll do our best but if you want to speed the process please consider limiting the number of products, versions, and relevant time period and answer the questions we've posed below.

Thank you,
Ben

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8105 | Fax: (206) 757-7105
Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

**From:** Cross, David D. <DCross@mofo.com>
**Sent:** Tuesday, July 21, 2020 8:19 PM
**To:** Byer, Ben <BenByer@dwt.com>; Kaiser, Mary <MKaiser@mofo.com>
**Cc:** Maas, David <DavidMaas@dwt.com>; Grothouse, David E. <DGrothouse@mofo.com>
**Subject:** RE: Teradata Corp., et al. v. SAP, et. al., No. 3:18-cv-3670-WHO (N.D. Cal.)

Ben -

With respect, your response is unhelpful and characteristic of the foot-dragging with which you've approached this from the beginning. Claiming we delayed two years to serve the subpoena is not only facially unreasonable, but it directly contradicts your argument that we should get some of this from SAP, which is still producing many documents, including categories requested long ago. It also is inconsistent with your argument that ample time remains for us to obtain this discovery.

I don't think it's productive to spend time debating where things stand or how we got here. You asked a question about our timing. I answered it. The reality is that we're rapidly approaching a point where we'll need help from the court to get the discovery we need.

Your threat to seek fees and costs is as insulting as it is baseless. I doubt that the court will view a motion as premature where you've not produced even one document in two months or even agreed to produce any specific categories of documents at all in response to our antitrust-related request. It's also difficult to understand how one of the most sophisticated software companies in the world cannot efficiently and effectively search its own electronic documents internally as you claim. I imagine that will be quite the revelation in public filings in motion practice, and one that seems contrary to a reputation that Microsoft has cultivated over many years as a leading software company.

In any event, we've tried in many calls and emails to reach some agreed-upon scope, with no progress or proposal from you at all. We've asked many times for you to let us know what you're willing to produce and when — and we've received nothing but more delay. We have no desire to involve the court. But if we can't get a meaningful and reasonable proposal from you soon, we'll need to get help from the court to get what we need.

Best,
DC

---

**From:** Byer, Ben <BenByer@dwt.com>
**Date:** Tuesday, Jul 21, 2020, 8:26 PM
**To:** Cross, David D. <DCross@mofo.com>, Kaiser, Mary <MKaiser@mofo.com>
**Cc:** Maas, David <DavidMaas@dwt.com>, Grothouse, David E. <DGrothouse@mofo.com>
**Subject:** RE: Teradata Corp., et al. v. SAP, et. al., No. 3:18-cv-3670-WHO (N.D. Cal.)

**- External Email -**

---

Hi David,

Thanks for helping to provide some more color here. We understand you'd prefer the documents immediately, but Teradata's delay created your predicament. Teradata delayed serving this subpoena until two years after initiating this case. Further, although our initial response explained that we need the identity of the product versions you are interested in, and although you agreed to do that during our meet and confers, you did not send that until last week. And when you did, you failed to target your request. Instead, you've identified 28 products by version number, three products without version numbers, and failed to narrow your date range,

insisting that we search for responsive material spanning nearly 10 years.  Four days later, your team sent the below email threatening to go to the court.

You have also yet to adequately explain why you need Microsoft to search for communications with SAP and restrictions SAP imposes on its products, which you can get directly from SAP.  You told us that SAP has claimed limits on certain eDiscovery but that doesn't explain why you can't get documents if they're truly relevant.  Please tell us what efforts you have taken to get these documents from SAP so that we can assess the reasonableness of seeking them from Microsoft.

We are continuing to assess whether Microsoft has responsive documents, which we cannot simply pull from a readily available database.  We are instead in the process of working with the business unit to determine what is possible and what isn't; where the burden lies and where it doesn't based on the information you sent last week.  With folks working remotely, this takes more time than it typically would.  We also need to understand and account for SAP's subpoena, to which we have not yet even responded.  Your proposal that we conduct two searches ignores that doing a compressive search dramatically reduces the burden on Microsoft because both parties' requests appear to seek the same material for overlapping but different sets customers.  For example, please take a look at your requests 2 and 3, and SAP's requests 1 and 2 and let me know if you see no overlap.  Conversely, you've identified no prejudice to Teradata if Microsoft takes the far more efficient approach—just a general claim that this is "just one part of a broader discovery strategy."

We continue to search for materials respective to your patent requests and are in the process of pulling physical materials from Microsoft's archives.  We have made arrangements to ship these materials to attorneys' residences for individualized review.  Due to COVID, things simply cannot happen as quickly as they might under better circumstances with a full staff at Microsoft's able to pull material from archives and outside counsel working in offices.  Nonetheless, we continue to move forward and expect to complete this review in the coming weeks.

Finally, please consider whether you are able to narrow your requests to a more reasonable set of products and identify the version of "EDAW" products you are interested in.  Happy to discuss if you have any questions or suggestions to speed this process.  In the meantime, we believe motion practice would be premature and would seek fees and costs if that's how you proceed.

Thank you,
Ben

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8105 | Fax: (206) 757-7105
Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

---

**From:** Cross, David D. <DCross@mofo.com>
**Sent:** Monday, July 20, 2020 5:59 PM
**To:** Byer, Ben <BenByer@dwt.com>; Kaiser, Mary <MKaiser@mofo.com>
**Cc:** Maas, David <DavidMaas@dwt.com>; Grothouse, David E. <DGrothouse@mofo.com>
**Subject:** RE: Teradata Corp., et al. v. SAP, et. al., No. 3:18-cv-3670-WHO (N.D. Cal.)

Hi Ben –

While we appreciate that a plan is forthcoming, the timing is problematic. Two more weeks even to get a proposed plan from you will have us approaching three months since we served the subpoena, and without any documents produced. To answer your question, the timing issue you're missing, respectfully, is that – as Mary

noted – this subpoena and the discovery we're seeking is just one part of a broader discovery strategy that will be informed and guided in part by the discovery we receive from you as a major player in the industry. We served the subpoena when we did – well before the close of fact discovery – for that very reason. We've been patient in trying to negotiate an agreeable scope and to try to avoid involving the Court, but unfortunately we're running out of time for that. I don't see why you'd need another two weeks simply to send us a plan for what you will produce and when. If you can't send us that by the end of this week, then regrettably we'll need to get help from the Court. We especially can't afford to lose two more weeks only to find that we're at impasse on important categories of discovery and/or on timing for completing production. If we can't agree on the plan, then we should determine that now so we can promptly obtain help from the Court.

Regarding SAP's subpoena, we of course appreciate the burden your client bears in this litigation as a third party, which is why we've spent the last couple months trying to reach agreement with you on scope and timing for production. Hopefully you can appreciate the unfairness and prejudice our client would suffer if those efforts were to suddenly get delayed or derailed simply because SAP chose to serve its own subpoena well after we served ours. The way I've handled such situations in the past was to complete negotiations with the first party to serve the subpoena, for which the other party will receive the same documents, and then to separately negotiate with the other party any additional narrow discovery that would be necessary and appropriate. I don't see why this approach wouldn't work here. In any event, SAP's subpoena doesn't change your client's obligations to timely produce documents responsive to our subpoena, and we need to complete that relatively soon—ideally without involving the Court.

We remain available to discuss any of these issues as needed and to try to reach agreement on the path forward.

Thanks very much.
DC

---

**From:** Byer, Ben <BenByer@dwt.com>
**Sent:** Monday, July 20, 2020 8:41 PM
**To:** Kaiser, Mary <MKaiser@mofo.com>
**Cc:** Maas, David <DavidMaas@dwt.com>; Cross, David D. <DCross@mofo.com>; Grothouse, David E. <DGrothouse@mofo.com>
**Subject:** RE: Teradata Corp., et al. v. SAP, et. al., No. 3:18-cv-3670-WHO (N.D. Cal.)

**- External Email -**

Hi Mary,

Thanks for explaining.  We're in the process of investigating how we can efficiently locate documents in response to both subpoenas.  We expect to have a plan within two weeks and will be back in touch with both parties with a proposal.  Given that the only deadline you identified comes in 2021, we don't see any harm this efficient plan would cause Teradata.  Conversely, forcing Microsoft to run multiple, overlapping searches just weeks apart would needlessly impose undue burden on a non-party.  Please let me know if you see some timing issue I am missing here.

Thanks,
Ben

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104

Tel: (206) 757-8105 | Fax: (206) 757-7105
Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

---

**From:** Kaiser, Mary <MKaiser@mofo.com>
**Sent:** Monday, July 20, 2020 12:59 PM
**To:** Byer, Ben <BenByer@dwt.com>
**Cc:** Maas, David <DavidMaas@dwt.com>; Cross, David D. <DCross@mofo.com>; Grothouse, David E. <DGrothouse@mofo.com>
**Subject:** RE: Teradata Corp., et al. v. SAP, et. al., No. 3:18-cv-3670-WHO (N.D. Cal.)

Hi Ben,

The deadline for fact discovery is January 15, 2021. However, this does not affect Microsoft's obligation to timely produce documents in response to a subpoena that has been pending for two months. Given Microsoft's significance in the industry at issue, we need its documents to help inform other discovery efforts in the case. We, therefore, need a complete production from Microsoft well before the end of fact discovery, hence the timing of the subpoena. Please let us know whether Microsoft will commit to a reasonable and firm date for production. Otherwise, as we have said, we will have to seek relief from the court.

Thanks,
Mary

---

**From:** Byer, Ben <BenByer@dwt.com>
**Sent:** Friday, July 17, 2020 7:11 PM
**To:** Kaiser, Mary <MKaiser@mofo.com>
**Cc:** Maas, David <DavidMaas@dwt.com>; Cross, David D. <DCross@mofo.com>; Grothouse, David E. <DGrothouse@mofo.com>
**Subject:** RE: Teradata Corp., et al. v. SAP, et. al., No. 3:18-cv-3670-WHO (N.D. Cal.)

- External Email -

---

Hi Mary,

The parties' failure to coordinate third-party discovery does not create a requirement for Microsoft to run multiple searches for the same material simply because one party fired off its subpoena a few weeks before the other. Nonetheless, I understand you'd prefer information sooner rather than later. Additional background here would help. When does discovery close and what upcoming deadlines do you have?

Thanks,
Ben

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8105 | Fax: (206) 757-7105
Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

---

**From:** Kaiser, Mary <MKaiser@mofo.com>
**Sent:** Friday, July 17, 2020 8:47 AM
**To:** Byer, Ben <BenByer@dwt.com>
**Cc:** Maas, David <DavidMaas@dwt.com>; Cross, David D. <DCross@mofo.com>; Grothouse, David E.

<DGrothouse@mofo.com>
**Subject:** RE: Teradata Corp., et al. v. SAP, et. al., No. 3:18-cv-3670-WHO (N.D. Cal.)

Hi Ben,

Teradata served its subpoena to Microsoft 8 weeks ago on May 22. SAP's decision to serve a subpoena now does not change or affect Microsoft's obligation to timely produce discovery in response to our long-outstanding subpoena. We have been patient in waiting this long, and in trying to narrow the scope of the requests and provide guidance for the types of documents sought and potential custodians. Microsoft either needs to commit to a reasonable and firm date for production or we will have to seek relief from the court. We remain available for a call to the extent it would be helpful, but need a prompt response regarding the timing of a production.

Thanks,
Mary

**MARY KAISER**
Associate | Morrison & Foerster LLP
2000 Pennsylvania Avenue, NW | Washington, DC 20006-1888
**P:** +1 (202) 887-6952
mofo.com | LinkedIn | Twitter

---

**From:** Byer, Ben <BenByer@dwt.com>
**Sent:** Thursday, July 16, 2020 7:37 PM
**To:** Kaiser, Mary <MKaiser@mofo.com>
**Cc:** Maas, David <DavidMaas@dwt.com>; Cross, David D. <DCross@mofo.com>; Grothouse, David E. <DGrothouse@mofo.com>
**Subject:** RE: Teradata Corp., et al. v. SAP, et. al., No. 3:18-cv-3670-WHO (N.D. Cal.)

**- External Email -**

---

Hi Mary,

Earlier today SAP served us a subpoena in this matter that at least partially overlaps with your requests.  As you can imagine, we cannot run multiple searches for the same information.  Your below email compounds the issue by not meaningfully narrowing your subpoena or addressing the issues we raised during our meet and confers.  This places us in an tough position.  We are now looking at both subpoenas, trying to identify the overlap, and working on a way that we can efficiently respond to both.  We'll circle back soon when we have more, but this new subpoena obviously throws a wrench into the works.  This does not, however, affect our ongoing efforts on your patent requests, as we don't see overlap there.  We are continuing our search for documents responsive to those requests.  But because of the age of the material you seek and COVID restrictions, we're having to pull from archives and ship materials for review, which takes some time.

Thanks,
Ben

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8105 | Fax: (206) 757-7105
Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

**From:** Kaiser, Mary <MKaiser@mofo.com>
**Sent:** Thursday, July 16, 2020 9:08 AM
**To:** Byer, Ben <BenByer@dwt.com>
**Cc:** Maas, David <DavidMaas@dwt.com>; Cross, David D. <DCross@mofo.com>; Grothouse, David E. <DGrothouse@mofo.com>
**Subject:** RE: Teradata Corp., et al. v. SAP, et. al., No. 3:18-cv-3670-WHO (N.D. Cal.)

Hi Ben,

Following up on my email below, please let us know when you are available for a call to discuss any remaining issues with the scope and timing of Microsoft's production.

Thanks,
Mary

**From:** Kaiser, Mary
**Sent:** Monday, July 13, 2020 9:41 AM
**To:** 'Byer, Ben' <BenByer@dwt.com>
**Cc:** Maas, David <DavidMaas@dwt.com>; Cross, David D. <DCross@mofo.com>; Grothouse, David E. <DGrothouse@mofo.com>
**Subject:** RE: Teradata Corp., et al. v. SAP, et. al., No. 3:18-cv-3670-WHO (N.D. Cal.)

Hi Ben,

Thank you for the update on the patent requests. As you know, we have already limited our antitrust-related requests (Requests 1-9) to 4 products and their predecessors that were sold during the relevant time frame. For ERP Applications, we believe all relevant product and versions include:

- Microsoft Dynamics 365
- Microsoft Dynamics CRM 2011
- Microsoft Dynamics CRM 2013
- Microsoft Dynamics CRM 2015
- Microsoft Dynamics CRM 2016
- Microsoft Dynamics GP 2010 R2 (11.0 SP2)
- Microsoft Dynamics GP 2013 (12.0)
- Microsoft Dynamics GP 2013 R2 (12.0)
- Microsoft Dynamics GP 2015 (14.0)
- Microsoft Dynamics GP 2015 R2 (14.0)
- Microsoft Dynamics GP 2016 (16.0)
- Microsoft Dynamics GP 2016 R2 (16.0)
- Microsoft Dynamics GP 2018 (18.0)
- Microsoft Dynamics GP 2018 R2 (18.0)
- Microsoft Dynamics GP 2018 (18.2)
- Microsoft Dynamics AX 2012
- Microsoft Dynamics AX 2012 R2
- Microsoft Dynamics AX 2012 R3
- Microsoft Dynamics AX ("AX7")

- Microsoft Dynamics NAV 2013
- Microsoft Dynamics NAV 2013 R2
- Microsoft Dynamics NAV 2015
- Microsoft Dynamics NAV 2016
- Microsoft Dynamics NAV 2017
- Microsoft Dynamics NAV 2018
- Microsoft Dynamics SL 2011
- Microsoft Dynamics SL 2015
- Microsoft Dynamics SL 2018

For EDAW Products, we request information regarding all versions of SQL Server Enterprise Edition, Azure Data Warehouse, and Azure SQL Database that were sold between January 1, 2011 and present.

We need to resolve any remaining disputes over the scope and timing of Microsoft's production this week. Please let us know when you are available for a call.

Thanks,
Mary

---

**From:** Byer, Ben <BenByer@dwt.com>
**Sent:** Thursday, July 9, 2020 7:05 PM
**To:** Kaiser, Mary <MKaiser@mofo.com>
**Cc:** Cross, David D. <DCross@mofo.com>; Maas, David <DavidMaas@dwt.com>
**Subject:** RE: Teradata Corp., et al. v. SAP, et. al., No. 3:18-cv-3670-WHO (N.D. Cal.)

- External Email -

---

Hi Mary,

When we spoke last you agreed to provide us a list of specific product versions and more limited date range. We're still waiting on that. Once we have that, we'll take another look at the requests and re-evaluate the objections we laid out in our letter and discussed on our calls. Can you please give us a status update? In the meantime, we've completed doc collection on the patent requests and have loaded those documents into our database. We're in the process of doing doc review now and expect to produce in the next few weeks.

Thanks,
Ben

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8105 | Fax: (206) 757-7105
Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

**From:** Kaiser, Mary <MKaiser@mofo.com>
**Sent:** Thursday, July 9, 2020 9:24 AM
**To:** Byer, Ben <BenByer@dwt.com>
**Cc:** Cross, David D. <DCross@mofo.com>; Maas, David <DavidMaas@dwt.com>
**Subject:** RE: Teradata Corp., et al. v. SAP, et. al., No. 3:18-cv-3670-WHO (N.D. Cal.)

Ben,

Following up on my email below, please let us know today when we can expect a response or when you are available to discuss the subpoena response.

Thanks,
Mary

---

**From:** Kaiser, Mary <MKaiser@mofo.com>
**Date:** Friday, Jul 03, 2020, 12:53 PM
**To:** Byer, Ben <BenByer@dwt.com>
**Cc:** Cross, David D. <DCross@mofo.com>, Maas, David <DavidMaas@dwt.com>
**Subject:** RE: Teradata Corp., et al. v. SAP, et. al., No. 3:18-cv-3670-WHO (N.D. Cal.)

Ben,

We have identified three Microsoft employees who had many communications with SAP during the relevant time period and may potentially have helpful information and/or documents responsive to Teradata's requests. While Microsoft is responsible for determining the right custodians for these requests since we have limited insight into employee responsibilities there, these look like possible leads.

- Arnie Mondloch - Microsoft's SAP Global Partner Alliance Director
- Todd Kemmerly – Miscrosoft's SAP Partner Development Manager
- Jeurgen Thomas – Principal Program Manager for SAP on Azure

Can you please let us know when we can expect to hear from you about what Microsoft is prepared to produce in response to the subpoena and when?

Thanks,
Mary

---

**From:** Kaiser, Mary
**Sent:** Monday, June 29, 2020 8:50 AM
**To:** 'Byer, Ben' <BenByer@dwt.com>
**Cc:** Cross, David D. <DCross@mofo.com>; 'Maas, David' <DavidMaas@dwt.com>
**Subject:** RE: Teradata Corp., et al. v. SAP, et. al., No. 3:18-cv-3670-WHO (N.D. Cal.)

Hi Ben,

Following up on our call last week, Teradata believes that the versions of the Microsoft Named Products that are relevant to Requests 10 and 11 are as follows:

- Microsoft SQL Server 2000
- Microsoft SQL Server 2000 Analysis Services
- Microsoft Commerce Server 2000
- Microsoft Commerce Server 2002

We will follow up with you on the remaining requests this week.

Thanks,
Mary

**From:** Kaiser, Mary
**Sent:** Monday, June 22, 2020 8:56 AM
**To:** 'Maas, David' <DavidMaas@dwt.com>; Cross, David D. <DCross@mofo.com>
**Cc:** Byer, Ben <BenByer@dwt.com>
**Subject:** RE: Teradata Corp., et al. v. SAP, et. al., No. 3:18-cv-3670-WHO (N.D. Cal.)

Hi David,

The Thursday time works for us. Look forward to speaking with you then.

Thanks,
Mary

**From:** Maas, David <DavidMaas@dwt.com>
**Sent:** Sunday, June 21, 2020 8:33 PM
**To:** Kaiser, Mary <MKaiser@mofo.com>; Cross, David D. <DCross@mofo.com>
**Cc:** Byer, Ben <BenByer@dwt.com>
**Subject:** RE: Teradata Corp., et al. v. SAP, et. al., No. 3:18-cv-3670-WHO (N.D. Cal.)

**- External Email -**

Mary and David,

Hope you're having a nice weekend.  Ben and I are available to continue our meet and confer this coming Thursday (6/25) from 8:30-9:15 a.m. PST or Friday (6/26) from 11:30-12:30 PST.  Let us know if either of those times work for you.

Best,

David

**David Maas** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98177
Tel: (206) 757-8184 | Fax: (206) 757-7174
Email: davidmaas@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

**From:** Byer, Ben <BenByer@dwt.com>
**Sent:** Tuesday, June 16, 2020 9:54 AM
**To:** Kaiser, Mary <MKaiser@mofo.com>
**Cc:** Cross, David D. <DCross@mofo.com>; Maas, David <DavidMaas@dwt.com>
**Subject:** RE: Teradata Corp., et al. v. SAP, et. al., No. 3:18-cv-3670-WHO (N.D. Cal.)

Hi Mary,

I'm working with David Maas on this, and looking into dates we're both available.  I hope to be back to you today.

Thanks,
Ben

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8105 | Fax: (206) 757-7105
Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

---

**From:** Kaiser, Mary <MKaiser@mofo.com>
**Sent:** Tuesday, June 16, 2020 8:20 AM
**To:** Byer, Ben <BenByer@dwt.com>
**Cc:** Cross, David D. <DCross@mofo.com>
**Subject:** RE: Teradata Corp., et al. v. SAP, et. al., No. 3:18-cv-3670-WHO (N.D. Cal.)

Hi Ben,

Following up on my email below, please let us know when you are available for a call.

Thanks,
Mary

---

**From:** Kaiser, Mary
**Sent:** Friday, June 12, 2020 9:26 PM
**To:** Byer, Ben <BenByer@dwt.com>
**Cc:** Cross, David D. <DCross@mofo.com>
**Subject:** RE: Teradata Corp., et al. v. SAP, et. al., No. 3:18-cv-3670-WHO (N.D. Cal.)

Hi Ben,

Please let us know your availability for a call to discuss the subpoena and objections on Monday or Tuesday next week.

Thanks,
Mary

---

**From:** Merritt, Lisa <LisaMerritt@dwt.com>
**Sent:** Friday, June 12, 2020 7:22 PM
**To:** Kaiser, Mary <MKaiser@mofo.com>
**Cc:** Byer, Ben <BenByer@dwt.com>
**Subject:** Teradata Corp., et al. v. SAP, et. al., No. 3:18-cv-3670-WHO (N.D. Cal.)

**- External Email -**

---

Dear Ms. Kaiser,

Attached please find Microsoft's objections to the subpoena served by Teradata in this matter.

Best regards,

Lisa

**Lisa Merritt** | Davis Wright Tremaine LLP
Executive Legal Assistant to Stuart Dunwoody, Brendan Mangan, Ben Byer and Rachel Herd
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104-1610
Tel: (206) 757-8490 | Fax: (206) 757-7700
Email: lisamerritt@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

===========================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.

===========================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.

===========================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.

===========================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.

===========================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.

===========================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.

===========================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.

# EXHIBIT 7

| | |
|---|---|
| **From:** | Kaiser, Mary |
| **To:** | Byer, Ben |
| **Cc:** | Cross, David D. |
| **Subject:** | RE: Teradata Subpoena |
| **Date:** | Tuesday, June 2, 2020 2:46:37 PM |

Hi Ben,

We agree to a 1-week extension on objections, which would be until next Friday, June 12. We would be willing to revisit that date if you need more time and will work with us between now and next Friday regarding the scope and timing of a production.

Thanks,
Mary

---

**From:** Byer, Ben <BenByer@dwt.com>
**Sent:** Tuesday, June 2, 2020 12:32 PM
**To:** Kaiser, Mary <MKaiser@mofo.com>
**Cc:** Cross, David D. <DCross@mofo.com>
**Subject:** RE: Teradata Subpoena

**- External Email -**

---

Mary,

Understood.  Thank you.  To confirm, you agree our objections, if any, are due June 22?

Thanks,
Ben

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8105 | Fax: (206) 757-7105
Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

**From:** Kaiser, Mary <MKaiser@mofo.com>
**Sent:** Tuesday, June 2, 2020 7:52 AM
**To:** Byer, Ben <BenByer@dwt.com>
**Cc:** Cross, David D. <DCross@mofo.com>
**Subject:** RE: Teradata Subpoena

Hi Ben,

The subpoena response date is not until June 22, three weeks from yesterday. We think that should give you ample time to consult with your client and let us know if Microsoft intends to make a significant production in response to the subpoena. In the meantime, we are more than happy to discuss the scope or timing of that response. Please let us know if and when that would be fruitful. We're also happy to revisit the deadline as it approaches, should you need more time. We understand these are unusual times and we don't mean to put you or your client in a jam. Let's schedule a call once you've discussed the parameters of a production with your client.

Thanks,
Mary

---

**From:** Byer, Ben <BenByer@dwt.com>
**Sent:** Monday, June 1, 2020 6:23 PM
**To:** Kaiser, Mary <MKaiser@mofo.com>
**Cc:** Cross, David D. <DCross@mofo.com>
**Subject:** RE: Teradata Subpoena

**- External Email -**

---

Mary,

The subpoena response is a few days out and I've just been retained.  I'm not in a position to make any commitments for what we can do here--I haven't even opened up a matter for this on my end.  If you're not willing to grant me a courtesy extension, we can obviously deal with that.  I just don't think that approach helps either of us or our clients.  Please let me know if you're willing to grant us a two week courtesy extension on our response.  If you need to talk, I can but mornings aren't good for me.

Thanks,
Ben

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8105 | Fax: (206) 757-7105
Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

---

**From:** Kaiser, Mary <MKaiser@mofo.com>
**Sent:** Monday, June 1, 2020 3:16 PM
**To:** Byer, Ben <BenByer@dwt.com>
**Cc:** Cross, David D. <DCross@mofo.com>
**Subject:** RE: Teradata Subpoena

Hi Ben,

We are both familiar with part-time teacher and childcare responsibilities right now and understand. In order to agree to an extension, we would need a commitment from you that Microsoft is going to make a reasonable production in response to the subpoena and the extension is intended to work with us to negotiate the scope and timing. If your client is going to object and decline to produce anything, we need to move the process forward now so we can resolve it without delaying the underlying litigation. Please let us know.

Thanks,
Mary

---

**From:** Byer, Ben <BenByer@dwt.com>
**Sent:** Monday, June 1, 2020 4:40 PM
**To:** Kaiser, Mary <MKaiser@mofo.com>
**Cc:** Cross, David D. <DCross@mofo.com>
**Subject:** RE: Teradata Subpoena

- External Email -

Hi Mary,

I'm just looking at this now, that's why I'm asking for the extension. Mornings are hard for me—I play part-time teacher for my kids these days. What information do you need from me?

Thanks,
ben

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98101
Tel: (206) 757-8105 | Fax: (206) 757-7105
Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

**From:** Kaiser, Mary <MKaiser@mofo.com>
**Sent:** Monday, June 1, 2020 1:37 PM
**To:** Byer, Ben <BenByer@dwt.com>
**Cc:** Cross, David D. <DCross@mofo.com>
**Subject:** RE: Teradata Subpoena

Hi Ben,

We would like to get some information from you before we agree to an extension. We are both tied up this evening. Could we try for tomorrow as early in the day as possible?

Thanks,
Mary

**From:** Byer, Ben <BenByer@dwt.com>
**Sent:** Monday, June 1, 2020 4:06 PM
**To:** Kaiser, Mary <MKaiser@mofo.com>
**Cc:** Cross, David D. <DCross@mofo.com>
**Subject:** RE: Teradata Subpoena

- External Email -

Hi Mary,

How's 4pm Pacific today? In the meantime, can you please confirm whether you can agree to a 2 week extension?

Thanks,
Ben

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98101
Tel: (206) 757-8105 | Fax: (206) 757-7105
Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

**From:** Kaiser, Mary <MKaiser@mofo.com>

**Sent:** Monday, June 1, 2020 12:49 PM
**To:** Byer, Ben <BenByer@dwt.com>
**Cc:** Cross, David D. <DCross@mofo.com>
**Subject:** RE: Teradata Subpoena

Hi Ben,

Following up on my email below, please let us know if there is a good time this afternoon or tomorrow to discuss the Teradata subpoena.

Thanks,
Mary

---

**From:** Kaiser, Mary
**Sent:** Friday, May 29, 2020 8:17 PM
**To:** 'benbyer@dwt.com' <benbyer@dwt.com>
**Cc:** Cross, David D. <DCross@mofo.com>
**Subject:** Teradata Subpoena

Hi Ben,

I'm sorry I missed your call this afternoon. Are you available for a call on Monday? I'm free before 1:00 ET and between 2:30 and 5:00.

Thanks,
Mary

========================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.

========================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.

========================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.

========================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.

# EXHIBIT 8

| **From:** | Byer, Ben |
| **To:** | Grothouse, David E.; Maas, David |
| **Cc:** | Cross, David D.; Diana Siri Breaux; Conaway, Jenna B. |
| **Subject:** | RE: Teradata subpoena to Microsoft - Update |
| **Date:** | Friday, October 30, 2020 7:11:41 PM |

<mark>**External Email**</mark>

Dave,

We'll circle back on the remaining issues soon, but wanted to first let you know that we do not have any objection to these experts.

Thanks,
Ben

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8105 | Fax: (206) 757-7105
Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

**From:** Grothouse, David E. <DGrothouse@mofo.com>
**Sent:** Saturday, October 24, 2020 1:16 PM
**To:** Maas, David <DavidMaas@dwt.com>; Byer, Ben <BenByer@dwt.com>
**Cc:** Cross, David D. <DCross@mofo.com>; Diana Siri Breaux <dianab@SummitLaw.com>; Conaway, Jenna B. <JConaway@mofo.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

David,

We are awaiting a response from SAP on whether they will join as a party to the proposed PO in the Western District of Washington based on the version we sent.

We confirm that Professor Asker has not had any engagements that involve Microsoft, inclusive of the circumstances you describe below.

Can Microsoft please confirm that they have no objections to Asker or the other experts for which we sent disclosure materials over two weeks ago?

Thanks,

Dave

**From:** Maas, David <DavidMaas@dwt.com>
**Sent:** Wednesday, October 21, 2020 6:56 PM
**To:** Grothouse, David E. <DGrothouse@mofo.com>; Byer, Ben <BenByer@dwt.com>
**Cc:** Cross, David D. <DCross@mofo.com>; Diana Siri Breaux <dianab@SummitLaw.com>; Conaway, Jenna B. <JConaway@mofo.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

**External Email**

---

Dave,

Can you confirm whether SAP would agree to be a party to the proposed PO in the Western District of Washington and has agreed to entry of the version you sent?

One additional clarification regarding one of your experts: you said John Asker hasn't had engagements for Microsoft, but what we want to know is whether he had engagements that involve Microsoft (which would include, for instance, an engagement for a competitor of Microsoft about competition with Microsoft).

Best,

David

**David Maas** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98177
Tel: (206) 757-8184 | Fax: (206) 757-7174
Email: davidmaas@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

**From:** Grothouse, David E. <DGrothouse@mofo.com>
**Sent:** Wednesday, October 21, 2020 3:20 PM
**To:** Byer, Ben <BenByer@dwt.com>
**Cc:** Cross, David D. <DCross@mofo.com>; Maas, David <DavidMaas@dwt.com>; Diana Siri Breaux <dianab@SummitLaw.com>; Conaway, Jenna B. <JConaway@mofo.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

**[EXTERNAL]**

---

Ben,

I'm following up on the below.  Please let us know if you agree to filing a protective order in WDWA and if you agree to the draft we sent on Monday.  Separately, please let us know if Microsoft has any objections to the existing experts based on the disclosure materials we sent.

Thanks,

Dave

**From:** Grothouse, David E.
**Sent:** Monday, October 19, 2020 4:13 PM
**To:** 'Byer, Ben' <BenByer@dwt.com>
**Cc:** Cross, David D. <DCross@mofo.com>; 'Maas, David' <DavidMaas@dwt.com>; 'Diana Siri Breaux' <dianab@SummitLaw.com>; Conaway, Jenna B. <JConaway@mofo.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

Ben,

We understand that Microsoft is delaying the production it represented to the Court would be made on September 28th until an amended protective order is in place.  In an effort to move this along, we'd like to file a protective order in the Western District of Washington that applies to any production Microsoft makes in this matter.

Our understanding is that the only open issue concerns expert disclosure.  You indicated on October 1st that you would think about the issue of disclosure to expert staff.  We've included provisions that addresses this.  Note that one of these provisions already was adopted in the underlying case with SAP but it was added after the PO was first adopted and we neglected to include it in the version we sent earlier. My apologies for that.  It was added at the end of section 7.4(c).  We've added the same provision at the end the new section 7.6(c) in the attached so that it covers the new non-party designation.  Both are in track changes in the attached redline against the version we sent you on 9/23.

It's important that staff who are needed to support experts have access to confidential materials without disclosing every staff member and awaiting approval. We've never seen that required in a PO and it would be unworkable.

Separately, can you please let us know this week if you have any objections to the existing experts after our follow-up on Friday?

Lastly, there was an additional provision inadvertently omitted from the prior PO we sent you that was adopted in the underlying case with SAP (also added after the PO was first adopted). That's noted in track changes in the attachment as paragraph 8(f).

Thanks,

Dave

---

**From:** Grothouse, David E.
**Sent:** Friday, October 16, 2020 3:26 PM
**To:** 'Byer, Ben' <BenByer@dwt.com>
**Cc:** Cross, David D. <DCross@mofo.com>; Maas, David <DavidMaas@dwt.com>; Diana Siri Breaux <dianab@SummitLaw.com>; Conaway, Jenna B. <JConaway@mofo.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

Ben,

We confirmed with Professor Asker that none of his consulting engagements have been with Microsoft or any company selling database or ERP applications.

Pinto's engagement with Tyler Technologies has concerned assessments of the viability of outsourcing certain aspects of product development (e.g., testing) to offshore-based consultants.

Let us know if you have any further questions,

Dave

---

**From:** Byer, Ben <BenByer@dwt.com>

**Sent:** Friday, October 16, 2020 2:22 PM
**To:** Grothouse, David E. <DGrothouse@mofo.com>
**Cc:** Cross, David D. <DCross@mofo.com>; Maas, David <DavidMaas@dwt.com>; Diana Siri Breaux
<dianab@SummitLaw.com>; Conaway, Jenna B. <JConaway@mofo.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

<mark>**External Email**</mark>

---

Dave,

Thanks for sending this.  A couple follow-up questions.

John Asker's consulting list doesn't have enough information for us to determine whether any of those
engagements relates to a company that offers database or ERP applications.  Can you please confirm whether
any of Mr. Asker's consulting is for a company selling database or ERP applications?  Can you please also confirm
whether any of Mr. Asker's consulting matters involved Microsoft?

Paul Pinto's CV and list of consulting engagements states that he provides ongoing consulting services to Tyler
Technologies, Inc., which has a large portfolio of software.  Can you please provide a description of the nature of
Mr. Pinto's consulting services for Tyler Technologies, including the products and divisions that Mr. Pinto
consults with.

Thanks,
Ben

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8105 | Fax: (206) 757-7105
Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

---

**From:** Grothouse, David E. <DGrothouse@mofo.com>
**Sent:** Wednesday, October 7, 2020 1:02 PM
**To:** Byer, Ben <BenByer@dwt.com>
**Cc:** Cross, David D. <DCross@mofo.com>; Maas, David <DavidMaas@dwt.com>; Diana Siri Breaux
<dianab@SummitLaw.com>; Conaway, Jenna B. <JConaway@mofo.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

Ben,

See attached updated disclosure materials for Jagadish and Thomas.  For Jagadish, the last two pages contain his
consulting and litigation experience.  Thomas's litigation experience is included at the end of his CV, with the
consulting matters in a separate document.

Let me know if you have any questions.

Dave

---

**From:** Byer, Ben <BenByer@dwt.com>

**Sent:** Tuesday, October 6, 2020 12:39 PM
**To:** Grothouse, David E. <DGrothouse@mofo.com>
**Cc:** Cross, David D. <DCross@mofo.com>; Maas, David <DavidMaas@dwt.com>; Diana Siri Breaux <dianab@SummitLaw.com>; Conaway, Jenna B. <JConaway@mofo.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

**External Email**

---

Dave,

Great; thank you for clarifying.  Please let us know when you've heard back from Thomas and Jagadish, even if it's just to confirm they have no further updates.

Thanks,
Ben

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8105 | Fax: (206) 757-7105
Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

**From:** Grothouse, David E. <DGrothouse@mofo.com>
**Sent:** Tuesday, October 6, 2020 9:37 AM
**To:** Byer, Ben <BenByer@dwt.com>
**Cc:** Cross, David D. <DCross@mofo.com>; Maas, David <DavidMaas@dwt.com>; Diana Siri Breaux <dianab@SummitLaw.com>; Conaway, Jenna B. <JConaway@mofo.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

Ben,

The materials I sent already separate litigation work from consulting work, the latter encompassing each place from which the experts have received compensation or funding that is not contained in the litigation work details.  That is why the materials sent separated consulting work from the litigation work.

For Asker, Pinto, and Thomas, each of these consulting lists are contained in clearly labeled separate files already sent.  I reattach them here for convenience.

For Jagadish, the precise question is answered on pg. 27 of the file with his name.  I've reattached and highlighted.

As noted below, we are checking with Thomas and Jagadish to make sure they have no further updates.

Dave

**From:** Byer, Ben <BenByer@dwt.com>
**Sent:** Tuesday, October 6, 2020 12:19 PM
**To:** Grothouse, David E. <DGrothouse@mofo.com>
**Cc:** Cross, David D. <DCross@mofo.com>; Maas, David <DavidMaas@dwt.com>; Diana Siri Breaux

<dianab@SummitLaw.com>; Conaway, Jenna B. <JConaway@mofo.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

**External Email**

---

Dave,

Item 4 is broader than litigation work.  To ensure we understand each place from which your proposed exerts have received compensation or funding, can you provide Item 4 as a standalone list for each expert or expressly highlight it in yellow in the materials you sent?

Thanks,
Ben

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8105 | Fax: (206) 757-7105
Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

---

**From:** Grothouse, David E. <DGrothouse@mofo.com>
**Sent:** Monday, October 5, 2020 5:30 PM
**To:** Byer, Ben <BenByer@dwt.com>
**Cc:** Cross, David D. <DCross@mofo.com>; Maas, David <DavidMaas@dwt.com>; Diana Siri Breaux <dianab@SummitLaw.com>; Conaway, Jenna B. <JConaway@mofo.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

Ben,

Those materials would be in the list of litigation cases (overlapping with item 5), and the "consulting" details.  For Asker and Pinto, I'm reattaching the individual files that contain that information.  For Thomas, I reattach the consulting matters file, and note that litigation matters for which Thomas has provided testimony are provided on the last 13 pages of his CV (also attached).  For Jagadish, that information is contained on the last two pages of the other file attached here.

As noted below, we are confirming with Thomas and Jagadish whether any further update is needed to their consulting matters.

Dave

---

**From:** Byer, Ben <BenByer@dwt.com>
**Sent:** Monday, October 5, 2020 8:18 PM
**To:** Grothouse, David E. <DGrothouse@mofo.com>
**Cc:** Cross, David D. <DCross@mofo.com>; Maas, David <DavidMaas@dwt.com>; Diana Siri Breaux <dianab@SummitLaw.com>; Conaway, Jenna B. <JConaway@mofo.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

**External Email**

Dave,

Thank you.  We'll await your confirmation.  In the meantime, where do these materials reflect item 4 (each person or entity from whom the Expert has received compensation or funding for work in his or her areas of expertise or to whom the expert has provided professional services, including in connection with a litigation, at any time during the preceding five years)?

Thank you,
Ben

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8105 | Fax: (206) 757-7105
Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

**From:** Grothouse, David E. <DGrothouse@mofo.com>
**Sent:** Monday, October 5, 2020 4:19 PM
**To:** Byer, Ben <BenByer@dwt.com>
**Cc:** Cross, David D. <DCross@mofo.com>; Maas, David <DavidMaas@dwt.com>; Diana Siri Breaux <dianab@SummitLaw.com>; Conaway, Jenna B. <JConaway@mofo.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

Ben,

The materials we sent were those sent to SAP for expert disclosure purposes.  To ensure the materials are up to date and contain the information requested, we asked each expert to update their materials since disclosure to SAP.  Attached are the updated materials.  Note that we are still awaiting confirmation from V. Thomas and H.V. Jagadish on whether they have any updates to their consulting engagements since their disclosure to SAP.   We will let you know as soon as we hear back.

Furthermore, for convenience and to ensure you have all of the information requested, see below a list of the city and state of the primary residence of each expert.

1) John Asker:  Los Angeles, CA
2) Paul C. Pinto:  Alpharetta, GA
3) Vincent A. Thomas:  Chicago, IL
4) Hosagrahar Visvesvaraya Jagadish:  Ann Arbor, MI

Please let us know if you have any questions,

Dave

**From:** Byer, Ben <BenByer@dwt.com>
**Sent:** Monday, October 5, 2020 4:20 PM
**To:** Grothouse, David E. <DGrothouse@mofo.com>
**Cc:** Cross, David D. <DCross@mofo.com>; Maas, David <DavidMaas@dwt.com>; Diana Siri Breaux

<dianab@SummitLaw.com>; Conaway, Jenna B. <JConaway@mofo.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

**External Email**

---

Dave,

I'm happy to check whether Microsoft would be willing to pre-vet these experts, but it would not be pursuant to a protective order as we do not yet have one in place. In order to speed this process, can you please confirm the information you sent: (1) sets forth the full name of the Expert and the city and state of his or her primary residence, (2) attaches a copy of the Expert's current resume, (3) identifies the Expert's current employer(s), (4) identifies each person or entity from whom the Expert has received compensation or funding for work in his or her areas of expertise or to whom the expert has provided professional services, including in connection with a litigation, at any time during the preceding five years, and (5) identifies (by name and number of the case, filing date, and location of court) any litigation in connection with which the Expert has offered expert testimony, including through a declaration, report, or testimony at a deposition or trial, during the preceding five years. If the Expert believes any of this information is subject to a confidentiality obligation to a third-party, then the Expert should provide whatever information the Expert believes can be disclosed without violating any confidentiality agreements, and the Party seeking to disclose the information to the Expert shall be available to meet and confer with the Designating Non-Party regarding any such engagement.

Thanks,
Ben

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8105 | Fax: (206) 757-7105
Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

**From:** Grothouse, David E. <DGrothouse@mofo.com>
**Sent:** Thursday, October 1, 2020 5:45 PM
**To:** Byer, Ben <BenByer@dwt.com>
**Cc:** Cross, David D. <DCross@mofo.com>; Maas, David <DavidMaas@dwt.com>; Diana Siri Breaux <dianab@SummitLaw.com>; Conaway, Jenna B. <JConaway@mofo.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

Ben,

Pursuant to Paragraph 7.6 of the draft amended Protective Order, see attached materials for the following (existing) experts to whom we may disclose materials Microsoft identifies as "RESTRICTED CONFIDENTIAL – OUTSIDE COUNSEL ONLY" or any less-restrictive confidentiality designation.

1) John Asker
2) Paul Pinto
3) Vincent Thomas
4) H.V. Jagadish (we don't presently anticipate sharing confidential Microsoft materials with him but are disclosing him now just in case)

Please let us know if you object to disclosure to any of these experts and their supporting staff. We understand Microsoft has not designated as confidential any documents it has produced, or is in the process of producing, in response to the patent-related requests in our pending subpoena.

Thanks,

Dave

---

**From:** Byer, Ben <BenByer@dwt.com>
**Sent:** Thursday, October 1, 2020 1:24 PM
**To:** Cross, David D. <DCross@mofo.com>; Grothouse, David E. <DGrothouse@mofo.com>
**Cc:** Maas, David <DavidMaas@dwt.com>; Diana Siri Breaux <dianab@SummitLaw.com>; Conaway, Jenna B. <JConaway@mofo.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

**External Email**

---

That might work for existing experts.  I also worry about opening it up to support staff without a description of who support staff can be.  I think we'd all agree it shouldn't be folks like current or former employees of competitors, but we'd need a way to pin that down.  And with support staff, were you envisioning any limits on how many?  Again, the idea here is to restrict access to this material.  I'm open to suggestions.  In the meantime, we're chewing on this to see what we can come up with.

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8105 | Fax: (206) 757-7105
Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

---

**From:** Cross, David D. <DCross@mofo.com>
**Sent:** Thursday, October 1, 2020 10:03 AM
**To:** Byer, Ben <BenByer@dwt.com>; Grothouse, David E. <DGrothouse@mofo.com>
**Cc:** Maas, David <DavidMaas@dwt.com>; Diana Siri Breaux <dianab@SummitLaw.com>; Conaway, Jenna B. <JConaway@mofo.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

Btw, one way we might resolve the expert issue is to disclose them now and ensure there's no objection to existing experts. Then the limit would apply only to new experts, which means we likely could reduce that limit. But I need to discuss with SAP too.

---

**From:** Byer, Ben <BenByer@dwt.com>
**Date:** Thursday, Oct 01, 2020, 12:40 PM
**To:** Cross, David D. <DCross@mofo.com>, Grothouse, David E. <DGrothouse@mofo.com>
**Cc:** Maas, David <DavidMaas@dwt.com>, Diana Siri Breaux <dianab@SummitLaw.com>, Conaway, Jenna B. <JConaway@mofo.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

**External Email**

---

David,

We're looking at the other issue now.  But that's a more complex question and I don't expect to have a response today.  We'll do our best to get back to you asap though.

Thanks,
Ben

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8105 | Fax: (206) 757-7105
Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

---

**From:** Cross, David D. <DCross@mofo.com>
**Sent:** Thursday, October 1, 2020 9:38 AM
**To:** Byer, Ben <BenByer@dwt.com>; Grothouse, David E. <DGrothouse@mofo.com>
**Cc:** Maas, David <DavidMaas@dwt.com>; Diana Siri Breaux <dianab@SummitLaw.com>; Conaway, Jenna B. <JConaway@mofo.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

Thanks. Please let me know about the other issues today if possible. Trying to wrap up the PO.

---

**From:** Byer, Ben <BenByer@dwt.com>
**Date:** Thursday, Oct 01, 2020, 12:36 PM
**To:** Cross, David D. <DCross@mofo.com>, Grothouse, David E. <DGrothouse@mofo.com>
**Cc:** Maas, David <DavidMaas@dwt.com>, Diana Siri Breaux <dianab@SummitLaw.com>, Conaway, Jenna B. <JConaway@mofo.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

**External Email**

---

Yes, I was referring to both.

Thanks,
Ben

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8105 | Fax: (206) 757-7105
Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

---

**From:** Cross, David D. <DCross@mofo.com>
**Sent:** Thursday, October 1, 2020 9:13 AM

**To:** Byer, Ben <BenByer@dwt.com>; Grothouse, David E. <DGrothouse@mofo.com>
**Cc:** Maas, David <DavidMaas@dwt.com>; Diana Siri Breaux <dianab@SummitLaw.com>; Conaway, Jenna B. <JConaway@mofo.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

By previous productions, do you mean the boxes being scanned and the small production of press releases we received? Just want to confirm we're talking about the same thing.

Thanks.

---

**From:** Byer, Ben <BenByer@dwt.com>
**Date:** Thursday, Oct 01, 2020, 12:04 PM
**To:** Cross, David D. <DCross@mofo.com>, Grothouse, David E. <DGrothouse@mofo.com>
**Cc:** Maas, David <DavidMaas@dwt.com>, Diana Siri Breaux <dianab@SummitLaw.com>, Conaway, Jenna B. <JConaway@mofo.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

**External Email**

---

David,

Confirmed---the previous productions do not carry an OCO designation.  As a result, the provisions of section 7.5 in the current draft of the PO would not apply to those productions.

Thanks,
Ben

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8105 | Fax: (206) 757-7105
Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

---

**From:** Cross, David D. <DCross@mofo.com>
**Sent:** Thursday, October 1, 2020 7:11 AM
**To:** Byer, Ben <BenByer@dwt.com>; Grothouse, David E. <DGrothouse@mofo.com>
**Cc:** Maas, David <DavidMaas@dwt.com>; Diana Siri Breaux <dianab@SummitLaw.com>; Conaway, Jenna B. <JConaway@mofo.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

Also, can you please confirm that the documents you're producing in response to the parent requests aren't designated OCO or any other level of confidentiality that would restrict access by our experts? We understood this to be the case from prior discussion with you, and that's why we agreed to the limit we agreed to. If that's not the case, then we'd need to revisit the limit. If the confidentiality issue re expert access only implicates our experts for the antitrust claims, then we're okay on the limit, noting SAP's request for six instead of four.

**From:** Cross, David D. <DCross@mofo.com>
**Date:** Thursday, Oct 01, 2020, 10:06 AM
**To:** Byer, Ben <BenByer@dwt.com>, Grothouse, David E. <DGrothouse@mofo.com>
**Cc:** Maas, David <DavidMaas@dwt.com>, Diana Siri Breaux <dianab@SummitLaw.com>, Conaway, Jenna B.
<JConaway@mofo.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

Ben -

Would you agree to a limit of six experts instead of four? SAP is requesting that. And again, each expert within that limit would include his or her support staff, ie a single testifying expert would constitute one expert within the limit even though his or her staff also would have access.

They also have expressed a concern about your ability to object to disclosure to experts who've been retained already and working on this case for a while. What if we each disclose those now and confirm there's no issue as to them before we file the PO?

Thanks.
DC

**From:** Byer, Ben <BenByer@dwt.com>
**Date:** Tuesday, Sep 29, 2020, 6:57 PM
**To:** Cross, David D. <DCross@mofo.com>, Grothouse, David E. <DGrothouse@mofo.com>
**Cc:** Maas, David <DavidMaas@dwt.com>, Diana Siri Breaux <dianab@SummitLaw.com>, Conaway, Jenna B.
<JConaway@mofo.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

<mark>**External Email**</mark>

Correct.  We also have an update on the scans--the vendor is about halfway through and discovered that it had underestimated volume.  It may be $1,500-$2,000 more than we initially estimated.

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8105 | Fax: (206) 757-7105
Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

**From:** Cross, David D. <DCross@mofo.com>
**Sent:** Tuesday, September 29, 2020 11:19 AM
**To:** Byer, Ben <BenByer@dwt.com>; Grothouse, David E. <DGrothouse@mofo.com>
**Cc:** Maas, David <DavidMaas@dwt.com>; Diana Siri Breaux <dianab@SummitLaw.com>; Conaway, Jenna B.
<JConaway@mofo.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

So all other documents you're producing are designated OCO?

**From:** Byer, Ben <BenByer@dwt.com>
**Date:** Tuesday, Sep 29, 2020, 2:17 PM

**To:** Cross, David D. <DCross@mofo.com>, Grothouse, David E. <DGrothouse@mofo.com>
**Cc:** Maas, David <DavidMaas@dwt.com>, Diana Siri Breaux <dianab@SummitLaw.com>, Conaway, Jenna B. <JConaway@mofo.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

**External Email**

---

David,

The patent docs are not OCO. Those are being scanned by our vendor now.

Thanks,
Ben

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8105 | Fax: (206) 757-7105
Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

**From:** Cross, David D. <DCross@mofo.com>
**Sent:** Tuesday, September 29, 2020 9:46 AM
**To:** Byer, Ben <BenByer@dwt.com>; Grothouse, David E. <DGrothouse@mofo.com>
**Cc:** Maas, David <DavidMaas@dwt.com>; Diana Siri Breaux <dianab@SummitLaw.com>; Conaway, Jenna B. <JConaway@mofo.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

We're still dealing with SAP on that. Presumably much of the production is not OCO. Can we get that now?

---

**From:** Byer, Ben <BenByer@dwt.com>
**Date:** Tuesday, Sep 29, 2020, 12:31 PM
**To:** Cross, David D. <DCross@mofo.com>, Grothouse, David E. <DGrothouse@mofo.com>
**Cc:** Maas, David <DavidMaas@dwt.com>, Diana Siri Breaux <dianab@SummitLaw.com>, Conaway, Jenna B. <JConaway@mofo.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

**External Email**

---

David,

Yes, production is ready. Can you please confirm when the court enters the protective order?

Thanks,
Ben

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8105 | Fax: (206) 757-7105
Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

---

**From:** Cross, David D. <DCross@mofo.com>
**Sent:** Monday, September 28, 2020 5:15 PM
**To:** Byer, Ben <BenByer@dwt.com>; Grothouse, David E. <DGrothouse@mofo.com>
**Cc:** Maas, David <DavidMaas@dwt.com>; Diana Siri Breaux <dianab@SummitLaw.com>; Conaway, Jenna B. <JConaway@mofo.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

Hi Ben –

Are we still receiving Microsoft's production today, per your court filing in WA?

Thanks,
DC

---

**From:** Byer, Ben <BenByer@dwt.com>
**Sent:** Friday, September 25, 2020 3:23 PM
**To:** Cross, David D. <DCross@mofo.com>; Grothouse, David E. <DGrothouse@mofo.com>
**Cc:** Maas, David <DavidMaas@dwt.com>; Diana Siri Breaux <dianab@SummitLaw.com>; Conaway, Jenna B. <JConaway@mofo.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

<mark>**External Email**</mark>

---

David,

Yes, that would work.

Thanks,
Ben

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8105 | Fax: (206) 757-7105
Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

---

**From:** Cross, David D. <DCross@mofo.com>
**Sent:** Thursday, September 24, 2020 4:10 PM
**To:** Byer, Ben <BenByer@dwt.com>; Grothouse, David E. <DGrothouse@mofo.com>
**Cc:** Maas, David <DavidMaas@dwt.com>; Diana Siri Breaux <dianab@SummitLaw.com>; Conaway, Jenna B. <JConaway@mofo.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

Ben –

Please let us know if the attached version is acceptable. If so, we'll follow up with SAP.

Thanks,
DC

---

**From:** Byer, Ben <BenByer@dwt.com>
**Sent:** Wednesday, September 23, 2020 3:12 PM
**To:** Cross, David D. <DCross@mofo.com>; Grothouse, David E. <DGrothouse@mofo.com>
**Cc:** Maas, David <DavidMaas@dwt.com>; Diana Siri Breaux <dianab@SummitLaw.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

**External Email**

---

David,

Yes, we could agree to 4.

Thanks,
Ben

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8105 | Fax: (206) 757-7105
Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

**From:** Cross, David D. <DCross@mofo.com>
**Sent:** Wednesday, September 23, 2020 9:20 AM
**To:** Byer, Ben <BenByer@dwt.com>; Grothouse, David E. <DGrothouse@mofo.com>
**Cc:** Maas, David <DavidMaas@dwt.com>; Diana Siri Breaux <dianab@SummitLaw.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

Ben -

Thanks for the information about the designation for patent information. Since we don't yet have that, we didn't know that.

I can't answer your question without seeing the documents and what you designate as OCO. It ultimately might not be more than 2-3 experts (if you don't designate any patent-related documents as OCO), but fact discovery is still developing and final expert reports, including rebuttal experts, are not due for a some time. For example, SAP could come in later with experts who require us to retain an additional expert or two to serve as rebuttal experts. This is not uncommon in antitrust cases. So we can't be certain at this stage that we'll never need more than two experts to access one or more MS documents designated OCO. I doubt it will be more than 3-4 experts (including their staff), if you don't designate any patent-related documents as OCO. As a compromise, I could discuss with our team and the client about whether we could live with a limit of four (with the right to expand that limit if needed). Would that resolve your concern?

I appreciate MS doesn't want access by an unlimited number of experts, but two is too few and MS retains the right to object to any specific expert.

Thanks.
DC

---

**From:** Byer, Ben <BenByer@dwt.com>
**Date:** Wednesday, Sep 23, 2020, 11:09 AM
**To:** Cross, David D. <DCross@mofo.com>, Grothouse, David E. <DGrothouse@mofo.com>
**Cc:** Maas, David <DavidMaas@dwt.com>, Diana Siri Breaux <dianab@SummitLaw.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

<mark>**External Email**</mark>

---

David,

We did not designate the information we produced in response to the patent requests as outside counsel only. How many experts do you have that would need access to the extremely sensitive information we have collected in response to Teradata's antitrust requests?

Thanks,
Ben

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8105 | Fax: (206) 757-7105
Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

**From:** Cross, David D. <DCross@mofo.com>
**Sent:** Tuesday, September 22, 2020 5:42 PM
**To:** Byer, Ben <BenByer@dwt.com>; Grothouse, David E. <DGrothouse@mofo.com>
**Cc:** Maas, David <DavidMaas@dwt.com>; Diana Siri Breaux <dianab@SummitLaw.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

Ben -

Thanks for getting back to us. The change re a hearing or trial is okay. We'll check with SAP too.

The change re experts is not agreeable. We can't agree to an arbitrary limit on our experts' access to highly relevant information, especially without seeing the documents. I also don't see a need for this limit since you have a right to object to disclosure to any expert we disclose. So if there's a legitimate confidentiality concern with any of our experts, you'll have an opportunity to bar disclosure to them. Candidly, I think this is an issue we'd have to take to the Court because it would impair our ability to adequately represent Teradata. If you have any cases you can direct us to where a court imposed such a limit over the objection of a party, we'll take a look at them. I've not seen such a limit before. Please let us know your final position on this.

Thanks.
DC

**From:** Byer, Ben <BenByer@dwt.com>
**Date:** Tuesday, Sep 22, 2020, 7:10 PM
**To:** Grothouse, David E. <DGrothouse@mofo.com>, Cross, David D. <DCross@mofo.com>
**Cc:** Maas, David <DavidMaas@dwt.com>, Diana Siri Breaux <dianab@SummitLaw.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

**External Email**

Dave,

I have a request in to scan the hard copy materials, and just asked for an eta. I'll circle back on that when I have it. I'm attaching our remaining comments on the PO. I think we're down to just two issues. We're still on track for the 28th.

Thanks,
Ben

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8105 | Fax: (206) 757-7105
Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

**From:** Grothouse, David E. <DGrothouse@mofo.com>
**Sent:** Tuesday, September 22, 2020 2:30 PM
**To:** Byer, Ben <BenByer@dwt.com>; Cross, David D. <DCross@mofo.com>
**Cc:** Maas, David <DavidMaas@dwt.com>; Diana Siri Breaux <dianab@SummitLaw.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

Ben,

Following up on my note below, please provide us with the timing of the electronic production of the 2.5 boxes.

In addition, we have not heard back from you on the amended protective order. Please let us know as soon as possible if you have any further issues with the amended version I sent on 9/18, as we are trying to finalize with SAP.

Finally, please confirm that Microsoft will make the promised productions in response to our antitrust requests on September 28th.

Thanks,

Dave

**From:** Grothouse, David E.
**Sent:** Monday, September 21, 2020 1:31 PM
**To:** 'Byer, Ben' <BenByer@dwt.com>; Cross, David D. <DCross@mofo.com>
**Cc:** Maas, David <DavidMaas@dwt.com>; Diana Siri Breaux <dianab@SummitLaw.com>

**Subject:** RE: Teradata subpoena to Microsoft - Update

Ben,

Please scan and produce electronic copies of the hard copy materials discussed below.  We agree to pay the expense indicated below.

Thanks,

Dave

**From:** Byer, Ben <BenByer@dwt.com>
**Sent:** Tuesday, September 15, 2020 7:54 PM
**To:** Cross, David D. <DCross@mofo.com>
**Cc:** Maas, David <DavidMaas@dwt.com>; Diana Siri Breaux <dianab@SummitLaw.com>; Grothouse, David E. <DGrothouse@mofo.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

<mark>**External Email**</mark>

David,

It will cost about $3,000 to scan and produce electronically the hard copy materials.  Please let us know if this works for you and we'll do so.  In addition, we have documents responsive to the antitrust requests ready for production once we get the new PO in place.  Do you have an updated draft of that ready for our review?

Thanks,
Ben

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8105 | Fax: (206) 757-7105
Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

**From:** Cross, David D. <DCross@mofo.com>
**Sent:** Friday, September 11, 2020 12:50 PM
**To:** Byer, Ben <BenByer@dwt.com>
**Cc:** Maas, David <DavidMaas@dwt.com>; Diana Siri Breaux <dianab@SummitLaw.com>; Grothouse, David E. <DGrothouse@mofo.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

Thanks, Ben.

**From:** Byer, Ben <BenByer@dwt.com>
**Date:** Friday, Sep 11, 2020, 3:48 PM
**To:** Cross, David D. <DCross@mofo.com>

**Cc:** Maas, David <DavidMaas@dwt.com>, Diana Siri Breaux <dianab@SummitLaw.com>, Grothouse, David E.
<DGrothouse@mofo.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

**External Email**

Hi David,

The materials describe the technical operation of the products you identified for the patent requests.  They're
not press releases.  I have a request in for a cost estimate and will circle back when I have an answer.

Thanks,
Ben

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8105 | Fax: (206) 757-7105
Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

**From:** Cross, David D. <DCross@mofo.com>
**Sent:** Thursday, September 10, 2020 6:14 PM
**To:** Byer, Ben <BenByer@dwt.com>
**Cc:** Maas, David <DavidMaas@dwt.com>; Diana Siri Breaux <dianab@SummitLaw.com>; Grothouse, David E.
<DGrothouse@mofo.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

When can we get an answer to this?

Thanks.

**From:** Cross, David D. <DCross@mofo.com>
**Date:** Thursday, Sep 10, 2020, 1:00 AM
**To:** Byer, Ben <BenByer@dwt.com>
**Cc:** Maas, David <DavidMaas@dwt.com>, Diana Siri Breaux <dianab@SummitLaw.com>, Grothouse, David E.
<DGrothouse@mofo.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

I don't understand why it took weeks to respond to this, but what's the estimated cost? And please give us a
description of what's in the boxes. If they're full of public press releases from decades ago like the one
production you sent us so far, then I imagine we'll pass. We can't decide whether they're worth the copying cost
without knowing what they are and what the cost likely will be – and we can't inspect them in your offices in the
current health environment. Alternatively, perhaps you could deliver them to Diana to inspect and copy at a
location she feels is safe.

**From:** Byer, Ben <BenByer@dwt.com>
**Sent:** Thursday, September 10, 2020 12:56 AM
**To:** Cross, David D. <DCross@mofo.com>

**Cc:** Maas, David <DavidMaas@dwt.com>; Diana Siri Breaux <dianab@SummitLaw.com>; Grothouse, David E. <DGrothouse@mofo.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

**External Email**

---

David,

As I explained on August 7, this was hardcopy material not available in electronic form.  Our previous offer still stands—we'll scan and send you an electronic copy so long as you'll agree to cover the expense of doing so.

Thanks,
Ben

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8105 | Fax: (206) 757-7105
Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

---

**From:** Cross, David D. <DCross@mofo.com>
**Sent:** Tuesday, September 8, 2020 7:16 PM
**To:** Byer, Ben <BenByer@dwt.com>
**Cc:** Maas, David <DavidMaas@dwt.com>; Diana Siri Breaux <dianab@SummitLaw.com>; Grothouse, David E. <DGrothouse@mofo.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

Ben –

Why haven't you produced to us copies of the 2.5 boxes you mentioned below a month ago as I requested on August 19? I never saw a response to that email. As I explained, it's not reasonable to insist on inspection at your offices given the pandemic, and it's not a small volume of boxes. Can you please produce copies by the end of this week?

I understand you and Diana have discussed other aspects of your production. For this email, I'm just focusing on this one issue since it seems simple to resolve.

Thanks,
DC

---

**From:** Byer, Ben <BenByer@dwt.com>
**Sent:** Friday, August 7, 2020 8:10 PM
**To:** Kaiser, Mary <MKaiser@mofo.com>; Cross, David D. <DCross@mofo.com>
**Cc:** Maas, David <DavidMaas@dwt.com>
**Subject:** Teradata subpoena to Microsoft - Update

**External Email**

David and Mary,

A few updates on Microsoft's response to the subpoena.  We have identified both electronic and physical documents we're ready to produce in response to requests 10-11.  The electronic documents are being processed by our vender now and will be ready in the next couple days.  Given the age of the material those requests seek, much of what we have located exists only in hardcopy.  We have located about two and half banker's boxes of books.  Those are available for your inspection at DWT's Seattle office.  Alternatively, please let us know if you'd prefer we process and produce (at Teradata's expense) this material electronically.

With respect to the antitrust requests, you still have not responded to our questions regarding any efforts to obtain material from SAP.  We therefore cannot agree to search for and produce documents in response to requests 5-9.  We're continuing to interview individuals in the business unit to identify what we can reasonably locate and produce in response to requests 1-4, and are working hard and juggling summary vacations.  We're hoping to have that pinned down next week.  But before we can produce anything there, we will need to amend the protective order to add a category for an outside counsel only designation.  In the interest of time, can you please provide a proposed amendment to the protective order for our review?  Getting this in place now will help speed any production.

Thanks,
Ben

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8105 | Fax: (206) 757-7105
Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

===================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.

===================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.

===================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.

===================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.

===================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's **Privacy Policy**.

================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's **Privacy Policy**.

================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's **Privacy Policy**.

================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's **Privacy Policy**.

================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's **Privacy Policy**.

================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's **Privacy Policy**.

================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's **Privacy Policy**.

================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's **Privacy Policy**.

================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's **Privacy Policy**.

================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by

reply email. Learn about Morrison & Foerster LLP's [Privacy Policy](#).

========================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's [Privacy Policy](#).

========================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's [Privacy Policy](#).

========================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's [Privacy Policy](#).

========================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's [Privacy Policy](#).

========================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's [Privacy Policy](#).

========================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's [Privacy Policy](#).

========================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's [Privacy Policy](#).

# EXHIBIT 9

| | |
|---|---|
| **From:** | Grothouse, David E. |
| **To:** | Cross, David D.; Byer, Ben |
| **Cc:** | Maas, David; Diana Siri Breaux |
| **Subject:** | RE: Teradata subpoena to Microsoft - Update |
| **Date:** | Monday, December 21, 2020 4:42:25 PM |

Ben,

See below for some clarifications on our conversation on Friday, although to be clear, this is not an attempt to correct every inaccuracy.  As David noted below, we disagree with the characterization that we raised "numerous new issues" on the call.

Thanks,

Dave

**\*\*\*\*\***

**Request 2**:  To be clear, Teradata has never agreed that this request should be limited to a single central depository of competitive assessments.  I noted that Microsoft's production in response to this request is very limited, and that it is very unlikely that Microsoft does not maintain any competitive assessments of major products that compete with Microsoft data warehouse products such as Microsoft SQL Server.  Our ask to is that Microsoft conduct a more thorough search for responsive competitive assessments, including those available before 2019.

**Request 3**: I noted Microsoft's production in response to this request does not appear to contain any loss reports at all or any win reports from before 2019.  We understand that this is based on the limited information available in the repository Microsoft has searched.  To be clear, Teradata does not believe that this is a complete production.  However, Microsoft has not provided Teradata with further information that would allow it to request additional searches, such as a limited set of custodians that may have such competitive assessments.

**Request 4**:  I first pointed out that Microsoft's claim in its previous briefing that Teradata was asking for data on "Microsoft's smallest customers" (see pg. 10 of Microsoft's opposition) was misleading because Microsoft has thousands of customers for each of the requested products.  Teradata limited its request to the top 100.  I also said that the top 25 customers would be the *bare minimum* Teradata may be willing to accept, not that Teradata was asking Microsoft to expand to 25.

**Requests 5 & 7**:  The request for the categories of information you noted below is not a "new ask."

The face of Request 5 asks for, in part, documents *relating* to communications between SAP and Microsoft about SAP's licensing restrictions.  As we made clear in our previous motion to compel almost four months ago, the purpose of this language was to capture highly relevant Microsoft internal documents related to how SAP has communicated to Microsoft about its licensing restrictions.  Furthermore, I reminded you that we had identified three potential Microsoft custodians that may have relevant documents, and you asked us to provide them with you again.  They are:

- Arnie Mondloch - Microsoft's SAP Global Partner Alliance Director
- Todd Kemmerly – Microsoft's SAP Partner Development Manager
- Jeurgen Thomas – Principal Program Manager for SAP on Azure

I also pointed out that the bulk of Request 7 asks for documents comprising or relating to communications that have nothing to do with SAP.  This is abundantly clear from the face of the request.  Microsoft's objection to this

request in its opposition to Teradata's first motion was focused only on communications with SAP, and Microsoft has not explained since why all of the other requested communications are not relevant.  Again, Teradata's request for these other communication is not "new."

Finally, you requested, for the first time, that we share some search terms to use for custodians for Requests 5 and 7. While it is difficult to provide such search terms without the context of the custodians to which they will be applied, see below for some initial suggestions:

**Request 5**

- (HANA OR "S/4" OR "S/4HANA" OR S4*) w/10 (interop* OR integrat* OR extract OR export OR access OR replicat*)

**Request 7**

- (HANA OR "S/4" OR "S/4HANA" OR S4*) w/30 (leave OR lose OR lost OR churn OR terminat* OR block* OR shut OR stop OR dead OR cancel* OR walk OR "void" OR "convert")

- (HANA OR "S/4" OR "S/4HANA" OR S4*) w/30 (complain* OR problem* OR restrict*)

---

**From:** Cross, David D. <DCross@mofo.com>
**Sent:** Monday, December 21, 2020 7:53 AM
**To:** Byer, Ben <BenByer@dwt.com>; Grothouse, David E. <DGrothouse@mofo.com>
**Cc:** Maas, David <DavidMaas@dwt.com>; Diana Siri Breaux <dianab@SummitLaw.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

Ben -

The degree to which you have misstated the facts in our seven months of negotiations, including in your email below, is deeply concerning. Your personal attack on me below is as false as it is inappropriate. I did not refuse to meet and confer. I invited you to have a productive discussion. You refused, instead repeatedly misstating our negotiations and refusing to offer proposals (unlike every other third party we've negotiated similar subpoenas with). It is false to say that we raised anything new in our discussion.

We are under no obligation to negotiate the same issues with you endlessly. Seven months is ample time to try to reach resolution, and we're simply retreading the same ground in each discussion because you refuse to engage with us in a meaningful way (again, unlike the other third parties). Any claim to the Court that we met and conferred on any issue for the first time last Friday would be dishonest and a serious breach of your ethical duties. We've been extremely patient with you for many months. If Microsoft were going to cooperate, it could have done so any time since May when we served the subpoena. It is painfully clear that you instead intend to drag this out forever with the false narrative that negotiations are always ongoing. Your threat to seek fees is not well taken given how much time and cost we've invested in seven months of negotiations.

We will file our motion. If you'd like to finally resolve these issues after we do so, we welcome that. But given we're nearing the end of discovery, we can wait no longer for your cooperation. And your repeated false statements give us no hope for resolution without help from the Court.

DC

**From:** Byer, Ben <BenByer@dwt.com>
**Date:** Monday, Dec 21, 2020, 12:09 AM
**To:** Grothouse, David E. <DGrothouse@mofo.com>, Cross, David D. <DCross@mofo.com>
**Cc:** Maas, David <DavidMaas@dwt.com>, Diana Siri Breaux <dianab@SummitLaw.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

**External Email**

Dave,

Thanks for talking with me on Friday, December 18, 2020. I appreciate the opportunity to hear your concerns and discuss our issues. I am sorry that David Cross did not believe he needed to participate in our meet and confer, instead insisting he'd just file a motion. His name calling, bullying, and express refusal to meet and confer highlights why we have made little progress to date.  You raised numerous new issues on the call that we were happy to consider, and that we agreed to investigate.  Below is a summary of what we discussed.  Please let me know if you think I've missed or misstated anything.

Request 1: You asked why we did not produce on this request and I explained that our opposition to your motion to compel detailed our position, which had not changed. This is the first time since we filed that opposition that we have discussed this request.  After we discussed this request David Cross lost his temper and hung up.

Request 2: Microsoft has a central repository of competitive assessments.  We produced everything they could locate covering the companies you identified and did not filter by year or industry.  You asked us to investigate whether they might have reports addressing the "data warehouse and analytics market" stored somewhere else and we agreed to discuss this with our client.

Request 3: Microsoft does not generally create loss reports.  It has a central repository of win reports, and we pulled what we could locate without filtering by year.  You did not request additional searching here.

Request 4: You'd like us to ask the client if they would expand from the top 10 customers to the to 25.  I explained the burden this imposed and the manual work required to do this but agreed to discuss this with the client.  I will get back to you by December 23.

Requests 5 and 7:  Our opposition to your motion first motion to compel set out Microsoft's positions on this request.  After our discussion, you asked us to consider searching for four sets of emails: (1) internal Microsoft emails about communications Microsoft had with SAP, (2) any complaints Microsoft received from its customers about SAP, (3) complaints Microsoft made to customers about SAP, and (4) any complaints Microsoft made to antitrust regulators about SAP.  You offered to provide us the search terms you'd want run.  We will investigate with the client who at Microsoft would likely be in possession of any such communications and the burden that this searching would impose.  Understand that many employees are not working over the holidays, so we will inquire and get what we can as soon as we can.

Request 9: Our opposition to your motion first motion to compel set out Microsoft's positions on this request.  After our discussion, you asked us to consider searching for internal Microsoft emails discussing whether Microsoft employees believe SAP's licensing restrictions are, in fact, restrictions.  I explained that we will discuss

this request with the client again.

I'm on a family vacation now, but return to the office on Tuesday and will look into everything I've noted above. In the meantime, I repeat what I explained over the phone—filing a premature motion to compel without giving us an opportunity to look into issues you met and conferred on for the first time on December 18 would violate of both the letter and spirit of the Western District of Washington's local rules that requires the parties to make a true effort to resolve disputes before rushing to the court.  We therefore reserve our right to seek fees should Teradata file a second improper motion to compel.

Thanks,
Ben

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8105 | Fax: (206) 757-7105
Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

---

**From:** Grothouse, David E. <DGrothouse@mofo.com>
**Sent:** Friday, December 18, 2020 4:02 PM
**To:** Byer, Ben <BenByer@dwt.com>; Cross, David D. <DCross@mofo.com>
**Cc:** Maas, David <DavidMaas@dwt.com>; Diana Siri Breaux <dianab@SummitLaw.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

Ben,

Thank you for your time today.  We were willing to walk through Teradata's narrowed requests again, as we have many times before, but we note that we yet again found ourselves repeating discussions we've already had many times through dozens of prior calls and emails with you over the past seven months.  Furthermore, to your repeated argument that some of our requests aren't clear on their face or from our many previous communications, we addressed each of them in the motion we filed almost four months ago.  At no point since you responded to that motion have you indicated any need for further clarification of any of our requests until today, at which point you simply repeated the same arguments that you've been making since early last summer.

For example, in regards to Teradata's Request 5, you noted that Teradata had previously not been clear that its request included communications beyond those between SAP and Microsoft, such as internal Microsoft communications about the same subject.  Not only have we explained that to you in many previous communications — and it is clear from the face of the request (which asks for documents comprising *or* relating to communications with SAP regarding SAP's conduct) — we unambiguously explained this in our motion in August.

At the end of today's call, you claimed that the Local Rules prohibit us from moving to compel because the parties are still "negotiating."  Your claim is far from accurate and not well taken.  Standing on the same objections, persisting with the same arguments, and claiming ignorance of facts already discussed many times over a period of seven months is not "negotiating."  We've been extraordinarily patient with you given the challenging circumstances we've all faced this year.  The parties unquestionably are at impasse and have been for a long time.  Any claim to the contrary is simply not accurate.  Given your representations to the Court last September, we had expected a robust production that would obviate many of our longstanding disputes.  Unfortunately, that didn't happen.  We now have no choice but to return to the Court for help.

We plan on filing a motion early next week.  We are of course willing to continue working with Microsoft to try

to reach an agreement or at least narrow our disputes.  But that will require you to finally engage with us in a good faith effort to find common ground, rather than continuing to retread old ground.  We have worked out reasonable agreements with two other major third-party providers in the industry on the same requests.  You alone have been unwilling to do that.

Dave

---

**From:** Byer, Ben <BenByer@dwt.com>
**Sent:** Tuesday, December 15, 2020 9:14 PM
**To:** Cross, David D. <DCross@mofo.com>
**Cc:** Maas, David <DavidMaas@dwt.com>; Diana Siri Breaux <dianab@SummitLaw.com>; Grothouse, David E. <DGrothouse@mofo.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

**External Email**

---

David,

We have not "declined to confer."  You raised new questions that we cannot answer without first talking with various departments at Microsoft.  We have already reached out to our clients to do so but will not be in a position to give you answers tomorrow.  I therefore suggest a call this Friday at 10:00am Pacific.  In the meantime, here's my initial reaction based on the numerous calls we conducted over the summer.  I understand that we produced all the competitive assessments we found that covered any of the companies listed in Teredata's subpoena, and did not limit the search by market or year—but we will double check and look into the "data warehouse and analytics market."  Likewise on the win/loss reports, I do not think Microsoft keeps "loss reports" and we produced all reports we were able to locate, and did not apply any date resection— but we will confirm.  Microsoft's production of sales information was intended to covers the products Teradata identified as the relevant Microsoft Dynamics ERP Applications, but again, we will confirm.  In the meantime, please let me know why Teradata is requesting documents showing when each customer began using and stopped using Dynamics.  I don't understand the relevance of that information to your lawsuit.

If you insist on bringing a premature motion to compel before we have an opportunity to get client feedback on the new issues you raised, we would need at least until January 18 to respond because of the intervening holidays and the pandemic.  We therefore think it makes sense to wait to file this to give us an opportunity to investigate the questions you've raised and to accommodate the clients' plans for the holidays.  If you're unwilling to wait to file your motion, please confirm you will notice your motion no sooner than January 18.  If you are unwilling to do either, please let me know your availability for a call with the court tomorrow.

Thank you,
Ben

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8105 | Fax: (206) 757-7105
Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

**From:** Cross, David D. <DCross@mofo.com>
**Sent:** Tuesday, December 15, 2020 3:41 PM
**To:** Grothouse, David E. <DGrothouse@mofo.com>; Byer, Ben <BenByer@dwt.com>
**Cc:** Maas, David <DavidMaas@dwt.com>; Diana Siri Breaux <dianab@SummitLaw.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

Ben -

We're refiling our motion this week. We can't afford further delay. We waited for months for a production that comes nowhere close to what we need or what we understood you were producing based on your prior representations. It's clear that your strategy has been to stall as long as possible since we served our subpoena in May. We're prepared to try to resolve these issues on a call tomorrow. Otherwise we'll proceed with our filing and let the Court know you again declined to confer with us as requested.

DC

---

**From:** Grothouse, David E. <DGrothouse@mofo.com>
**Date:** Tuesday, Dec 15, 2020, 2:43 PM
**To:** Byer, Ben <BenByer@dwt.com>
**Cc:** Cross, David D. <DCross@mofo.com>, Maas, David <DavidMaas@dwt.com>, Diana Siri Breaux <dianab@SummitLaw.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

Ben,

Below are some of the deficiencies based on Teradata's initial review of Microsoft's production:

- Microsoft does not appear to have produced documents responsive to Teradata's Request Nos. 1, 5, 7, and 9
- Microsoft's production includes only a small number of competitive assessments in response to Teradata's Request No. 2.
  - Many of these assessments apply to a limited set of use cases in the broader applications market, with only a few relevant to the ERP Applications market
  - Teradata has not located any competitive assessment of the data warehouse and analytics market
  - From the limited information available within the documents, the competitive assessments Teradata was able to locate were limited to 2019 and 2020
- While Microsoft did produce a significant amount of documents responsive to Teradata's Request No. 3, these appear to be limited to Microsoft "wins."
  - Teradata has not been able to locate any information in Microsoft's production related to Microsoft losses.
  - Furthermore, according to the limited information available within the documents, these win reports appear be limited to 2019 and 2020
  - Microsoft has also not indicated whether it keeps  information responsive to Teradata's Request No. 3 in a centralized database. It would be surprising if it does not, considering Microsoft sells a product (Microsoft Dynamics CRM) that performs precisely this function.
- In response to Teradata's Request No. 4, Microsoft produced only data on the revenue Microsoft earned from its top 10 customers of four relevant products or product categories, whereas Teradata's Request No. 4 asked for data on Microsoft's top 100 customers

    ○ Microsoft's production did not include the other information requested in Teradata's Request No. 4 on when each customer began using and stopped using the relevant product
    ○ Furthermore, Microsoft produced the top 10 customers for all of its Microsoft Dynamics products, as opposed to just its Microsoft Dynamics ERP Applications products.

Let us know if you think we missed anything in Microsoft's production.

Please let us know when you are available tomorrow to discuss.

Thanks,

Dave

---

**From:** Byer, Ben <BenByer@dwt.com>
**Sent:** Tuesday, December 15, 2020 2:12 PM
**To:** Grothouse, David E. <DGrothouse@mofo.com>
**Cc:** Cross, David D. <DCross@mofo.com>; Maas, David <DavidMaas@dwt.com>; Diana Siri Breaux <dianab@SummitLaw.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

<mark>**External Email**</mark>

---

Dave,

Please let us know what Teradata believes is deficient in our production.  Without knowing what the issue is, we'd have no way to get ready for a meet and confer.

Thanks,
Ben

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8105 | Fax: (206) 757-7105
Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

---

**From:** Grothouse, David E. <DGrothouse@mofo.com>
**Sent:** Monday, December 14, 2020 9:11 AM
**To:** Byer, Ben <BenByer@dwt.com>
**Cc:** Cross, David D. <DCross@mofo.com>; Maas, David <DavidMaas@dwt.com>; Diana Siri Breaux <dianab@SummitLaw.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

Ben,

Following up on the below, we have reviewed Microsoft's production and found it to be deficient in responding to Teradata's antitrust-related requests.

Please let us know your availability to meet and confer in the next couple of days (no later than Thursday) to

discuss.  Teradata intends to refile our motion to compel unless Microsoft agrees to adequately supplement its production.

Thanks,

Dave

---

**From:** Grothouse, David E.
**Sent:** Friday, December 11, 2020 10:33 AM
**To:** 'Byer, Ben' <BenByer@dwt.com>
**Cc:** Cross, David D. <DCross@mofo.com>; Maas, David <DavidMaas@dwt.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

Thanks, Ben.

We received your productions yesterday and are processing them.  The cover letter to the productions did not indicate to which of Teradata's requests the productions were responsive nor if Teradata should expect additional productions.

Can you please indicate to which of Teradata's requests yesterday's productions were meant to be responsive?  Also, does Microsoft intend to make additional productions, and if so, when?

Thanks,

Dave

---

**From:** Byer, Ben <BenByer@dwt.com>
**Sent:** Wednesday, December 9, 2020 7:22 PM
**To:** Grothouse, David E. <DGrothouse@mofo.com>
**Cc:** Cross, David D. <DCross@mofo.com>; Maas, David <DavidMaas@dwt.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

**External Email**

---

Thanks Dave.  We'll get the production out ASAP—hopefully tomorrow.

Ben

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8105 | Fax: (206) 757-7105
Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

---

**From:** Grothouse, David E. <DGrothouse@mofo.com>
**Sent:** Wednesday, December 9, 2020 9:45 AM
**To:** Byer, Ben <BenByer@dwt.com>
**Cc:** Cross, David D. <DCross@mofo.com>; Maas, David <DavidMaas@dwt.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

Ben,

The modified PO has been entered.  See attached.

Please let us know when to expect the additional Microsoft productions that have been awaiting this.

Thanks,

Dave

**From:** Byer, Ben <BenByer@dwt.com>
**Sent:** Monday, December 7, 2020 8:41 PM
**To:** Grothouse, David E. <DGrothouse@mofo.com>
**Cc:** Cross, David D. <DCross@mofo.com>; Maas, David <DavidMaas@dwt.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

**External Email**

David,

We're good with this subject to two changes:

> Please update the first sentence of 2.7 to read: ". . . all items or information, <u>including from any Non-Party,</u> regardless of the medium or manner. . ."

> Please change the notice period of 7.7(b) to 7 calendar days or 5 business days (we don't care which). Three days isn't sufficient notice.

Thanks,
Ben

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8105 | Fax: (206) 757-7105
Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

**From:** Grothouse, David E. <DGrothouse@mofo.com>
**Sent:** Friday, December 4, 2020 3:05 PM
**To:** Byer, Ben <BenByer@dwt.com>
**Cc:** Cross, David D. <DCross@mofo.com>; Maas, David <DavidMaas@dwt.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

Ben,

Please see attached an amended protective order we plan to file jointly with SAP on Monday in NDCA.  This is the product of negotiations with SAP and multiple other third parties, and we believe it provides adequate

protection for third party materials.

Thanks,

Dave

---

**From:** Byer, Ben <BenByer@dwt.com>
**Sent:** Tuesday, December 1, 2020 5:10 PM
**To:** Cross, David D. <DCross@mofo.com>; Grothouse, David E. <DGrothouse@mofo.com>; Maas, David <DavidMaas@dwt.com>
**Cc:** Diana Siri Breaux <dianab@SummitLaw.com>; Beauchamp, Joe <jbeauchamp@JonesDay.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

**External Email**

---

David,

We asked for your proposal weeks ago—I don't know whether the delay in proposing it originated with Teradata or SAP, but it didn't originate with Microsoft. Indeed, we responded the same day you sent your proposal. Your proposal simply doesn't make sense. Any violation of this order would likely occur as part of Teradata's litigation in the Northern District of California. Indeed, your proposal incorporates and expressly cites a procedure laid out in Local Rule 79-5 of the Northern District of California. We don't see why a Judge in the Western District of Washington should be interpreting the Northern District of California's local rules and attempting to unravel a disclosure that took place in your lawsuit. Judge Spero is in a far better position to do both and we question whether burying this in Washington complies with the duty of candor to the court. Nonetheless, we don't object to your current experts and I understand discovery closes soon. Has Teradata finalized its selection of experts? If so, there may be a simpler amendment that adds the outside counsel only level and ensures Microsoft's materials won't be shared with a new expert it objects to, and then file the amended PO in the Northern District of California.

Thanks,
Ben

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8105 | Fax: (206) 757-7105
Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

---

**From:** Cross, David D. <DCross@mofo.com>
**Sent:** Tuesday, November 24, 2020 6:26 PM
**To:** Byer, Ben <BenByer@dwt.com>; Grothouse, David E. <DGrothouse@mofo.com>; Maas, David <DavidMaas@dwt.com>
**Cc:** Diana Siri Breaux <dianab@SummitLaw.com>; Beauchamp, Joe <jbeauchamp@JonesDay.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

Ben -

This is surprising and seems intended for delay. You've known for weeks we were preparing a PO to file

in WA for Microsoft, just as we have in other cases. You could and should have told us weeks ago you wouldn't agree to this. You led us to believe you would. This has been an enormous waste of time and money.

And your position is without merit. You've cited no case to support your objection to filing this in WA, and we've confirmed we've done this for third-party competitors in monopolization cases in multiple federal courts in other cases. I've no idea what you mean by your reference to Judge Spero and the duty of candor. Again, there's nothing unusual about this, much less improper.

Lastly, we specifically revised this to conform to the standard WA PO. It's not accurate to say that this relies heavily on the ND Cal Local Rules.

Please reconsider and let's get this resolved at last. I'm sure Judge Martinez would have no problem entering a PO agreed to by SAP, Teradata, and Microsoft, as with other federal judges in the same circumstances. Judge Martinez obviously has jurisdiction to do this per the motion we originally filed and that you represented was unnecessary because of your commitment to produce much of what we've requested. You represented to the Court months ago you'd produce your documents by September 28. We're long past that promised date without the promised production.

Thanks.
DC

**From:** Byer, Ben <BenByer@dwt.com>
**Date:** Tuesday, Nov 24, 2020, 7:21 PM
**To:** Grothouse, David E. <DGrothouse@mofo.com>, Maas, David <DavidMaas@dwt.com>
**Cc:** Cross, David D. <DCross@mofo.com>, Diana Siri Breaux <dianab@SummitLaw.com>, Beauchamp, Joe <jbeauchamp@JonesDay.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

**External Email**

David,

Our experience with the Northern District of California has led us to conclude that filing a protective order in the case that only applies to Microsoft might not go well with the Court. We prefer that any protective order be filed in the case in chief and apply to everyone. Microsoft is not a party to this action and does not approve taking any action that Judge Spero may find to be in conflict with the duty of candor. Furthermore, the PO you're proposing relies heavily on the Northern District of California's local rules. Judge Spero is in a far better position to interpret and enforce those than Judge Martinez. This disconnect between the language of the PO and the forum you're proposing further highlight that this ought to be filed in the underlying action before Judge Spero.

Thanks,
Ben

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8105 | Fax: (206) 757-7105
Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

**From:** Grothouse, David E. <DGrothouse@mofo.com>
**Sent:** Tuesday, November 24, 2020 9:34 AM
**To:** Byer, Ben <BenByer@dwt.com>; Maas, David <DavidMaas@dwt.com>
**Cc:** Cross, David D. <DCross@mofo.com>; Diana Siri Breaux <dianab@SummitLaw.com>; Beauchamp, Joe <jbeauchamp@JonesDay.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

Ben,

Please see attached the proposed stipulated protective order we would like to file in the Western District of Washington.  We have been working with SAP, and this is a version that both parties have agreed to.  I've copied Joe Beauchamp, SAP's counsel from Jones Day.

We understand from Diana that we can file the stipulated PO on the same docket (MISC NO. 2:20-mc-0074 RSM ) and Judge Martinez would then decide whether to reopen the case and rule on it.

Please let us know if you have any questions,

Dave

---

**From:** Byer, Ben <BenByer@dwt.com>
**Sent:** Friday, November 6, 2020 5:25 PM
**To:** Grothouse, David E. <DGrothouse@mofo.com>; Maas, David <DavidMaas@dwt.com>
**Cc:** Cross, David D. <DCross@mofo.com>; Diana Siri Breaux <dianab@SummitLaw.com>; Conaway, Jenna B. <JConaway@mofo.com>
**Subject:** RE: Teradata subpoena to Microsoft - Update

<mark>**External Email**</mark>

---

Hi David,

Can you please send us exactly what you propose filing (with the correct caption), how you propose doing so, and confirm SAP has agreed to it?

Thanks,
Ben

**Ben Byer** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8105 | Fax: (206) 757-7105
Email: benbyer@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

===================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.

# EXHIBIT 10



Suite 3300
920 Fifth Avenue
Seattle, WA  98104-1610

**Benjamin J. Byer**
206-757-8105 tel
206-757-7105 fax

benbyer@dwt.com

December 23, 2020

*Via Email*

David Grothouse
Morrison & Foerster
2100 L Street, NW
Suite 900
Washington, D.C. 20037
dgrothouse@mofo.com

Re:    Teradata Subpoena to Microsoft

Dear Mr. Grothouse:

This letter responds to your email on Monday, December 21, 2020, our December 18 discussion, and your December 15 email.  I have organized this response according to the ordering of the third-party discovery requests for which Teradata now seeks additional searching and production.

**Request for Production No. 1**.  This request seeks "Documents comprising or reflecting Your product roadmaps, promotional materials, product development plans, and marketing plans for each of the ERP Applications or EDAW Products and related services that You offer."

Our September 15, 2020, opposition to Teradata's Motion to Compel (Dkt. 6) explained why this request was overbroad and overly burdensome, covering dozens of versions of one product, all versions of two other product, and spanning nearly ten years.  You have not offered to narrow or otherwise focus this request.  Nonetheless, we are working with our client to determine what documents we can provide efficiently that would be responsive and relevant.  At present, much of the Microsoft staff is on vacation for the holiday, but we are still seeking what information we can get immediately.

**Request for Production No. 2**.  This request seeks competitive assessments.  We conducted an extensive search for responsive materials and have produced to Teradata all non-privileged material we located.  On December 18, I confirmed this, and confirmed that we did not limit our production by year or industry.  You asked us to conduct additional searching for "competitive assessment of the data warehouse and analytics market."  We have now completed that

4827-3701-3205v.1 0025936-003252

DWT.COM

Anchorage | Bellevue | Los Angeles | New York
Portland | San Francisco | Seattle | Washington, D.C.

David Grothouse
December 23, 2020
Page 2

additional searching and confirmed that Microsoft does not have more materials responsive to this request.

**Request for Production No. 3**.  This request seeks what you have termed "win-loss reports." We conducted an extensive search for responsive materials and have produced to Teradata all non-privileged material we located.  On December 18 I confirmed this, and confirmed that we did not limit our production by year or whether the reports described wins or losses.  You asked us to conduct additional searching for reports focusing on lost sales.  We have now completed that additional searching and confirmed that Microsoft does not have additional materials responsive to this request.

**Request for Production No. 4**.  This request seeks material regarding Microsoft's largest customers, by revenue, for three sets of products.  We conducted an extensive search for responsive materials and produced to Teradata, as soon as the amended protective order was in place, details regarding Microsoft's top 10 customers.  Our September 15, 2020, brief explained the unduly burdensome manual effort involved in putting this production together, and why we believed producing the top 10 customers balanced the burden on Microsoft while providing Teradata the material most relevant to its request.

On December 18, I provided you additional details on the burden to Microsoft, and explained that Microsoft needed to manually process the data you requested because it does not organize its sales information in the manner in which Teradata requested it.  You asked us to consider producing additional documents covering Microsoft smaller customers, and stated you would accept a production of the next 15 smaller customers.  We are investigating now what burden this would impose on Microsoft.  Currently, most Microsoft employees (including our client contacts) are out for the holidays.  We therefore will update you on this request no later than the first week of the year.

**Requests for Production Nos. 5 and 7**.  These request seek a variety of documents that "comprise" or "relate to" Microsoft's communications with SAP.  Throughout numerous meet and confers, Teradata explained that it sought these emails from Microsoft and not SAP because its underlying lawsuit with SAP imposed restrictions on the electronic discovery Teradata could obtain from SAP.  Our September 15, 2020 brief explained our position on these requests.

On December 18, you asked us to conduct searches for four sets of emails: (1) internal Microsoft emails about communications Microsoft had with SAP, (2) complaints Microsoft received from its customers about SAP, (3) complaints Microsoft made to its customers about SAP, and (4) any complaints Microsoft made to antitrust regulators about SAP.  SAP is both a customer of and a competitor to Microsoft.  We understand it is unlikely that Microsoft has such communications and we are working with our client to investigate these communications.  Currently, most Microsoft employees (including our client contacts) are out for the holidays.  We therefore will update you on these requests no later than the first week of the year.

David Grothouse
December 23, 2020
Page 3

**Request for Production No. 9**.  This request seeks "Documents sufficient to show the existence of any restrictions or prohibitions imposed by SAP on the ability of users of any SAP ERP Application to transfer, export, or extract data derived, created, or processed by such SAP ERP Applications for use or storage in a Named Product."  We have conducted a search for documents sufficient to show any interoperability of SAP's products and Microsoft's ERP products.  We will produce the documents we located no later than the first week of the year. We have no reasons to believe Microsoft is likely to have documents showing the interoperability of SAP's products with non-Microsoft products and are working with our client to investigate the existence of these documents.  Currently, most Microsoft employees (including our client contacts) are out for the holidays.  We therefore will update you on this request no later than the first week of the year.

As I explained on December 18 and repeated in my December 19 email, filing a premature motion to compel without giving us an opportunity to look into issues you met and conferred on for the first time on December 18 since the filing of our opposition would violate of both the letter and spirit of the Western District of Washington's local rules that requires the parties to make a true effort to resolve disputes before rushing to the court.  We therefore reserve our right to seek fees should Teradata file a second improper motion to compel.

Very truly yours,

Davis Wright Tremaine LLP

Benjamin J. Byer

Cc:    David Cross
       Diana Siri Breaux

# EXHIBIT 11

| | |
|---|---|
| **From:** | Diana Siri Breaux |
| **Sent:** | Thursday, December 24, 2020 12:12 PM |
| **To:** | Byer, Ben |
| **Cc:** | Cross, David D.; Grothouse, David E.; Patricia Shillington |
| **Subject:** | Teradata |

Hi Ben,

For months you've been on notice of our specific requests.  In your letter of yesterday afternoon, you admit that Microsoft has, to date, failed to even conduct searches for documents responsive to Requests for Production Nos. 1, 5 and 7, and has only recently begun to search for documents responsive to Request for Production No. 9.  And yet, in the same letter, you suggest that a motion to compel would be premature and threaten an application for fees.  We are confident that the Court will see the diligence with which Teradata has attempted to procure your cooperation for the past seven months.  Finally, your representations that you have conducted a reasonably diligent search and not found additional documents responsive to RFP Nos. 2 and 3 strain rational thought and are inconsistent with Microsoft's own publicly-touted capabilities, which include software designed to capture the win-loss data sought in RFP No. 3. As to RFP No. 2, the claim that Microsoft has created only 12 documents containing competitive assessments of its primary competitors in the enterprise resource planning applications market and *no* documents containing competitive assessments of its primary competitors in the data warehouse and analytics market is difficult to credit for a company of Microsoft's sophistication and product offerings in those industries. That you've refused to provide any details about the searches Microsoft purportedly has conducted for these requests heightens our concerns and leaves us with no choice but to seek help from the Court on these and our other requests.

In sum, for seven months we've tried to work with you.  At this point, it's not a question of the limit of our patience and the professional courtesies we can extend, but rather the limits the Northern District of California has given Teradata on the time within which we can complete discovery.  Accordingly, we will be filing a motion to compel.

We wish we were not filing this motion on the eve of a holiday weekend, but we have no choice given the significant outstanding issues and schedule in the underlying litigation.

Best regards and happy holidays,

Diana & David C.


**Diana Siri Breaux · *Partner***
206-676-7058
dianab@SummitLaw.com



315 5th Ave S Suite 1000
Seattle, Washington 98104

========================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.

========================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.

========================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.

========================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.

========================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.

========================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.